# Exhibit 48

S. REP. 92-414, S. Rep. No. 414, 92ND Cong., 2ND Sess. 1972, 1972 U.S.C.C.A.N. 3668, 1971 WL 11307 (Leg.Hist.)

**\*3668** P.L. 92-500, FEDERAL WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972

Senate Report (Public Works Committee) No. 92-414,

Oct. 28, 1971 (To accompany S. 2770)

House Report (Public Works Committee) No. 92-911,

Mar. 11, 1972 (To accompany H.R. 11896)

Senate Conference Report No. 92-1236,

September 28, 1972 (To accompany S. 2770)

House Conference Report No. 92-1465,

September 28, 1972 (To accompany S. 2770)

Cong. Record Vol. 117 (1971)

Cong. Record Vol. 118 (1972)

DATES OF CONSIDERATION AND PASSAGE

Senate November 2, 1971; October 4, 1972

House March 29, October 4, 1972

The Senate bill was passed in lieu of the House bill. The Senate Report and the Senate Conference Report are set out.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED
MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

SENATE REPORT NO. 92-414

Oct. 28, 1971

THE Committee on Public Works, to which was referred the bill (S. 2770) Federal Water Pollution Control Act Amendments of 1971, having considered the same, reports favorably thereon without amendment and recommends that the bill do pass. An original bill (S. 2770) is reported in lieu of S. 523, S. 1012, S. 1013, S. 1014, S. 1017 and S. 1238 which were considered by the committee.

**\*3669** GENERAL STATEMENT

HISTORY

For more than two decades, Federal legislation in the field of water pollution control has been keyed primarily to an important principle of public policy: The States shall lead the national effort to prevent, control and abate water pollution. As a corollary, the Federal role has been limited to support of, and assistance to, the States.

The 1948 legislation, for example, assigned powers for enforcement in water pollution control to Governors of the States. The Federal agencies were authorized only to support research in water pollution, projects in new technology, and limited loans to assist the financing of treatment plants.

Given these basic provisions, State and Federal efforts in water pollution control went forward with little legislative change for nearly 10 years. It was a period of transition. To most Americans, the problems of water pollution control appeared to be localized and moderate.

In 1956, the Congress approved the first major legislative changes in the water pollution control program. Federal grants were authorized to assist States in preparing plans for pollution control and to help localities in building treatment plants. The authority for research and technical assistance was increased and broadened. Measures for controlling pollution of interstate waters were tightened.

**\*3674**  In primary treatment of sewage, between 30 to 50 percent of organic pollution is removed. With secondary treatment, between 50 and 90 percent is removed.

Neither of the traditional methods, then, can be completely satisfactory, and both have significant disadvantages. Primary and secondary treatment, for example, requires large capital expenditures and the use of extensive land areas.

The sludge remaining from secondary treatment can create special problems. Some localities burn sludge, thus contributing to air pollution. Other localities use sledge for landfill. Still others dump sludge into the oceans where it is hazardous to sea life.

The reliance of the Federal program upon primary and secondary treatment continues, although the program's efforts in research and demonstration is now more than 10 years old. The annual budget for research by the water quality office of the Environmental Protection Agency amounts to less than $50 million.

## COMMITTEE FINDINGS

From its two-year study of the Federal water pollution control program, the Committee concludes that the national effort to abate and control water pollution has been inadequate in every vital aspect:

-- Many of the Nation's navigable waters are severely polluted, and major waterways near the industrial and urban areas are unfit for most purposes;

-- Rivers are the primary sources of pollution of coastal waters and the oceans, and many lakes and confined waterways are aging rapidly under the impact of increased pollution;

-- Rivers, lakes, and streams are being used to dispose of man's wastes rather than to support man's life and health; and

-- The use of any river, lake, stream or ocean as a waste treatment system is unacceptable.

