# Exhibit 49

92D CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
2d Session                                    No. 92–911

# FEDERAL WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972

MARCH 11, 1972.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. BLATNIK, from the Committee on Public Works, submitted the following

# REPORT

together with

## ADDITIONAL AND SUPPLEMENTAL VIEWS

[To accompany H.R. 11896]

The Committee on Public Works, to whom was referred the bill (H.R. 11896) to amend the Federal Water Pollution Control Act, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

\*          \*          \*          \*          \*          \*          \*

## BACKGROUND

America's waters are in serious trouble, thanks to years of neglect, ignorance and public indifference. Almost from its inception in 1946 the Committee on Public Works has been trying to bring to reality an effective properly funded program to restore and enhance the quality of our waters and to insure their future as a lasting national asset.

Prior to the Reorganization Act of 1946 there had been some legislation enacted in this general field—The Refuse Act of 1899, the Public Health Service Act of 1912 and the Oil Pollution Act of 1924. However, it was not until after the Committee on Public Works was established and considered the problem of water pollution control to be sufficiently serious for national attention that, in 1948, the first comprehensive measure aimed specifically at that problem was enacted. This landmark legislation was Public Law 80–845.

Public Law 80–845 essentially had a five-fold purpose:

1. Authorized the Surgeon General to assist in and encourage State studies and plans, interstate compacts, and creation of uniform State laws to control pollution.

(753)

Digitized by Google 

Original from
UNIVERSITY OF MICHIGAN

Generated for Cormac Bloomfield (Duke University) on 2019-09-17 19:59 GMT / http://hdl.handle.net/2027/mdp.39015004456722
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

762

29. The bill precludes the Federal Government from patronizing or subsidizing polluters through its procurement practices and policies.

30. Directs the Secretary of Commerce to make an investigation and study of the effect that the costs of undertaking abatement control programs would have on the competitive position of the United States manufacturers as compared with foreign industrial nations not having the same degree of pollution control. This study would include alternative means of equalizing any competitive cost advantage that foreign nations may have and encouraging them to implement pollution and abatement programs. $1,000,000 is authorized for the study and an initial report is due within 6 months from the date of the enactment of this section.

31. Amends the Small Business Act and makes available $800,000,000 to make loans to assist small concerns likely to suffer substantial economic injury in meeting the water pollution requirements established under the Federal Water Pollution Control Act. These loans would be for the purpose of making additions or alterations in the equipment, facilities, including the construction of treatment facilities and interceptor sewers, or methods of operation.

32. Requires the President to investigate and report to the Congress within 6 months the feasibility of establishing a separate court or court system to deal with environmental matters.

33. Requires the President to make an investigation and to report the results to the Congress within 2 years of all national policies and goals heretofore established by law with the purpose of determining the relationship between these possibly competing policies and goals. This evaluation should take into account the available resources of the Nation. $5,000,0000 is authorized for this study.

34. Authorizes the establishment of an Environmental Financing Authority (EFA) under the supervision of the Secretary of the Treasury for the purpose of facilitating the efforts of State and local governments to obtain funds to finance their share of the construction costs of waste treatment facilities that receive grants from the Federal Government.

## ANALYSIS OF THE BILL

*Section 1.*—This is the short title of the bill—"The Federal Water Pollution Control Act Amendments of 1972."

*Section 2.*—The existing Federal Water Pollution Control Act consists of 27 sections. Section 2 of H.R. 11896, as reported, would restructure the Act by replacing the 27 sections with 5 titles, each of which would be divided into an appropriate number of sections.

In order to fully understand section 2, it is necessary to recognize that certain terms used in the drafting of this section have very specific and technical meanings. The definitions of these terms are included in section 502 of title V, and it is recommended that very special attention be accorded section 502. However, since these terms will be used in this report with the same meanings as they are given in the legislation, it is appropriate to note some of the more important terms at this point.

(1) The term "pollution" means the man-made or man-induced alteration of the natural chemical, physical, biological, and radiological integrity of water.

