**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
Charleston Division**

| | |
|---|---|
| SOUTH CAROLINA COASTAL CONSERVATION LEAGUE, et al., | |
| Plaintiffs, | |
| v. | Case No. 2:20-cv-01687-DCN |
| ANDREW R. WHEELER, in his official capacity as Administrator of the U.S. Environmental Protection Agency, et al., | |
| Defendants, | |
| and | |
| AMERICAN FARM BUREAU FEDERATION, et al., | |
| Intervenor-Defendants. | |

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

PETER M. MCCOY, JR.
*United States Attorney*
District of South Carolina

LEE E. BERLINSKY (Fed. ID# 05443)
*Assistant United States Attorney*
Liberty Center Building
151 Meeting Street, Suite 200
Charleston, SC 29402
(843) 266-1679
Lee.Berlinsky@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

TABLE OF AUTHORITIES ....................................................**Error! Bookmark not defined.**

GLOSSARY ............................................................................................................ ix

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

    I.     Statutory and Regulatory Background................................................. 3

         A.     Prior Regulatory Definitions of "Waters of the United States" and Litigation.................................................................................. 3

               1.     The 2015 Rule.................................................................. 5

               2.     The Repeal Rule and the Navigable Waters Protection Rule ......... 6

    II.     Procedural History ............................................................................. 7

STANDARD OF REVIEW ....................................................................................... 7

ARGUMENT ......................................................................................................... 8

    I.     The NWPR Is Permissible Under the CWA and Should Be Upheld.................... 8

         A.     The CWA Does Not Unambiguously Prohibit the NWPR's Interpretation............................................................................ 8

         B.     The NWPR Is a Reasonable Construction of Ambiguous Statutory Terms. ................................................................................... 10

         C.     Plaintiffs' Various Snippets of the CWA Do Not Unambiguously Preclude the Agencies' Interpretation of "Navigable Waters."................ 12

    II.     The NWPR Is Neither Arbitrary nor Capricious Under the APA. ...................... 16

         A.     The Agencies' Decision Was Well-Explained. ......................................... 17

B.    The Agencies Explained Their Consideration of Water Quality and Science. ................................................................................................. 18

C.    The NWPR Provides Regulatory Certainty. .............................................. 27

D.    The Agencies Addressed Any Reliance Interests. ..................................... 30

E.    The NWPR's Waste Treatment System Exclusion Is Lawful and Reasonable. .............................................................................................. 32

    1.    The waste treatment system exclusion (including its potential application to cooling ponds) is longstanding. .............. 32

    2.    The Agencies provided ample notice and reasonably responded to the limited comments on these issues..................... 35

    3.    The exclusion is consistent with the CWA. .................................. 37

    4.    Potential application of the exclusion to any particular water body is not properly before the Court in this action. .......... 38

III.    The Court Lacks Jurisdiction over Plaintiffs' Challenge to the NWPR. ............. 40

IV.    The Court Should Defer Ruling on a Remedy Until After Deciding the Cross-Motions for Summary Judgment. ............................................................... 43

CONCLUSION................................................................................................................ 45

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*All. for Nat'l Health U.S. v. Sebulius,*
 775 F. Supp. 2d 114 (D.D.C. 2011) ............................................................................. 28

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
 988 F.2d 146 (D.C. Cir. 1993) ................................................................................... 43

*Ass'n for Retarded Citizens v. Dallas Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees,*
 19 F.3d 241 (5th Cir. 1994) ....................................................................................... 42

*Baehr v. Craig Northrup Team,*
 953 F.3d 244 (4th Cir. 2020) ..................................................................................... 40

*Bailey v. United States,*
 516 U.S. 137 (1995) ................................................................................................... 15

*Baltimore Gas & Elec. Co. v. NRDC,*
 462 U.S. 87 (1983) ........................................................................................... 2, 21, 26

*California v. Wheeler,*
 No. 3:20-cv-03005, 2020 WL 3403072 (N.D. Cal. June 19, 2020).... 7, 9, 10, 12, 14, 26, 31, 45

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA,*
 846 F.3d 492 (2d Cir. 2017)....................................................................................... 16

*Camp v. Pitts,*
 411 U.S. 138 (1973) ................................................................................................... 39

*Chevron, U.S.A., Inc. v. NRDC, Inc.,*
 467 U.S. 837 (1984)................................................................................................. 8, 9

*Citizens to Preserve Overton Park v. Volpe,*
 401 U.S. 402 (1971).................................................................................................... 8

*City of Milwaukee v. Illinois,*
 451 U.S. 304 (1981) ................................................................................................... 15

*Colorado v. EPA,*
 No. 1:20-cv-01461, 2020 WL 3402325 (D. Colo. June 19, 2020) .................................. 6, 8, 45

*Cty. of Maui, Haw. v. Haw. Wildlife Fund,*
 140 S. Ct. 1462 (2020)................................................................................................. 3

*Dep't of Homeland Security v. Regents of Univ. of Cal.,*
 140 S. Ct. 1891 (2020)............................................................................................... 31

*Entergy Corp. v. Riverkeeper, Inc.*,
  556 U.S. 208 (2009) .................................................................................. 11

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ........................................................................ 16, 17, 30

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) .................................................................................. 15

*1000 Friends of Md. v. Browner*,
  265 F.3d 219 (4th Cir. 2001) ............................................................... 35, 39

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ........................................................................ 40, 41, 42

*Georgia v. Pruitt*,
  326 F. Supp. 3d 1356 (S.D. Ga. 2018) ...................................................... 5

*Georgia v. Wheeler*,
  418 F. Supp. 3d 1336 (S.D. Ga. 2019) ................................................. 5, 18

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) .............................................................................. 44

*In re EPA & DOD Final Rule*,
  803 F.3d 804 (6th Cir. 2015), *vacated by* 713 F. App'x 489 (2018) ..................... 5, 31

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
  92 F.3d 1248 (D.C. Cir. 1996) .................................................................. 21

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................................ 40, 41

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) .................................................................................. 41

*Mayo Found. for Med. Educ. & Research v. United States*,
  562 U.S. 44 (2011) .................................................................................... 10

*Monsanto Co v Geertson Seed Farms*,
  561 U.S. 139 (2010) ............................................................................ 43, 45

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010) .................................................................................. 12

*Nat'l Ass'n of Home Builders v. EPA*,
  667 F.3d 6 (D.C. Cir. 2011) ...................................................................... 43

*Nat'l Ass'n of Mfrs. v. DOD*,
  138 S. Ct. 617 (2018) ................................................................................ 41

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ................................................................. 1, 9, 10, 11

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) ................................................................ 43

*N.C. Growers' Ass'n v. United Farm Workers*,
  702 F.3d 755 (4th Cir. 2012) .................................................................... 7

*North Dakota v. EPA*,
  127 F. Supp. 3d 1047 (D.N.D. 2015) ......................................................... 5

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
  556 F.3d 177 (4th Cir. 2009) ......................................... 8, 32, 34, 37, 38

*Public Lands Council v. Babbitt*,
  167 F.3d 1287 (10th Cir. 1999) .............................................................. 40

*Puget Soundkeeper All. v. Wheeler*,
  No. C15-1342-JCC, 2019 WL 6310562 (W.D. Wash. Nov. 25, 2019) ......................... 6, 36, 42

*Rapanos v. United States*,
  547 U.S. 715 (2006) .......................... 1, 2, 4, 8, 9, 11, 14, 19, 23, 26, 31

*Real Truth About Abortion, Inc. v. FEC*,
  681 F.3d 544 (4th Cir. 2012) .................................................................. 44

*Reno v. Flores*,
  507 U.S. 292 (1993) ................................................................................ 40

*Rodriguez v. United States*,
  480 U.S. 522 (1987) ................................................................................ 16

*S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*,
  541 U.S. 95 (2004) .................................................................................. 15

*S.C. Coastal Conservation League v. Pruitt*,
  318 F. Supp. 3d 959 (D.S.C. 2018) ........................................................... 7

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ................................................................................ 39

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87 (1995) ................................................................................. 28

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs ("SWANCC")*,
    531 U.S. 159 (2001)................................................................................... 3, 4, 9-11, 13, 24, 26

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016).............................................................................................. 42

*Summers v. Earth Island Inst.*,
    129 S. Ct. 1142 (2009).............................................................................................. 42

*Texas v. EPA*,
    389 F. Supp. 3d 497 (S.D. Tex. 2019) ...................................................................... 5

*Texas v. EPA*,
    3:15-CV-00162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018)............................... 5

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017).............................................................................................. 44

*U.S. Army Corps. of Eng'rs v. Hawkes Co., Inc.*,
    136 S. Ct. 1807 (2016)......................................................................................... 1, 27

*United States v. Deaton*,
    332 F.3d 698 (4th Cir. 2003) ................................................................................... 37

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009)................................................................................................. 10

*United States v. Mendoza*,
    464 U.S. 154 (1984)................................................................................................. 45

*United States v. Riverside Bayview Homes, Inc.*,
    474 U.S. 121 (1985)............................................................................. 3, 10, 11, 14, 15, 22

*Va. Soc'y for Human Life v. FEC*,
    263 F.3d 379 (4th Cir. 2001) ................................................................................... 43

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)........................................................................................... 44, 45

## FEDERAL STATUTES

5 U.S.C. § 706(2) ........................................................................................................ 7, 44

33 U.S.C. § 1251, *et. seq.*............................................................................................. 3

33 U.S.C. § 1251(a) ............................................................................................... 3, 12, 16

33 U.S.C. § 1251(b) ................................................................................ 3, 11, 12, 14

33 U.S.C. § 1255(a)(1) ........................................................................................... 15

33 U.S.C. § 1258(a) ............................................................................................... 16

33 U.S.C. § 1311(a) ................................................................................................. 3

33 U.S.C. § 1329(i) ............................................................................................... 16

33 U.S.C § 1362(7) ..................................................................................... 3, 11, 15

## FEDERAL REGULATIONS

33 C.F.R. § 328.3 ..................................................................................................... 1

33 C.F.R. § 328.3(a) (1987) ..................................................................................... 3

33 C.F.R. § 328.3(c) (15) ....................................................................................... 44

40 C.F.R. § 232.2(q) (1988) ..................................................................................... 3

40 C.F.R. § 423.11(m) (1980) ..................................................................... 33, 34, 37

## FEDERAL REGISTER NOTICES

39 Fed. Reg. 12,115 (1974) ................................................................................. 3, 11

42 Fed. Reg. 37,122 (July 19, 1977) ......................................................................... 3

44 Fed. Reg. 32,854 (June 7, 1979) ......................................................................... 32

45 Fed. Reg. 33,290 (May 19, 1980) ....................................................................... 33

45 Fed. Reg. 48,620 (July 21, 1980) ....................................................................... 33

47 Fed. Reg. 52,290 (Nov. 19, 1982) ...................................................................... 33

51 Fed. Reg. 41,206 (Nov. 13, 1986) ...................................................................... 34

53 Fed. Reg. 20,764 (June 6, 1988) ........................................................................ 34

80 Fed. Reg. 37,054 (June 29, 2015) ................................................. iv, 2, 5, 18, 24, 34

82 Fed. Reg. 34,899 (July 27, 2017) ....................................................................... 31

84 Fed. Reg. 4154 (Feb. 14, 2019) ........................................................................... 31, 35

84 Fed. Reg. 56,626 (Oct. 22, 2019).............................................................. iv, 6, 18, 34

85 Fed. Reg. 22,250 (Apr. 21, 2020) ............................................ iv, 6, 7, 10-13, 15, 17-32, 36-39

**EXECUTIVE ORDER**

Executive Order 13778 (Feb. 28, 2017).......................................................................... 31

# GLOSSARY

2015 Rule    Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015)

APA    Administrative Procedure Act

Br.    Mem. in Support of Plaintiffs' Mot. for Summ. J. (ECF No. 58-1, July 10, 2020)

CWA    Clean Water Act

EA    Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the United States," *available at* https://www.epa.gov/nwpr/navigable-waters-protection-rule-supporting-documents

NWPR    Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020)

Repeal Rule    Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019)

RPA    Resource and Programmatic Assessment for the Navigable Waters Protection Rule: Definition of "Waters of the United States," *available at* https://www.epa.gov/nwpr/navigable-waters-protection-rule-supporting-documents

RTC    Public Comment Summary Document (Response to Comments), *available at* https://beta.regulations.gov/document/EPA-HQ-OW-2018-0149-11574 (excerpts are attached as Exhibits 1-7 of this Memorandum)

## INTRODUCTION

The Navigable Waters Protection Rule ("NWPR") brings decades of debate regarding the jurisdictional limits of the Clean Water Act ("CWA") to a close. For years, the "notoriously unclear" significant nexus regime inaugurated by the Supreme Court's decision in *Rapanos v. United States*, 547 U.S. 715 (2006), muddied the waters of CWA jurisdiction, *see U.S. Army Corps. of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1816 (2016) (Kennedy, J., concurring). It spawned years of litigation. Those wondering whether a water or wetland constitutes a "water of the United States" will now be able to review 33 C.F.R. § 328.3. And, with more clarity than those regulations have provided in decades, they can determine if a CWA permit is needed to discharge into a particular water. The NWPR is far less complicated and idiosyncratic—and therefore fairer—than the complex, multi-factored "significant nexus" test Plaintiffs endorse.