The Committee believes the restoration of the natural chemical, physical, and biological integrity of the Nation's waters is essential. To achieve this objective, the Committee recommends that the following be adopted as national policy:

-- The discharge of pollutants into the navigable waters be eliminated by 1985;

-- An interim goal of water quality be achieved by 1981 to provide for the protection and propagation of fish, shellfish, and wildlife, and for recreation in and on the water;

-- The discharge of toxic pollutants in toxic amounts be prohibited;

-- Federal grant assistance be provided to any community which constructs a waste treatment facility which is consistent with the program as set forth by the Congress;

-- Regional waste management treatment programs be developed and implemented to assure adequate control of all sources of pollution in each State; and

-- A major research and demonstration effort be initiated to find the technological methods necessary to eliminate waste discharges.

not be waived. In subparagraph (c)(1)(A) of the section, the contamination of marine organisms or waters which prevents the harvesting of sea food that is safe to eat, the use of oceans for recreation, or its use as drinking water after desalination, among other things, would be recognized as detrimental to human health or welfare.

The ocean's waters are in constant circulation, so that any discharge beyond any arbitrary limit, such as 3 or 12 miles, may reach the beaches of the United States. Thus, in considering discharge effects, the Administrator must consider the effect that the discharge may have elsewhere on the integrity of marine systems.

In subparagraph (c)(1)(G) the Committee wishes to emphasize the need to preserve the ocean in as natural a state as possible at least until we understand its tolerances and characteristics, so that discharges permitted today will not irreversibly modify the oceans for future uses. Any discharge which would so alter the ocean's character that scientific study of that feature of the ocean is forever destroyed would seem to the Committee inconsistent with the objective of maintaining the integrity of the Nation's coastal waters, which constantly circulate with waters in the open ocean. For example, discharge of a harmful pollutant at 15 miles may migrate into the coastal zone region, killing large numbers of one or more species, altering the character of the marine ecosystem characteristic of the coastal zone, and preventing study of the zone's natural features before alteration by man's discharges.

## TITLE V-GENERAL PROVISIONS

### SECTION 501-ADMINISTRATION

This section is similar to section 22 of existing law. A new subsection allows EPA to dispatch employees to assist State pollution agencies in their work.

### SECTION 502-GENERAL DEFINITIONS

The section defines pollutant, pollution, effluent limitation, discharge, toxic pollutant, point source, biological monitoring, and several other words and phrases as they are used in this Act.

The bill would amend the definition of a State water pollution control agency from that contained in existing law to reflect the changes that have occurred since the definition was first included in the law. Originally the pollution control agencies were coincident with public health officers of the States, and therefore such officers generally administered water pollution control activities. The bill amends the definition of State water pollution control agency to mean the State agency designated by the Governor with responsibility for enforcing State water pollution control laws.

The definition of interstate agency is refined to make it clear that only those interstate agencies approved by Congress or those with sufficient power to implement the requirements of the Act as determined **\*3742** by the Administrator are functionally qualified to participate in the provisions of the Act.

The term State, for the purpose of the Act, includes the fifty States of the United States as well as several other jurisdictions specified. In addition the term State includes those agencies or instrumentalities of the United States with jurisdiction over river basins which are created by the United States with jurisdiction over river basins if the agency was created by or pursuant to an Act of Congress and has been designated either by the Governor or by the statutes of the participating States as having jurisdiction to implement the Act in the river basin.

The definition of municipalities is clarified to make clear that public bodies eligible for grants under this Act includes associations formed under State law for the purpose of dealing with water problems, whether or not they are given broad powers of general government, as well as operating agencies established and approved under section 209.

The term person, for purpose of the Act, means all entitles which are capable of suing or being sued.

For the first time the Committee would add to the law a definition of the term pollutant. In order to trigger the control requirements over addition of materials to the navigable water, waters of the contiguous zone and the ocean, it is necessary to define such materials so that litigable issues are avoided over the question of whether the addition of a particular material is subject to control requirements. The Committee has extracted from the Refuse Act the basic formula and added municipal discharges to it, so that before any material can be added to the navigable waters authorization must first be granted by the Administrator, or State in the case of an approved State program, under Section 402. The Committee has made two specific exceptions from the term pollutant; sewage from vessels, as that term is defined and controlled through the provisions of Section 312, and water, gas, or other materials associated with the secondary recovery of oil.

The Committee has added a definition of pollution to further refine the concept of water quality measured by the natural chemical, physical and biological integrity. Maintenance of such integrity requires that any changes in the environment resulting in a physical, chemical or biological change in a pristine water body be of a temporary nature, such that by natural processes, within a few hours, days or weeks, the aquatic ecosystem will return to a state functionally identical to the original.