75


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for Cormac Bloomfield (Duke University) on 2019-09-17 19:59 GMT / http://hdl.handle.net/2027/mdp.39015004456722
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Generated for Cormac Bloomfield (Duke University) on 2019-09-17 19:59 GMT / http://hdl.handle.net/2027/mdp.39015004456722
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

763

(2) The term "pollutant" means, but is not limited to, dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, agricultural, and other waste discharged into water. This term does not mean (a) "sewage from vessels" within the meaning of section 312 of this Act; or (b) water, gas, or other material which is injected into a well to facilitate production of oil or gas, or water derived in association with oil or gas production and disposed of in a well, if the well used either to facilitate production or for disposal purposes is approved by authority of the State in which the well is located, and if such State determines the injection or disposal of such water, gas, or other material will not result in the degradation of ground or surface water resources; or (c) thermal discharges in accordance with regulations issued pursuant to section 316 of this Act; or (d) organic fish wastes.

(3) The term "discharge of a pollutant" and the term "discharge of pollutants" means (a) any addition of any pollutant to navigable waters from any point source, (b) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft.

(4) The term "thermal discharge" means introduction of water into the navigable waters or from a point source at a temperature different from the ambient temperature of the receiving waters.

(5) The term "discharge" when used without qualification means both discharges of a pollutant or of pollutants and a thermal discharge.

(6) The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft from which pollutants are or may be discharged, or from which there is or may be a thermal discharge.

### TITLE I—RESEARCH AND RELATED PROGRAMS

*Section 101—Declaration of Goals and Policy*

Subsection (a) of section 101 declares the objective of this legislation to be the restoration and maintenance of the chemical, physical, and biological integrity of the Nation's waters.

The word "integrity" as used is intended to convey a concept that refers to a condition in which the natural structure and function of ecosystems is maintained.

As a concept, natural structure and function is relatively well understood by ecologists both in precise terms, and as an abstract concept in those few cases where specific quantification is not confidently attainable.

Although man is a "part of nature" and a product of evolution, "natural" is generally defined as that condition in existence before the activities of man invoked perturbations which prevented the system from returning to its original state of equilibrium.

This definition is in no way intended to exclude man as a species from the natural order of things, but in this technological age, and in numer-

 Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for Cormac Bloomfield (Duke University) on 2019-09-17 19:59 GMT / http://hdl.handle.net/2027/mdp.39015004456722
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

764

ous cases that occurred before industrialization, man has exceeded nature's homeostatic ability to respond to change. Any change induced by man which overtaxes the ability of nature to restore conditions to "natural" or "original" is an unacceptable perturbation.

Ecosystems themselves are dynamic, changing things. They undergo their own evolutionary changes, and these are "natural". The time scale that we are referring to for the purposes of this legislation, however, implies a relatively high degree of stability, when compared to the changes that occur over geological or evolutionary time. The latter time scales would encompass major evolutionary changes such as major successional changes, extinctions, appearances of new forms, major climatic changes, major physiograph changes and the like. Our time scale involves lesser adaptations and almost no evolutionary changes, and allows for the minor physical activities that accompany a shorter time frame, such as the peturbations caused by earthquakes, landslides, hurricanes, floods, volcanic activity, and the like. These changes are part of the general order of things: the natural law that has existed since the planet began to support life.

On that basis we could describe that ecosystem whose structure and function is "natural" as one whose systems are capable of preserving themselves at levels believed to have existed before irreversible perturbations caused by man's activities.

Such systems can be identified with substantial confidence by scientists.

In order to achieve the stated objective, the legislation declares two national goals. It is declared to be national goals to eliminate the discharge of pollutants into the waters of the United States by 1985 and to achieve wherever attainable an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by 1981.

The Committee recognizes the problems associated with implementing a no-discharge policy. Although considerable views were heard on this subject by the Committee during hearings, it was apparent that very little hard evidence was available on which to make final irretrievable judgement on this matter. It was for this reason that the legislation includes section 315 providing for a study by the National Academy of Sciences and the National Academy of Engineering, acting through the National Research Council, of the effects of achieving or not achieving the 1981 and 1985 goals. At the conclusion of the study, with the appropriate information available, the Congress will be in a position to fully evaluate the implications of a no-discharge policy.