The Agencies reasonably employed their *Chevron*-delegated deference to adopt the NWPR. Indeed, what constitutes a "water of the United States" is a textbook example of statutory ambiguity for which agencies are "delegat[ed] . . . authority to . . . fill the statutory gap in reasonable fashion." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). Interpreting ambiguous language "involves difficult policy choices"; so judicial deference is critical as "agencies are better equipped to make [such choices] than courts." *Brand X*, 545 U.S. at 980. A reasonable "agency construction" even displaces prior *judicial* decisions unless such holdings "follow[ed] from the unambiguous terms of the statute." *Id.* at 982.

A central fallacy of Plaintiffs' claims is that a majority of justices in *Rapanos* rejected the interpretation adopted in the NWPR. That is simply wrong. The opinions of the *Rapanos* case are about the outer limits of the CWA. In other words, *Rapanos* speaks to what waters the Agencies *cannot* regulate. The opinions do not dictate what waters the Agencies *must* regulate. Heeding the admonition of Chief Justice Roberts in *Rapanos* to "develop[] *some* notion of an outer bound to

1

the reach of their authority," 547 U.S. at 757-58 (Roberts, C.J., concurring), the Agencies adopted the NWPR. While Plaintiffs may not agree with their policy judgments, the Agencies are "delegated rulemaking authority under . . . the Clean Water Act [and] are afforded generous leeway by the courts in interpreting the statute they are entrusted to administer." *Id*.

The Agencies' extensive analysis supporting the NWPR spans ***more than 1,500 pages*** across the rule's preamble, Resource and Programmatic Assessment, Economic Analysis, and Response to Comments. These documents establish that the Agencies appropriately considered, and thoroughly explained, their decisions, including regarding scientific matters. Contrary to Plaintiffs' hyperbolic forecasts of environmental harm—based on unreliable data—the NWPR and its partnership with states in the CWA's regime of cooperative federalism could provide comparable environmental protection, at less societal cost, and net public benefit. Ironically, Plaintiffs claim that the 2015 Rule was based on science. But, to the contrary, that rule relied on distance limitations found to be arbitrary, without scientific foundation, and unlawful. Furthermore, heeding the recommendation of EPA's Science Advisory Board, the 2015 Rule "clarif[ies] in the preamble" that "'significant nexus' is a legal term, not a scientific one." 80 Fed. Reg. 37,065. The NWPR, by contrast, truly does rely on well-established and objectively measurable scientific distinctions to define CWA jurisdiction. On these issues "within [the agencies'] area of special expertise," "a reviewing court must generally be at its most deferential." *Baltimore Gas & Elec. Co. v. NRDC, Inc.*, 462 U.S. 87, 103 (1983).

Regardless, Plaintiffs lack standing. They have not shown a concrete, imminent action giving rise to an injury in fact caused by the regulatory changes promulgated by the NWPR. Thus, the Agencies are entitled to summary judgment.

# BACKGROUND

## I.    Statutory and Regulatory Background

Congress enacted the CWA, 33 U.S.C. §§ 1251 et seq., with the objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," *id*. § 1251(a), while declaring its policy to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." *Id*. § 1251(b). The Act prohibits "the discharge of any pollutant by any person," *id*. § 1311(a), to "navigable waters," which "means the waters of the United States." *Id*. § 1362(7). The Act *also* prohibits discharges to non-jurisdictional waters that are conveyed downstream to jurisdictional waters. *Cty. of Maui, Haw. v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1477 (2020) (holding CWA applies to discharges to non-jurisdictional groundwater that reach navigable waters by a "functional equivalent" of direct discharge).

### A.    Prior Regulatory Definitions of "Waters of the United States" and Litigation

The Corps first promulgated regulations defining "waters of the United States" in the 1970s, which included only waters that were navigable in fact. 39 Fed. Reg. 12,115 (1974). Thereafter, the Corps substantially broadened its interpretation. *See, e.g.*, 42 Fed. Reg. 37,122, 37,144 (July 19, 1977). In the 1980s, the Agencies adopted regulatory definitions substantially similar to the 1977 definition that remained until 2015. *See* 33 C.F.R. § 328.3(a) (1987) (Corps); 40 C.F.R. § 232.2(q) (1988) (EPA) (collectively, the "1986 Regulations").

Over time, the Agencies refined their application of the 1986 Regulations, informed by three Supreme Court decisions. In *Riverside Bayview*, the Court applied *Chevron* to hold the Corps' assertion of jurisdiction over wetlands "actually abut[ting]" a traditional navigable water was reasonable. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131-35 & n.9 (1985). But in *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159

3

(2001) ("*SWANCC*"), the Court held "the text of the statute will not allow" the extension of CWA jurisdiction to "ponds that are *not* adjacent to open water." *Id*. at 168.

In *Rapanos*, the Supreme Court then assessed the Corps' application of the 1986 Regulations to assert jurisdiction over four wetlands. *Rapanos*, 547 U.S. at 719-20, 729-30. Both the plurality and Justice Kennedy remanded the Corps' application. *Id.* at 757 (Scalia, J., plurality); *id.* at 786-87 (Kennedy, J., concurring). The plurality stated that "the traditional term 'navigable waters' . . . carries *some* of its original substance" and "includes, at bare minimum, the ordinary presence of water." *Id.* at 734 (Scalia, J., plurality). But the plurality stated the term "waters of the United States" does "not necessarily exclude *seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months." *Id*. at 732 n.5. Further, the plurality would have excluded from jurisdiction "[w]etlands with only an intermittent, physically remote hydrologic connection to 'waters of the United States.'" *Id.* at 742.

In concurring in the judgment, Justice Kennedy opined that jurisdiction may extend to wetlands with a "'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Id.* at 759 (Kennedy, J., concurring). But Justice Kennedy rejected "the dissent" view that the CWA "would permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters." *Id.* at 778. The dissent found the Corps' application of its regulations "reasonable," and would have upheld its findings of jurisdiction. *Id.* at 797, 810 (Stevens, J., dissenting). Though joining the plurality, Chief Justice Roberts criticized the Agencies for their failure to use the "generous leeway by the courts in interpreting the statute" to "develop[] *some* notion of an outer bound to the reach of their authority." *Id*. at 757-58 (Roberts, C.J., concurring).

### 1. The 2015 Rule

In 2015, the Agencies revised the regulatory definition of "waters of the United States." 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule"). Claiming Justice Kennedy's "significant nexus" discussion as its legal touchstone, *id.* at 37,060, the 2015 Rule had the "objective of enhancing regulatory clarity, predictability, and consistency." *Id.* at 37,090. It purported to accomplish this primarily by establishing "distance thresholds"—applied without variation to all waters nationwide—whereby water would be deemed either: "*per se* jurisdictional" if "any part" of the water was within range; "subject to a case-specific significant nexus evaluation"; or presumptively not jurisdictional (unless one of several special identified categories). *Id.* at 37,092-93

Multiple parties sought judicial review of the 2015 Rule in courts across the country. A court of appeals and multiple district courts stayed or enjoined the 2015 Rule, concluding plaintiffs were likely to succeed.[1] Two courts ruled on summary judgment that the 2015 Rule was "unlawful" and remanded the Rule to the Agencies. *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1372 (S.D. Ga. 2019); *Texas v. EPA*, 389 F. Supp. 3d 497, 504-06 (S.D. Tex. 2019). This included because "the definition of waters of the United States in the [2015] WOTUS Rule extends beyond their [Agencies'] authority under the CWA." *Georgia*, 418 F. Supp. 3d at 1360. But also because "distance limitations" were arbitrarily "selected for 'clarity' and convenience" yet lacked "scientific findings" justifying these key features of the 2015 Rule. *Id.* at 1366. Another court dismissed a challenge to the waste treatment system exclusion of the 2015 Rule on standing grounds. It held that none of the plaintiffs' members had identified "any project, proposed or

---

[1] *See*, *e.g.*, *In re EPA & DOD Final Rule*, 803 F.3d 804, 808 (6th Cir. 2015), *vacated by* 713 F. App'x 489 (2018); *Texas v. EPA*, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356 (S.D. Ga. 2018); *North Dakota v. EPA*, 127 F. Supp. 3d 1047 (D.N.D. 2015); *North Dakota v. EPA*, No. 3:15-cv-59, Dkt. No. 250 (D.N.D. Sept. 18, 2018).

existing, that is causing or will soon cause the harms he is concerned about." *Puget Soundkeeper All. v. Wheeler*, No. C15-1342-JCC, 2019 WL 6310562, at *7 n.8 (W.D. Wash. Nov. 25, 2019).

### 2.    The Repeal Rule and the Navigable Waters Protection Rule

In 2017, the Agencies began reconsidering the 2015 Rule. After a notice-and-comment rulemaking process, the Agencies repealed the 2015 Rule. This reinstated the 1986 Regulations' definition of "waters of the United States." *See* 84 Fed. Reg. 56,626, 56,626 (Oct. 22, 2019) ("Repeal Rule"). A number of parties filed suits challenging the Repeal Rule. The Repeal Rule became effective nationwide on December 23, 2019.

On January 23, 2020, the Agencies then signed a new final rule—the Navigable Waters Protection Rule ("NWPR")—that takes a new approach to defining "waters of the United States." The NWPR went into effect on June 22, 2020, 85 Fed. Reg. 22,250 (Apr. 21, 2020), except in the state of Colorado where a preliminary injunction applies. *See Colorado v. EPA*, No. 1:20-cv-01461-WJM-MRN, 2020 WL 3402325, at *1 (D. Colo. June 19, 2020), *appeals docketed*, Nos. 20-1238, 20-1262, 20-1263 (10th Cir.). The NWPR establishes four categories of jurisdictional waters: (1) The territorial seas and traditional navigable waters; (2) tributaries of such waters; (3) certain lakes, ponds, and impoundments of jurisdictional waters; and (4) wetlands adjacent to other jurisdictional waters (other than jurisdictional wetlands). 85 Fed. Reg. at 22,273. The Rule also specifies "exclusions for many water features that traditionally have not been regulated, and define[s] the operative terms used in the regulatory text." *Id*. at 22,270; *see also id*. at 22,340-41.

The NWPR relies on "a unifying legal theory for federal jurisdiction over those waters and wetlands that maintain a sufficient surface water connection to traditional navigable waters or the territorial seas." *Id*. at 22,252. It asserts jurisdiction over "intermittent" tributaries that "flow[] continuously during certain times of the year and more than in direct response to precipitation."