In those water bodies which are not pristine, it should be the national policy to take those steps which will result in change towards that pristine state in which the physical, chemical and biological integrity of the water body can be said to exist. Striving towards, and maintaining the pristine state is an objective which minimizes the burden to man in maintaining a healthy environment, and which will provide for a stable biosphere that is essential to the well-being of human society.

The control strategy of the Act extends to navigable waters. The definition of this term means the navigable waters of the United States, portions thereof, tributaries thereof, and includes the territorial seas and the Great Lakes. Through a narrow interpretation of the definition of interstate waters the implementation 1965 Act was severely limited. Water moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source. Therefore, **\*3743** reference to the control requirements must be made to the navigable waters, portions thereof, and their tributaries.

The Committee has added definitions of the terms territorial seas, contiguous zone, and ocean to describe clearly the jurisdictional limits of the Act, and provide a basis for its relationship to other laws of the United States as well as to international law.

A definition of effluent limitations has been included so that control requirements are not met by narrative statements of obligation, but rather are specific requirements of specificity as to the quantities, rates, and concentration of physical, chemical, biological and other constituents discharged from point sources. It is also made clear that the term effluent limitation includes schedules and time tables of compliance.

The Committee has added a definition of schedules and time-tables of compliance so that it is clear that enforcement of effluent limitations is not withheld until the final date required for achievement.

The Committee has also added a definition of the term discharge to indicate the scope of the control requirements under the Act. Any pollutant added to the navigable waters from any point source or the addition of any pollutant to the contiguous zone or the water of the ocean by outfall or other pipeline is included within the control requirements of Title III or the addition of any pollutant to a publicly owned treatment works by any industrial user.

A definition of toxic substance is provided to assist the Administrator in implementing his authority under section 307 to regulate toxic discharges. The definition provides a benchmark for evaluating those pollutants which in certain concentrations would have a particularly adverse impact on humans as well as other forms of life. It is necessary to evaluate the effect of all forms of such pollutants and consider their persistence, degradation, or interaction with other materials, once in the receiving water.

Disease-causing agents are intended to refer to all pathogens, including viruses, which may produce disease symptoms in any organisms. In addition, any pollutant or agent which lowers an organism's resistance to serious disease should be considered a toxic pollutant.

The following substances were mentioned in relation to potential toxic effects by the President's Council on Environmental Quality (April, 1971) in a report entitled Toxic Substances: lead, cadmium, mercury, vanacium, arsenic, molybdenum, antimony, nickel, barium, beryllium, copper, selenium, zinc, nitrilotriacetic acid (NTA), orthonitrochlorobenzene (****), polychlorinated biphenyls (BCB's), dichlordiphenyl-trichloroethane (DDT). The Committee expects the Administrator to give first consideration to these pollutants in the exercise of his authority under Section 307.

Such substances as heavy metals should be controlled on an absolute rather than on a regional waste management basis. The following criteria would affect such classification:

  -- the presence of pathogenic organisms, including viruses;

  -- the seriousness and irreversibility of any effects on man or the environment that might occur;

  -- the likelihood or possibility that such effects might occur;

  -- the possibility for incorporation into biological organisms and man in concentrations which latest scientific knowledge suggests will produce effects on man and organisms;

  **\*3744**  -- the nondegradable or persistent nature of the substance;

  -- the availability of date on similar substances or compounds; and

  -- margins of safety to reflect the lack of data on potential toxicity where there is no experience under conditions of human or environmental exposure.

In order to further clarify the scope of the regulatory procedures in the Act the Committee has added a definition of point source to distinguish between control requirements where there are specific confined conveyances, such as pipes, and control requirements which are imposed to control runoff. The control of pollutants from runoff is applied pursuant to section 209 and the authority resides in the State or local agency.


SECTION 503-WATER POLLUTION CONTROL ADVISORY BOARD

This section is section 9 of existing law, conformed with the remainder of the bill, and modified to allow $100 per diem for Board members while attending conferences or meetings of the Board.

The Committee expects that the recommendations of the Board shall be included in the annual report required under Section 515 of the Act.


SECTION 504-EMERGENCY POWERS

If a pollution source presents an imminent or substantial endangerment to the health of persons, EPA shall issue an immediate abatement order. If a pollution source could present a substantial economic injury to persons because of their inability to market shellfish, EPA shall initiate a civil suit for relief.