Subsection (a) further states it to be national policy that Federal financial assistance be provided to construct publicly-owned waste treatment works; that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each state; and that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans. These policies are implemented in this legislation with major commitments of

77

Digitized by  Google

Original from
UNIVERSITY OF MICHIGAN

765

Federal funds. The bill provides $18 billion for construction of waste treatment works for fiscal years 1973–1975; $600,000,000 for basic and advanced research, development and training; and almost $1,-000,000,000 for State basin, and area-wide planning.

Subsection (b) states a policy of the Congress to recognize, preserve and protect the primary responsibilities and rights of States to prevent and abate pollution, to plan the development and use of land and water resources, and to consult with the Administrator in the exercise of his authority. It is the further policy to support and aid research relating to the prevention and abatement of pollution, and to provide Federal technical services and financial aid to State and interstate agency and municipalities.

It is also declared to be the policy of Congress that the President shall take action to insure that to the fullest extent possible all foreign countries shall take meaningful action for the prevention, control, and abatement of water pollution in their waters and international waters and for the achievement of goals to at least the same extent as the United States does.

Subsection (d) states that except as otherwise expressly provided, the Administrator or the Environmental Protection Agency shall administer this Act.

A major finding of the Committee's oversight hearings was that the water pollution control program had been seriously impaired by the lack of continuity which had existed for years because of various reorganizations, transfers, restructuring, and staff manpower shortages. The consequences of these eventually resulted in a start-stop, halting arrangement, of operations and procedures and the inability of the agency to perform necessary duties and functions. It is earnestly hoped that there will be no more reorganizations or restructuring of the Federal agency responsible for the water pollution control program. The following chart shows the many changes in the leadership of this program.

 1948—Division of Water Pollution Control established in the Department of Health, Education, and Welfare. Shortly thereafter, the division was transferred to the Bureau of State Services of the Public Health Service.

 1954—Division of Water Pollution Control was reduced to a branch and was consolidated with other divisions into the new Division of Sanitary Engineering Services.

 1959—Water Pollution Control Branch and other water pollution research and technical functions became the Division of Water Supply and Pollution Control.

 1960—Division of Water Supply and Pollution Control was grouped with other divisions to form the environmental health segment of the Bureau of State Services, Public Health Service.

 1961—Research and training grants responsibilities under the control of the National Institutes of Health were transferred to the Division of Water Supply and Pollution Control.

 1965—Division of Water Supply and Pollution Control became the Federal Water Pollution Control Administration,

78

Generated for Cormac Bloomfield (Duke University) on 2019-09-17 19:59 GMT / http://hdl.handle.net/2027/mdp.39015004456722
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

766

> a separate administration within the Department of Health, Education, and Welfare.
>
> 1966—Federal Water Pollution Control Administration was transferred to the Department of the Interior in accordance with Reorganization Plan No. 2.
>
> 1967—Federal Water Pollution Control Administration was reorganized.
>
> 1968—Federal Water Pollution Control Administration was reorganized.
>
> 1970—Federal Water Pollution Control Administration became the Federal Water Quality Administration.
>
> 1970—Federal Water Quality Administration was transferred to the Environmental Protection Agency in accordance with Reorganization Plan No. 3, and became the Water Quality Office.
>
> 1971—Water Quality Office became the Office of Water Programs and with the Office of Air Programs was placed under the Assistant Administrator for Media Programs.

Subsection (e) provides for public participation in the development, revision and enforcement of any regulation, standard or effluent limitation established by the Administrator or any State. The subsection further directs the Administrator and the States to encourage and assist the public so that it may fully participate in the administrative process.

Subsection (f) declares it to be the national policy that to the maximum extent possible the procedures utilized for implementing this legislation shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government.