*Id*. at 22,338. The NWPR also includes non-abutting, but "adjacent wetlands" that are "inundated by flooding" from a jurisdictional water during "a typical year," and those separated from a jurisdictional water "only by a natural berm, bank, dune, or similar natural feature." *Id*. at 22,338.

## II.     Procedural History

Multiple parties have challenged the NWPR in various district courts. The Northern District of California denied a preliminary injunction sought by 17 states, finding those claims unlikely to succeed on the merits. *California v. Wheeler*, No. 3:20-cv-03005, 2020 WL 3403072, at *5-8 (N.D. Cal. June 19, 2020). South Carolina and 22 other states intervened in support of the Agencies and the NWPR and to oppose the injunction. *See California v. Wheeler*, No. 3:20-cv-03005, Mot. to Intervene, Dkt. No. 107 (N.D. Cal. June 1, 2020). The District of Oregon also recently declined to preliminarily enjoin the NWPR, finding the plaintiff lacked standing. *Or. Cattlemen's Ass'n v. EPA*, 3:19-cv-00564, Dkt. No. 108 (D. Or. Aug. 7, 2020).

Plaintiffs filed this lawsuit on April 29, 2020, claiming the NWPR is arbitrary, capricious, and otherwise not in accordance with the law under the Administrative Procedure Act ("APA").[2] They moved for summary judgment on July 10, 2020. Dkt. No. 58-1 ("Br.").

## STANDARD OF REVIEW

Under the APA, "a reviewing court will overturn an agency action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, . . . [or] without observance of procedure required by law.'" *N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 763 (4th Cir. 2012) (quoting 5 U.S.C. § 706(2)). This standard "is highly deferential,

---

[2] Previously, several of these Plaintiffs filed a separate lawsuit challenging the Repeal Rule. *See S.C. Coastal Conservation League v. Wheeler*, No. 2:19-cv-03006 (D.S.C.). That case is in abeyance. *See* Order, Dkt. No. 32 in No. 2:19-cv-03006 (D.S.C. Feb. 18, 2020). Several Plaintiffs also challenged the Agencies' final rule adding a 2020 applicability date to the 2015 Rule. This Court granted summary judgment to those plaintiffs and vacated that action. *S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959 (D.S.C. 2018).

with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (citation omitted). The Court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). "[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.*

## ARGUMENT

### I.    The NWPR Is Permissible Under the CWA and Should Be Upheld.

Where, as here, a challenged rule contains an agency interpretation of statutory language, this Court reviews that interpretation under *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). At Step One, this Court determines "whether Congress has directly spoken to the precise question at issue." *Id.* at 842-43. "[I]f the statute is silent or ambiguous with respect to the specific issue," the Court proceeds to Step Two to determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. The NWPR reflects a reasonable interpretation of CWA § 1362(7) (defining "navigable waters" as "waters of the United States").

### A.    The CWA Does Not Unambiguously Prohibit the NWPR's Interpretation.

Plaintiffs claim "the Supreme Court has rejected" the Agencies' NWPR interpretation in *Rapanos*. Br. at 30.[3] That is incorrect. For Plaintiffs' brief doesn't even cite—let alone address—fundamental Supreme Court precedent on administrative law. *Chevron* and *Brand X* foreclose Plaintiffs' superficially enticing, but intellectually empty, arguments regarding the fractured

---

[3] Plaintiffs' reliance on *Colorado*, 2020 WL 3402325, at *12, is misplaced. That court based its erroneous conclusion that *Rapanos* foreclosed the NWPR on an unnecessary application of the process for determining which Supreme Court opinion is controlling when there are multiple non-majority opinions. *See id.* The *Colorado* court also fundamentally misunderstood the Rule and that it was not a rote application of the *Rapanos* plurality. *See id.* (stating that the NWPR was intended to "take the plurality opinion . . . and make it the new law of the land").

opinions in *Rapanos*. That is because a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference **only if** the prior court decision holds that its construction follows from the ***unambiguous*** terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982 (emphasis added).

When arguing that *Rapanos* somehow forecloses the Agencies' interpretation, Plaintiffs do not actually contend "waters of the United States" is an unambiguous term—for good reason. The Supreme Court has repeatedly recognized ambiguity in that phrase, including in *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring); *id.* at 752 (Scalia, J., plurality) (the CWA "is in *some* respects ambiguous"); *id.* at 796 (Stevens, J., dissenting) (noting "ambiguity inherent in the phrase 'waters of the United States'"); *SWANCC*, 531 U.S. at 170-71.

More critically, no opinion in *Rapanos* addresses the question of what waters the Agencies *must* regulate under the CWA. As an initial matter, *Rapanos* was an as-applied challenge of Corps' *implementation* of the 1986 Regulations, not a facial review of the regulatory text. Thus, the issue was whether the Corps extended jurisdiction to waters the CWA *cannot* regulate. Five justices observed that the Corps did. But the Supreme Court was not addressing whether the Agencies' *Chevron*-delegated interpretation failed to cover waters the Agencies *must* regulate. *See California*, 2020 WL 3403072, at *5.

Contrary to Plaintiffs' argument, the *Rapanos* dissent's disagreement with the plurality's and Justice Kennedy's standards does not constrain the Agencies' discretion to define the limits of jurisdiction in the NWPR. In fact, the dissent expressly invoked *Chevron* when analyzing whether the Corps' assertion of jurisdiction was "reasonable." *Rapanos*, 547 U.S. at 788, 796-97 (Stevens, J. dissenting). Thus, as the Northern District of California correctly recognized when denying a preliminary injunction, "nothing in either the *Rapanos* concurrence or the dissent—or in the two

read together—can be characterized as a holding 'that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.' *Brand X*, 545 U.S. at 982." *California*, 2020 WL 3403072, at *6.

To be sure, *Rapanos*, *SWANCC*, and *Riverside Bayview* articulate principles that served as guideposts for the Agencies' rulemaking. *See* 85 Fed. Reg. at 22,255-57. The Agencies particularly analyzed and incorporated the "commonalities" between the fractured *Rapanos* opinions. *Id.* at 22,268. But neither *Rapanos* nor any other Supreme Court case said that the CWA unambiguously precludes the Agencies' new interpretation. This is because a "court's choice of one reasonable reading of an ambiguous statute does not preclude an implementing agency from later adopting a different reasonable interpretation." *United States v. Eurodif S.A.*, 555 U.S. 305, 315 (2009).

This principle stems from *Chevron*. It "established a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Brand X*, 545 U.S. at 982 (internal quotation omitted). Accordingly, under *Brand X*, because "waters of the United States" is ambiguous, the Agencies were empowered to reconsider their prior statutory interpretation. They could even adopt a reading that *none* of the *Rapanos* Justices might necessarily think is the best reading of the CWA so long as the statute does not preclude the Agencies' interpretation.

## B.    The NWPR Is a Reasonable Construction of Ambiguous Statutory Terms.

The question at *Chevron* Step Two is "whether the agency's answer [to the interpretive question] is based on a permissible construction of the statute." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 54 (2011) (quoting *Chevron*, 467 U.S. at 843). This need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the

10

courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009). Interpreting ambiguous language "involves difficult policy choices," so judicial deference is critical, as "agencies are better equipped to make [such choices] than courts." *Brand X*, 545 U.S. at 980.

Given the longstanding and difficult issues interpreting the ambiguous phrase "waters of the United States," Chief Justice Roberts specifically noted that the Agencies should be "afforded generous leeway" for "developing *some* notion of an outer bound" to their CWA jurisdiction. *Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring). And the NWPR falls well within that broad leeway. The interpretation is consistent with the text, structure, objective, and policies of the Act. And the Agencies supported and explained their choices.

The NWPR is principally based on the text of the statute, informed by Supreme Court decisions. Congress defined "navigable waters" as "waters of the United States, including the territorial seas." 33 U.S.C § 1362(7). The Corps originally defined these terms to encompass only navigable waters in fact. 39 Fed. Reg. 12,115 (1974). After the Agencies broadened their statutory reading, the Court confirmed that Congress intended this language to extend to some "waters" that would not actually be "'navigable' under the classical understanding of that term." 85 Fed. Reg. at 22,262 (citing *Riverside Bayview*, 474 U.S. at 133). But "the term 'navigable' indicates 'what Congress had in mind as its authority for enacting the CWA.'" *Id.* (citing *SWANCC*, 531 U.S. at 172). The Supreme Court has found nothing in the CWA's legislative history that indicates "Congress intended to exert anything more than its commerce power over navigation." *Id.* (citing *SWANCC*, 531 U.S. at 168 n.3). The NWPR thus avoids federally regulating non-navigable, non-adjacent waters that lack a sufficient connection to traditional navigable waters.

When enacting the CWA, Congress also sought "to preserve and protect" the power of states to regulate water resources and land within their borders. 33 U.S.C. § 1251(b). The NWPR

honors that policy. At bottom, the NWPR's "unifying legal theory"—consistent with this statutory text—asserts "federal jurisdiction over those waters and wetlands that maintain a sufficient surface water connection to traditional navigable waters." 85 Fed. Reg. at 22,252.

### C.     Plaintiffs' Various Snippets of the CWA Do Not Unambiguously Preclude the Agencies' Interpretation of "Navigable Waters."

Tellingly, Plaintiffs do not argue that the NWPR is an unreasonable interpretation under *Chevron*. They do not even acknowledge the Supreme Court's *Chevron* decision. Essentially, the only *actual text* of the CWA that Plaintiffs rely upon is the congressional "objective" to restore and maintain the "integrity of the Nation's waters," Br. at 21 (citing 33 U.S.C. § 1251(a)), and "policy." Br. at 35 (citing 33 U.S.C. § 1251(b)). From these, Plaintiffs suggest their preferred policy preferences for obtaining this "objective" should override the Agencies' delegated discretion to balance other statutory elements and policy considerations. It does not.

"It is [a court's] function to give the statute the effect its language suggests, however modest that may be; not to extend it to admirable purposes it might be used to achieve." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 270 (2010); *see also California*, 2020 WL 3403072, at *6 (concluding that plaintiffs' "arguments that the narrowness of the [NWPR] serves poorly to carry out the objectives of the CWA . . . do not provide a sufficient basis for a court to substitute its judgment for the policy choices of the Agency"). To this end, the Agencies gave appropriate consideration to the "objective" of the Act. 33 U.S.C. § 1251(a).[4] But the Agencies also balanced

---

[4] For example, the Agencies considered that the Act's longstanding National Pollutant Discharge Elimination System ("NPDES") permitting program will likely continue to address point source discharges of certain pollutants that flow downstream into waters of the United States. *See* 85 Fed. Reg. at 22,319 ("[A] CWA section 402 permittee currently discharging to a jurisdictional water that becomes non-jurisdictional under this final rule would likely remain subject to the requirements of the Act."); RPA at 79. And the CWA's non-regulatory measures will continue to address pollution of the nation's waters generally. *See* 85 Fed. Reg. at 22,253 (discussing non-

and implemented Congress' other policy directives expressed in CWA § 1251(b). *See* 85 Fed. Reg. at 22,261-62, 22,273, 22,277, 22,287, 22,302, 22,308, 22,313. This included the Supreme Court's direction that "[t]he term 'navigable'" has "import" for determining jurisdiction under the CWA. *SWANCC*, 531 U.S. at 172.

Plaintiffs erroneously suggest that snippets of CWA legislative history and an out-of-circuit district court decision override the Supreme Court's subsequent holding that the CWA imposes statutory limits. Br. at 33-34. They do not. In *SWANCC*, the Court considered the same legislative history now cited by Plaintiffs. It recognized that "neither this, nor anything else in the legislative history . . . signifies that Congress intended to exert anything more than its commerce power over navigation." *SWANCC*, 531 U.S. at 168 n.3. Authority under the Commerce Clause "though broad, is not unlimited." *Id.* at 173. Where an agency's interpretation of a statute "invokes the outer limits of Congress' power," the Court expects "a clear indication that Congress intended that result." *Id.* at 172. The Court found no such clear statement of Congress' intent for the CWA to reach the waters at issue in *SWANCC*. *Id.* at 174.