This provision implements the recommendations of the Subcommittee on Investigations and oversight which held extensive hearings on the subject of red tape in the Federal agencies and on their decision making processes.

Subsection (g) provides that in the implementation of this legislation, agencies responsible therefore shall consider all potential impacts relating to the water, land, and air to insure that other significant environmental degradation and damage to the health and welfare of man does not result.

The Committee believes that there is little to be gained in stopping water pollution if the preventive actions cause more environmental damage than it eliminates. Therefore, the agencies are directed to consider all the ramifications of their actions.

*Section 102—Comprehensive Program for Water Pollution Control*

Section 3(a) of the existing Federal Water Pollution Control Act is the basic authority for the Environmental Protection Agency (EPA) to conduct comprehensive water quality management planning. This authority is continued in subsection (a) of section 102 of H.R. 11896, as reported.

Section 3(b) of the existing law provides for the inclusion of storage in Federal projects for the regulation of stream flow for water quality

79

 Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for Cormac Bloomfield (Duke University) on 2019-09-17 19:59 GMT  /  http://hdl.handle.net/2027/mdp.39015004456722
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

767

control with Federal assumption if the costs of the benefits are widespread or national in scope. Section 3(b) further specifically provides that releases from Federal reservoirs may not be used as a substitute for the adequate treatment of wastes, or other methods of controlling pollution at the source. The Committee is satisfied that flow regulation will continue as a viable alternative in the foreseeable future even with further improvements in waste treatment technology and, therefore, has continued this authority in subsection (b) of section 102. An additional provision relating to storage for regulation of stream flow in hydroelectric power projects licensed by the Federal Power Commission has been included in subsection (b) of section 102.

Subsection (c) authorizes the Administrator to make grants to pay up to 50 percent of the administrative expenses of planning agencies for a 3-year period. These grants would be for the development of comprehensive water quality control and abatement plans for a basin or portions thereof. These plans must be developed in cooperation with and consistent with applicable area-wide waste management plans under section 208 and comprehensive basin plans under section 209, and any State plan under section 303(e). Any agency presently receiving a grant under the existing law would be eligible for grants for an additional 3 years.

### Section 103—Interstate Cooperation and Uniform Laws

This section essentially restates the provisions of section 4 of the existing law. It establishes a policy for active Federal promotion of cooperative efforts among the States to promote pollution control. Such efforts include programs to promote model legislation and uniform laws and administration of laws in the States and to encourage interstate compacts and agreements for pollution control.

### Section 104—Research, Investigations, Training and Information

This section basically rewrites and revises the research programs of section 5 of the existing law. Subsections (a) and (b) of section 104 grant the Administrator broad general authorities to participate in and encourage research, investigations, experiments, training, demonstrations, surveys and studies relating to the causes, effects, extent, prevention and abatement of pollution. The Administrator is directed to conduct public investigations concerning the pollution of any navigable waters; establish advisory committees to assist in the examination and evaluation of research progress and proposals; to avoid duplication of research; to establish, equip and maintain a water quality surveillance system for monitoring the quality of the navigable waters, ground waters, contiguous zones and the oceans; and to develop the tools and techniques for measuring the social and economic costs and benefits of activities regulated under this legislation. In order to carry out this directive, the Administrator is authorized to publish information which has been developed, make grants and enter into contracts, establish and maintain research fellowships, and take other relevant actions.

In subsection (c) the Administrator is authorized to conduct research on, and survey the results of other scientific studies on, the harmful effects on the health or welfare of persons caused by pollutants. In carrying out this effort, the Administrator is required to

80

 Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

817

lations to govern the discharged or fill material into the navigable waters which shall require the application to these projects of the same criteria, factors to be evaluated, procedures, and requirements which are made applicable to the issuance of permits under subsections (a) and (b).

The Committee expects that until such time as economic and feasible alternative methods for disposal of dredge material are available, no arbitrary of unreasonable restrictions shall be imposed on dredging activities essential for the maintenance of interstate and foreign commerce, and that, consistent with the intent of this Act, the Committee expects the disposal activities of private dredgers and the Corps of Engineers will be treated in a similar manner.