Thus, *SWANCC* fully rejects Plaintiffs' same argument here that the Agencies must interpret the CWA to the broadest extent that may be constitutionally permissible. *See id.* at 166 (reversing holding that "the CWA reaches as many waters as the Commerce Clause allows"); *id.* at 176-77 (Stevens, J., dissenting) (describing the majority's decision as "invalidat[ing] . . . the Corps' assertion of jurisdiction over all waters except for actually navigable waters, their tributaries, and wetlands adjacent to each"). Denying preliminary injunction, the *California* court

---

regulatory program provisions). These programs collectively pursue the objective of maintaining the integrity of the nation's waters, which the Agencies endorse as the fundamental objective of the Act. States, tribes, and local entities can also exercise programs that further enhance the quality of waters within their borders. *See* RPA Appendix A; EA at 37. And many states do so. *Id.*

similarly recognized that the CWA does not "compel[] the Agencies to extend federal regulation to the broadest permissible extent under the Commerce Clause, in the name of providing *all* of the benefits for water quality the science suggests might be achievable." 2020 WL 3403072, at *7.

Plaintiffs' invocation of the statutory "objective" also discounts statutory language establishing the important role of states for implementing water regulation. *See* 33 U.S.C. § 1251(b) (establishing Congress's policy to "protect the primary responsibilities and rights of States"). Congress thereby recognized that states play a fundamental role in maintaining water quality and implementing the Act. *See, e.g.*, *Rapanos*, 547 U.S. at 755-56 (Scalia, J., plurality) ("[C]lean water is not the *only* purpose of the statute. So is the preservation of primary state responsibility for ordinary land-use decisions."). Yet Plaintiffs dismiss the import of § 1251(b). They contend it merely speaks to states' role in implementing the CWA. Br. at 35-38. That makes no sense. Section 1251(b) not only "recognize[s]" the "rights of States"; it also calls for "preserv[ing], and protect[ing] the . . . rights of States," including "to plan the development and use . . . of land." *Id.* So the NWPR reasonably balances the CWA's statutorily-stated "policy" to preserve traditional state authority with the overall "objective" to address water quality. *See California*, 2020 WL 3403072, at *7 (finding that the NWPR's "different balance between federal and state responsibilities does not mean [the Agencies] have disregarded the primary objective of the statute in an arbitrary or capricious manner that is likely to warrant setting aside the Rule.").

The Agencies' interpretation of "navigable" as a subset of "the Nation's waters" is entirely reasonable (if not required). Plaintiffs cite *Riverside Bayview* for the proposition that "the 1977 CWA amendments 'retain[ed] *the comprehensive jurisdiction over the Nation's waters* exercised in the 1972 [Clean Water] Act.'" Br. at 39 (quoting 474 U.S. at 137). Plaintiffs imply that this broad reading of "the Nation's waters" in § 1251(a) is inconsistent with the NWPR's interpretation

of "navigable waters" defined as "waters of the United States" in § 1362(7). However, the full paragraph in *Riverside Bayview* makes clear that the quote from that case was in the context of the Court's description of Congress's "*debate* on the proposals to narrow the definition of navigable waters." 474 U.S. at 136-37 (emphasis added). Plaintiffs thus misrepresent this as a holding.[5] Similarly, in Plaintiffs' other cited cases, Br. at 39 (citing *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004)[6]; *City of Milwaukee v. Illinois*, 451 U.S. 304, 310-11 (1981)), the Court merely used "the Nation's waters" as shorthand without any analysis.

While courts have not focused on the distinction, Congress's use of the "Nation's waters" must have distinct meaning from "waters of the United States." The CWA defines "navigable waters" as "waters of the United States." 33 U.S.C. § 1362(7). But the Act doesn't define "the Nation's waters." When Congress uses two terms, courts assume that Congress "intended each term to have a particular, nonsuperfluous meaning." *Bailey v. United States*, 516 U.S. 137, 146 (1995). A statute's words must be read in context "and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation omitted). Under this Supreme Court precedent, courts must presume that Congress intended "navigable waters" to have a *different* meaning from "the Nation's waters."

After all, the CWA does far more than provide for federal permitting of discharges of pollutants to the "waters of the United States." *See* 85 Fed. Reg. at 22,253. It provides for technical and financial assistance to states, local governments, interstate agencies, and tribes to address pollution in waters that are *not* federally regulated. *See, e.g.*, 33 U.S.C. § 1255(a)(1) (authorizing

---

[5] *Riverside Bayview*'s only other use of "the Nation's waters" is in quoting the objective of section 101(a). 474 U.S. at 132.

[6] In fact, "the Nation's waters" only appears twice in that opinion—in Plaintiffs' quoted sentence and in quoting the objective of section 101(a). *S. Fla. Water Mgmt. Dist.*, 541 U.S. at 102.

grants to assist with "preventing, reducing, and eliminating the discharge into *any waters* of pollutants . . . .") (emphasis added); *id*. § 1258(a) (authorizing EPA to enter into agreements with states to "eliminate[e] or control . . . pollution, within all or any part of the watersheds of the Great Lakes"); *id*. § 1329(i) (authorizing grants to help states "carry[] out *groundwater* quality protection activities") (emphasis added). Even if the Court does not agree with the Agencies' interpretation that "waters of the United States" is a subset of a larger category of "the Nation's waters," the Court can still reject Plaintiffs' claim because the NWPR is consistent with the CWA's goals.

Plaintiffs attempt to use the general water quality objective of CWA § 1251(a) to override the Agencies' discretion. Courts have rejected such arguments. In *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, for example, the Second Circuit sustained a CWA rule concerning water transfers—even though it may not be "the interpretation best designed to achieve the Act's overall goal of restoring and protecting the quality of the nation's water." 846 F.3d 492, 501 (2d Cir. 2017). It was "an interpretation supported by valid considerations: The Act does not require that water quality be improved whatever the cost or means, and the Rule preserves state authority over many aspects of water regulations." *Id.*; *see also Rodriguez v. United States*, 480 U.S. 522, 525-56 (1987) ("no legislation pursues its purposes at all costs"). Here, too, nothing in the CWA unambiguously precludes the Agencies' interpretation of the CWA set forth in the NWPR.

## II.     The NWPR Is Neither Arbitrary nor Capricious Under the APA.

To change a policy, an agency must merely provide "a satisfactory explanation for its action." *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 513 (2009) (internal quotation marks and citation omitted). This does not require reasons any "more substantial than those required to adopt a policy in the first instance." *Id*. at 514. And an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices

that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.* at 515.

### A.    The Agencies' Decision Was Well-Explained.

The Agencies' more than 1,500 pages of NWPR preamble (from the pre-publication version), programmatic and economic analyses and appendices, and response to comments documents thoroughly explained why "the agenc[ies] believe [the NWPR] to be better" than prior regulations. *Id.* That is all the law requires. The summary of key elements spanned almost 60 pages. 85 Fed. Reg. at 22,273-329. The Agencies further analyzed the legal opinions of numerous courts as to the infirmities of the 2015 Rule, including the decision of the Southern District of Georgia granting summary judgment against the 2015 Rule and remanding it to the Agencies. *E.g.*, *id.* at 22,272. The Agencies also analyzed relevant Supreme Court cases—including how Justice Kennedy's concurring opinion and the plurality opinion in *Rapanos* share commonalities, which the NWPR applied. *E.g.*, *id.* at 22,268. This analysis is further supplemented by almost 400 pages of responses to comments. *See generally* Response to Comments (Topics 1-13) ("RTC").

The Agencies explained that "replacing the multi-factored case-specific significant nexus analysis with categorically jurisdictional and categorically excluded waters in the final rule provides clarifying value for members of the regulated community." *See, e.g.*, 85 Fed. Reg. at 22,270. Plaintiffs imply that "five Justices" "agreed" "with a 'significant nexus'" test. Br. at 4. But that is untrue. As the Agencies explained, *eight* justices actually *rejected* the significant nexus methodology because it was not grounded in the text of the CWA or should not supplant agency rulemaking. *See* Ex. 1 at 60-68. The Agencies "used the Connectivity Report to inform certain aspects of the definition of 'waters of the United States,' but recognize[d] that science cannot dictate where to draw the line between Federal and State Waters." 85 Fed. Reg. at 22,261. And

they thoroughly explained why the "Connectivity Report" and other science did not preclude—but actually supported—the definitions of the rule. *E.g.*, *id.* at 22,288-95.

Plaintiffs say the Agencies "never" explain "their decision to depart from those policy choices" of the 2015 Rule and the Repeal Rule. Br. at 29. This, too, is inaccurate. As with the NWPR, a primary purpose of the 2015 Rule was to "increase CWA program predictability and consistency by clarifying the scope of 'waters of the United States.'" 80 Fed. Reg. at 37,054. To do this, the 2015 Rule relied on one-size-fits-all distance limitations that a court ruled were arbitrary, "improper under Justice Kennedy's test in *Rapanos*," and not supported by science. *Georgia*, 418 F. Supp. 3d at 1367. The Agencies explained their decision to abandon the distance limitations. These included the "difficult[y] to select a boundary that is not arbitrary for a rule that applies to so many diverse situations nationwide," and the "difficult[y] to identify a starting point from which to measure." 85 Fed. Reg. at 22,313-14. And the Agencies explained the preferred policy in the NWPR for a "clear regulatory line," with the "benefit of being less complicated than prior regulatory regimes that required a case-specific significant nexus analysis." *Id*. at 22,288. It is also misleading to say the Agencies "acknowledged the significant nexus test as the applicable standard" when repealing the 2015 Rule. Br. at 32. The Agencies repealed the 2015 Rule because they recognized they had "failed to properly consider or adopt the limits of the significant nexus standard" that the Agencies *claimed applicable* in 2015. 84 Fed. Reg. at 56,640-41.

### B.     The Agencies Explained Their Consideration of Water Quality and Science.

Plaintiffs claim that the Agencies "jettison the science and data underlying past definitions," Br. at 2, by, among other things, not considering the "functional interconnection" of upstream waters on downstream water quality. Br. at 31-33; *id.* at 18-23. This, too, is refuted by the Agencies' administrative record. The Agencies thoroughly reviewed the science, including

their prior scientific findings, and considered impacts on water quality. Notwithstanding that science may inform the Agencies' interpretation, the Agencies recognize that ultimately the definition of "waters of the United States" must be grounded in a legal analysis of the limits on CWA jurisdiction reflected in the statutory text and Supreme Court precedent.

*First*, Plaintiffs say the Agencies did no more than "[m]erely acknowledg[e] a spectrum of connectivity," and did not consider the Rule's potential effects on water quality or the connectivity of upstream waters. Br. at 20. This is untrue. The preamble summarized why the connectivity gradient *supports* the Agencies' treatment of ephemeral streams as excluded. 85 Fed. Reg. at 22,288. The Agencies relied on principles of hydrologic connectivity to develop, among other things, the flow classifications (perennial, intermittent, ephemeral) used in the NWPR, the incorporation of inundation by flooding as a surface water connection establishing jurisdiction for certain waters and wetlands, and the use of the "typical year" concept that relies upon a large body of precipitation and other climatic data to inform what may be in a normal range for a particular geographic region. *E.g.*, *id.* Citing EPA's Science Advisory Board's review of a draft Connectivity Report, the Agencies recognized that, of perennial, intermittent, and ephemeral streams, ephemeral streams have the lowest probability of impacting downstream water quality. *See id.* The Agencies similarly based the definition of "tributary" "upon a reasonable inference of ecologic interconnection" between those tributaries and paragraph (a)(1) waters. *See id.* (citing *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring)). And the definition and categorical jurisdiction of "adjacent wetlands" were informed by the Connectivity Report's finding that "areas that are closer to rivers and streams have a higher probability of being connected than areas farther away." *Id.* at 22,314 (internal quotation marks omitted); *see also* Ex. 1 at 67, 114-15, 137; Ex. 2 at 42.