The Committee further notes that under section 404 the Secretary of the Army shall have final decision-making responsibility and he shall not abdicate this responsibility to any other agency. For example, after consultation with the Administrator, the Secretary can override the Administrator's designation if he determines that it is not economically feasible to use the designated site.

It is expected that the Secretary shall act promptly on dredging permits essential for the maintenance of interstate commerce because of the seasonal nature of dredging and the need to preschedule scarce dredging equipment. The Committee expects that the Secretary will act on the permit applications usually within 30 days after notice and opportunity for public hearings.

Finally, the shift in emphasis of this legislation from water quality standards to effluent controls does not obviate the need for temporary turbidity standards for dredging activities.

Consequently, the Committee expects the Administrator to develop and issue to the States criteria providing for the establishment of standards for temporary turbidity resulting from dredging and disposal of dredge material, and to take such other action as is necessary in establishing effluent limitations to assure continuation of dredging essential to our Nation's waterborne transportation.

TITLE V—GENERAL PROVISIONS

### Section 501—Administration

This section continues, with conforming language changes, the provisions of section 22 of the existing law.

A new subsection (f) is added which allows EPA, upon the request of a State Water Pollution Control Agency, to detail employees to assist the State agencies in carrying out the provisions of this legislation.

### Section 502—General definitions

The section includes definitions for the following terms:

    (1) State Water Pollution Control Agency
    (2) Interstate Agency
    (3) State
    (4) Municipality
    (5) Person
    (6) Pollutant
    (7) Pollution

Digitized by 

Original from
UNIVERSITY OF MICHIGAN

818

    (8) Navigable Waters
    (9) Territorial Seas
    (10) Contiguous Zone
    (11) Ocean
    (12) Effluent Limitation
    (13) Discharge of a Pollutant and Discharge of Pollutants
    (14) Toxic Pollutant
    (15) Point Source
    (16) Biological Monitoring
    (17) Thermal Discharge
    (18) Discharge

One term that the Committee was reluctant to define was the term "navigable waters." The reluctance was based on the fear that any interpretation would be read narrowly. However, this is not the Committee's intent. The Committee fully intends that the term "navigable waters" be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes.

The term "pollutant" as defined in the bill includes "radioactive materials." These materials are those not encompassed in the definition of source, byproduct, or special nuclear materials as defined by the Atomic Energy Act of 1954, as amended, and regulated pursuant to that Act. "Radioactive materials" encompassed by this bill are those beyond the jurisdiction of the Atomic Energy Commission. Examples of radioactive material not covered by the Atomic Energy Act, and, therefore, included within the term "pollutant," are radium and accelerator produced isotopes.

It is the intent of the Committee that the exclusion from the term "pollutant" relating to the injection of water, gas, or other materials into wells applies only to the properly executed injection of materials into wells to stimulate the primary, secondary, or subsequent production of crude oil or natural gas, and to the properly executed disposal in wells of brines derived in association with the production of crude oil or natural gas, with appropriate precautions taken to assure that such injection or disposal does not lead to, or make substantially more likely, the degradation of usable water resources. For such exclusion to be effective, the State is required (1) to approve the well used either to facilitate production or for disposal purposes, and (2) to make a determination, based on sufficient investigation and evidence, that such degradation has not taken place and has not been or will not be made substantially more likely as a result of such injection or disposal.

It should be noted that the term "thermal discharge" is defined as the introduction of water into the navigable waters or the waters of the contiguous zone at a temperature different from the ambient temperature of the receiving waters. It is intended that the term "thermal discharge" and the term "discharge of a pollutant" (and "discharge of pollutants") are mutually exclusive.

*Section 503—Water Pollution Control Advisory Board*

This section continues, with conforming language changes, the provisions of section 9 of the existing law. The per diem allowance for Board members while attending conferences or meetings of the Board is raised from $50 per diem to $100 per diem.

131

 Digitized by Google

Original from
UNIVERSITY OF MICHIGAN