Thus, Plaintiffs' assertion that the Agencies provided "no substantive discussion of the Science Report" of 2015 (what the Agencies call the Connectivity Report), Br. at 19, is wildly inaccurate. Using what Plaintiffs now call the Science Report, the Agencies accepted and analyzed the aforementioned "connectivity gradient," and potential consequences between perennial, intermittent, and ephemeral streams and downstream waters within a tributary system. 85 Fed. Reg. at 22,288. And the Agencies' extensive record also includes many sections specifically discussing, for example, the "Prior Findings in the Connectivity Report," "Consideration of Forgone Environmental Benefits," the intersection of "Scientific Rationale and Legal Authority," "The Connectivity Report," and "Other Comments on Science." Ex. 1 §§ 1.5.5.3, 1.5.5.7, 1.7; Ex. 3 §§ 13.1.7.1, 13.1.7.2.

Plaintiffs are also wrong to say there is "no substantive discussion" of "water quality." Br. 19. The Response to Comments contains 117 pages of analyses on water quality. *See generally* Ex. 4. That analysis includes numerous discussions directly or cross-referencing such issues, including (but not limited) to § 11.3.3.2 ("Reduction in Jurisdictional Waters"), § 11.3.2.3 ("Concerns with States' Abilities to 'Fill the Gap'"), § 11.3.2.5 ( "Interstate Impacts from the Proposed Rule"), § 11.4 ("CWA Programmatic Analysis"), § 11.6 ("Aquatic Resource Benefits and Ecosystem Services"). *Id.* The Agencies also prepared a 101-page (excluding attachments) Resource and Programmatic Assessment (RPA) "for the final rule [that] describes the agencies' assessment of the potential effects of the revised definition on the federal regulation of aquatic resources across the country, as well as the potential effects of the revised definition on CWA programs and certain other programs under other federal statutes." RPA at 6.

**Second**, Plaintiffs claim that the NWPR "lacks any consistent or scientific principle governing which streams and wetlands are jurisdictional and which are not." Br. at 24. This too is

inaccurate. The Agencies fully and consistently explains their rationale underlying the Rule. Plaintiffs attempt to analogize another agency's unexplained disparate treatment of similar payments in *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996), to the NWPR's definition of "waters of the United States." Br. at 24-25. But this misses the mark.[7] In contrast to *Independent Petroleum*, the Agencies fully explained their rationale for including certain waters within the NWPR's definition of "waters of the United States" and excluding others. Again, on such issues "within [the Agencies'] area of special expertise," "a reviewing court must generally be at its most deferential." *Baltimore Gas*, 462 U.S. at 103.

The Agencies "determined that requiring surface water flow in a typical year from relatively permanent bodies of water to traditional navigable waters and wetlands adjacent to such waters as a core requirement of [jurisdiction] is the most faithful way of interpreting the Federal government's CWA authority over a water." 85 Fed. Reg. at 22,271. Because ephemeral features "only flow during or in immediate response to rainfall," *id.* at 22,274, they are not "relatively permanent bodies of water," *id.* at 22,271; *see also id.* at 22,289. As the Agencies rationally explained, ephemeral streams *are* scientifically different from intermittent or perennial streams. *E.g.*, *id.* at 22,275-76 (describing differences in source of water and duration of flow). This difference includes that ephemerals "flow only in direct response to precipitation." *Id.* at 22,251; *see also id.* at 22,275. The Agencies considered again here the "connectivity gradient," including

---

[7] In *Independent Petroleum*, the court determined that an agency's different treatment of two similar types of payments was impermissible. 92 F.3d at 1258-59. The agency had adopted a standard from a court ruling for one type of payment, while it did not consider that standard to apply to the other type of payment. *Id.* The court concluded that the agency had not given a sufficient reason for treating the two types of payments differently. *Id.* at 1259. Because the rationale of the court-adopted standard applied to both types of payments, "there was no meaningful distinction" between the two and they were "functionally indistinguishable," so the agency's treatment of them must be consistent. *Id.* at 1259-60.

the "decreased 'probability that changes . . . will be transmitted to downstream waters' at flow regimes less than perennial or intermittent." *Id.* at 22,288 (quoting the Draft Connectivity Report). So ephemeral streams "are more appropriately regulated by States and Tribes under their sovereign authorities." *Id.* at 22,287. The Agencies also noted that such "[a] clear regulatory line between jurisdictional and excluded waters has the additional benefit of being less complicated than prior regulatory regimes that required a case-specific significant nexus analysis." *Id.* at 22,288.

Likewise, the NWPR's exclusion of certain wetlands is principled and well-explained as the result of both law and science. "Adjacent wetlands" are included in the definition of "waters of the United States" because they are "'inseparably bound up with the "waters" of the United States.'" *Id.* at 22,308 (quoting *Riverside Bayview*, 474 U.S. at 134). The Agencies noted that "science cannot dictate where to draw the line between Federal and State or tribal waters, as those are legal distinctions that have been established within the overall framework and construct of the CWA." *Id.* Classifying all wetlands as jurisdictional would be inconsistent with the CWA and Supreme Court guidance. *Id.* So would inclusion of isolated wetlands that lack a hydrological surface connection to other jurisdictional waters, or that connect hydrologically only infrequently. *Id.* The NWPR therefore provides objective, categorical tests for adjacency, with improved clarity and ease of administration. *Id.* at 22,307-08.

Both law and science also support the Agencies' principled distinction between natural and artificial barriers separating wetlands from jurisdictional waters. Natural barriers indicate a sufficient connection between jurisdictional water and wetlands, while artificial barriers do not. *Id.* at 22,312-14. The Agencies relied on their scientific record "in establishing that wetlands separated from jurisdictional waters only by a natural berm, bank, dune, or similar natural feature are 'inseparably bound up with' and adjacent to those waters." *Id.* at 22,271. Such natural features

indicate "a sufficient hydrologic surface connection between the jurisdictional water and the wetland," making the wetlands "part of" adjacent jurisdictional waters. *Id.* at 22,280 (quoting *Rapanos* plurality); *Id.* at 22,307, 22,311. The Agencies reasoned that wetlands physically separated from jurisdictional waters by artificial barriers are not similarly linked to jurisdictional waters unless the barrier allows for a direct hydrologic surface connection in a typical year. *Id.* at 22,312-14. Thus, the Agencies' inclusion of wetlands separated by natural barriers and exclusion of wetlands separated by artificial barriers that lack a direct hydrologic surface connection is rational and well-explained.

The Agencies also explained why flooding from a jurisdictional water into a wetland is different from a wetland overtopping and spilling into a jurisdictional water. Wetlands inundated by flooding *from* a jurisdictional water in a typical year "are inseparably bound up with their adjacent jurisdictional waters and are therefore jurisdictional." 85 Fed. Reg. at 22,280 (citing *Rapanos* plurality). In such a case, flooding from the jurisdictional water creates a continuous surface connection between the jurisdictional water and the wetland, rendering the wetland "a part of" the jurisdictional water. *Id.* at 22,310 (internal quotation marks and citation omitted). As the Agencies explained, flooding from a wetland *to* a jurisdictional water is not such an extension of jurisdictional waters. It is more akin to diffuse stormwater run-off or directional sheet flow over upland—so does not render the wetland jurisdictional. *Id.*

The Agencies also explained the inclusion of abutting wetlands, which touch a jurisdictional water at least at one point or side, 85 Fed. Reg. at 22,315, as categorically jurisdictional while requiring a regular surface water connection (or evidence of a regular surface water connection in the case of a natural barrier) for non-abutting wetlands. *See*, *e.g.*, *id.* at 22,279 (noting inclusion of abutting wetlands and "other wetlands that are inseparably bound up with

jurisdictional waters," and reliance "on certain regular hydrologic surface connections to establish jurisdiction" of non-abutting wetlands); *id.* at 22,279-80 (discussing *Rapanos* plurality and *Riverside Bayview*). The term "abut" "clearly identif[ies] those waters that are inseparably bound up with other jurisdictional waters." *Id.* at 22,307. The Agencies reasoned that wetlands that abut jurisdictional waters are "in such close proximity to jurisdictional waters that they are considered categorically jurisdictional under the CWA." *Id.* at 22,309. The Agencies explained that a surface water connection is not required for abutting wetlands, unlike the other categories of adjacent wetlands, "as not all abutting wetlands display surface water as the wetland hydrology factor but rather may have saturated soils, a high water table, or other indicators of hydrology." *Id.*

**Third**, Plaintiffs wrongly suggest that determining the CWA's jurisdictional reach must be solely "driven by science," Br. at 31-33, such that the Agencies acted improperly by considering factors in addition to scientific considerations. Yet the Supreme Court rejected this position long ago. *SWANCC*, 531 U.S. at 168 (concluding "the text of the statute will not allow" that "the jurisdiction of the Corps extends to ponds that are *not* adjacent to open water") (emphasis added). In fact, the Agencies have long stated that science alone cannot dictate the CWA's line between federal and state waters. *See, e.g.*, 80 Fed. Reg. at 37,055. The 2015 Rule "interpretation [wa]s based not only on legal precedent and the best available peer-reviewed science, but also on the agencies' technical expertise and extensive experience in implementing the CWA over the past four decades." *Id*. EPA's Science Advisory Board similarly stressed in 2015: "'significant nexus' is a legal term, not a scientific one." *Id*. at 37,065. So "science does not provide a precise point along the continuum at which waters provide only speculative or insubstantial functions to downstream waters." *Id*. at 37,090.

In the NWPR, the Agencies once again correctly explained that the contours of CWA jurisdiction require a balancing of various factors and evidence, including both legal and scientific considerations. *E.g.*, 85 Fed. Reg. at 22,288. These include the statutory limits on the Agencies' legal authority (including the CWA text and structure), *e.g.*, *id.* at 22,283-89, what would sufficiently embody the statutory link to what is "navigable," and what would give due deference and respect for state authority. *See, e.g.*, *id.* at 22,270; Ex. 1 at 64-68, 114-15. After considering these factors, the Agencies determined that ephemeral streams "are more appropriately regulated by States and Tribes under their sovereign authorities." *Id.* at 22,287.

Ironically, Plaintiffs claim that "[t]he agencies admit that lost protections from these waters will cause many harms." Br. at 9 & 22 (citing Economic Analysis ("EA") at 105-06). Ironic, for this not only undermines Plaintiffs' other (inaccurate) assertion that the Agencies failed to consider harms, it also mischaracterizes the findings of the EA. To be sure, the Agencies assessed the potential impacts of the NWPR on "stream flows, water quality, drinking water treatment, endangered and threatened species habitats, and other ecosystems services." EA at xviii. But Plaintiffs fail to tell the Court that the analysis ultimately found that the public *benefits* of the NWPR will outweigh such impacts. For example, the NWPR's regulatory regime will lead to fewer transaction costs, fewer consultants, and reduced federal permitting costs, thereby providing a significant public benefit with potentially comparable environmental protection together with the protective state regulatory regimes. *See, e.g.*, *id.* at xi-xxiii, 1-2; 85 Fed. Reg. at 22,270 (explaining why "the final rule will be clearer than either the 2015 Rule or the pre-existing regulatory regime restored by the 2019 Rule"); *id.* at 22,273 ("This final rule establishes categorical bright lines to improve clarity and predictability for regulators and the regulated community."). So even when making the most cautious assumptions in the economic forecast, the improved clarity and

consistency of the NWPR and its reduced federal permitting and transaction costs outweigh any alleged foregone benefits. EA at xviii.

*Fourth*, Plaintiffs' hyberbolic claim that "millions" of stream miles and wetlands will no longer be protected is similarly unfounded. Br. at 1, 9. Plaintiffs rely on data from the National Hydrography Dataset ("NHD") and the National Wetlands Inventory ("NWI") in an attempt to support these allegations. *E.g., id.* at 9 & n.14. However, the expert analysis of the Agencies (owed great deference by courts, *Baltimore Gas*, 462 U.S. at 103) explains that there are critical technical deficiencies that cannot be resolved within these datasets. For example, the NHD does not differentiate between intermittent or ephemeral flows in most parts of the country. Additionally, the NWI uses a different definition of "wetlands" than the Agencies' longstanding (and unchanged) regulatory definition of the term. The NHD and NWI thus cannot indicate the scope of CWA jurisdiction and must not be misused for that purpose. RPA at 34-35. In fact, former EPA Administrator McCarthy (for President Obama) even testified to Congress that the maps Plaintiffs rely upon are "not used to determine jurisdiction and not intended to be used for jurisdiction," "are not relevant to the jurisdiction of the 'waters of the U.S.," and "are not consistent with how we look at the jurisdiction of the [CWA]." 85 Fed. Reg. at 22,330.

This well-supported balance of relevant considerations is neither arbitrary nor capricious. Science does not and cannot offer a precise answer to the question of what constitutes a water of the United States. *See id.* at 22,262-71 (discussing *SWANCC* and *Rapanos*). As the *California* court found in declining to preliminarily enjoin the NWPR, the CWA does not "compel[] the Agencies to extend federal regulation to the broadest permissible extent under the Commerce Clause, in the name of providing *all* of the benefits for water quality the science suggests might be achievable." *California*, 2020 WL 3403072, at *7. But in any event, as explained above, Plaintiffs'

wild and inaccurate claims that "science," the "Science Advisory Board," the "Connectivity Report" and the like were ignored or disregarded by the Agencies is flatly refuted by the record.

### C.     The NWPR Provides Regulatory Certainty.

Plaintiffs assume that the NWPR is "confusing and complex," with "no underlying principle to guide agency discretion." Br. at 26-27. Here, again, Plaintiffs are wrong. There can be no serious dispute that, by defining clear categories of jurisdictional waters, the NWPR provides greater regulatory certainty, especially as compared to prior regulatory regimes relying on case-by-case significant nexus assessments of jurisdiction.[8] 85 Fed. Reg. at 22,270-71, 22,288; *see Hawkes*, 136 S. Ct. at 1811-12 (noting the definition of "waters of the United States" in use at that time and describing the often case-specific process of determining whether a property contains jurisdictional waters); 85 Fed. Reg. 22,273 ("[T]he meaning of the phrase 'waters of the United States' has been mired in confusion for decades."). The administrative record addresses the NWPR's provision of greater regulatory certainty in depth. *See, e.g.*, 85 Fed. Reg. at 22,256, 22,270-74, 22,312, 22,314, 22,317-19, 22,325, 22,331; Ex. 1 at 8, 36, 38, 67-68, 79, 110, 118-19, 155-56; Ex. 5 at 17-18, 29-30, 33, 34-35; Ex. 2 at 39-40.

For example, the Agencies provide detailed descriptions of methods and tools the public and agencies can use to help determine whether a feature meets the NWPR's definition of "tributary." Many of these are publicly available, so that landowners "can make an informed decision about how to proceed with requests for jurisdictional determinations or authorization for activities under the CWA." 85 Fed. Reg. at 22,292. The Agencies note there are numerous cases where a landowner's informed decision could avoid unnecessary jurisdictional determination

---

[8] Contrary to Plaintiffs' implication, Br. at 26, while the Rule "is intended" to provide regulatory clarity and predictability, *id.* at 22,325, 22,252, clarity "is not the fundamental basis for the [NWPR]." Ex. 1 at 68; *see* 85 Fed. Reg. at 22,252.

requests, and provide examples where features would clearly be outside of federal jurisdiction. *Id.*; *see also* Ex. 6 at 3 (stating that the Agencies "will provide a publicly-available tool on their websites for calculating normal precipitation and climatic conditions," and that "landowners will often have sufficient knowledge to understand how water moves throughout their properties"). But contrary to Plaintiffs' suggestion that landowners may unwittingly be led into an "enforcement action," Br. at 27, the Agencies appropriately caution that where a landowner decides *not* to "request a jurisdictional determination and discharges pollutants into a waterbody that is, in fact, jurisdictional without required permits, the individual could be subject to the agencies' enforcement authorities under the CWA." 85 Fed. Reg. at 22,292.

Plaintiffs claim confusion concerning the "typical year" definition because it provides some flexibility when choosing a relevant time period to evaluate (*e.g.*, seasonally, annually). Br. at 26-27. But they fail to acknowledge that the Agencies were not required "to promulgate regulations that, either by default rule or by specification, address every conceivable question." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96 (1995); *All. for Nat. Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 134 (D.D.C. 2011) ("[I]t is not the Court's role to dictate what level of specificity is appropriate. When Congress has not specified the level of specificity expected of the agency, . . . the agency is entitled to broad deference in picking the suitable level."). Thus, the fact that the NWPR's "typical year" definition may be "variable" in some cases, Br. at 27, is not an arbitrary flaw of the Rule.[9]

_____

[9] Plaintiffs' argument here is also in tension with their claims elsewhere that the NWPR's sweeping categories disregard distinctions between waters. *E.g.*, Br. at 24. The "typical year" concept is a mechanism to rationally allow for variation given regional differences and site-specific characteristics. *See* 85 Fed. Reg. at 22,292; Ex. 6 at 2.

Indeed, the Agencies thoroughly explained how a typical year analysis would be conducted. The Agencies explained that the intent of analyzing a "typical year" is to "evaluate the flow regime of a stream and the connectedness of a wetland within the context of what is typical for that water or wetland to avoid making erroneous jurisdictional determinations at times that may be too wet or too dry to be considered 'normal.'" 85 Fed. Reg. at 22,271. A 30-year rolling average was adopted to ensure consistent application, *id.* at 22,274-75, while accounting for variability over time as well as climate change. *See* Ex. 6 at 11.  And a method to determine whether water features are assessed during normal precipitation conditions is explained in detail.[10] 85 Fed. Reg. at 22,274-75. While the Agencies "will generally use this method to implement [the NWPR]," the Agencies stated that they will make adjustments to their approach as may be scientifically warranted, and may also consider "alternative methods that are developed and appropriately validated." *Id.*; *see also* Ex. 6 at 5-6. The Agencies also described how they use professional judgment and a weight of the evidence approach in considering precipitation data along with other data sources. 85 Fed. Reg. at 22,275.

Flexibility in the application of the "typical year" definition is necessary given the nationwide scope of the phrase "waters of the United States." That phrase is equally applicable to waters as diverse as South Carolina swamps, Rocky Mountain snowpack-fed streams, and the mighty Mississippi. And the relevant factors to be considered and available information may vary for different waters, different parts of the country, or over time. *See id.* at 22,274 (noting that the

---

[10] Specifically, the Agencies use data from NOAA's Global Historic Climatology Network, "which integrates climate data from over 20 sources." *Id.* at 22,274. They "evaluate normal precipitation conditions based on the three 30-day periods preceding the observation date. For each period, a weighted condition value is assigned by determining whether the 30-day precipitation total falls within, above, or below the 70th and 30th percentiles for totals from the same date range over the preceding 30 years." *Id.* The Agencies "make a determination of 'normal,' 'wetter than normal,' or 'drier than normal' based on the condition value sum." *Id.*

Agencies modified the definition of "typical year" from the proposal to "expressly include other climatic variables in addition to precipitation" and to signal that "the normal periodic range . . . need not be based on a calendar year"); *id.* at 22,294-95 (recognizing "the need to consider seasonality and the timing of tributary flows" and describing considerations in evaluating an intermittent tributary that only flows during seasonally wet conditions); Ex. 6 at 2, 5, 9-10. Providing flexibility in the precise method of measuring a "typical year" allows for consideration and use of "the best available data and information, which provides the most accurate and reliable representative information" for a given waterbody. 85 Fed. Reg. at 22,275. It does not render the NWPR arbitrary and capricious.

### D.    The Agencies Addressed Any Reliance Interests.

Plaintiffs claim "reliance" interests on behalf of members who "have bought homes and made their livings based upon decades of federal protections for clean water." Br. at 23. They have failed to establish the existence of any justifiable, detrimental reliance dependent on the "significant nexus" regime never changing. Regardless, that Agencies thoroughly and appropriately responded to reliance interests.

As an initial matter, third-party "reliance" does not preclude Agencies from changing their policies or interpretations of the law. If a "prior policy has engendered serious reliance interests," an agency may not ignore them, but must only provide a reasoned explanation for its change in policy. *Fox*, 556 U.S. at 515. Here, the Agencies did respond to and address alleged reliance interests. *See*, *e.g.*, Ex. 1 at 29. And they provided a thorough and reasoned explanation for the changed definition, as discussed above. This is all the law required to address any "reliance" concerns. *Fox*, *supra*.

Plaintiffs' citation to *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020), is thus misplaced. There, the DHS argued that it "did not need to" consider reliance interests with respect to an agency policy decision, and the Supreme Court faulted the agency for wholly failing to address that factor. *Id.* Here, in contrast, the Agencies provided exactly the reasoned explanation that was held lacking in *Regents*. *See*, *e.g.*, 85 Fed. Reg. at 22,331-34; RPA at 6-8; Ex. 1 at 27-30.

Regardless, Plaintiffs cannot credibly claim justified, detrimental reliance. As the Northern District of California recognized when denying preliminary injunction, "given the long uncertainty about the permissible scope of federal regulation under the CWA, it is difficult to see how significant cognizable reliance interests would have arisen." *California*, 2020 WL 3403072, at *8. At its inception, Justice Kennedy specifically offered the significant nexus standard only "[a]bsent more specific regulations" and "to avoid unreasonable applications of the statute." *Rapanos*, 547 U.S. at 782; *see also id.* at 811 (Breyer, J., dissenting) (the Agencies "may write regulations defining the term—something that [they have] not yet done."); *id.* at 758 (Roberts, C.J., concurring) (admonishing the failure to exercise the Agencies' "delegated rulemaking authority" under the Clean Water Act). The Agencies have since struggled to provide clarity through various guidance and regulatory changes for decades. *See, e.g., In re EPA & DOD Final Rule*, 803 F.3d at 808 (staying the 2015 Rule as likely unlawful). And the public has been specifically on notice that the Administration intended to replace the 2015 Rule for over three years. *See* Executive Order 13778 (Feb. 28, 2017); 82 Fed. Reg. 34,899 (July 27, 2017); 84 Fed. Reg. 4154 (Feb. 14, 2019). Plaintiffs cannot claim justifiable reliance in a permanent continuation of the prior, highly criticized regulatory regime.

### E.     The NWPR's Waste Treatment System Exclusion Is Lawful and Reasonable.

There is no merit to Plaintiffs' argument (Br. at 12-17) that the waste treatment system exclusion, and in particular the exclusion's application to "cooling ponds," creates a new and inappropriate exemption. Waste treatment systems have been excluded from the definition of "waters of the United States" for 40 years. Cooling ponds similarly have been eligible for that exclusion since 1980. As the Fourth Circuit has found, the exclusion fits well within the Agencies' authority to interpret the ambiguous term "waters of the United States." *See Ohio Valley*, 556 F.3d at 209-16. Here, the NWPR's waste treatment system exclusion largely "[c]ontinu[ed] the agencies' longstanding practice." 85 Fed. Reg. at 22,324. The few clarifying changes to the exclusion are reasonable and were fully explained. *See id.* at 22,324-28; Ex. 7 § 10.9.

Although the Agencies provided complete responses to all public comments received on these issues, Plaintiffs raise concerns that neither they nor anyone else raised in comments. They challenge *application* of the exclusion to five specific bodies of water. Plaintiffs' failure to comment on these five water bodies waived such arguments now. Regardless, these speculative arguments, at most, go to hypothetical implementation issues that are causing no injury now and are not properly raised in Plaintiffs' current facial challenge to the NWPR.

### 1.     The waste treatment system exclusion (including its potential application to cooling ponds) is longstanding.

Plaintiffs admit the waste treatment system exclusion has been part of the regulatory definition of "waters of the United States" since 1979. *See* 44 Fed. Reg. 32,854, 32,901 (June 7, 1979) (providing that "waste treatment systems" other than certain cooling ponds "are not waters of the United States"). Plaintiffs suggest, however, that application of the waste treatment system exclusion to cooling ponds in the NWPR is new. Br. at 12-13. That is incorrect.

In the 1980 revisions to the "waters of the United States" definition, EPA clarified that the exclusion *could* apply to cooling ponds *other* than a specific subset cross-referenced in then-existing 40 C.F.R. § 423.11(m). *See* 45 Fed. Reg. 33,290, 33,298 (May 19, 1980). EPA explained that only "*certain* cooling ponds fall outside the exemption," and "EPA has referred to the definition of cooling ponds in 40 C.F.R. § 423.11(m) to indicate the *type* of cooling ponds intended." *Id.* at 33,298 (emphasis added).[11] The waste treatment system exclusion was further broadened later in 1980 to make clear that it applied to both natural and manmade systems.[12]

When EPA's steam electric effluent limitations guidelines were revised, the definition of "cooling ponds" previously set forth in 40 C.F.R. § 423.11(m) was removed. *See* 47 Fed. Reg. 52,290, 52,304-05 (Nov. 19, 1982). This created ambiguity for application of the waste treatment system exclusion, which cross-referenced that now-obsolete provision. EPA thus clarified decades ago that "given the deletion of the steam electric cooling pond definition," the exclusion can be interpreted "as encompassing all steam electric cooling ponds." EPA, "Waters of the United States" Determination for Proposed Cooling Pond Site in Polk County, Florida (Dec. 13, 1993), at 4-5, *available at* https://www3.epa.gov/npdes/pubs/owm0099.pdf. EPA made clear that the cross-reference was obsolete and applied to a null set. EPA's guidance nevertheless applied the regulations to grant EPA regions discretion to determine the jurisdictional status of a cooling pond

---

[11] Cooling ponds included "any manmade water impoundment which does not impede the flow of a navigable stream and which is used to remove waste heat from heated condenser water prior to returning the recirculated cooling water to the main condenser." 40 C.F.R. § 423.11(m) (1980).

[12] The original 1980 rule had explained that only "manmade" waste treatment systems were excluded. *See* 45 Fed. Reg. at 33,298. However, later that same year, EPA explained it was "suspending" the limitation to address longstanding practices under which EPA had exempted "discharges into existing waste treatment systems." 45 Fed. Reg. 48,620 (July 21, 1980). Although EPA stated its intention to initiate a new rulemaking to further consider these issues, that never occurred. *See Ohio Valley*, 556 F.3d at 212-14 (recounting this history).

on a case-by-case basis in individual NPDES permit proceedings. *Id*. Notably, this longstanding, case-specific approach to cooling pond determinations is consistent with *Ohio Valley*. The Fourth Circuit there recognized the Agencies' discretion to resolve any ambiguities in the waste treatment system exclusion on a case-specific, as-applied basis. *See Ohio Valley*, 556 F.3d at 213-14.

The waste treatment system exclusion remained substantively unchanged as the "waters of the United States" definition was revised in 1986, 1988, and 2015. In fact, prior to the NWPR, the only change involved deletion of the obsolete cross-reference to 40 C.F.R. § 423.11(m) in the 2015 Rule.[13] The cross-reference reappeared in the C.F.R., however, due to the Repeal Rule, which re-codified the 1986 Regulations' definition word-for-word in repealing the 2015 Rule. *See* 84 Fed. Reg. at 56,626, 56,667.

Accordingly, at the time the NWPR was issued: (1) the waste treatment system exclusion had continued as part of the Agencies' regulations since 1979 and its application had been upheld by the Fourth Circuit in 2009; (2) cooling ponds other than those specifically cross-referenced in the old 40 C.F.R. § 423.11(m) had been eligible for the waste treatment system exclusion since 1980; (3) after the definition of "cooling ponds" in section 423.11(m) was eliminated in 1982, the exclusion could apply to any cooling pond, as determined on a case-specific basis; and (4) the 2015 Rule recognized and did not change this longstanding application of the waste treatment system exclusion to cooling ponds. Though this regulatory history is complex, the Agencies' decision to continue these longstanding policies in the NWPR—and to make limited, clarifying changes to the exclusion's regulatory text—was eminently reasonable and well explained.

---

[13] *See* 80 Fed. Reg. 37054, 37,099, 37,107 (June 29, 2015) (deleting obsolete cross-reference from 2015 Rule but stating the intention to leave the exclusion substantively unchanged); *see also* 51 Fed. Reg. 41,206, 41,250 (Nov. 13, 1986); 53 Fed. Reg. 20,764, 20,774 (June 6, 1988) (mistakenly retaining the obsolete cross-reference in 1986 and 1988 rules).

### 2. The Agencies provided ample notice and reasonably responded to the limited comments on these issues.

The NWPR proposal gave the public ample notice of the clarifying—but substantively marginal—changes the Agencies intended to make to the waste treatment system exclusion. But no comment raised the specific objections now raised by Plaintiffs. As such, Plaintiffs waived any such objections to the NWPR as now finalized and cannot maintain them here. *See, e.g.*, *1000 Friends of Md. v. Browner*, 265 F.3d 216, 227-28 (4th Cir. 2001).

The NWPR proposal explained that the regulatory definition of "waters of the United States" excluded waste treatment systems since 1979. *See* 84 Fed. Reg. 4154, 4190, 4193 (Feb. 14, 2019). To foster additional clarity in the application of the exclusion, the Agencies then proposed to incorporate a specific regulatory definition of "waste treatment system," as well as certain other changes. *Id*. at 4155, 4158, 4161. The new definition proposed to expressly include the longstanding application of the exclusion to "cooling ponds." *Id*. at 4190, 4193. The Agencies explained that, consistent with their prior practice, the exclusion would apply to discharges *into* the "waste treatment system," but any discharges *from* the system into a water of the United States would require a CWA permit. *Id*. at 4193. The Agencies also proposed to make the "ministerial" revision of deleting the long obsolete cross-reference to Section 423.11(m). *Id*. at 4193.

Many public comments on the waste treatment system exclusion supported continuing its application to cooling ponds. Other commenters advocated for certain expansions of the exclusion. *See, e.g.*, Hunton Andrews Kurth Comments Submitted on Behalf of Utility Water Act Group (April 15, 2019), at 50-63. Some environmental groups opposed continuation of the exclusion. *See, e.g.*, Waterkeeper Alliance Comments, at 90-98 ("Waterkeeper Comments") (April 15, 2019). However, these comments were general in nature; none focused in any detail on cooling ponds in

particular.[14] And the Agencies have not located *any* public comments concerning application of the waste treatment system exclusion to the five specific bodies of water cited in Plaintiffs' summary judgment motion. *See* Br. at 14.

In the NWPR, the Agencies received comments on both sides of this issue. The Agencies stated that they "disagree with suggestions to expand or eliminate the exclusion and have finalized the definition as proposed." 85 Fed. Reg. at 22,325. The Agencies explained they merely "codif[ied] the longstanding exclusion that was first included in regulation in 1979." *Id*. The Agencies further explained that, consistent with prior rules, the exclusion would apply to cooling ponds created before the CWA and cooling ponds created pursuant to CWA Section 404 permits. *Id.* at 22,328. But discharges from such systems (to downstream jurisdictional waters) continue to be subject to CWA Section 402 discharge permits. *Id.* A demonstrative illustration of such a system (in the mining context) is shown.[15]



---

[14] For example, two lead Plaintiffs in this case—National Wildlife Federation and American Rivers—devoted one *four-sentence* paragraph of their 120-page comment to the waste treatment system exclusion. *See* Comment submitted by Jan Goldman-Carter, Senior Counsel, Wetlands and Water Resources, National Wildlife Federation, at 58 (April 15, 2019). That paragraph did not mention cooling ponds at all. The 120-page comments submitted by Waterkeeper Alliance did mention cooling ponds, but only briefly and in passing. Waterkeeper Comments at 90.

[15] The diagram reproduced here was provided for illustrative purposes in the Agencies' brief in litigation involving the 2015 Rule. *See* Fed. Defs.' Reply in Support of Cross-Mot. for Summ. J., *Puget Soundkeeper Alliance v. Wheeler*, No. 2:15-cv-01342-JCC, at 2 (W.D. Wash., filed June 28, 2019); *see also Puget Soundkeeper*, 2019 WL 6310562 (dismissing case on standing grounds).

The Agencies further addressed comments on the waste treatment system exclusion in the longer response to comments document. *See* Ex. 7 at 58 (the Agencies' RTC was divided into 13 separate topical volumes, with one entire volume addressing exclusions). The Agencies disagreed with comments stating that the exclusion was "unlawful" or "contravenes Congress' intent or violates the plain language of the Act." *Id.* They explained, citing the Fourth Circuit's decision in *Ohio Valley*, that the waste treatment system exclusion falls squarely within their authority to define the ambiguous term "waters of the United States." *Id.* They also stressed that the exclusion does not free a discharger from the need to comply with the CWA for pollutants discharged from a waste treatment system to a water of the United States. *Id.* Instead, "only discharges *into* the waste treatment system are excluded from the Act's requirements." *Id.* And as to cooling ponds, the Agencies confirmed the "ministerial change" of deleting the long-obsolete cross-reference to 40 C.F.R. § 423.11(m). *Id.*; *see also* 85 Fed. Reg. at 22,325 & n.58.

### 3.    The exclusion is consistent with the CWA.

In arguing that the waste treatment system exclusion is unlawful, Br. at 16-17, Plaintiffs' arguments once again ignore critical case law. In *Ohio Valley*, the Fourth Circuit rejected a similar challenge to the Corps' application of the waste treatment system exclusion to certain mining projects. The court of appeals first noted that Congress chose to define "navigable waters" as "waters of the United States," a term that is "sufficiently ambiguous to constitute an implied delegation of authority to the Corps" to determine its scope. *Ohio Valley*, 556 F.3d at 212 (quoting *United States v. Deaton*, 332 F.3d 698, 709 (4th Cir. 2003)). The court went on to hold that the Corps acted lawfully and consistently with the CWA in finding that "stream segments, together with the sediment ponds to which they connect, are unitary 'waste treatment systems,' not 'waters of the United States.'" 556 F.3d at 209. The court found the challenged application of the waste

treatment system exclusion to be reasonable. It noted the "statutory tightrope" the Agencies must walk in balancing the pure environmental objectives of the CWA with the practical requirements for development of effective waste treatment systems. *Id.* at 216. The Fourth Circuit's analysis of these issues is controlling here. It fully supports the legality of the NWPR's formalization and clarification of the waste treatment system exclusion.

Moreover, Plaintiffs grossly distort the application of the exclusion. As the Agencies emphasized, the exclusion applies "only to waste treatment systems constructed in accordance with the requirements of the CWA and to all waste treatment systems constructed prior to the 1972 CWA amendments." 85 Fed. Reg. at 22,325; *see also* Ex. 7 at 58. And, as recognized in *Ohio Valley*, waste treatment systems are a necessary part of responsible strategies to *prevent* pollution. In short, the waste treatment system exclusion is not, as Plaintiffs suggest, an unjustified loophole that will simply serve to "open up" America's waters in a wholesale fashion to "toxic pollution and other degradation." Br. at 2. Instead, waste treatment systems—which often require a CWA § 404 permit to create, and then a CWA § 402 permit to discharge from, *see* Ex. A—have long served as part of the Agencies' reasonable and lawful approach to facilitating responsible pollution control strategies. The NWPR's addition of a definition of "waste treatment system" in the rule to clarify the scope of the exclusion was appropriate.

### 4.     Potential application of the exclusion to any particular water body is not properly before the Court in this action.

Much of Plaintiffs' challenge to the waste treatment system exclusion focuses on its potential application to five specific water bodies: Lake Keowee and Lake Monticello Reservoir in South Carolina, Hyco Lake and Sutton Lake in North Carolina, and Woods Reservoir in Tennessee. Br. at 14-15. Although Plaintiffs' arguments are vague, they appear to be concerned that, while these and similar water bodies currently are subject to CWA regulation, utilities *might*

now argue that they are excluded "cooling ponds." To begin with, neither Plaintiffs nor any other party discussed any of these five water bodies in their rulemaking comments. Accordingly, any argument as to application of the waste treatment system exclusion to specific water bodies (either in their own right, or as illustrative of allegedly broader flaws in the rule) is waived. *See, e.g., 1000 Friends*, 265 F.3d at 227-28.

Even if this were not the case, however, this is not the time or place for such speculative concerns to be adjudicated. As Plaintiffs themselves acknowledge, Br. at 15, the Agencies made clear in the NWPR that they "are not changing the longstanding approach to implementing the waste treatment system exclusion." 85 Fed. Reg. at 22,328. As a result, the Agencies will continue to evaluate the application of the exclusion on a case-by-case basis. Especially in the absence of public comments advocating a different approach, continuing this implementation policy clearly was a reasonable exercise of discretion. *See SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) (choice between rulemaking and adjudication is one that lies primarily in the informed discretion of the administrative agency). Should parties actually seek revisions to any NPDES permits in the future based on application of the waste treatment system exclusion, Plaintiffs and any other members of the public will have the right to participate in that process and seek judicial review if necessary. In that context, the reviewing court would have the benefit of a specific agency determination and administrative record tailored to the particular water body at issue, rather than the sheer extra-record speculation presented by Plaintiffs here.[16]

---

[16] The Court should not even consider Plaintiffs' extra-record filings attached to their summary judgment motion. *See, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). But even if the Court does consider them, they only underscore the speculative nature of Plaintiffs' claims. For example, Plaintiffs' argument is in part premised on a Duke Energy state regulatory filing concerning the Roxboro Power Plant that pre-dated the

The only cooling pond issues properly before the Court are those that were raised in the rulemaking process, i.e., the general question of whether it was appropriate to continue to include cooling ponds as a type of water potentially eligible for the waste treatment system exclusion. "To prevail in such a facial challenge," plaintiffs "'must establish that no set of circumstances exists under which the [regulation] would be valid.'" *Reno v. Flores*, 507 U.S. 292, 300-01 (1993) (citation omitted); *see also, e.g.*, *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1293, 1301 (10th Cir. 1999). Plaintiffs fail to meet that high burden, especially in light of *Ohio Valley*. As discussed above, the Agencies fully and reasonably articulated the basis for formally updating their regulations regarding the waste treatment system exclusion.

## III.    The Court Lacks Jurisdiction over Plaintiffs' Challenge to the NWPR.

Plaintiffs claim Article III standing (a) in their own right and (b) as representatives of their organizational members ("representational standing"). Br. at 39, 44. But Plaintiffs fail to prove "(1) [they] ha[ve] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant"—which is, here, the incremental changes to CWA jurisdiction as a result of the NWPR—and "(3) it is likely, as opposed to merely speculative, that the injury will be addressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) ("*Laidlaw*"); *Baehr v. Creaig Northrop Team*, 953 F.3d 244, 252 (4th Cir. 2020). Where, as here, Plaintiffs are not the object of the challenged rule, "standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan v. Defenders of*

---

rule by over a year, and nowhere mentions the rule or the rule's waste treatment system exclusion. *See, e.g.*, Br. at 15 & Ex. 56. In fact, as Plaintiffs themselves should be aware, discharges from the Roxboro Power Plant to Hyco Lake have been, and continue to be, subject to a state-issued CWA Section 402 permit. *See* Br., Ex. 55 (May 29, 2020 NPDES permit granted by State of North Carolina to Duke Energy covering discharges to Hyco Lake).

*Wildlife*, 504 U.S. 555, 562 (1992) (citations and internal quotation marks omitted). The relevant inquiry is not injury to the environment *somewhere*, but concrete injury to the *plaintiff*. *Laidlaw*, 528 U.S. at 181. Because Plaintiffs allege merely hypothetical injuries that might come to pass—and fail to prove any particular injury to specific water or wetlands that they are using that are or will imminently be polluted without the need for a federal permit because of the NWPR—Plaintiffs lack standing, this Court lacks jurisdiction, and the Agencies should receive summary judgment.

"Some statutes permit broad regulations to serve as the 'agency action,' and thus to be the object of judicial review directly, even before the concrete effects normally required for APA review are felt." *Lujan*, 504 U.S. at 891. But the Supreme Court held a regulation defining "waters of the United States" is not covered by such a provision of the CWA. *Nat'l Ass'n of Mfrs. v. DOD*, 138 S. Ct. 617, 624 (2018). "Absent such a provision, however, a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

Plaintiffs fail to identify particular "concrete action applying the regulations" to harm them. *Id.* They assert that their members recreate in or along waters, operate businesses relying on waters, and/or rely on water for drinking purposes, and that those interests will be adversely affected by the NWPR. Br. at 41-43. But just saying they generically use waters is not enough. Plaintiffs must point to "concrete" or "particularized" injuries—*caused specifically by the mere promulgation of the NWPR and attributable specifically to a regulatory change the NWPR makes*—that are "certainly impending." *Nat'l Wildlife Fed'n*, 497 U.S. at 889 (rejecting "averments which state only that one of respondent's members uses unspecified portions of an immense tract of territory,

on some portion of which mining activity has occurred or probably will occur by virtue of the government action"). They have not pointed to any third-parties discharging or about to discharge pollutants into waters or wetlands that they personally use and affect them, but that are no longer regulated, because of the incremental changes to CWA jurisdiction made under the NWPR.

To meet this burden, Plaintiffs must do more than point to waters and claim the regulatory treatment is different under the NWPR compared to the 1986 Regulations or 2015 Rule. Plaintiffs must still show a "concrete" and "certainly impending" injury *to them personally and directly* that would result from any differences. *See Puget Soundkeeper*, 2019 WL 6310562 at *7, n.8 (finding organization lacked standing to challenge waste treatment system exclusion in 2015 Rule where organization's member had not identified "any project, proposed or existing, that is causing or will soon cause the harms he is concerned about"). This is fatal to Plaintiffs' standing and this Court's jurisdiction. For an organization only "has standing to bring suit on behalf of members when its members would otherwise have standing to sue in their own right." *Laidlaw*, 528 U.S. at 181.

Plaintiffs also fail to prove they, as organizations, have suffered or will suffer such injury. Plaintiffs claim the incremental changes of the NWPR "deprive Plaintiffs of information about, and an opportunity to comment on, projects impacting newly non-jurisdictional waters," and "force" them to expend resources to advocate at state and local levels, monitor waterbodies, and clean up polluted waters. Br. at 44-45. But such "a bare procedural violation, divorced from any concrete harm," cannot satisfy the injury in fact requirement. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016)(citing *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1151 (2009)). "The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *Ass'n for Retarded Citizens of Dallas v. Dallas Cty. Mental Health & Mental*

*Retardation Center Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994). And an impact upon an organization's advocacy or educational initiatives does not constitute injury in fact. *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). *See also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011).

In any case, Plaintiffs' allegations of informational impacts and anticipated responses to the NWPR are hypothetical. They do not constitute "certainly impending" injury. The Agencies should receive summary judgment for Plaintiffs' lack of standing and Article III jurisdiction.

## IV.    The Court Should Defer Ruling on a Remedy Until After Deciding the Cross-Motions for Summary Judgment.

If the Court perceives an APA violation, rather than set aside the entire NWPR, a court must impose a "less drastic remedy," for example "partial" vacatur of individual provisions, if "sufficient to redress respondents' injury." *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). Because remedy issues are complex—and the implications for setting aside a nationwide rule with net public benefits like the NWPR significant—the Agencies request further detailed briefing to the Court on any issues of remedy that may arise. A blanket, nationwide vacatur or injunction against the NWPR would be improper.

Without detailed briefing of the implications of the request, Plaintiffs generically ask the court to "vacate the Replacement Rule." Br. at 45. But courts should not simply vacate agency regulations as a matter of course. *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (deciding whether to vacate or remand without vacatur based on seriousness of agency action's deficiencies and vacatur's disruptiveness). A remedy must impact no more than the specific deficiencies identified and consider whether the agency may fix them. *See id.*; *Monsanto*, 561 U.S. at 165-66 (requiring "partial" vacatur if "sufficient"). Thus, the APA does not require blanket disruption of the NWPR for the entire country. *Va. Soc'y for Human*

43

*Life, Inc. v. FEC*, 263 F.3d 379, 394 (4th Cir. 2001), overruled on other grounds by *The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012).

Plaintiffs raise a variety of challenges to the NWPR, including narrow challenges to particular provisions, such as the Rule's waste treatment system exclusion. Br. at 12-15. A remedy for this narrowly-targeted concern must be limited to this definition: *e.g.*, 33 C.F.R. § 328.3(c)(15). Depending on the findings of the Court as to other issues, an appropriate remedy may similarly need to be tailored based on the claimed violation, the identified injury to Plaintiffs, and the broader equities of impacting the NWPR and the millions of other persons its effects nationwide.

Critically, Supreme Court precedent regarding jurisdictional and prudential limits of Article III—and how those limits apply to challenges to government action—has expanded exponentially since passage of the APA in 1948. Congress may not expand the Article III powers of the courts through statutory provisions. *See, e.g., Spokeo*, 136 S. Ct. at 1549. So Article III's jurisdictional limits have been grafted onto the APA's general instruction that unlawful agency action "shall" be "set aside." 5 U.S.C. § 706(2).

As a result, the Supreme Court has held that § 706(2) does not mandate a "depart[ure] from established principles" of equitable discretion. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). A "Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it"; so "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931, 1933-34 (2018). APA § 706 does not supplant the Article III requirement that, "[f]or all relief sought, there must be a litigant with standing." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). Thus, "[i]f a less drastic remedy (such as partial or complete vacatur of [an agency's challenged] decision)

was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted." *Monsanto*, 561 U.S. at 165-66.

As a court acting in equity deciding only the case or controversy before it, *see Romero-Barcelo*, 456 U.S. at 313, an appropriate remedy must take into account the jurisdiction of and parties before other district courts, debating similar issues about the NWPR, throughout the country. "Government litigation frequently involves legal questions of substantial public importance," so "[a]llowing only one final adjudication would deprive this [Supreme] Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari." *United States v. Mendoza*, 464 U.S. 154, 160 (1984). One district court already rejected that 17 states have a likelihood of successfully defeating the NWPR, and refused a nationwide injunction. *California*, 2020 WL 3403072, at *5-8. South Carolina actually intervened in that case to oppose that motion for injunction and to support the NWPR coming into effect. Another court granted a Colorado-only injunction. *Colorado*, 2020 WL 3402325, at *1. Any judicial remedy here cannot be nationwide, but must both be narrowly tailored to the Article III injuries proven and not unnecessarily interfere with other district courts and parties' rights throughout the country. That tailoring of remedy should occur pursuant to separate briefing, specific to any issues identified, and based on the facts and circumstances at that time.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied and Defendants' cross-motion for summary judgment should be granted.

Dated: August 24, 2020                              Respectfully submitted,

PETER M. MCCOY, JR.
*United States Attorney*
District of South Carolina

/s/ *Lee E. Berlinsky*
LEE E. BERLINSKY (Fed. ID# 05443)
*Assistant United States Attorney*
Liberty Center Building
151 Meeting Street, Suite 200
Charleston, SC 29402
(843) 266-1679
Lee.Berlinsky@usdoj.gov