**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

SOUTH CAROLINA COASTAL                )
CONSERVATION LEAGUE, *et al*.,        )
                                      )
            Plaintiffs,               )
                                      )
        v.                            )
                                      )
ANDREW R. WHEELER, *et al*.,          )
                                      )        No. 2:20-cv-01687-DCN
            Defendants.               )
                                      )
AMERICAN FARM BUREAU                  )
FEDERATION, *et al*.,                 )
                                      )
        Intervenor-Defendants.        )
                                      )
                                      )
_____      )

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AND RESPONSE IN OPPOSITION TO CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………………......iv

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................2

I.  The Replacement Rule Unlawfully Excludes Navigable Lakes ..........................................2

    A.  The Agencies did not acknowledge their unlawful expansion of the
        waste treatment exclusion during the rulemaking, and they fail to
        acknowledge it now. ...................................................................................................2

    B.  This issue is properly before the Court. .......................................................................6

II.  The Replacement Rule Violates the Administrative Procedure Act...................................8

    A.  The Agencies failed to justify their dramatic departure from prior
        policy.........................................................................................................................9

        1.  The Agencies erased clean water protections without meaningfully addressing
            the facts and circumstances that underlay prior policies.........................................10

        2.  The Agencies failed to provide good reasons for excluding streams and wetlands
            that their own experts have found to be essential to meeting the Act's objective. .14

        a.  The failure to use science in defining jurisdictional boundaries is not excused by
            technical implementation measures the Rule will require...................................... 14

        b.  Irrational distinctions between waters that perform similar functions are not
            excused by superficial and nonsensical references to science. .............................. 15

    B.  The Agencies failed to meaningfully address the most important issue
        in the rulemaking—the Rule's impact on national water quality. ...............................19

        1.  The Agencies were required to, but did not, meaningfully address record
            evidence in determining whether the Rule will further the Act's objective............20

        2.  The Agencies' conclusory water quality claims contradict the record. .................22

    C.  The Rule promotes confusion rather than the promised clarity.................................25

    D.  The Agencies did not meaningfully consider reliance interests. .................................28

    E.  The Agencies' novel reading of section 101(b) cannot cure the APA
        violations..................................................................................................................29

    F.  Agency discretion does not override APA requirements..............................................32

III.  The Rule Codifies an Impermissible Interpretation of "Waters of the
     United States" ................................................................................................................33

    A.  The Agencies' reliance on the Rapanos plurality is fatal to the Rule.........................34

        1.  The Replacement Rule codifies Justice Scalia's Rapanos plurality opinion..........34

2. Rapanos conclusively rejected the plurality's interpretation. ................................37

a. The agreement of five Justices on an issue of law creates binding precedent. ...... 37

b. Brand X does not permit the Agencies' rejected statutory interpretation. ............. 40

c. The Agencies' "Rapanos as ceiling" argument is a red herring. ............................ 42

B. The Replacement Rule is impermissible under the Clean Water Act. ........................43

1. Regardless of whether Rapanos precludes it, the Rule conflicts with the Clean Water Act. ..................................................................................................................43

2. Agencies' and Intervenors' misreading of section 101(b) cannot justify the Rule. 45

3. The "waters of the United States" are not a subset of "the Nation's waters." ........46

4. The Rule unreasonably contradicts longstanding precedent requiring protection of streams and wetlands that significantly affect traditional navigable waters. .......48

5. Catskill Mountains underscores why the Replacement Rule is unreasonable. .......52

IV.   Plaintiffs Have Standing on Behalf of Themselves and Their Members ..........................53

A. Under any standard, Plaintiffs have representational standing. ...................................53

1. Plaintiffs have shown concrete injury from the Replacement Rule. ......................53

2. Plaintiffs satisfy the incorrect, heightened standards the Agencies would impose.58

B. Plaintiffs have organizational standing ........................................................................59

V.    Plaintiffs' Claims Are Ripe for Disposition ........................................................................60

VI.   Vacatur without Remand Is the Proper Remedy ................................................................61

CONCLUSION ................................................................................................................................65

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

1000 Friends of Maryland v. Browner,
265 F.3d 216 (4th Cir. 2001) .......................................................................8, 54, 55

AARP v. U.S. Equal Emp't Opp. Comm'n,
292 F. Supp. 3d 238 (D.D.C. 2017) ......................................................................61

Abdul-Kabir v. Quarterman,
550 U.S. 233 (2007).............................................................................................38

AFL-CIO v. Chao,
496 F. Supp. 2d 76 (D.D.C. 2007) .......................................................................63

Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Agric.,
317 F. Supp. 3d 385 (D.D.C. 2018) .....................................................................62

Alexander v. Choate,
469 U.S. 287 (1985).........................................................................................38, 39

Alexander v. Sandoval,
532 U.S. 275 (2001).............................................................................................38

Alliance for Natural Health United States v. Sebelius,
775 F. Supp. 2d 114 (D.D.C. 2011) .....................................................................28

Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n,
389 F.3d 536 (6th Cir. 2004) ...............................................................................60

Am. Canoe Ass'n v. Murphy Farms, Inc.,
326 F.3d 505 (4th Cir. 2003) ...............................................................................54

Am. Med. Ass'n v. Reno,
57 F.3d 1129 (D.C. Cir. 1995).............................................................................63

Am. Trucking Ass'ns, Inc. v. EPA,
175 F.3d 1027, 1052 (D.C. Cir. 1999), rev'd on other grounds sub nom.,
Whitman v. Am. Trucking Ass'ns, 531 U.S. 457 (2001) ......................................22

Appalachian Power Co. v. EPA,
251 F. 3d 1026 (D.C. Cir. 2001)............................................................................8

Baltimore Gas & Electric Co. v. NRDC,
462 U.S. 87 (1983).................................................................................32, 33, 55

Beck v. McDonald,
  848 F.3d 262 (4th Cir. 2017) ..........................................................................54, 55

California v. Bernhardt,
  No. 19-cv-06013-JST, 2020 WL 3097091, (N.D. Cal. May 18, 2020) ...................58

California v. Wheeler,
  No. 20-cv-03005-RS, 2020 WL 3403072, (N.D. Cal. June 19, 2020) ....................42

Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc.,
  25 F. Supp. 3d 798 (E.D.N.C. 2014)........................................................................3

CASA de Md., Inc. v. Trump,
  971 F.3d 220 (4th Cir. 2020) ...................................................................................60

Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA,
  846 F.3d 492 (2d Cir. 2017)...............................................................................52, 53

Cent. Delta Water Agency v. United States,
  306 F.3d 938 (9th Cir. 2002) ..............................................................................55, 57

Chevron, U.S.A., Inc. v. NRDC,
  467 U.S. 837 (1984)....................................................................................40, 41, 42

City & Cty. of S.F. v. Azar,
  411 F. Supp. 3d 1001 (N.D. Cal. 2019) ...................................................................65

Colorado v. EPA,
  445 F. Supp. 3d 1295 (D. Colo. 2020)........................................................34, 37, 41, 42

Comcast Corp. v. FCC,
  579 F.3d 1 (D.C. Cir. 2009)......................................................................................63

Commonwealth of Massachusetts, Department of Public Welfare v. Secretary of
  Agric.
  984 F.2d 514, 522 (1st Cir. 1993)............................................................................32

County of Maui v. Hawaii Wildlife Fund,
  140 S. Ct. 1462 (2020)....................................................................................24, 26, 37

CTIA-Wireless Ass'n v. F.C.C.,
  466 F.3d 105 (D.C. Cir. 2006)...................................................................................7

Dep't of Commerce v. New York,
  139 S. Ct. 2551 (2019)....................................................................................27, 28, 31

Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,
  140 S. Ct. 1891 (2020)....................................................................8, 20, 29, 30, 31

Dist. of Columbia v. U.S. Dep't of Agric.,
    444 F. Supp. 3d 1 (D.D.C. 2020) ...........................................25

Encino Motorcars, LLC v. Navarro,
    136 S. Ct. 2117 (2016) .........................................10, 29, 40

Esch v. Yeutter,
    876 F.2d 976 (D.C. Cir. 1989) ...........................................63

FCC v. Fox Television Stations, Inc.,
    556 U.S. 502 (2009)........................................9, 13, 19, 29

Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,
    204 F.3d 149 (4th Cir. 2000) .....................................53, 55, 57

Greater Yellowstone Coal. v. Bosworth,
    209 F.Supp.2d 156 (D.D.C. 2002) .........................................64

Gresham v. Azar,
    950 F.3d 93 (D.C. Cir. 2020) ........................................7, 25, 29

Grutter v. Bollinger,
    539 U.S. 306 (2003)........................................38

Havens Realty Corp. v. Coleman,
    455 U.S. 363 (1982)........................................60

Holder v. Martinez Gutierrez,
    566 U.S. 583 (2012)........................................41

Independent Petroleum Association of America v. Babbitt,
    92 F.3d 1248 (D.C. Cir. 1996) ........................................15, 17

King v. Palmer,
    950 F.2d 771(D.C. Cir. 1991) ........................................39

Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand
    at Lansdowne, LLC, 713 F.3d 187 (4th Cir. 2013)................................61

League of United Latin Am. Citizens v. Perry,
    548 U.S. 399 (2006)........................................38

Lujan v. Nat'l Wildlife Fed'n
    497 U.S. 871, 890 (1990)........................................58

Marks v. United States,
    430 U.S. 188 (1977)........................................38, 39, 51

Mayor of Balt. v. Azar,
    No. 19-1614, 2020 WL 5240442, (4th Cir. Sept. 3, 2020) ....................................2, 8, 9, 13, 30

Mejia v. Sessions,
    866 F.3d 573 (4th Cir. 2017) .............................................................................................40, 41

Mercado-Zazueta v. Holder,
    580 F.3d 1102, 1112–13 (9th Cir. 2009) ...............................................................................41

Miller v. Brown,
    462 F.3d 312 (4th Cir. 2006) ................................................................................................61

Monsanto Co. v. Geertson Seed Farms,
    561 U.S. 139 (2010)........................................................................................................60, 65

Moses H. Cone Memorial Hospital v. Mercury Construction Corporation,
    460 U.S. 1 (1983)...................................................................................................................40

Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983).....................................................................................10, 13, 20, 25, 30, 32

N. Cal. River Watch v. City of Healdsburg,
    496 F.3d 993 (9th Cir. 2007) ................................................................................................51

N. Cal. River Watch v. Wilcox,
    633 F.3d 766 (9th Cir. 2011) ................................................................................................51

N.C. Growers' Ass'n v. United Farm Workers,
    702 F.3d 755 (4th Cir. 2012) ................................................................................................50

N.M. Health Connections v. HHS,
    340 F. Supp. 3d 1112 (D.N.M. 2018), rev'd on other grounds, 946 F.3d 1138
    (10th Cir. 2019)......................................................................................................................64

NAACP v. Trump,
    298 F. Supp. 3d 209, 245 (D.D.C. 2018) (citing In re Core Comm'n, Inc.,
    531 F.3d 849, 862 (D.C. Cir. 2008)......................................................................................62

Nat'l Ass'n of Home Builders v. EPA,
    682 F.3d 1032 (D.C. Cir. 2012)..............................................................................................9

Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,
    417 F.3d 1272 (D.C. Cir. 2005)............................................................................................61

Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,
    440 F.3d 459 (D.C. Cir. 2006)..............................................................................................57

Nat'l Cable & Telecommunications Association v. Brand X Internet Services,
    545 U.S. 967 (2005) ................................................................................40, 41, 42

Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,
    145 F.3d 1399 (D.C.Cir.1998) ...............................................................61, 65

Nat'l Park Hosp. Ass'n v. Dep't of Int.,
    538 U.S. 803 (2003) ...........................................................................................60

Nat'l Shooting Sports Foundation, Inc. v. Jones
    716 F.3d 200, 214–16 (D.C. Cir. 2013) ...............................................32

Nat'l Venture Capital Ass'n v. Duke,
    291 F. Supp. 3d 5, 20 (D.D.C. 2017) (quoting Ill. Pub. Telecomms. Ass'n v.
    FCC, 123 F.3d 693, 693 (D.C. Cir. 1997)) ...........................................61

Natural Resources Defense Council v. Wheeler
    955 F.3d 68, 77 (D.C. Cir. 2020) .......................................................54, 55

New Cingular Wireless PCS, LLC v. Finley,
    674 F.3d 225 (4th Cir. 2012) ..................................................................43

New Hope Power Co. v. U.S. Army Corps of Eng'rs,
    746 F. Supp. 2d 1272 (S.D. Fla. 2010) ...............................................61

New York v. U.S. Dep't of Health & Human Servs.,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) ...............................................62, 65

Nichols v. United States,
    511 U.S. 738 (1994) ...........................................................................................38

Nken v. Holder,
    556 U.S. 418 (2009) ...........................................................................................65

NRDC v. EPA,
    489 F.3d 1250 (D.C. Cir. 2007) ...............................................................62

NRDC v. EPA,
    961 F.3d 160 (2d Cir. 2020) ..................................................................60

O.A. v. Trump,
    404 F. Supp. 3d 109 (D.D.C. 2019) ...............................................64

Ohio Forestry Ass'n, Inc. v. Sierra Club,
    523 U.S. 726 (1998) ...........................................................................................60

Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,
    556 F.3d 177 (4th Cir. 2009) ..................................................................5

Okla. Dept. of Envtl. Quality v. EPA,
    740 F.3d 185 (D.C. Cir. 2014) ...................................................................................7

Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.,
    313 U.S. 508 (1941)..................................................................................................44

Padilla-Caldera v. Holder,
    637 F.3d 1140 (10th Cir. 2011) ...............................................................................41

Patel v. Napolitano,
    706 F.3d 370, 375–76 (4th Cir. 2013) .....................................................................41

PennEnvironment v. PPG Indus., Inc.,
    23 F. Supp. 3d 553 (W.D. Pa. 2014).........................................................................59

Physicians for Soc. Resp. v. Wheeler,
    956 F. 3d 634 (D.C. Cir. 2020)...................................................................13, 18, 30

Precon Dev. Corp., Inc. v. U.S. Army Corps of Eng'rs,
    633 F.3d 278 (4th Cir. 2011) .............................................................................35, 50

Puget Soundkeeper All. v. Wheeler,
    No. 15-cv-1342-JCC, 2018 WL 6169196, (W.D. Wash. Nov. 26, 2018) ..................55, 56, 57

Puget Soundkeeper All. v. Wheeler,
    No. 15-cv-1342-JCC, 2019 WL 6310562 (W.D. Wash. Nov. 25, 2019) ..........................55, 56

Rapanos v. United States,
    547 U.S. 715 (2006).......................................................................................... *passim*

Renewable Fuels Ass'n v. EPA,
    948 F.3d 1206 (10th Cir. 2020) ...............................................................................13

Robertson v. United States,
    139 S. Ct. 1543 (2019), 2019 WL 1126162.......................................................50, 51

S.C. Coastal Conservation League v. Pruitt,
    318 F. Supp. 3d 959 (D.S.C. 2018), appeal dismissed (4th Cir. Feb. 4, 2019)............49, 53, 57

S.C. Coastal Conservation League v. Wheeler,
    No. 2:20-cv-03062-DCN, Doc. 1 (D.S.C. Aug. 26, 2020) .....................................31

Schwartz v. Wellin,
    No. 2:13-cv-3595, 2014 WL 12637912, (D.S.C. Aug. 14, 2014)............................60

Shalala v. Guernsey Mem'l Hosp.,
    514 U.S. 87 (1995)....................................................................................................27

Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs,
    531 U.S. 159 (2001)...................................................................................35, 36, 44, 48, 49

St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard,
    85 F. Supp. 3d 197 (D.D.C. 2015) ...........................................................................62

Susan B. Anthony List v. Driehaus,
    573 U.S. 149 (2014)..................................................................................................54

Tesoro Ak. Petrol. Co. v. FERC,
    234 F.3d 1286 (D.C. Cir. 2000) ...............................................................................25

United States v. Bailey,
    571 F.3d 791 (8th Cir. 2009) ....................................................................................51

United States v. Cundiff,
    555 F.3d 200 (6th Cir. 2009) ..............................................................................35, 51

United States v. Davis,
    825 F.3d 1014 (9th Cir. 2016) ..................................................................................51

United States v. Donovan,
    661 F.3d 174 (3d Cir. 2011).................................................................................39, 51

United States v. Gerke Excavating, Inc.,
    464 F.3d 723, 724–25 (7th Cir. 2006) ......................................................................51

United States v. Home Concrete & Supply, LLC,
    566 U.S. 478 (2012)..................................................................................................41

United States v. Jacobsen,
    466 U.S. 109 (1984)............................................................................................38, 39

United States v. Johnson,
    467 F.3d 56 (1st Cir. 2006).................................................................................39, 51

United States v. Riverside Bayview Homes, Inc.,
    474 U.S. 121 (1985)........................................................2, 35, 36, 43, 44, 45, 48, 49

United States v. Robertson,
    875 F.3d 1281 (9th Cir. 2017), cert. granted and judgment vacated on other
    grounds, 139 S. Ct. 1543 (2019) .............................................................................51

United States v. Robison,
    505 F.3d 1208 (11th Cir. 2007) ................................................................................51

United Steel v. Mine Safety & Health Admin.,
    925 F.3d 1279 (D.C. Cir. 2019)...........................................................................57, 62

Vasquez v. Hillery
    474 U.S. 254, 261 (1986) ...................................................................................39, 40

Virginia Soc'y for Human Life, Inc. v. FEC,
    263 F.3d 379 (4th Cir. 2001) ........................................................................65

West Virginia Coal Ass'n v. Reilly,
    728 F. Supp.1276 (S.D. W.Va. 1989), aff'd, 932 F.2d 964 (4th Cir. 1991) .............................4

Wickard v. Filburn,
    317 U.S. 111 (1942) .....................................................................................44

Wilton v. Seven Falls Co.,
    515 U.S. 277 (1995) .....................................................................................38

**Statutes**

Administrative Procedure Act

    5 U.S.C. § 702 ...........................................................................................58

    5 U.S.C. § 704 ...........................................................................................58

    5 U.S.C. § 706(2)(A)–(D) ...............................................................................8

Clean Water Act

    33 U.S.C. § 1251(a) .............................................19, 20, 30, 31, 33, 43, 44, 45, 48

    33 U.S.C. § 1251(b) ...................................................29, 30, 31, 45, 46, 48

    33 U.S.C. § 1311(a) ...................................................................................25

    33 U.S.C. § 1344 .....................................................................................5, 32

    33 U.S.C. § 1362(12) ..................................................................................25

    33 U.S.C. § 1369(b) ...................................................................................58

Colo. Rev. Stat. §§ 25-8-504, 25-8-202(8) ............................................................57

Mont. Code Ann. §§ 75-5-203, 75-6-116 ............................................................57

N.C. Gen. Stat. § 150B-19.3(a) ......................................................................57

Va. Code Ann. §§ 62.1-44.15(3a), (10) ..............................................................57

**Regulations**

33 C.F.R. § 328.3(a)..............................................................................................................3

40 C.F.R. § 423.11(m) ..........................................................................................................5

**Federal Register**

Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42,210 (July 13,
      2020) .......................................................................................................................31

Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg.
      37,054 (June 29, 2015)..................................................................................10, 16, 29

Consolidated Permit Regulations: RCRA Hazardous Waste; SDWA Underground
      Injection Control; CWA National Pollutant Discharge Elimination System;
      CWA Section 404 Dredge or Fill Programs; and CAA Prevention of
      Significant Deterioration, 45 Fed. Reg. 33,290 (May 19, 1980) ..........................4, 5

Definition of "Waters of the United States" -- Recodification of Pre-Existing
      Rules, 84 Fed. Reg. at 56,626 (Oct. 22, 2019)......................................11, 37, 49, 64

Steam Electric Power Generating Point Source Category; Effluent Limitations
      Guidelines, Pretreatment Standards and New Source Performance Standards,
      47 Fed. Reg. 52,290 (Nov. 19, 1982)........................................................................5

National Pollution Discharge Elimination System, 38 Fed. Reg. 13,528
      (May 22, 1973)..........................................................................................................10

The Navigable Waters Protection Rule: Definition of "Waters of the United
      States," 85 Fed. Reg. 22,250 (Apr. 21, 2020).................................................. *passim*

Permits for Discharges of Dredged or Fill Material Into Waters of the United
      States, 42 Fed. Reg. 37,122 (July 19, 1977) .............................................10, 28, 47

Revised Definition of "Waters of the United States," 84 Fed. Reg. 4,154
      (Feb. 14, 2019)..........................................................................................................11

**Legislative History**

H.R. Rep. No. 92-911 (1972)...........................................................................................43, 44

H.R. Rep. No. 116-6745 (2020).............................................................................................53

S. Conf. Rep. No. 92-1236 (1972) .........................................................................................43

S. Rep. No. 92-414 (1971) .....................................................................................................47

S. Rep. No. 95-370 (1977) .....................................................................................................47

**Other Authorities**

Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the
    'Waters of the United States' Rule, Exec. Order No. 13,778, 82 Fed. Reg.
    12,497-98 (Mar. 3, 2017) .........................................................................................34

Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 8364
    (2d ed. Apr. 2020 update) ..........................................................................................7

Clean Water Act Jurisdiction following the U.S. Supreme Court's Decision in
    Rapanos v. United States & Carabell v. United States.
    (Dec. 2, 2008) ........................................................1, 10, 11, 13, 18, 20, 28, 37, 49

 EPA, "Waters of the United States" Determination for Proposed Cooling Pond
    Site in Polk County, Florida (Dec. 13, 1993) ...........................................................4

**INTRODUCTION**

The Replacement Rule is unlawful for three principal reasons. First, the Rule excludes traditionally navigable waters that are plainly "waters of the United States." Second, it draws jurisdictional lines that are arbitrary, capricious, and unmoored from the science documented in the record, in violation of the Administrative Procedure Act (APA). Third, the Rule adopts a legal interpretation of "waters of the United States" rejected by a majority of the Supreme Court. Each of these flaws, set forth in our opening brief, require that the Rule be set aside. The Agencies' and Intervenors' responses do nothing to change that conclusion.

The Agencies still do not acknowledge that the Rule strips protection from navigable waters that have always been jurisdictional. But the shift is self-evident, and the failure to acknowledge or explain this reversal itself violates the APA; stripping jurisdiction from these waters violates the Clean Water Act.

The responses also fail to cure the Agencies' APA violations. The Agencies argue that they used scientific terms to create definitions and will use science to implement the Rule; yet they cannot point to *any* scientific *analysis* used to establish jurisdictional boundaries. The Agencies offer that similarly situated streams and wetlands are not *identical*; they do not, however, explain why waters with indistinguishable downstream effects should be treated dissimilarly by the Rule. The Agencies and Intervenors incorrectly claim that Plaintiffs would have science alone control jurisdictional boundaries, but they fail to show that the Rule's *boundaries* rely on science *at all*, an irrational departure from the Agencies' 1986 regulations, 2008 Rapanos Guidance, 2015 Clean Water Rule, and 2019 Repeal Rule "waters of the United States" definitions. The Agencies attempt to excuse their failure to analyze the effect of this Rule on the integrity of the Nation's waters by saying they *believe* the Rule will meet the Act's

objective, but that uninformed aspirational approach was rejected by the Fourth Circuit Court of Appeals less than three weeks ago. <u>Mayor of Balt. v. Azar</u>, No. 19-1614, 2020 WL 5240442, at *10 (4th Cir. Sept. 3, 2020) (en banc).

Finally, the Agencies have no meaningful response to the reality that their interpretation of "waters of the United States" has been unambiguously rejected by the Supreme Court. While the term "waters of the United States" is ambiguous, that does not give the Agencies boundless discretion in interpreting it. In <u>Rapanos v. United States</u>, 547 U.S. 715 (2006), a majority of the Court unambiguously rejected the jurisdictional test adopted by the Rule, foreclosing its use here. The Intervenors' related notion that a point of law adopted by a majority of the Supreme Court is not binding has been rejected by the Supreme Court at least eight times.

The Rule[1] is unlawful under the APA and Clean Water Act, and should be vacated.

## ARGUMENT

### I. The Replacement Rule Unlawfully Excludes Navigable Lakes

#### A. The Agencies did not acknowledge their unlawful expansion of the waste treatment exclusion during the rulemaking, and they fail to acknowledge it now.

Traditionally navigable public lakes that were impounded to provide cooling water are now deemed non-jurisdictional under the Rule for the first time in the history of the Clean Water Act. The Agencies do not attempt to justify this dramatic and unprecedented change and, instead, dispute that the change even exists.

The Rule's plain text makes clear that it allows previously protected "waters navigable in fact" to be excluded from "waters of the United States," in violation of the most basic tenets of the Act. <u>See</u> <u>United States v. Riverside Bayview Homes, Inc.</u>, 474 U.S. 121, 123 (1985). As a

---

[1] <u>See</u> The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("Replacement Rule" or "Rule").

result, lakes that are navigable-in-fact, impoundments of traditional navigable waters, and used in interstate commerce fall within the broad new "waste treatment system exclusion."

This is unquestionably a change in policy. Before the Agencies enacted this Rule, electric utilities categorized such lakes as "cooling ponds," see Doc. 58-1 at 13–15, but they were still subject to the jurisdiction of the Clean Water Act and therefore protected from unpermitted pollution. That did not stop electric utilities from trying—unsuccessfully—to evade these protections by asserting such lakes should be exempt from the Clean Water Act, as Duke Energy attempted with Sutton Lake in Wilmington, North Carolina:

> Defendant [utility] argues that because DENR [the state environmental agency] treats Sutton Lake as a cooling pond through its permits, it is not a water of the United States. However, this argument is not convincing, particularly where defendant has other public lakes used as cooling reservoirs for other power plants, which are classified and treated as waters of the United States.
>
> Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc., 25 F. Supp. 3d 798, 809

(E.D.N.C. 2014) (emphasis added). Now, the Rule adopts the unlawful position that these public lakes are excluded from the "waters of the United States."

Attempting to downplay the Rule's dramatic change, the Agencies first claim that its "waste treatment system" exclusion only applies to cooling ponds on a "case-by-case basis." Doc. 69 at 39.[2] In truth, the Rule expressly excludes *all* cooling ponds: "The term waste treatment system includes . . . cooling ponds." 85 Fed. Reg. at 22,339. The exclusion applies even if the cooling ponds are otherwise jurisdictional waters. 33 C.F.R. § 328.3(a) (2020) (all bases for jurisdiction are "subject to the exclusions"); 85 Fed. Reg. at 22,325 ("If the water meets any of the[] exclusions, the water is excluded even if the water satisfies one or more of the conditions to be a [jurisdictional] water.").

---

[2] The Agencies filed two identical briefs in this case, Doc. 69 and Doc. 70-1, with accompanying exhibits. Although Plaintiffs arguments respond to both briefs and exhibits, Plaintiffs refer to Doc. 69 and its exhibits here.

The Agencies next claim that their new approach is consistent with past practice, contending that certain cooling ponds "had been eligible for the waste treatment system exclusion since 1980." Doc. 69 at 34. That is incorrect. Jurisdictional rivers or streams impounded for cooling lakes were *not* eligible for the exclusion, as the Agencies' own regulatory history (which they cite to this Court) admits: "Because CWA was not intended to license dischargers to freely use waters of the United States as waste treatment systems, the definition makes clear that *treatment systems created in those waters or from their impoundment remain waters of the United States.*" 45 Fed. Reg. 33,290, 33,298 (May 19, 1980) (emphases added) (cited in Doc. 69 at 33).

The Agencies also attempt to rely on a regional memorandum from 1993 that purportedly adopted a "case-by-case" approach to cooling ponds, Doc. 69 at 33–34, but this memo concerned "an isolated artificial water body that will not be open for any recreational purposes."[3] It did not say that non-artificial navigable waterways and jurisdictional rivers or streams impounded before the Clean Water Act are excluded from the Act. To the contrary, EPA's longstanding policy, upheld by the Fourth Circuit, was that "impoundments of waters of the United States remain 'waters of the United States,'" even if they are used for treatment. West Virginia Coal Ass'n v. Reilly, 728 F. Supp.1276, 1290 (S.D. W.Va. 1989), aff'd, 932 F.2d 964 (4th Cir. 1991). Accordingly, a limited exception for waste treatment systems constructed in jurisdictional waters pursuant to a section 404 permit is irrelevant here—the Rule's waste treatment exclusion is not

---

[3] EPA, "Waters of the United States" Determination for Proposed Cooling Pond Site in Polk County, Florida (Dec. 13, 1993), at 2.

limited to treatment systems constructed pursuant to a section 404 Permit. See Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177 (4th Cir. 2009) (describing limited exception).[4]

Instead, the exclusion now applies, as the Agencies admit, not only to systems "constructed in accordance with the requirements of the CWA" and its section 404 permitting program, but also to "*all* waste treatment systems constructed prior to the 1972 CWA amendments." Doc. 69 at 38 (quoting 85 Fed. Reg. at 22,325) (emphasis added).

The Agencies attempt to portray Plaintiffs' challenge as concerning only the "application of the waste treatment system exclusion to specific water bodies." Doc. 69 at 39. As set out in the Complaint and opening brief, however, Plaintiffs explicitly challenge the new exclusion itself as inconsistent with the Clean Water Act and the APA; they have cited examples to underscore the impact of this policy change on Plaintiffs' members.

The Agencies' other attempts to stave off scrutiny of their new exclusion until some later date, Doc. 69 at 39, are also without merit. Utilities, and anyone else adding pollution to these lakes, have been subject to the Clean Water Act until now. By changing the scope of the Act with the Replacement Rule, the Agencies have opened up any lake that falls within the terms of the new exclusion to unregulated pollution. There is no support for the Agencies' attempt to evade judicial review now.

---

[4] The Agencies miss the point by discussing the history of a cross-reference to impounded "cooling ponds." This is irrelevant; that provision distinguished between "cooling ponds" that do not "impede[] the flow of a navigable stream," 40 C.F.R. § 423.11(m) (1980), and impounded "cooling lakes" that *do* "impede the flow of a navigable stream," id. § 423.11(n) (1980)—the latter of which were not eligible for the waste treatment exclusion. See 45 Fed. Reg. at 33,298 ("treatment systems created in . . . waters [of the U.S.] or from their impoundment remain waters of the [U.S.]"). In any event, these definitions were removed in 1982. See 47 Fed. Reg. 52,290, 52,304–05 (Nov. 19, 1982). Since then, the regulation has contained no distinction between "cooling lakes" and "cooling ponds." With the exception of some systems created pursuant to section 404 of the Act, as discussed above, the waste treatment exclusion has never applied to impounded navigable waters.

Finally, the Agencies try to distract from the issue by arguing that "discharges *from*" excluded lakes "*to* downstream jurisdictional waters" will "be subject to CWA Section 402 discharge permits." Doc. 69 at 36 (emphases added). But that ignores the problem: discharges *into* public lakes used for drinking water, fishing, swimming, and boating are now exempt.

Ultimately, the Agencies' new waste treatment exclusion is indefensible: it removes Clean Water Act jurisdiction from traditionally navigable lakes, which are at the heart of any reasonable understanding of "waters of the United States." The Agencies have not acknowledged or provided a reasoned explanation for this unprecedented and impermissible approach.

## B.   This issue is properly before the Court.

The Agencies make another bid to shield their dramatic new exclusion from judicial scrutiny by claiming this issue was not raised during the comment period. That is false. The Texas Commission on Environmental Quality (TCEQ) objected that:

> The definition of 'waste treatment system' could cause confusion due to the inclusion of 'cooling pond' within the proposed definition. Texas has many surface water impounds or reservoirs built on perennial and intermittent streams, some of significant size, that were built primarily for cooling purposes. These may be considered cooling ponds and therefore subject to the exclusion. The TCEQ recommends the Agencies remove the term 'cooling ponds' from the definition.[5]

This comment squarely presented the issue that the Rule's new waste treatment system exclusion threatens jurisdictional surface water impounds "of significant size," which Texas argued should remain protected under the Act and not be subject to the exclusion.

From the opposite end, utilities asked the Agencies to exclude such lakes from the Act. A utility trade group, the Edison Electric Institute, specifically encouraged the application of the

---

[5] TCEQ, Comment Letter on Proposed Rule: Revised Definition of "Waters of the United States," (AR 4887) (Apr. 15, 2019) (TCEQ Comments), at 2.

waste treatment exclusion to impounded "waters of the United States" and told the Agencies that the federal court's ruling on Sutton Lake, see supra p. 3, was "inappropriate[]."[6]

As a result, there can be no question that the Agencies were confronted with this issue during their rulemaking. Plaintiffs were under no obligation to submit duplicative comments. CTIA-Wireless Ass'n v. F.C.C., 466 F.3d 105, 117 (D.C. Cir. 2006) (holding issue was properly before the court where it was raised by a third party during the comment period).[7]

Despite having been presented with the issue in public comments, the Agencies kept silent. The Agencies' "response" to Texas did not acknowledge that significant lakes would be subject to the exclusion for the first time. Instead, they stated that impoundments "*currently excluded* from jurisdiction would also remain excluded under the final rule." Doc. 69-7 at 61 (emphasis added). This statement does nothing to address the new removal of jurisdiction from navigable impoundments previously protected under the Act. The Agencies' failure to address this significant concern was arbitrary and capricious. E.g., Gresham v. Azar, 950 F.3d 93, 103 (D.C. Cir. 2020) (agency action is arbitrary and capricious when it "dismiss[ed important] concerns in a handful of conclusory sentences").

In their brief, the Agencies attempt to narrow the issue to the point of absurdity by suggesting that in order to preserve the issue, comments needed to discuss the particular waterbodies that Plaintiffs cited in their opening brief as examples of the problem. Doc. 69 at 36. The Agencies are wrong: comments need only "be made with sufficient specificity reasonably to

---

[6] Thomas R. Kuhn, President, Edison Electric Institute, Comment Letter on Proposed Rule: Revised Definition of "Waters of the United States," (AR 8115) (Apr. 15, 2019), at 14–15.

[7] See also Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 8364 (2d ed. Apr. 2020 update) (collecting cases and noting that a plaintiff is not "generally require[d] . . . to raise an objection herself during notice-and-comment proceedings; it suffices that another person has raised the issue, allowing the agency to consider it."). Even if multiple parties had not raised the issue, the Agencies had an obligation to consider this serious issue themselves. See, e.g., Okla. Dept. of Envtl. Quality v. EPA, 740 F.3d 185, 192 (D.C. Cir. 2014).

alert the agency" to the issue. Appalachian Power Co. v. EPA, 251 F. 3d 1026, 1036 (D.C. Cir. 2001). Here, commenters voiced concern that the new expansion of the waste treatment system exclusion threatens "significant" reservoirs, TCEQ Comments at 2, which was more than enough to "reasonably alert the agency" to the issue. Id. The decision in 1000 Friends of Maryland v. Browner, 265 F.3d 216, 227–28 (4th Cir. 2001), which the Agencies cite, supports Plaintiffs; it held that an issue was preserved for litigation where comments were "phrased somewhat *generally*" and "referr[ed] (at least *implicitly*)" to the issue under consideration. Id. at 228 (emphasis added); accord Mayor of Balt., 2020 WL 5240442, at *22 (reaffirming 1000 Friends). The Agencies cannot evade review of this issue.

## II.    The Replacement Rule Violates the Administrative Procedure Act

Throughout this rulemaking, the Agencies attempted to shield their procedural shortcomings behind a new legal interpretation. Because a new legal interpretation—even if correct—does not excuse them from the obligation to "turn square corners" in following the APA's reasoned decisionmaking requirements, Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1909–10 (2020), the Agencies now attempt to show they meet those requirements. The effort fails.

The Agencies' and Intervenors' ultimate position appears to be that the Agencies' rulemaking documents—the Rule's preamble, Resource and Programmatic Assessment, Economic Analysis, and Response to Comments—meet all APA requirements, 5 U.S.C. § 706(2)(A)–(D), simply because those documents are lengthy.[8] What they fail to bring to the Court's attention when citing the "1,500 pages" of record documents is that the Agencies have

---

[8] E.g., Doc. 69 at 2 ("more than 1,500 pages"); id. at 17 ("60 pages" in the preamble and "400 pages of responses to comments"); id. at 20 ("101-page (excluding attachments) Resource and Programmatic Assessment"); Doc. 68-1 at 13 ("75 pages of the Federal Register").

disclaimed over half of those pages and the information contained within "was not used to establish the new regulatory text."[9] They ask the Court to rely on documents the Agencies declined to.

Of course, compliance with the APA is not measured by the volume of rulemaking documents an agency produces; it is assessed by the substance of those documents and the quality of agency decision making. "[J]ust because an agency puts words to a page does not mean it has provided a 'sufficiently reasoned basis.'" Mayor of Balt., 2020 WL 5240442, at *11 n.8; see id. *9 ("[C]ourts 'must engage in a searching and careful inquiry of the administrative record, so that [they] may consider whether the agency considered the relevant factors and whether a clear error of judgment was made.'" (internal citation omitted)). That substance and quality is lacking here.

### A. The Agencies failed to justify their dramatic departure from prior policy.

For close to half a century, the Agencies have recognized that Clean Water Act jurisdiction must be defined functionally, and extended broadly, to achieve the Act's water quality objective. That determination, based on the application of the Agencies' scientific expertise to define the legal standard, has not been meaningfully addressed, much less repudiated, in this rulemaking, and the Agencies have provided no "good reasons" or "changed circumstances" to justify their departure from it. See, e.g., FCC v. Fox Television Stations, Inc.,

---

[9] E.g., 85 Fed. Reg. at 22, 332 ("The agencies note that the final rule is not based on the information in the agencies' economic analysis or resource and programmatic assessment . . . . This information was not used to establish the new regulatory text for definition of "waters of the United States."); 22,335 (citing Nat'l Ass'n of Home Builders v. EPA, 682 F.3d 1032, 1039–40 (D.C. Cir. 2012) (claiming "the agencies are not relying on the economic analysis . . . as a basis for this final rule" and citing caselaw suggesting that only if the "agency decides to rely on a cost-benefit analysis" would flaws undermining that analysis render the Rule unreasonable)).

556 U.S. 502, 515 (2009); <u>Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.</u>,

463 U.S. 29, 42 (1983); <u>Encino Motorcars, LLC v. Navarro</u>, 136 S. Ct. 2117, 2126 (2016).

    **1.** ***The Agencies erased clean water protections without meaningfully addressing the facts and circumstances that underlay prior policies.***

    The Replacement Rule reverses decades of agency practice and precedent of protecting

streams and wetlands integral to the quality of downstream navigable waters.[10] Instead of

grappling with the facts and evidence that informed decades of their prior policy and practice, the

Agencies mischaracterize or ignore them.

    The Agencies' 2015 "Science Report" (or Connectivity Report)[11] confirmed that

ephemeral streams and many wetlands outside the annual floodplain of jurisdictional streams and

rivers exert a significant impact on the quality of downstream waterways.[12] In addition to agency

review, these findings were reviewed and approved by a panel of 27 of the nation's top scientists

formed by EPA's Science Advisory Board, including hydrologists, wetland and stream

ecologists, biologists, geomorphologists, biogeochemists, and freshwater scientists.[13]

---

[10] <u>See</u>, <u>e.g.</u>, National Pollutant Discharge Elimination System, 38 Fed. Reg. 13,528, 13,529 (May 22, 1973) (regulating "[t]ributaries of navigable waters of the United States"); Permits for Discharges of Dredged or Fill Material into Waters of the U.S., 42 Fed. Reg. 37,122, 37,128 (July 19, 1977) (regulating "adjacent wetlands that form the border of or are in reasonable proximity to other waters of the United States"); Clean Water Act Jurisdiction following the U.S. Supreme Court's Decision in <u>Rapanos v. United States & Carabell v. United States</u>, at 1, 8, 12 (AR 11695) (Dec. 2, 2008) (<u>Rapanos</u> Guidance) (regulating impermanent streams and wetlands not abutting navigable waters if shown to significantly affect navigable water quality); Clean Water Rule, 80 Fed. Reg. at 37,055, 37,104–06 (regulating impermanent streams and wetlands shown to significantly affect navigable water quality).

[11] EPA, Connectivity of Streams & Wetlands to Downstream Waters: A Review & Synthesis of the Scientific Evidence (AR 11691) (Jan. 2015).

[12] <u>E.g.</u>, Science Rep. at ES-2–ES-4, 2-22–2-30, 3-1–3-45, 4-20–4-39.

[13] Clean Water Rule: Definition of "Waters of the U.S.," 80 Fed. Reg. 37,054, 37,062 (June 29, 2015).

Just last year, these same Agencies promulgated a "Repeal Rule"[14] that adopts the 2008 <u>Rapanos</u> Guidance,[15] deeming streams and wetlands jurisdictional if they had a "significant nexus" with traditional navigable waters, based on "the functions" they provide,[16] including their capacity to hold back "flood waters that would otherwise enter traditional navigable waters," and "to transfer nutrients and organic carbon vital to support downstream food webs . . . [and] habitats]."[17]

The Agencies now claim that the "Connectivity Report and other science did not preclude—but actually supported"—the current Rule. Doc. 69 at 17. For example, the Agencies point to EPA's Science Advisory Board's review of the draft Science Report as supposedly showing that the Report's "connectivity gradient" supports their exclusion of ephemeral streams. Doc. 69 at 19 (citing 85 Fed. Reg. at 22,288). The facts show the exact opposite. In reviewing the present rule proposal, EPA's Science Advisory Board members concluded that it "is *fully at odds with the EPA's own scientific Connectivity Report*"; noted that the Report "is mentioned briefly, and then set aside"; and found "[i]n cases where the agencies [do] refer to science, they cherry pick from the SAB Review, misinterpreting and taking information out of context."[18] These conclusions apply with equal force to the Rule,[19] including the Agencies' reliance on the "connectivity gradient," <u>see</u> 85 Fed. Reg. at 22,288 (citing "SAB Review at 54 figure 3").

---

[14] Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) (Repeal Rule).

[15] <u>See</u> Repeal Rule, 84 Fed. Reg. at 56,626 ("The agencies will implement the pre-2015 Rule regulations informed by applicable agency guidance documents.").

[16] <u>Rapanos</u> Guidance at 11.

[17] <u>Id.</u>; <u>see also</u> Doc. 58-1 at 18–19.

[18] S. M. P. Sullivan et al., Scientific Societies, Comment Letter on Proposed Rule: Revised Definition of "Waters of the U.S.," (AR 3825) (Apr. 5, 2019) (SAB Members Comment Letter), at 3 (emphases added); <u>see also</u> SELC et al., Comment Letter on Proposed Rule: Revised Definition of "Waters of the U.S.," (AR 9717) (Apr. 15, 2019) (SELC Comments), at 53–60.

[19] <u>Compare</u> <u>e.g.</u>, Proposed Rule, Revised Definition of "Waters of the United States," 84 Fed. Reg. 4,154, 4,176 (Feb. 14, 2019), <u>with</u> Replacement Rule, 85 Fed. Reg. at 22,288.

Finding that the Agencies "misrepresent[]" the connectivity gradient, the SAB concluded that it "arrives at an erroneous conclusion not supported by the science, and opposite the intent of the SAB."[20] Rather than address or dispute these and other comments criticizing the Agencies' treatment of the Science Report head on, the Agencies simply said—without analysis—that they "disagree[d]" with them. Doc. 69-3 at 13.

Similarly, after acknowledging that the Science Report's connectivity gradient found that the amount of surface water flow is less important than "degree of connection (e.g., frequency, magnitude, timing, duration) and the extent to which those connections affect the chemical, physical, and biological integrity of downstream waters," 85 Fed. Reg. 22,288 (cited in Doc. 69 at 20), the Agencies discount the Report as a "science, not policy document," id. Indeed, the documents cited in the Agencies' brief, Doc. 69 at 19–20, time and again pay lip service to the Agencies' prior conclusions before summarily dismissing them:

> The agencies also recognize the importance of protecting water resources and as a general matter do not dispute the important role of headwaters, including certain ephemeral and intermittent streams, in supporting outdoor recreation and ecosystem services such as providing habitat and promoting biodiversity, among other values and functions. However, as explained in the preamble to the final rule, while science informs the agencies' interpretation of the definition of "waters of the United States," science cannot dictate where to draw the line between federal and state or tribal waters, as those are legal distinctions . . . .

Doc. 69-1 at 115; see also, e.g., Doc. 69-3 at 13–14 (acknowledging and then dismissing Agencies' prior conclusions that waters "lacking surface water connections, provide physical, chemical, and biological functions that could affect the integrity of downstream waters," because the "final rule is grounded in a [so-called] unifying legal theory . . . .").

Elsewhere, when explaining how science supposedly "informed" the Rule, the Agencies either admit that science applied "to inform implementation" (but not the substance) of the

---

[20] SAB Members Comment Letter at 3 (emphasis removed); see also SELC Comments at 53–60.

Rule,[21] or they ask the public and this Court to take their word for it.[22] All of this violates the Agencies' duty to address record evidence and their prior conclusions "head-on," as the APA requires. Mayor of Balt., 2020 WL 5240442, at *11; Fox, 556 U.S. at 537 (Kennedy, J., concurring). Rather than utilize their scientific and practical *expertise* to explain their departure from prior conclusions and policy, the Agencies sidestepped scientific analysis entirely by saying their decision is the result of a reasoned analysis "'because we said so.'" Mayor of Balt., 2020 WL 5240442, at *11 n.8. The APA demands more.

The Replacement Rule removes protections from vast numbers of waters protected under past "waters of the United States" definitions, yet the Agencies did not point to any "good reasons," Fox, 556 U.S. at 515, or "change[d] circumstances"— no new developments in science or law—that would warrant their abrupt reversal, State Farm, 463 U.S. at 42, and they effectively ignored the voluminous science on hydrologic connectivity underlying the Clean Water Rule and previous policies, Fox, 556 U.S. at 515–16. The Agencies do not dispute or distinguish the factual conclusions of the Science Report, the Clean Water Rule, or the Rapanos Guidance, or the functional analysis they embody.[23] This is fatal to the Rule. Fox, 556 U.S. at 515; Physicians for Soc. Resp. v. Wheeler, 956 F. 3d 634, 644 (D.C. Cir. 2020) ("[W]hen departing from precedents or practices, an agency must offer a reason to distinguish them or explain its apparent rejection of their approach.'" (internal quotations omitted)); Renewable Fuels Ass'n v. EPA, 948

---

[21] Doc. 69-1 at 138.

[22] Id. ("Consistent with the APA and applicable case law, in this final rule the agencies have provided ample justification for a change in interpretation of the CWA concerning the scope of jurisdiction over waters and wetlands, including any changes from their prior interpretations."); Doc. 69 at 2 ("These documents establish that the Agencies appropriately considered, and thoroughly explained, their decisions, including regarding scientific matters.").

[23] Contrary to Intervenors' claim, Doc. 68-1, Plaintiffs do not fault the Agencies because they "did not wholesale adopt the Connectivity Report"; rather, Plaintiffs fault the Agencies for failing to use that science to define "waters of the United States."

F.3d 1206, 1255 (10th Cir. 2020) (finding change in agency policy arbitrary and capricious where "EPA ignored or failed to provide reasons for deviating from prior studies").

### 2. *The Agencies failed to provide good reasons for excluding streams and wetlands that their own experts have found to be essential to meeting the Act's objective.*

The Agencies attempt to excuse the absence of a reasoned explanation for the Rule's jurisdictional scope with two arguments: science will be used to implement the Rule, and the fact that similar waters are not identical justifies treating them differently. Both arguments fail.

Unable to point to "good reasons" for the jurisdictional lines drawn, the Agencies and Intervenors create the fictional position that Plaintiffs argue that "*only* science" can be considered. Doc. 68-1 at 19 (emphasis in original); Doc. 69 at 24. In fact, consistent with past agency policy and the "objective" of the Clean Water Act to restore and maintain the Nation's water quality, the Agencies were required to meaningfully consider the factors they considered in adopting prior definitions: "legal precedent," "the best available peer-reviewed science," *and* "the Agencies technical expertise and extensive experience over the past four decades." Doc. 69 at 24. None was applied here.

### a. *The failure to use science in defining jurisdictional boundaries is not excused by technical implementation measures the Rule will require.*

While the Agencies and the public will have to use technical measures to *implement* the Rule defining Clean Water Act jurisdiction,[24] this does nothing to cure the lack of scientific or expert basis for the jurisdictional lines the Agencies drew.[25]

---

[24] Doc. 69-1 at 115 ("[T]he agencies have looked to scientific principles, including findings in the Connectivity Report, to inform *implementation* of the final rule."); Doc. 69-1 at 137 ("The agencies recognize that scientific analysis is essential to the *implementation* of the CWA, and have looked to scientific principles to inform *implementation* of the final rule."); 85 Fed. Reg. at 22,288 (describing science informed flow classifications, the use of typical year test, and other aspects to "*implement*" the Rule "such as the development of tools and science-based approaches to identify flow classifications and typical year conditions") (all emphases added).

Although basic science may have been used to define different flow classifications, Doc. 69 at 19, the Agencies have not offered any scientific explanation for excluding ephemeral streams despite their significant hydrological and ecological connections to, and effects on, downstream waters.[26] Likewise, while the Agencies note that science will inform the implementation of the "typical year" standard, Doc 69 at 19,[27] they offer no scientific rationale for why or how they selected *that* standard to "establish [that] the surface water connection . . . is sufficient to warrant [their view of] federal jurisdiction." 85 Fed. Reg. at 22,274.[28]

    b.   *Irrational distinctions between waters that perform similar functions are not excused by superficial and nonsensical references to science.*

As in Independent Petroleum Association of America v. Babbitt, 92 F.3d 1248, 1258 (D.C. Cir. 1996), the Rule irrationally and arbitrarily treats similar cases in a dissimilar way.

The fact that "ephemeral streams *are* scientifically different from intermittent or perennial streams," Doc. 69 at 21, provides no basis for different treatment where they have similar effects on downstream waters. According to Agency experts, ephemeral streams exert a "strong influence" "on the integrity of downstream waters," Science Rep. at ES-2, and the "runoff, nutrients, and particulate matter originating from ephemeral streams" has "substantial

---

[25] See, e.g., Doc. 69-1at 137 ("[T]he line between federal and state waters is a legal distinction, not a scientific one . . . .")

[26] E.g., EA at 107.

[27] See also Doc. 69 at 16 ("the agencies have looked to scientific principles to inform implementation of the final rule as the agencies differentiate between waters of the United States and non-jurisdictional waters and features . . . [for] example, . . . in requiring the use of a 'typical year scenario. . . .'").

[28] See 85 Fed. Reg. at 22,289 (citing Rapanos plurality for typical year requirement for tributaries). When faced with comments suggesting a single year standard may not be appropriate, for example, the Agencies provided no explanation other than stating that a typical year is not necessarily a calendar year. 85 Fed. Reg. at 22,274.

connection and important consequences . . . on the integrity and sustainability of downstream perennial streams." Id. at 5-8.[29]

The Agencies ignore this reality and attempt to rely on the connectivity gradient cited in the Science Report to support their categorical exclusion of ephemeral streams, Doc. 69 at 19 (citing 85 Fed. Reg. at 22,288). But pointing to the gradient without analyzing the factors that determine the gradient itself or a waters' place on it is an empty gesture. In fact, both "volume" of flow and "mass of inputs" are key variables in determining where a stream falls along the gradient,[30] and by ignoring those factors as to ephemeral streams, the Agencies irrationally exclude "torrents thundering at irregular intervals through otherwise dry channels," while protecting "[t]he merest trickle, if continuous." Rapanos, 547 U.S. at 769 (Kennedy, J., concurring). Contrary to the Agencies' position, the gradient confirms "that relatively low levels of connectivity can be meaningful in terms of impacts on the chemical, physical, and biological integrity of downstream waters."[31]

Even in their own Economic Analysis prepared for this rulemaking, the Agencies admit that ephemeral streams are functionally similar to intermittent and perennial streams, stating that ephemeral streams "perform *similar* hydrological and ecological functions [as groundwater-fed perennial and intermittent streams do], including moving water, sediments, and nutrients, providing connectivity within the watershed and habitat to wildlife," and "supporting

---

[29] See also Clean Water Rule, 80 Fed. Reg. at 37,064 ("'[T]here is strong scientific evidence to support . . . includ[ing] all tributaries [with an ordinary high water mark and a bed and a bank] within the jurisdiction of the Clean Water Act.'" (citations omitted)); id. at 37,076 (citing Science Rep. at ES-2).
[30] SAB Ltr. to The Hon. Gina McCarthy, SAB Review of the Draft Science Report, (AR 0386) (Oct. 14, 2014) (SAB Review), at 54.
[31] SAB Review at 2.

biodiversity."[32] Nonetheless, the Agencies categorically excluded ephemeral streams while protecting most perennial and some intermittent streams[33] purportedly on the basis of their ecological benefits.[34] Thus the Agencies' claim that the Rule's definition of "tributary" rests "'upon a reasonable inference of ecologic interconnection' between those tributaries and [traditional navigable waters]," Doc. 69 at 19 (citations and quotations omitted), cannot be squared with this irrational distinction. The Agencies unlawfully failed to "treat similar cases in a similar manner." Indep. Petroleum Ass'n, 92 F.3d at 1258.

The Agencies' justification for excluding certain wetlands fares no better. For example, the Agencies distinguish between wetlands separated by an artificial barrier (non-jurisdictional) and wetlands that are separated by a natural barrier (jurisdictional). Doc. 69 at 22-23. That distinction is based solely on their claim that wetlands separated by artificial barriers are not "similarly linked to jurisdictional waters" because they lack a "sufficient hydrologic surface connection." Id. (citations and quotations omitted); see also Doc. 68-1 at 28 (stating a natural feature indicates a "sufficient surface water connection"). But the Agencies never offer any scientific or record-based explanation for (1) *why* a hydrologic surface connection is necessary or (2) *what* makes a surface water connection "sufficient" for differentiating between wetlands.[35]

---

[32] EA at 107 (emphasis added); see also 85 Fed. Reg. at 22,288 (claiming to protect streams when there is "a reasonable inference of ecological interconnection"); Science Rep. at 5-8 (describing "substantial connection and important consequences of . . . ephemeral tributaries on the integrity and sustainability of downstream perennial streams" in the Southwest).

[33] EA at 9–17, 22–23.

[34] 85 Fed. Reg. at 22,288 ("The 'tributary' definition . . . 'rests upon a reasonable inference of ecological interconnection'" with traditional navigable waters.").

[35] The Agencies do not even attempt to defend their arbitrary distinction between wetlands that touch jurisdictional waters at only "one point," for no "specific duration," which are jurisdictional without a surface water connection, and those wetlands near (but not touching) jurisdictional waters, which are not jurisdictional unless they have a surface water connection within a typical year. Doc. 58-1 at 25 (citing 85 Fed. Reg. at 22,310).

Just last October, in fact, *these* same Agencies adopted a rule that made no such distinction. Not only were "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like" jurisdictional under the Repeal Rule,[36] but so were wetlands if (1) they had "an unbroken or *shallow sub-surface* connection to jurisdictional waters"; or (2) "their proximity to a jurisdictional water is reasonably close, supporting the science-based inference that wetlands have an ecological interconnection with jurisdictional waters."[37] In light of *these* Agencies' fundamentally different treatment of the effect of natural and artificial barriers, with the need for a "sufficient *surface* water connection" in this Rule, simply saying that one barrier is natural and one is artificial is not a reasoned explanation. See, e.g., Physicians for Soc. Resp., 956 F.3d at 646.

Similarly, the Agencies' differentiation between wetlands that are flooded *by* jurisdictional waters as compared with those that flood *into* jurisdictional waters is arbitrary in the context of a statute designed to improve downstream water quality. Doc. 69 at 22–23. Notwithstanding the Agencies' attempt to nominally distinguish between the two wetland types,[38] Agency experts have found that "even [] wetlands that rarely flood can be important because of long-lasting effects on streams and rivers," Science Rep. at 4-39, and wetlands with occasional surface water connections provide benefits "that could affect downstream waters if they are connected to (or isolated from) the river network in such a way that it allows (or prevents) transport of materials to downstream waters," Id. at 4-41. Indeed, "some effects of non-

---

[36] Rapanos Guidance at 5.

[37] Id. at 5–6 (emphasis added).

[38] The Agencies claim that "flooding from a wetland *to* a jurisdictional water is not such an extension of jurisdictional waters," but "is more akin to diffuse stormwater run-off or directional sheet flow over upland—so does not render the wetland jurisdictional." Doc. 69 at 23. That claim fails: flooding is, by definition, sheet flow over uplands. *Definition of Flood*, MERRIAM-WEBSTER (defining flooding as "a rising and overflowing of a body of water especially onto normally dry land"), https://perma.cc/F6AW-5K53 (permalink).

floodplain wetlands on downstream waters *are due to their isolation*, rather than their connectivity. Wetland "sink" functions that trap materials and prevent their export to downstream waters (e.g., sediment and entrained pollutant removal, water storage) result because of the wetland's ability to isolate material fluxes." Id. at ES-4. The "[wetland literature is replete with examples of [non-floodplain] wetlands improving water quality through assimilation, transformation, or sequestration of nutrients and other pollutants." Id. at 4-29; see also Rapanos, 547 U.S. at 775 (Kennedy, J.) (noting wetlands' pollution storage functions mean that "the absence of an interchange of waters [may be what] makes protection of the wetlands critical to the [Act]" (citations omitted)). Had the Agencies considered the Science Report and its analysis, they could not have disregarded these "inconvenient facts"—or distinguished between wetlands with similar functions. Fox, 556 U.S. at 537.

In the end, the Agencies have attempted to justify their distinctions between similar cases by saying those cases are not identical. What the Agencies have not done is explain why the differences identified *matter* empirically in the drawing of jurisdictional lines. Streams and wetlands that provide similar functions must be treated similarly absent a "good reason" for not doing so. The Agencies have offered no reasons at all.

**B.    The Agencies failed to meaningfully address the most important issue in the rulemaking—the Rule's impact on national water quality.**

The Agencies divorced their drawing of jurisdictional boundaries from those boundaries' effects on the integrity of the Nation's waters. By so doing, they have failed to meaningfully address the most important aspect of the problem: the Rule's effect on the Clean Water Act's "objective" to "restore and maintain . . . the Nation's waters," 33 U.S.C. § 1251(a). The record evidence demonstrates that the Rule's exclusion of ephemeral streams and wetlands will significantly degrade water quality. In the face of this evidence, the Agencies inexplicably claim

that the Rule "effectively furthers" the Act's "objective," <u>e.g.</u>, 85 Fed. Reg. at 22,287; <u>accord</u> <u>id.</u> at 22,271 (same), when it plainly does the opposite. This is a textbook case of arbitrary agency action. <u>State Farm</u>, 463 U.S. at 43.

1. ***The Agencies were required to, but did not, meaningfully address record evidence in determining whether the Rule will further the Act's objective.***

The Agencies claim that science cannot "dictate" their "legal" interpretation of "waters of the United States." <u>E.g.</u>, 85 Fed. Reg. at 22,271; Doc. 69 at 17; <u>see also</u> Doc. 69 at 26 ("Science does not and cannot offer a precise answer to the question of what constitutes a water of the United States."). That misses the mark—the Agencies cannot make the necessary legal determination without considering science. The Clean Water Act was enacted to protect the "chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). That is the core of the science-based, functional standard applied by the Agencies in the 2008 <u>Rapanos</u> Guidance, the 2015 Clean Water Rule, and the 2019 Repeal Rule. <u>State Farm</u> requires the Agencies to meaningfully address the record evidence bearing on this fundamental, empirical aspect of the problem and to weigh the consequences of their action.[39] 463 U.S. at 43; <u>Dep't of Homeland Sec.</u>, 140 S. Ct. at 1914–15.

The Agencies claim that their "substantive discussion" of "water quality" is in their Resource and Programmatic Assessment (RPA), and their response to comments document for their RPA, Doc. 69 at 20. Those citations are telling: the Agencies already have conceded that the information in the RPA "*was not used* to establish the new regulatory text for definition of 'waters of the United States.'" 85 Fed. Reg. at 22,332 (emphasis added). The Agencies' citation to the RPA now only confirms that they did not rely on any water quality analysis "to establish

---

[39] The Agencies acknowledge that satisfying the Act's objective is an important aspect of the problem. <u>E.g.</u>, 85 Fed. Reg. at 22,272 ("[The Replacement Rule] aim[s] to accomplish the objective of the Act.").

the new regulatory text." The Agencies have, therefore, failed to consider the most important aspect of this Rule.

The Agencies *could have* considered water quality effects: they were armed with the evidence and the analytical tools to confirm the Rule's devastating impacts,[40] but they did not examine them.[41] Now, they attack Plaintiffs' conclusion that millions of stream miles and wetlands will no longer be protected as "hyberbolic [*sic*]." Doc. 69 at 26. Plaintiffs' estimates are based on expert analysis of the National Hydrography Dataset (NHD) and the National Wetlands Inventory (NWI), whose limitations, as the Agencies admit, make them conservative[42] and provide the best available data on surface water (NHD) and on the abundance, characteristics, and distribution of the Nation's wetlands (NWI).[43] Rather than supply their own impacts analysis, the Agencies opted not to meaningfully consider these impacts at all.

There is no reason why the Agencies could not have estimated the consequences of the Rule's jurisdictional changes, as they did for the Clean Water Rule.[44] They collected much of the underlying data for doing so: for their now-discarded Clean Water Act section 404 analysis, the Agencies projected reductions in permitting and mitigation by analyzing "permit data," EA at

---

[40] Doc. 59 at 8–14; Doc. 59-2; Doc. 61-1 at 12–16; see also SELC Comments, Ex. B; Steve Moyer, Trout Unlimited, Comment Letter on Proposed Rule: Revised Definition of "Waters of the United States," (AR 4912) (Apr. 15, 2019), at 5, 13 & Attachs: Fesenmyer et al, 2019 Mapping PowerPoint; Science Rep. at 2-17, 2-29, 3-4.

[41] See also Doc. 59 at 8–14; Doc. 59-2; Doc. 61-1 at 13–16.

[42] E.g., EPA & Dep't of Army, Draft Apps. to RPA for the Navigable Waters Protection Rule: Definition of "Waters of the U.S.," (AR 0005) (Dec. 18, 2020) (Draft RPA Apps.) at 35-38 ("NHD does not map ephemeral streams in many parts of the country"), ("NWI does not map all wetlands"), ("NHD and NWI both tend to undermap small features").

[43] See Draft RPA Apps. at 36 (explaining NHD/NWI "represent the most comprehensive data available at a national level that show the potential extent of streams, rivers, lakes, and wetlands across the country").

[44] EPA & U.S. Dep't of the Army, Economic Analysis of the EPA-Army Clean Water Rule at v (2015) (acknowledging "limited amount of data" but explaining that Agencies estimated impacts through "analysis" and plausible "assumptions"), https://perma.cc/7TKP-HC7P (permanent link).

xxii, yet did not analyze that data to estimate impacts from the Rule.[45] The Agencies thus failed to meet their obligation to reasonably assess available information about the Rule's impacts and cannot simply "ignore[]" impacts that are "difficult . . . to quantify." Am. Trucking Ass'ns, Inc. v. EPA, 175 F.3d 1027, 1052 (D.C. Cir. 1999), rev'd on other grounds sub nom., Whitman v. Am. Trucking Ass'ns, 531 U.S. 457 (2001); see also Doc. 61-1 at 7–10.

### 2. *The Agencies' conclusory water quality claims contradict the record.*

Despite failing to analyze the widespread, harmful effects of the Rule on the Nation's waters, the Agencies claim that the Rule will further the Act's objective. Their arguments are spurious.

First, they argue that the benefits of the Rule outweigh the effects of lost jurisdiction over millions of acres of wetlands and thousands of stream miles, Doc. 69 at 25. But the benefits cited —"fewer transaction costs, fewer consultants, and reduced federal permitting costs," id.,—would accrue only to a few (i.e., heavy industry, development interests, etc.) and were not compared to the negative impacts to the many downstream or on "stream flows, water quality, drinking water treatment, endangered and threatened species habitat, and other ecosystems services" that the Agencies concede will result from this Rule. Id. (citing EA at xviii); see also EA at 105–06. The resulting analysis is "irrational" and designed to "minimiz[e] the Rule's extensive harms and mak[e] them seem minor in relation to its alleged cost savings." Doc. 61-1 at 3.[46]

---

[45] The Agencies actually performed a limited analysis that would have allowed them to evaluate the Rule's effects, but excluded it from the rulemaking. EPA staff estimated that up to 70 percent of the Nation's streams and over half of the Nation's wetlands may lose protection under limits similar to those in the final Rule, Prelim. Results of Attempted Analyses of NHD and NWI, (AR 11767) (Sept. 5, 2017), at 2–5, 9, yet the Agencies now disclaim that analysis—without providing any comparable replacement, see EPA and Dep't of Army, RPA for the Navigable Waters Protection Rule: Def. of "Waters of the U.S.," (AR 11573) (Jan. 23, 2020), at 41 n.56.
[46] See also SELC Comments at 41–46; id., Ex. C: John C. Whitehead Report; id. Ex. D: Dr. Jeffrey D. Mullen Report.

Second, the Agencies and Intervenors claim that water quality will not suffer because states and even polluters might voluntarily continue the protections that the Agencies have swept away. EA at 105; <u>see</u> Doc. 69 at 2; Doc. 68-1 at 25–26.[47] The Agencies and Intervenors rely on pure speculation that contradicts the administrative record, and even then, the Agencies acknowledge that state regulation will be only a partial patch. <u>E.g.</u>, Doc. 68-1 at 26 ("states *could* step in and fill any necessary gaps" (emphases added)). But the Clean Water Act was not designed to leave the fate of the Nation's waters to baseless hopes of goodwill from those no longer regulated by it.

Omitted from the Agencies' discussion is the undisputed record evidence indicating that many states do not have comparable programs, often cannot adopt laws more stringent than federal standards, and do not have adequate staffing to implement more robust programs—much less in the short time needed to prevent degraded water quality.[48] And there is absolutely no basis in the record for the idea that polluters would voluntarily undertake compliance with nonexistent requirements (indeed, Intervenors' interest in this litigation indicates the exact opposite).

---

[47] <u>See</u> <u>also</u> EA at 47, 57, 59, 61, 65, 79, 85, 86, 162, 186 (expressing that some entities *may voluntarily* continue compliance measures eliminated by the Rule).

[48] Doc. 61-1 at 18–21; Barbara D. Underwood, Attorney General of New York et al., Comment Letter on Proposed Rule: Revised Definition of "Waters of the U.S.," (AR 5467) (Apr. 15, 2019), at Attach. A at 12 (citing "substantial" financial obstacles to states filling gap in lost federal protections); <u>see</u> <u>also</u> Inst. for Policy Integrity, Comment Letter on Proposed Rule: Revised Definition of "Waters of the U.S.," (AR 6898) (Apr. 15, 2019), at 10–12 (explaining why states have "little incentive" to regulate "pollution across state lines"); Doc. 58-14 at 12–14, 16 (noting South Carolina's "limited operational programs directly protecting waterways" due to its "long reli[ance] on the historic protections of the Clean Water Act," and expressing "concerns" about impacts to the state's water quality as a result of "large gap" in protections left by the Rule); Doc. 58-34 at 36 (expressing concern that many states, like North Carolina, lack time and resources to "propose, pass, and implement new statutes and regulations, as well as hire and properly train their staff" to protect the "important resources" left unprotected by Rule); <u>accord</u> EA at 158 ("New Mexico is not anticipated to protect waters beyond the [Rule]"); EA at 35 (conceding that literature on environmental federalism indicates state-by-state regulation "can yield inefficiently weak regulations" "); <u>see</u> <u>also</u> <u>infra</u> note 77.

The Agencies also attempt to highlight various non-regulatory programs to assert that their drastic contraction of "waters of the United States" is nevertheless reasonable and somehow "consistent" with the Act's water quality objective. Doc. 69 at 25–26. Yet those are empirical propositions the Agencies treat as abstract interpretive questions: the Agencies cite nothing to support the notion that these non-regulatory programs are remotely as effective at achieving the Act's water quality objective as its federal regulatory programs. Therefore, the various harms the Agencies admit at a conceptual level—*i.e.*, increased water pollution, flooding, loss of aquatic habitat, and degraded drinking water, see EA at 105–06; Doc. 58-1 at 22–23—are sure to occur. Indeed, EPA's own Science Advisory Board concluded that the Rule "potentially introduc[es] new risks to human and environmental health," "decreases protection for our Nation's waters and does not provide a scientific basis in support of its consistency with the objective of restoring and maintaining 'the chemical, physical and biological integrity' of these waters."[49]

In a footnote, the Agencies assert that they "considered that the Act's longstanding National Pollutant Discharge Elimination System (NPDES) permitting program will likely continue to address point source discharges of certain pollutants that flow downstream into waters of the United States." Doc. 69 at 12 n.4. But this does not justify the Agencies' stripping of jurisdiction from streams and wetlands that should be protected from pollution under the Act.[50] Moreover, the Agencies plainly failed to consider that the Rule would no longer require a

---

[49] EPA, SAB, Draft Comment. on the Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act (AR 11589) (Oct. 16, 2019) (AR 11589), at 2, 4; see also EPA SAB, Final Comment. on the Proposed Rule Defining the Scope of Waters Federally Regulated under the Clean Water Act (Feb. 27, 2020), at 4 (similar), https://perma.cc/76UW-LW9R (permanent link).

[50] The Agencies cite County of Maui v. Hawaii Wildlife Fund, 140 S. Ct. 1462, 1477 (2020) (Doc. 69 at 3), which set out a "functional equivalent" discharge standard; pollution flowing via an excluded ephemeral stream into a still-jurisdictional water can be subject to the Act's permitting requirements under that standard. But that standard is no substitute for broad Clean

Clean Water Act section 404 permit to fill in these newly non-jurisdictional wetlands and streams. It is beyond dispute that filling streams and wetlands harms downstream waters by eliminating the filled waterways' functions, such as "pollutant trapping, flood control, and runoff storage," as well as destroying fish and wildlife habitat. Rapanos, 547 U.S. at 779–80 (Kennedy, J.); see, e.g., Doc 58-48 at ¶ 10; Doc. 58-29 at ¶¶ 25–26. This obvious oversight provides yet another reason the Rule is unreasonable.

In the face of overwhelming evidence showing that their new Rule will degrade water quality, the Agencies' failure to meaningfully address that problem—and their blind insistence to the contrary—violate the APA. See, e.g., Dist. of Columbia v. U.S. Dep't of Agric., 444 F. Supp. 3d 1, 23 (D.D.C. 2020) ("[W]hen faced with considerable evidence that its preferred [approach] was inappropriate or incomplete . . . , the agency needed to provide a meaningful response to that evidence and 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" (quoting State Farm, 463 U.S. at 43)); accord Gresham, 950 F.3d at 103 (action arbitrary and capricious when it "dismiss[ed important] concerns in a handful of conclusory sentences"); Tesoro Ak. Petrol. Co. v. FERC, 234 F.3d 1286, 1294 (D.C. Cir. 2000).

### C. The Rule promotes confusion rather than the promised clarity.

The Agencies' claim that this Rule provides clarity is misguided. Clarity cannot rescue a rule that defeats the objective of the Act it is intended to enforce. As the Supreme Court noted in a recent Clean Water Act case, "a more absolute position . . . may be easier to administer," but when "those positions have consequences that are inconsistent with major congressional

---

Water Act jurisdiction over "waters of the United States." The standard provides no safeguards for excluded streams and wetlands *themselves*, focusing solely on pollution of protected downstream waters. See 33 U.S.C. §§ 1311(a), 1362(12).

objectives, as revealed by the statute's language, structure, and purposes," they must be rejected. Cty. of Maui, 140 S. Ct. at 1477. In any event, the Rule is not clear: it substitutes one case-by-case regime for another that is even more convoluted.

First, the Agencies' assertion that the Rule "defin[es] clear categories of jurisdictional waters," Doc. 69 at 27, is illusory, because each of those categories—save for traditional navigable waters —is delimited by the indeterminate "typical year" test, Doc. 58-1 at 26. The test is supposed to facilitate a determination of whether conditions are "'normal,' 'wetter than normal,' or 'drier than normal,'" 85 Fed. Reg. at 22,274, but it does not specify whether normalcy is based on "seasonal[]" or "annual[]" averages, or some other unspecified time period, id. at 22,339. Normalcy is further based on the "normal periodic range," which *sometimes* means that precipitation conditions fall between the "70th and 30th percentiles for totals from the same date range over the preceding 30 years." Id. at 22,274. Other times, the determination may be made using different, unspecified methods. Id. In other words, anything goes.

The Agencies admit that determining whether a stream is "ephemeral" (not jurisdictional), "intermittent" (maybe jurisdictional), or "perennial" (maybe jurisdictional) may require evaluating "local flow data," "trapezoidal flumes and pressure transducers for measuring surface flow," or using "physical and biological field indicators, such as the presence of hydrophytic vegetation and benthic macroinvertebrates, to determine the flow duration class of a stream reach." 85 Fed. Reg. at 22,294. Some of these methods only exist in North Carolina and the Pacific Northwest and must be developed on a state or regional basis, id., and development of those methods nationwide will take years.[51] Others methods are not even publicly available. Doc.

---

[51] SELC Comments, Ex. B, Moffat & Nichol at 14 ("It takes at least two years to develop these methods and at least two years to train a critical mass of agency personnel to properly use the

69 at 27. Moreover, after flow classification is determined, the landowner must *still* determine

whether a stream "contributes surface water flow" to a downstream traditional navigable water in

a "typical year." 85 Fed. Reg. at 22,339. Citizens are thus left with a disjointed list of

"complementary data sources and tools," with no direction or examples regarding how these

sources are to be used to determine whether flows occur in a "typical year."[52]

Even assuming definite values for all variables in the typical year analysis, the test still

gives no answers for many situations. For example, nothing in the record states what the

Agencies will do in an atypical year—which, if the Agencies use the 30th and 70th percentiles to

define the typical year, that will be 60 percent of cases. The Rule's purported "flexibility," Doc.

69 at 30, is, instead, fundamental indeterminacy.

Of course, the Agencies do not have a "*statutory* duty" under the Clean Water Act "to

promulgate regulations that . . . address *every* conceivable question." See Shalala v. Guernsey

Mem'l Hosp., 514 U.S. 87, 96 (1995) (emphasis added). But that misses the mark. For one thing,

the typical year standard is open-ended to the point of meaninglessness; it does not answer any

questions. More fundamentally, the Agencies here have *chosen* to sweep away decades of

science-based "waters of the United States" definitions in part to "provide[] clarity and

predictability for the . . . regulated community, and the public." 85 Fed. Reg. at 22,252. And

when agencies *choose* to premise a rule on a rationale that bears no reasonable relation to what

the rule actually says, it is arbitrary and capricious. See Dep't of Commerce v. New York, 139 S.

Ct. 2551, 2575 (2019) (noting "[t]he reasoned explanation requirement of administrative law"

means that courts "cannot ignore the disconnect between the decision made and the explanation

---

method. Therefore, accurate implementation of a flow duration-based regulatory program cannot
be done quickly without massive inconsistencies in implementation in the field.").

[52] 85 Fed. Reg. at 22,293–94 (describing various methodologies that "could be used to determine
flow classification of potential tributaries") (emphasis added).

given"). Whether the Clean Water Act or APA imposes specificity requirements in "waters of the United States" definitions is beside the point. Doc. 69 at 28.[53] The Rule's "clarity" rationale is arbitrary and capricious. See Dep't of Commerce, 139 S. Ct. at 2575.[54]

### D. The Agencies did not meaningfully consider reliance interests.

The Agencies and Intervenors claim that prior debate over the scope of "waters of the United States," the remand of the Clean Water Rule, and the notice provided in the President's 2017 Executive Order that the Agencies intended to revise the definition of "waters of the United States" consistent with Justice Scalia's opinion, preclude any justifiable reliance interests in prior regulatory definitions of the term. See Doc. 68-1 at 16–17, 26; Doc. 69 at 31. That argument is nonsense—the Replacement Rule reverses clean water protections that have been in place for almost a half a century under the Clean Water Act, and the public had every reason to rely on those protections.

Indeed, the Agencies' 1980s regulations extended broad clean water protections to all streams and wetlands in "reasonable proximity to other waters of the United States."[55] The 1980s regulations as limited by the 2008 Rapanos Guidance (and the 2019 Repeal Rule) offered case-by-case protections for integral streams and wetlands, including ephemeral streams and wetlands that are not covered under the Replacement Rule.[56] And the Clean Water Rule provided clearer protections for waters found to significantly affect the physical, chemical, and biological

---

[53] For these reasons, the Agencies' reliance on Alliance for Natural Health United States v. Sebelius, 775 F. Supp. 2d 114, 134 (D.D.C. 2011) is inapt. In that case, plaintiffs asserted that the APA imposed facial specificity requirements on agency regulations. Id. In contrast, Plaintiffs here challenge the disconnect between the Rule's rationale and what the Rule actually says.
[54] But even if the Rule did provide clear results, those could not legitimate the arbitrary and capricious jurisdictional lines the Agencies have devised. See supra Section II.A–B.
[55] 42 Fed. Reg. at 37,128.
[56] Rapanos Guidance at 1, 8, 12.

integrity of the Nation's waters.[57] Plaintiffs' members relied on the more-protective clean water

protections that predated the Replacement Rule—they bought homes and made their livings

based not only on the Clean Water Rule but upon decades of federal protections, including every

definition of "waters of the United States" prior to this one. E.g., Doc. 58-1 at 41–43.

    In claiming to have considered these interests, the Agencies point to a single instance in

their response to comments document in which they considered (and dismissed) the states'

reliance interests in the 2015 Clean Water Rule and 2019 Repeal Rule (but did not consider the

states' or anyone else's reliance interests on the federal clean water protections that have been in

place since the 1980s). See Doc. 69 at 30 (citing Doc. 69-1 at 29). Intervenors seem to suggest

that the only other reliance interests worthy of consideration belong to the "business

community." Doc. 68-1 at 26–27. But neither the Agencies nor Intervenors show where in the

record the Agencies acknowledged reliance interests beyond their brief dismissal of state

concerns, let alone *meaningfully* or *reasonably* addressed them, as required by the APA. See,

e.g., Gresham, 950 F.3d at 103 ("Nodding to concerns raised by commenters only to dismiss

them in a conclusory manner is not a hallmark of reasoned decisionmaking."). Because the

Agencies failed to address "serious reliance interests," the Rule violates the APA. Encino

Motorcars, 136 S. Ct. at 2126 (quoting Fox, 556 U.S. at 515); see also Dep't of Homeland Sec.,

140 S. Ct. at 1913–14.

### E.    The Agencies' novel reading of section 101(b) cannot cure the APA violations.

    The Agencies repeatedly insist that the scope of "waters of the United States" is a "legal

question that must be answered based on the overall framework and construct of the CWA."

E.g., 85 Fed. Reg. at 22,261; Doc. 69 at 19. But adopting a new legal interpretation does not

---

[57] Clean Water Rule, 80 Fed. Reg. at 37,055, 37,104–06.

obviate an agency's APA responsibility to engage in a reasoned decision-making *process*. Dep't of Homeland Sec., 140 S. Ct. 1909–10. This is particularly true when the Agencies do not claim their Rule is legally *compelled*. Rather, they admit they are making a policy choice by, for example, "balanc[ing]" the Clean Water Act's water quality "objective" in section 101(a) with the policy in section 101(b) out of a professed concern for "state authority." Doc. 69 at 14; see also id. at 11–12. When Agencies seek to exploit ambiguity in a statute (here, an ambiguity that does not extend as far as they would take it, see infra Section III), they must meaningfully explain their decisions. Physicians for Soc. Resp., 956 F.3d at 646 ("Nothing . . . absolves an agency of its obligation 'to enable' a reviewing court to conclude that the agency's action 'was the product of reasoned decisionmaking.'" (quoting State Farm, 463 U.S. at 52)).[58]

Although the Agencies may "believe" the Replacement Rule to be better than prior policies, Doc. 69 at 17, that is not "all the law requires." Id. As the Fourth Circuit affirmed earlier this month, an agency "cannot simply state it 'believes' something to be true—against the weight of all the evidence before it—without further *support*." Mayor of Balt., 2020 WL 5240442, at *10 (emphasis added). "Indeed, it is the 'agency's responsibility' to offer an explanation why it made a certain decision, when 'every indication in the record points the other way.'" Id. (quoting State Farm, 463 U.S. at 56).

Therefore, despite their novel legal interpretation, the APA requires the Agencies to explain, based on evidence, how the Replacement Rule will "restore and maintain" the Nation's

---

[58] Although the Agencies point to the Clean Water Rule's "distance limitations" as the reason a court remanded that rule to the Agencies, the Agencies have not claimed that the Repeal Rule adopted in 2019 was unlawful or that the entire Clean Water Rule was substantively unlawful. See Doc. 69 at 5. Even if the Agencies' prior policies were unlawful, the Agencies would not be excused from adequately explaining the consequences of their decision to depart from those policy choices, or their failure to consider whether alternatives to full rescission were available. Dep't of Homeland Sec., 140 S. Ct. at 1909–10, 1914–15.

water quality given the undisputed record evidence to the contrary, see supra Section II.A–B, and identify the "other interests and policy concerns" that *outweigh* the grave costs associated with the diminished water quality that will occur under this Rule (i.e., by defending their interpretation that section 101(b) *overrides* section 101(a)). See Dep't of Homeland Sec., 140 S. Ct. at 1914. At a minimum, the Agencies must offer some criteria they use to "balance" sections 101(a) and 101(b)—that explanation does not exist. Reasonably explaining their policy reversal—and evaluating its consequences—is "the agenc[ies'] job, but [they] failed to do it." Id.

Even the Agencies' concern for state sovereignty is illusory, as demonstrated by the administration's "401 Certification Rule"[59] recently challenged in this Court. In that rule, EPA expressly limited states' ability to protect waters within their borders using authority Congress expressly granted them under Clean Water Act section 401. See generally S.C. Coastal Conservation League v. Wheeler, No. 2:20-cv-03062-DCN, Doc. 1 (D.S.C. Aug. 26, 2020). When explaining the need for the 401 Certification Rule, the Agencies insisted that the Act "places important limitations on how the . . . [states'] role may be implemented . . . ." 85 Fed. Reg. at 42,211; see also id. at 42,285 (preventing states from using their 401 certification authority to impose state law conditions on discharges into waters that are not "waters of the United States"). The limitations imposed in the 401 Certification Rule strikingly underscore that the purported rationale for the Replacement Rule—i.e., respecting "the important role of states for implementing water regulation," Doc. 69 at 14—is a farce. See Dep't of Commerce, 139 S. Ct. at 2575–76 ("The reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions.").[60]

---

[59] See Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42,210 (July 13, 2020).
[60] The Agencies fail to acknowledge, much less explain, the fundamental "tension" between the rulemakings, see EPA, Navigable Waters Protection Rule—Public Comment Summary

#### F. Agency discretion does not override APA requirements.

The Agencies cannot redeem their failure to provide a reasoned explanation and to consider the Rule's impacts on water quality by insisting on deference. Because the Agencies have provided no scientific data or rationale for establishing the scope of jurisdiction, "[t]here are no findings and no analysis here to justify the choice made, [and] no indication of the basis on which the [agency] exercised its expert discretion." State Farm, 463 U.S. at 48 (brackets in original). The Rule thus violates the APA.

The cases Intervenors cite, Doc. 68-1 at 22, 24, confirm that deference is not warranted. In those cases, the Agencies relied on *data* using their *technical expertise* to *explain* the reasons behind their regulatory line-drawing. In National Shooting Sports Foundation, Inc. v. Jones, the D.C. Circuit upheld the agency's decision to require gun sale reporting in some border states and not others because the agency's decision was based on its expert analysis of data showing that the selected states were the top source locations for all firearms found in Mexico. 716 F.3d 200, 214–16 (D.C. Cir. 2013). Likewise, in Commonwealth of Massachusetts, Department of Public Welfare v. Secretary of Agric., the agency's "line-drawing"—its setting of limits on food stamp distribution—warranted deference because it was based on expertise in "statistical sampling" "plotted sensibly . . . consistent with statutory imperatives." 984 F.2d 514, 522 (1st Cir. 1993).

Baltimore Gas & Electric Co. v. NRDC, 462 U.S. 87 (1983), relied on by the Agencies (Doc. 69 at 2, 21, 26), is also inapt. There, the Supreme Court upheld the Nuclear Regulatory Commission's conclusion that permanent nuclear waste storage would not have a significant environmental impact under NEPA. The Court's decision rested in part on the fact that the agency's decision was based on its "special expertise, *at the frontiers of science*." Id. at 102–04

---

Document, Topic 11 at 47–48 (AR 11574) ("disagree[ing] . . . that there is tension"), and they fail to address in either rulemaking how limiting states' ability to protect non-jurisdictional waters under section 401 will magnify the water quality impacts of the Replacement Rule.

(emphasis added); see also id. at 103 ("When examining [an agency's] *scientific* determination, . . . a reviewing court must generally be at its most deferential." (emphasis added)).

At no point did the Agencies here use their expertise, much less "special expertise, at the frontiers of science," Baltimore Gas, 462 U.S. at 103, to define the Rule's jurisdictional boundaries or answer the fundamental question that must be at the center of this rulemaking: will this rule meet the Act's objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters"? 33 U.S.C. § 1251(a). Rather than answer these questions using a scientific, expertise-dependent analysis, the Agencies dodge them. They repeat, *ad nauseum*, that "science cannot dictate" the scope of "waters of the United States," as the "line between federal and state waters is a legal distinction, not a scientific one." See, e.g., Doc. 69-1 at 137. Yet neither the text of the Act nor any case law interpreting it requires the limits the Agencies have adopted—which are dramatically different than those of the last 40 years. Even if it did, it would not excuse the Agencies from justifying their Rule with expert analysis of the evidence. That analysis is lacking, meaning there is nothing to justify deference.

## III.     The Rule Codifies an Impermissible Interpretation of "Waters of the United States"

Because the Replacement Rule was promulgated in violation of the APA, the Court need not address the substance of the Agencies' new interpretation of the Clean Water Act. But if it does so, it will find that the Agencies' novel statutory interpretation is unlawful. The two foundational tests that underlie the Rule—the relative permanence and continuous surface connection requirements—have been rejected by a majority of the Supreme Court as lacking any "support in the language and purposes of the Act or in our cases interpreting it." Rapanos, 547 U.S. at 767–68 (Kennedy, J.); id. at 800 (Stevens, J., joined by three other Justices, dissenting) (same). That alone resolves the interpretive issues in this case, and provides separate grounds on

which to vacate the Rule. In addition, the Rule unlawfully and unreasonably rejects the forty

years of Supreme Court precedent and practice maintaining Clean Water Act protections for

waters that significantly affect downstream traditional navigable waters.

### A. The Agencies' reliance on the <u>Rapanos</u> plurality is fatal to the Rule.

Although the Supreme Court split 4-1-4 over the meaning of "waters of the United

States" in <u>Rapanos</u>, a binding majority rejected Justice Scalia's interpretation as unreasonable.

Because the Replacement Rule codifies that repudiated interpretation, it is unlawful. In response,

the Agencies and Intervenors attempt to distract the Court by focusing on whether <u>Rapanos</u>

established which waters the Agencies *must* regulate. But that is beside the point, because five

Justices held that they *must not* interpret "waters of the United States" in the manner of the

plurality opinion.

#### 1. *The Replacement Rule codifies Justice Scalia's <u>Rapanos</u> plurality opinion.*

The Agencies here "self-consciously intended to take the plurality opinion . . . , flesh out

the details, and make it the new law of the land." <u>Colorado v. EPA</u>, 445 F. Supp. 3d 1295, 1311

(D. Colo. 2020). Indeed, that was President Trump's directive, Exec. Order No. 13,778, § 3, 82

Fed. Reg. 12,497 (Mar. 3, 2017), which the Agencies dutifully followed, <u>e.g.</u>, 85 Fed. Reg. at

22,288–89 ("The final rule's definition of 'tributary' is [] consistent with the <u>Rapanos</u> plurality's

position that "'the waters of the United States" include only relatively permanent, standing, or

flowing bodies of waters'").

The Agencies now attempt to deny that they based the Replacement Rule on the Scalia

plurality, claiming their Rule "incorporate[s] the 'commonalities' between the fractured <u>Rapanos</u>

opinions." Doc. 69 at 10 (citations omitted). Similarly, Intervenors maintain that the Rule "does

not wholly adopt the <u>Rapanos</u> plurality opinion nor wholly reject Justice Kennedy's concurrence." Doc. 68-1 at 33. Both positions are wrong.

Justice Kennedy and the four <u>Rapanos</u> dissenters rejected every material aspect of Justice Scalia's plurality opinion, save for uncontroversial points such as that the Act covers "something more than traditional navigable waters," <u>Rapanos</u>, 547 U.S. at 731 (Scalia, J.). As Justice Kennedy concluded, however: "[f]rom this reasonable beginning the plurality proceeds to impose two limitations [that] are without support in the language and purposes of the Act or in our cases interpreting it." <u>Id.</u> at 768 (Kennedy, J.); <u>id.</u> at 800 (Stevens, J.) (same); <u>accord</u> <u>United States v. Cundiff</u>, 555 F.3d 200, 210 (6th Cir. 2009) (noting opinions of Justice Kennedy and plurality "flatly reject" the other such that "there is quite little common ground between" them).

The differences between Justice Scalia's opinion and Justice Kennedy's are irreconcilable, and overwhelm the purported commonalities identified by Intervenors. <u>See</u> Doc. 68-1 at 33. For example, whereas Justice Kennedy recognized that the Act's text incorporates "a flexible ecological inquiry into the relationship between the wetlands at issue and traditional navigable waters," <u>Precon Dev. Corp., Inc. v. U.S. Army Corps of Eng'rs</u>, 633 F.3d 278, 294 (4th Cir. 2011), Justice Scalia interpreted the text as hostile to ecological considerations based on a selective reading of a dictionary, <u>see</u> <u>Rapanos</u>, 547 U.S. at 770 (Kennedy, J.); <u>id.</u> at 801, 805 (Stevens, J.). And while both require a "connection to" navigable waters, Justice Scalia required a "continuous surface connection," <u>Rapanos</u> 547 U.S. at 742, whereas Justice Kennedy carried forward the science-based, functional test from <u>Riverside Bayview</u> and <u>SWANCC</u>[61] that jurisdictional waters "significantly affect" traditional navigable waters, <u>id.</u> at 780.

---

[61] <u>Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs</u>, 531 U.S. 159, 167 (2001).

Siding with Justice Scalia, the Agencies reject the very "concept" of the significant nexus test that was at the core of Justice Kennedy's opinion and the Court's decisions in Riverside Bayview and SWANCC. See Doc. 58-63 at 16 ("[T]he NWPR removes the bedeviling 'significant nexus' concept for identifying 'navigable waters.'"). Instead, the Replacement Rule embraces and implements the two main jurisdictional tests of Justice Scalia's opinion that five justices rejected: (1) the relative permanence requirement, and (2) the regular surface connection requirement. Compare, e.g., 85 Fed. Reg. at 22,288–89 (basing Rule's tributary definition on "Rapanos plurality's position that 'the waters of the United States' include only relatively permanent, standing or flowing bodies of waters"), and id. at 22,279 (defining "'adjacent wetlands' to include . . . wetlands [with] certain regular hydrologic surface connections to [such waters]"), with Rapanos, 547 U.S. at 768–776 (Kennedy, J.), and id. at 800–07 (Stevens, J.). Indeed, the Agencies' brief does not highlight a *single provision* of the Rule that diverges from the two unlawful limitations in Justice Scalia's opinion.[62]

While the Agencies attempt to frame their rejection of the significant nexus test and codification of Justice Scalia's interpretation as a reasonable response to Justice Kennedy's mention of "'more specific regulations,'" 85 Fed. Reg. at 22,291 (quoting Rapanos, 547 U.S. at 782 (Kennedy, J.)), Justice Kennedy *rejected* the interpretation codified by the Replacement Rule as "inconsistent with the Act's text, structure, and purpose." Rapanos, 547 U.S. at 776. Read in context, Justice Kennedy's invitation for "more specific regulations" was so that the Agencies could "identify categories" of waters that, "in the majority of cases," *satisfy* the

---

[62] While Intervenors claim that unspecified aspects of the Rule's "tributary" definition "'incorporate[] important aspects of Justice Kennedy's opinion, together with those of the plurality,'" Doc. 68-1 at 33–34 (quoting 85 Fed. Reg. at 22,291), the sentence following the one they selectively quote adopts the *plurality's* interpretation of a "relatively permanent flow" and rejects Justice Kennedy's interpretation. 85 Fed. Reg. at 22,291.

significant nexus test, thereby reducing the need for case-by-case evaluations. Id. at 780–81. This Rule's spelling out of the *plurality's* test in more regulatory detail, Colorado, 445 F. Supp. 3d at 1311, does not satisfy Justice Kennedy's call for "more specific regulations," Rapanos, 547 U.S. at 782—it directly rejects it.[63]

### 2. *Rapanos conclusively rejected the plurality's interpretation.*

When a majority of the Supreme Court agrees on a point of law in a fractured decision, **that is the law**. Even the Agencies agree that "[w]hen there is no majority opinion in a Supreme Court case, controlling legal principles may be derived from those principles espoused by five or more justices," including dissenters. Rapanos Guidance at 3 & nn. 15–16 (collecting cases).[64]

In Rapanos, five Justices held that the plurality's interpretation of "waters of the United States" was an impermissible construction of that ambiguous statutory phrase. 547 U.S. at 776 (Kennedy, J.) ("[T]he plurality's opinion is inconsistent with the Act's text, structure, and purpose."); id. at 800 (Stevens, J., joined by three other Justices, dissenting) (the plurality's "limitations . . . are without support in the language and purposes of the Act or in our cases interpreting it." (citations and quotations omitted)). Five Justices' rejection of the statutory interpretation at the heart of the Replacement Rule is decisive.

### a. *The agreement of five Justices on an issue of law creates binding precedent.*

Intervenors maintain that the views of dissenting Justices may never be considered to ascertain rules of law in fractured Supreme Court opinions. Doc. 68-1 at 34. Their position is

---

[63] For this reason, Intervenors' citation to Cty. of Maui, 140 S. Ct. 1462 (2020), is inapt. The Court in Cty. of Maui cited to tangential aspects of the plurality opinion in Rapanos—not to the two repudiated limitations that were rejected as unreasonable by five Justices. The Court has never "draw[n] guidance about the meaning of the statute," Doc. 68-1 at 36, from the repudiated parts of the plurality opinion.

[64] The Agencies re-adopted the guidance containing this provision last year. See Repeal Rule, 84 Fed. Reg. at 56,626, 56,660 (noting the Repeal Rule revives "applicable agency guidance documents," including the Rapanos Guidance).

contrary to at least *eight* Supreme Court cases and numerous circuit court decisions, which establish that points of law embraced by any five Justices are binding. See, e.g., Doc. 58-1 at 30 (collecting cases); Abdul-Kabir v. Quarterman, 550 U.S. 233, 253-54, n.15 (2007) (analyzing opinions of "five concurring and dissenting Justices" in prior decision to ascertain rule of law with majority support); League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 413–14 (2006) (noting "holding" of prior fractured case was principle endorsed by "majority" comprised of concurrences and dissents); Alexander v. Sandoval, 532 U.S. 275, 281–82 (2001) (analyzing concurring and dissenting opinions to ascertain point of law supported by Court majority in prior case); Wilton v. Seven Falls Co., 515 U.S. 277, 285 (1995) ("[T]he combination of Justice Blackmun and the four dissenting Justices in [a prior case] had made five to require application of [a legal standard they agreed upon]."); Alexander v. Choate, 469 U.S. 287, 293, n. 8 (1985) (noting that "holding" of prior fractured case was rule of law supported by four concurring Justices and three dissenting Justices); United States v. Jacobsen, 466 U.S. 109, 115–18 (1984) (holding that the controlling rule of law in prior case was the principle adopted by two Justices writing separately in majority and four Justices who dissented); see also Nichols v. United States, 511 U.S. 738, 746 (1994) (finding that "[f]ive Members of the Court in [a prior case]—the four dissenters and Justice Stewart—expressed continued adherence to [prior case]").

Contrary to Intervenors' brief, Doc. 68-1 at 34, Marks v. United States, 430 U.S. 188 (1977), does not counsel that courts may only consider concurrences in the judgment when identifying the holding in a fragmented Supreme Court opinion. The Supreme Court has counseled that the Marks test ought not to be taken literally. See, e.g., Grutter v. Bollinger, 539 U.S. 306, 325 (2003) ("It does not seem useful to pursue the Marks inquiry to the utmost logical

possibility." (internal citation omitted)); <u>accord</u> <u>United States v. Johnson</u>, 467 F.3d 56, 65 (1st

Cir. 2006) ("[T]he Supreme Court itself has moved away from the <u>Marks</u> formula.").

Rather, as here, where it is "immediately obvious how [the Justices'] views could be

combined to form a five-Justice Majority," courts have no "reservations" about "combining a

dissent with a concurrence to find [a] ground of decision embraced by a majority of the Justices."

<u>Johnson</u>, 467 F.3d at 65; <u>see also</u> <u>United States v. Donovan</u>, 661 F.3d 174, 182 (3d Cir. 2011)

(holding where "votes of dissenting Justices . . . combined with the votes from plurality or

concurring opinions[] establish a majority view on the relevant issue," that is the law).

Intervenors' reliance on <u>King v. Palmer</u>, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc), Doc. 68-

1 at 44, is inapt. <u>King</u> did not interpret <u>Rapanos</u>. As the First Circuit explained in <u>Johnson</u>—a

case that <em>did</em> interpret <u>Rapanos</u>—the different Supreme Court case <u>King</u> addressed lacked an

"obvious" majority view; thus, <u>King</u>'s approach does not apply to <u>Rapanos</u>. 467 F.3d at 65.

Similarly, Intervenors' unsupported claim that dissenters only count "to verify that

existing law ha[s] not changed" is simply wrong. Doc 68-1 at 44. The Supreme Court has

routinely considered views of dissenters to ascertain "new" majority-supported rules of law in

fractured cases. <u>See</u>, <u>e.g.</u>, <u>Jacobsen</u>, 466 U.S. at 115–17 (noting that a claim "must be tested"

against "standard [that] was adopted by a majority of the Court" in a prior decision—a majority

consisting of two Justices opining for the Court and four dissenters); <u>Alexander</u>, 469 U.S. at 293

n.8 (noting that "holding" in prior fractured decision was rule of law embraced by four

concurring Justices and three dissenters).

Intervenors' effort to undermine the two Supreme Court decisions Plaintiffs cited in their

opening brief similarly fails. <u>See</u> Doc. 68-1 at 34–35. In <u>Vasquez v. Hillery</u>, 474 U.S. 254, 261

n.4 (1986), the Court treated as "precedent[]" the views of a three-justice plurality plus "[t]wo

additional Justices [who] *dissented from the judgment*" in a prior case. The dissenters in the prior

case did not "concur[] in the relevant part of the *judgment*," Doc. 68-1 at 35 (emphasis added), as

Intervenors claim—they simply agreed with the plurality on a *point of law* in a broader analysis

leading to a judgment from which they "dissented." Vasquez, 474 U.S. at 261 n.4. That is

precisely what happened in Rapanos, where the four dissenters agreed with Justice Kennedy on a

point of law—that the plurality interpretation of "waters of the United States" is unreasonable—

but disagreed with Kennedy's judgment of reversal. Intervenors also misread Moses H. Cone

Memorial Hospital v. Mercury Construction Corporation, 460 U.S. 1, 17 (1983). There, the

Court found that "the four dissenting Justices and Justice Blackmun" in a prior opinion "formed

a majority to require application of" a legal principle. Id. at 17. That is, the agreement of five

concurring and dissenting Justices on a point of law binds the lower courts to that principle.

     b.  *Brand X does not permit the Agencies' rejected statutory interpretation.*

Against this plain backdrop, the Agencies' and Intervenors' reliance on Chevron[65] and

Brand X[66] to defend the Rule fails. First, the Agencies' rulemaking is not entitled to Chevron

deference due to the procedural violations of the APA described above. Encino Motorcars, 136

S. Ct. at 2125 (when "agency procedures . . . are defective, a court should not accord Chevron

deference to the agency interpretation."). Second, Agencies may not adopt a statutory

interpretation if a court has unambiguously foreclosed it. But that is exactly what has happened

here—five Justices have said that the Scalia plurality's reading is impermissible.

When a court holds that an agency's interpretation of an ambiguous statutory phrase—

such as "waters of the United States"—is legally impermissible or otherwise unreasonable, the

agency may not codify that interpretation. See, e.g., Mejia v. Sessions, 866 F.3d 573, 583 (4th

---

[65] Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 865-66 (1984).
[66] Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 545 U.S. 967 (2005).

Cir. 2017) ("If . . . the statute is silent or ambiguous, we defer to the agency's interpretation *if it is reasonable*." (emphasis added) (citations and quotations omitted)); Padilla-Caldera v. Holder, 637 F.3d 1140, 1152–53 (10th Cir. 2011) ("[I]f this court holds that [an agency's] interpretation of an ambiguous provision of [a statute] is unreasonable, the [agency] cannot ignore our holding and continue to follow its unreasonable interpretation."); Mercado-Zazueta v. Holder, 580 F.3d 1102, 1112–13 (9th Cir. 2009) ("While agencies retain discretion to fill ambiguous statutory gaps, it does not follow that an agency may repeatedly put forward an interpretation that we already have examined under Chevron and found unreasonable at its second step."), abrogated on other grounds by Holder v. Martinez Gutierrez, 566 U.S. 583 (2012).[67]

Rapanos thus precludes the Agencies from adopting a "waters of United States" definition based on the plurality's repudiated legal test. See, e.g., Mejia, 866 F.3d at 583; Padilla-Caldera, 637 F.3d at 1152–53; Mercado-Zazueta, 580 F. 3d at 1112–13. As one district court has held in preliminarily enjoining the Rule in the state of Colorado, the Agencies lack authority to codify a statutory interpretation rejected by a Supreme Court majority. Colorado, 445 F. Supp. 3d 1295, 1311–12.[68] A clear majority in Rapanos rejected the core elements of this Rule; that majority controls here.

---

[67] Because Justice Kennedy and the dissenters in Rapanos were evaluating a judicial interpretation (Justice Scalia's), and not yet a misguided agency interpretation offered under Chevron, their omission of the word "unambiguous" is irrelevant. Courts need not use "magic words" for their statutory interpretations to unambiguously foreclose future agency readings. Patel v. Napolitano, 706 F.3d 370, 375–76 (4th Cir. 2013) (discussing United States v. Home Concrete & Supply, LLC, 566 U.S. 478 (2012) and explaining that, when a court rejects an interpretation based on statutory text, legislative history, and incongruity with the statutory scheme, the agency is precluded from adopting it under Brand X—the lack of "magic words" in the court's opinion notwithstanding).

[68] In denying a motion for preliminary injunction against the Rule, the United States District Court for the Northern District of California was apparently "unaware" of the voluminous precedent establishing that views held by *any* five Justices of the Supreme Court constitute

Nothing in <u>Brand X</u> allows an agency to adopt statutory constructions that have already been held impermissible—to the contrary, <u>Brand X</u> reaffirmed that <u>Chevron</u> deference requires an agency's construction to be "reasonable." <u>Brand X</u>, 545 U.S. at 980. Thus, the Agencies decision here—to adopt a standard that five members of the Court rejected as inconsistent with the Clean Water Act—is not resuscitated by <u>Brand X</u>.[69]

    c. *The Agencies' "<u>Rapanos</u> as ceiling" argument is a red herring.*

The Agencies' assertion that "no opinion in <u>Rapanos</u> addresses the question of what waters the Agencies *must* regulate under the CWA," Doc. 69 at 19, *i.e.,* set a jurisdictional floor, is a red herring. Five Justices "unambiguously" held that the Agencies must *not* define "waters of the United States" in the manner prescribed by the plurality opinion. <u>Colorado</u>, 445 F. Supp. 3d at 1311; <u>Rapanos</u>, 547 U.S. at 776 (Kennedy, J.) ("[T]he plurality's opinion is inconsistent with the Act's text, structure, and purpose."); <u>id.</u> at 800 (Stevens, J., joined by three other Justices, dissenting) (the plurality's "limitations . . . are without support in the language and purposes of the Act or in our cases interpreting it." (citations and quotations omitted)). While the dissenters "invoked <u>Chevron</u>" in articulating *their own* view of the statute, Doc. 69 at 19, that is beside the point: when addressing Justice Scalia's interpretation (codified by this Rule), the dissenters and Justice Kennedy held that it was impermissible.

---

binding law. See <u>Colorado</u>, 445 F. Supp. 3d at 1311 n.9 (citing <u>California v. Wheeler</u>, No. 20-cv-03005-RS, 2020 WL 3403072, at *6 (N.D. Cal. June 19, 2020)).

[69] The Agencies' brief completely glosses over a critical part of the <u>Brand X</u> holding it quotes: "court's prior judicial construction of a statute trumps an agency construction *otherwise entitled to <u>Chevron</u> deference* only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." Doc. 69 at 9 (emphasis added). For all the reasons discussed in this section and elsewhere, <u>see</u> <u>supra</u> Sections I–II, the Rule is not reasonable, so it is not "otherwise entitled to <u>Chevron</u> deference."

**B.   The Replacement Rule is impermissible under the Clean Water Act.**

**1.  *Regardless of whether <u>Rapanos</u> precludes it, the Rule conflicts with the Clean Water Act.***

Regardless of whether <u>Rapanos</u> is binding, the Court should reject the Rule's interpretation of "waters of the United States" because it is contrary to the Act's text, structure, and purpose. <u>See</u> <u>Rapanos</u>, 547 U.S. at 768–778 (Kennedy, J.); <u>id.</u> at 794–807 (Stevens, J.).

In a statute enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), which uses "broad" but ambiguous terms —"waters of the United States"—to define which waters are protected, <u>Riverside Bayview</u>, 474 U.S. at 133, the Agencies have unreasonably exercised their discretion to strip protections from millions of stream miles and wetland acres that science shows are *integral* to the quality of downstream navigable waters, <u>see</u> <u>supra</u> note 12; <u>see also</u> <u>Rapanos</u>, 547 U.S. at 806 (Stevens, J.) (plurality interpretation "endangers the quality of waters which Congress sought to protect"); <u>accord</u> <u>id.</u> at 778 (Kennedy, J.) ("The limits the plurality would impose . . . give insufficient deference to Congress' purposes in enacting the Clean Water Act."). This is underscored by the legislative history, which shows that Congress did not intend the Rule's drastic reductions in the scope of protected waters. <u>See</u>, <u>e.g.</u>, H.R. Rep. No. 92-911 at 818 (1972) (Doc. 58-52) ("The Committee fully intends that the term 'navigable waters' be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes."); S. Conf. Rep. No. 92-1236 at *3822 (1972) (Doc. 58-53) (same).[70]

---

[70] The legislative history quoted above is material to the reasonableness of the Agencies' interpretation. <u>See</u> <u>New Cingular Wireless PCS, LLC v. Finley</u>, 674 F.3d 225, 249 (4th Cir. 2012) ("If the language is ambiguous, we then turn to other evidence to interpret the meaning of the provision, such as . . . the legislative history.") (citations omitted). <u>SWANCC</u> did not hold otherwise, <u>contra</u> Doc. 69 at 13, and simply noted that nothing "in the legislative history . . .

The Agencies claim that Plaintiffs would require them to go beyond the "statutory limits" and Commerce Clause authority of the Clean Water Act, Doc. 69 at 13, but Plaintiffs argue for no such thing. Instead, Plaintiffs maintain that the Agencies were not free to disregard either the Act's mandate to protect the Nation's waters or the administrative record by categorically excluding streams and wetlands shown to significantly affect them. Protecting these waters is consistent with the Commerce Clause,[71] the Act, and SWANCC, which explained that "Congress' concern for the protection of water quality and aquatic ecosystems" provides the basis for Clean Water Act jurisdiction and that "[i]t was the significant nexus between the wetlands and 'navigable waters' that informed our reading of the CWA in Riverside Bayview Homes." SWANCC, 531 U.S. at 167. Unlike the regulatory approach the Court rejected in SWANCC—where the agency based its action on the "aggregate effect of the 'destruction of the natural habitat of migratory birds' on interstate commerce," id. at 166—Plaintiffs insist only that the Agencies do as Congress instructed to protect water quality. 33 U.S.C. § 1251(a); Riverside Bayview, 474 U.S. at 132 (confirming Congress's "broad, systemic goal of maintaining and improving water quality: . . . 'the word "integrity" . . . refers to a condition in which the natural structure and function of ecosystems [are] maintained." (citing H. Rep. No. 92-911 at 76)).

---

signifies that Congress intended to exert anything more than its commerce power over navigation." SWANCC, 531 U.S. at 168 n.3. The issue here is not—as in SWANCC—what the legislative history says about the constitutional basis for the Act: the issue is that the legislative history shows clear Congressional intent against the drastic restrictions imposed by the Replacement Rule, an "unprecedented reading" that the SWANCC Court did not have before it, Rapanos, 547 U.S. at 778 (Kennedy, J.).

[71] See, e.g., Rapanos, 547 U.S. at 803–04 (Stevens, J.) ("'There is no constitutional reason why Congress cannot, under the commerce power, treat the watersheds as key to flood control on navigable streams and their tributaries.'" (quoting Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 525 (1941))); id. at 777 (Kennedy, J.) (suggesting that federal regulation of streams and wetlands does not "raise a difficult Commerce Clause issue" given "those waters' aggregate effects on national water quality" (citing Wickard v. Filburn, 317 U.S. 111 (1942))).

## 2. *Agencies' and Intervenors' misreading of section 101(b) cannot justify the Rule.*

The Agencies and Intervenors rely on a tortured interpretation of the Act never before adopted by any court or other administration—they claim the Act's primary water quality objective in section 101(a) must yield to a rigid regime of state rights. Doc. 69 at 14; Doc. 68-1 at14.[72] In their view, the Act's "policy" of transferring to states certain "regulatory duties" in section 101(b), <u>Riverside Bayview</u>, 474 U.S. at 136, justifies stripping federal Clean Water Act jurisdiction *regardless* of the harm it will cause the Nation's waters.

Contrary to Intervenors' and the Agencies' claims, Doc. 69 at 14, 22–23; Doc. 68-1 at 14, however, sections 101(a) and 101(b) speak to separate issues. Section 101(a) establishes the Act's explicit (and only) objective to protect national water quality. Section 101(b), by contrast, delegates specific *functions* to states in implementing the Act's programs, satisfying Congress' "policy" "to recognize, preserve, and protect the primary responsibilities and rights of States" over "land and water resources." 33 U.S.C. § 1251(b).

Intervenors latch on to the <u>Rapanos</u> plurality's assertion that Congressional policy "to recognize, preserve, and protect the primary responsibilities and rights and responsibilities of States" to control water pollution, 33 U.S.C. § 1251(b), "refer[s] to something beyond the . . . state administration program" because Congress announced the quoted policy in 1972 but did not establish the state administrative programs until the 1977 amendments to the Clean Water Act. 547 U.S. at 737 (Scalia, J.). Doc. 68-1 at 39. But if anything, Congress amended the Act in 1977 to show how its policy in section 101(b) would be satisfied—by having states administer certain Clean Water Act functions. "Even focusing only on the Act as it stood between 1972 and 1977,

---

[72] <u>See</u> <u>also</u>, <u>e.g.</u>, Doc. 69-1 at 21 ("The way in which states and tribes choose to exercise their responsibilities over resources that are not waters of the United States, i.e., whether they choose to regulate state waters more stringently than the federal CWA, less stringently, using a different model or approach, or not at all, is within the scope of their discretion.").

broad exercise of jurisdiction by the Corps still left the States with ample rights and responsibilities," such as "impos[ing] tougher water pollution standards than required by the Act," "prevent[ing] the Corps and the EPA from issuing permits," and "nearly exclusive responsibility for containing pollution from nonpoint sources." Rapanos, 547 U.S. at 803 (Stevens, J., dissenting) (citations omitted).

Moreover, the Agencies' approach is so haphazard—giving some states an expansive role and others little to none—as to provide no balance at all. For example, the Rule categorically sets ephemeral streams, the extent of which varies dramatically between states, as the dividing line between state and federal jurisdiction. E.g., Doc. 69 at 25 (citing 85 Fed. Reg. at 22,287). Based on that dividing line, for example, Nevada has primary responsibility for more than 85 percent of its watersheds while Montana is left with primary responsibility for less than 2 percent of its watersheds. See EA at 199 (describing percentage of ephemeral streams). To accept the Agencies' interpretation of section 101(b) is to accept the premise that Congress intended to exclude a quarter of the country, nearly the entire Southwest, from the protections provided by the Clean Water Act. See id. That interpretation is not credible and must be rejected.

### 3.  *The "waters of the United States" are not a subset of "the Nation's waters."*

The Agencies and Intervenors insist that "the Nation's waters" means something different than "waters of the United States"—i.e., that Nation refers to something other than "the United States." E.g., Doc. 69 at 15; see also Doc. 68-1 at 40–41. There is no interpretive cannon that counsels attributing different meanings to *synonymous* words. Doc. 68-1 at 40.

As far back as 1977, the Corps recognized the terms as interchangeable. In promulgating new rules to implement the Act, the Corps recognized that "Section 402 establishes the National

Pollutant Discharge Elimination System to regulate industrial and municipal point source discharges of pollutants into the Nation's waters." 42 Fed. Reg. at 37,123.

Legislative history also uses the terms as synonyms. The legislative history from the 1972 Act identifies the goal "to ultimately eliminate the discharge of pollutants into the Nation's waters." S. Rep. No. 92-414 at *3684 (1971) (Ex. A). Section 301 of the Act established there is no "inherent right to use the nation's waterways for the purpose of disposing of wastes." Id. at 3709. Section 402's public participation requirements were included as "[a]n essential element in any control program involving the nation's waters." Id. at 3738.

The Senate Committee Report supporting the 1977 amendments recognized that the Act enacted a "national policy" that prohibited "communities and industries" from discharging "waste directly into the Nation's waters." S. Rep. No. 95-370 at 4330 (1977) (Ex. B). The committee recognized "the need to achieve a high degree of municipal waste treatment for discharges into the Nation's rivers, lakes, and streams." Id. at 4331. The report covered wetlands too, stating that "[t]here is no question that the systematic destruction of the Nation's wetlands is causing serious, permanent ecological damage." Id. at 4336. Section 404 was designed to prevent the "unregulated destruction of these areas" by "regulating the kinds of activities which interfere with the overall ecological integrity of the Nation's waters." Id.

Common sense, legislative history, regulatory history, and the case law Plaintiffs cited in their opening brief, see Doc. 58-1 at 38–39, demonstrate that the "Nation's waters" cannot be different than "waters of the United States," and that the Agencies' attempt to rely on this supposed distinction to justify their violation of the Act's objective is without merit.

**4.  *The Rule unreasonably contradicts longstanding precedent requiring protection of streams and wetlands that significantly affect traditional navigable waters.***

As discussed above, because the Supreme Court rejected the plurality interpretation codified by the Replacement Rule, the Rule is unlawful, and the Court need not address the separate issue of whether <u>Rapanos</u> established a "controlling" interpretation of "waters of the United States." Should the Court reach the issue, the Rule must be vacated because it discards the functional inquiry the Supreme Court has adhered to for decades, and most recently described in Justice Kennedy's opinion in <u>Rapanos</u>.

As Plaintiffs explained in their opening brief, Doc. 58-1 at 31–33, the Supreme Court consistently has recognized that the scope of Clean Water Act jurisdiction is informed by the scientific reality that protecting traditional navigable waters requires regulating upstream waters and wetlands that significantly affect their quality. <u>See</u> <u>Riverside Bayview</u>, 474 U.S. at 135 n.9; <u>SWANCC</u>, 531 U.S. at 167 (2001); <u>Rapanos</u>, 547 U.S. at 759 (Kennedy, J.). Because the Rule excludes countless streams and wetlands that *undisputedly* have a significant impact on navigable water quality, <u>supra</u> note 12, it is also unlawful on this distinct basis.

Neither the Agencies nor Intervenors address this fundamental point head-on. The Agencies claim that "<u>Rapanos</u>, <u>SWANCC</u>, and <u>Riverside Bayview</u> articulate principles that served as guideposts for the Agencies' rulemaking." Doc. 69 at 10. But as explained above, the Agencies did not use those guideposts and, instead, copied the reasoning and statutory interpretation from the repudiated <u>Rapanos</u> plurality opinion. And although the Agencies insist their Rule "avoids federally regulating non-navigable, non-adjacent waters that lack a sufficient connection to traditional navigable waters," Doc. 69 at 11, they have avoided regulating waters that *do have* a significant nexus to traditional navigable waters based on their misguided reading of section 101(b) and "the Nation's waters" in section 101(a), <u>e.g.</u>, <u>supra</u>, Section III.B.2–3.

The Agencies' claim that "*eight* justices [in Rapanos] actually *rejected* the significant nexus methodology because it was not grounded in the text of the CWA or should not supplant agency rulemaking," Doc. 69 at 17 (emphasis in original), is simply incorrect.

While the four Rapanos dissenters unambiguously held that the plurality's interpretation is "without support in the language and purposes of the Act or in our cases interpreting it," 547 U.S. at 800, they noted that Justice Kennedy's articulation of the significant nexus test "is far more faithful to our precedents and to principles of statutory interpretation than is the plurality's" test, id. at 788. The dissent never stated that the significant nexus interpretation was unreasonable, and voted to affirm federal jurisdiction in all cases in which it is satisfied, id. at 810. This understanding is consistent with SWANCC and Riverside Bayview. See SWANCC, 531 U.S. at 167 ("It was the significant nexus between the wetlands and 'navigable waters' that informed our reading of the CWA in Riverside Bayview."); Riverside Bayview, 474 U.S. at 135 n.9 (valid jurisdiction based on whether covered wetlands "have *significant effects* on water quality and the aquatic ecosystem" (emphasis added)).

The Agencies' position that "eight justices" rejected the significant nexus test also flies in the face of more than a decade of their own post-Rapanos implementation of the test, which they reaffirmed *just last year*. See Repeal Rule, 84 Fed. Reg. at 56,626, 56,660 (noting Repeal Rule incorporates "applicable agency guidance documents," including the "Rapanos Guidance," which requires "significant nexus analyses"). That is, the Agencies under this Administration adopted the significant nexus regime that they now say was rejected by eight Supreme Court Justices. This is the embodiment of "administrative evasiveness" and the "'whim and caprice of the bureaucracy.'" S.C. Coastal Conservation League v. Pruitt, 318 F. Supp. 3d 959, 967 (D.S.C.

2018), <u>appeal dismissed</u>, No. 18-1964 (4th Cir. Feb. 4, 2019) (quoting N.C. Growers' Ass'n v.

United Farm Workers, 702 F.3d 755, 772 (4th Cir. 2012) (Wilkinson, J., concurring)).

Intervenors, for their part, again caricature Plaintiffs' argument as overreliance on science

at the expense of all other considerations. Doc. 68-1 at 36. As explained above, this

characterization misses the point: the text of the Clean Water Act incorporates "a flexible

ecological inquiry into the relationship between the wetlands at issue and traditional navigable

waters," Precon Dev. Corp., 633 F.3d at 294, and nothing in the Act supports the Agencies'

departure from it. It also ignores *why* any definition of "waters of the United States" must

consider science and scientifically recognized connections between waterways: because

Congress, the Supreme Court, and every Court of Appeals to consider the issue have said it must.

The Agencies are delegated authority to define "waters of the United States *because* of their

scientific and technical expertise: they must use it.

Intervenors would also drag this Court into a protracted and unnecessary battle over

whether Rapanos establishes a "controlling" interpretation of "waters of the United States." Doc.

68-1 at 31–33. Intervenors refuse to recognize the unanimous chain of precedent after Rapanos

recognizing that waters satisfying Justice Kennedy's "significant nexus" articulation of the

standard are "waters of the United States." But more importantly, they refuse to recognize that

Justice Kennedy's opinion reaffirms the Supreme Court's consistent holding in multiple cases

that "waters of the United States" are those that significantly affect traditional navigable waters.

As the United States has recognized, six circuit courts have construed Rapanos to hold

that (1) waters and wetlands satisfying the significant nexus test are "waters of the United

States," and (2) waters and wetlands need not satisfy Justice Scalia's test to qualify. See Doc. 58-

1 at 5 n.2 (collecting cases); Br. for United States in Opp'n at 5–6, 10, 18–20, Robertson v.

United States, 139 S. Ct. 1543 (2019) (No. 18-609), 2019 WL 1126162, at *5–6, *10, *18–20. Three circuits—the Seventh, Ninth, and Eleventh—hold that Kennedy's standard is binding under Marks. United States v. Gerke Excavating, Inc., 464 F.3d 723, 724–25 (7th Cir. 2006); N. Cal. River Watch v. City of Healdsburg, 496 F.3d 993, 999–1000 (9th Cir. 2007);[73] United States v. Robison, 505 F.3d 1208, 1221–22 (11th Cir. 2007). Three other circuits—the First, Third, and Eighth—recognize that a water may be a "water of the United States" when it satisfies either the Scalia or Kennedy test, as the Rapanos dissenters advised. See Donovan, 661 F.3d at 182–84; Johnson, 467 F.3d at 63–66; United States v. Bailey, 571 F.3d 791, 799 (8th Cir. 2009).

Neither the Agencies nor Intervenors acknowledge these cases here. Noticeably, Intervenors cite five circuit court decisions that applied Marks to different fractured Supreme Court cases, Doc. 68-1 at 31–32,[74] but fail to cite a single one of the six circuit opinions discussed above that applied Marks to Rapanos. Nor do they acknowledge that one of the circuits subscribing to their preferred "logical subset" approach to Marks—see United States v. Davis, 825 F.3d 1014, 1021–22 (9th Cir. 2016)—has already held that "Justice Kennedy's concurrence provides the controlling rule of law for our case." City of Healdsburg, 496 F.3d at 999–1000.[75]

But the fatal flaw in their arguments is not just this failure to recognize the consensus view of Rapanos. It is their defense of a Rule that discards the approach to Clean Water Act jurisdiction the Supreme Court and every court of appeals to consider the issue has endorsed for

---

[73] The Ninth Circuit has subsequently stated that City of Healdsburg did not necessarily preclude the Agencies from using Justice Scalia's test to establish jurisdiction in addition to asserting jurisdiction over waters that satisfy Justice Kennedy's test. N. Cal. River Watch v. Wilcox, 633 F.3d 766, 780–81 (9th Cir. 2011).

[74] A sixth case cited by Intervenors addressed Rapanos but reserved the question of "which test in-fact controls" because "jurisdiction is proper here under both Justice Kennedy's and the plurality's tests." Cundiff, 555 F.3d at 210.

[75] "City of Healdsburg remains valid and binding precedent" after Davis. United States v. Robertson, 875 F.3d 1281, 1292 (9th Cir. 2017), cert. granted and judgment vacated on other grounds, 139 S. Ct. 1543 (2019).

decades in favor of a restrictive view the Supreme Court rejected. It is simply unreasonable to interpret the phrase "waters of the United States" to categorically exclude countless streams and wetlands that exert a significant effect on navigable water quality. The Rule flies in the face of decades of precedent supporting this conclusion.

### 5.  *Catskill Mountains* underscores why the Replacement Rule is unreasonable.

The Agencies' citation to <u>Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA</u>, 846 F.3d 492 (2d Cir. 2017) underscores why the Replacement Rule is an unreasonable construction of the Act. <u>Catskill Mountains</u> involved a challenge to EPA's rule codifying its longstanding informal policy of exempting "water transfers" between "waters of the United States"—with pollutants being added to individual "waters of the United States" but not to "waters of the United States" as whole—from NPDES permitting requirements. 846 F.3d at 504. Plaintiffs had argued that the rule was inconsistent with the Act's objective, and the Second Circuit held that this was "a strike against [the rule's] reasonableness," but "not [alone] enough for the EPA's position to be 'out.'" <u>Id.</u> at 517.

There are at least four additional strikes against the Rule's reasonableness which—if present in <u>Catskill Mountains</u>—would have been more than enough for an out. First, as explained by Justice Kennedy and the <u>Rapanos</u> dissenters, the Rule's interpretation of "waters" in "waters of the United States" and "adjacent" are unreasonable, separate from any reference to the Act's objective. <u>See</u> 547 U.S. at 768–778 (Kennedy, J.); <u>id.</u> at 794–807 (Stevens, J.). Second, the <u>Catskill Mountains</u> court found that the Act's legislative history was "silent, or very nearly so, as to the applicability of the NPDES permitting program to water transfers," 846 F.3d at 515, whereas the legislative history of "waters of the United States" conflicts with the Rule's interpretation, <u>see</u> <u>supra</u> Section III.B.1. Third, EPA's prior informal practice of exempting water

transfers from NPDES permitting had "prevailed for decades without Congressional course-correction of any kind," Catskill Mountains, 846 F.3d at 516, whereas the Rule is unprecedented and with no plausible Congressional acquiescence; on the contrary, legislation was promptly introduced in the House of Representatives to overturn the Rule, see H.R. Rep. No. 116-6745 (2020) (Ex. C). Fourth, the Second Circuit determined that the water transfers rule made "practical" sense, Catskill Mountains, 846 F.3d at 525, whereas the Replacement Rule's approach "makes little practical sense in a statute concerned with downstream water quality." Rapanos, 547 U.S. at 769 (Kennedy, J.); accord id. at 800 (Stevens, J.).

## IV.  Plaintiffs Have Standing on Behalf of Themselves and Their Members.

### A.  Under any standard, Plaintiffs have representational standing.

In vacating the Suspension Rule, this Court took plaintiffs' standing as self-evident. See S.C. Coastal Conservation League, 318 F. Supp. 3d at 959–70. Plaintiffs' injuries inflicted by the Replacement Rule *are even more* severe, given the Rule's gutting of clean water protections. Nevertheless, the Agencies (though not the Intervenors) briefly contend that Plaintiffs are not injured by a Rule that allows unregulated pollution of the streams, rivers, wetlands, and lakes their members drink from, paddle, and swim in. Doc. 69 at 41. The Agencies systematically overstate what is required to establish standing, and they ignore or misconstrue undisputed material facts in Plaintiffs' standing declarations. These declarations satisfy even the heightened standards the Agencies seek to impose on environmental litigants.

### 1.  *Plaintiffs have shown concrete injury from the Replacement Rule.*

As Plaintiffs explained in their opening brief, Doc. 58-1 at 40, when standing is premised on injury to environmental interests, "[t]hreats or increased risk [] constitutes cognizable harm." Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 160 (4th Cir. 2000).

Standing is "not onerous" in environmental cases, <u>Am. Canoe Ass'n v. Murphy Farms, Inc.</u>, 326 F.3d 505, 517 (4th Cir. 2003), because the "'destruction of a wilderness habitat, or the fouling of air and water are harms that are frequently difficult or impossible to remedy' by monetary compensation," <u>Beck v. McDonald</u>, 848 F.3d 262, 274 n.5 (4th Cir. 2017) (citations omitted).

Despite the Agencies' claims, a future injury need not be "certainly impending" to be "actual and imminent." Instead, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." <u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 158 (2014) (internal citation omitted); <u>see</u> <u>also</u> <u>Beck v. McDonald</u>, No. 3:13-cv-999, 2015 WL 13777969, at *8–9 (D.S.C. Mar. 31, 2015) (acknowledging "reasonable concern of future harm" is sufficient for standing and collecting Fourth Circuit cases), <u>aff'd</u>, 848 F.3d 262 (4th Cir. 2017).

Accordingly, and contrary to the Agencies' brief, Doc. 69 at 42, the Fourth Circuit and other courts have consistently found that plaintiffs need not point to bulldozers on the ground to challenge a rule that deregulates pollution. In <u>1000 Friends of Maryland v. Browner</u>, for example, the Fourth Circuit upheld plaintiff's standing to challenge EPA's approval of Baltimore's "motor vehicle emissions budget" even though that budget did not approve any specific project or pollution. 265 F.3d at 219, 225–26. The court held that plaintiff had standing because its members "have an interest in preventing ill-conceived transportation projects from increasing the level of motor vehicle emissions pollution to which [they] are exposed." <u>Id.</u> at 225. Just like the action challenged there, the Replacement Rule eliminates regulatory protections for the pollution of areas that Plaintiffs' members use and enjoy.

Similarly, in <u>Natural Resources Defense Council v. Wheeler</u>, the D.C. Circuit held that a plaintiff whose member owned coastal property threatened by climate change had standing to

challenge an EPA rule that "allows entities" to emit more of a certain type of greenhouse gas. 955 F.3d 68, 77 (D.C. Cir. 2020). The rule did not approve any specific project or pollution, but the court accepted the obvious: that deregulating the greenhouse gas "thus will cause an increase in [] emissions [of the greenhouse gas]." Id. at 77;[76] accord Gaston Copper Recycling Corp., 204 F.3d at 161; Beck, 848 F.3d at 274 n.5; Cent. Delta Water Agency v. United States, 306 F.3d 938, 949–50 (9th Cir. 2002) (collecting cases and holding "that governmental action that creates a risk of environmental harm may be challenged before the potential harm occurs").

Indeed, when courts have considered standing in challenges to prior rules restricting the scope of "waters of the United States," they have held that plaintiffs establish standing where they have "interests in various wetlands, tributaries, and other smaller bodies of water," and those waters "face increased risks of pollution following the promulgation of the [rule]." Puget Soundkeeper All. v. Wheeler, No. 15-cv-1342-JCC, 2018 WL 6169196, at *2 (W.D. Wash. Nov. 26, 2018) (Puget Soundkeeper I) (finding standing to challenge the Suspension Rule). The Agencies' reliance on a footnote in another opinion from that case, Doc. 69 at 42, is inapt: plaintiffs there challenged a (much less drastic) change to the waste treatment exclusion in the 2015 Clean Water Rule. Puget Soundkeeper All. v. Wheeler, No. 15-cv-1342-JCC, 2019 WL 6310562 (W.D. Wash. Nov. 25, 2019) (Puget Soundkeeper II). The declarant in that case had expressed interests in the Puget Sound—a traditional navigable water not threatened by the exclusion challenged in that case—"and its surrounding water features." Id. at *7 n.8. Given the narrowness of the challenged exclusion, the court faulted the plaintiff for "not identify[ing] any project, proposed or existing, that is causing or will soon cause the harms he is concerned about."

---

[76] NRDC and 1000 Friends reviewed agency rules under the judicial review provisions of the Clean Air Act, but the review mechanism did not influence their analyses of Article III injury that directly apply to this case.

Id. Plaintiffs' challenge to the Replacement Rule is instead analogous to the Puget Soundkeeper I decision finding standing to challenge the Suspension Rule. But even if the Court looked to Puget Soundkeeper II to evaluate standing for the waste treatment exclusion challenged here, Plaintiffs have satisfied that standard—identifying numerous discharges to newly non-jurisdictional cooling lakes that members use for varied purposes, infra Section IV.A.2.

Under this proper application of standing doctrine, Plaintiffs' declarations more than suffice. As detailed in their opening brief, Doc. 58-1 at 41–44, Plaintiffs' members have established aesthetic, recreational, business, and property interests in the streams, wetlands, and lakes that the Replacement Rule opens to pollution without federal permit protections—and also in downstream waters that will be degraded when newly-unprotected upstream waters are polluted. The undisputed facts show that it is the members themselves who will be harmed when the wetlands where they observe wildlife are destroyed or the streams they kayak are less appealing or less safe. The Agencies cannot—and do not—deny that these waters face "substantial risk" of pollution under the Replacement Rule, making them less useable and enjoyable to Plaintiffs' members; to the contrary, they concede the precise risks that constitute the injury. E.g., EA at 105.

As such, the Agencies do not deny that members' fears that the waters they use will be degraded are "reasonable." Nor could they, for members rely on affected waters in high development and industrial areas across the country, which already suffer from pollution, e.g., Doc. 58-1 at 41–42, and live and work in states that are unable or unwilling to protect newly non-jurisdictional waters, supra note 48—including states that prohibit or restrict environmental

protections that are more stringent than the federal government's.[77] Members have also witnessed how local developers have responded to past contractions in federal clean water protections—with the wholesale destruction of wetlands, causing immense ecological damage, e.g., Doc. 58-34 at ¶¶ 30–31. Under the Replacement Rule, the result will be the same.

The Agencies' mistaken claim that Plaintiffs must "identify particular concrete action applying the regulations to harm them," Doc. 69 at 41 (citations and quotations omitted), is particularly striking in the context of this Rule, whose express exclusions mean that polluters can dredge or discharge into newly unprotected waters without requesting any "application" of the Rule or providing Plaintiffs any notice or opportunity to object, e.g., Doc. 58-16 at ¶ 18; Doc. 58-34 at ¶ 14. Indeed, the Agencies invite polluters to proceed without "unnecessary jurisdictional determination requests" in "numerous cases." 85 Fed. Reg. at 22,292. Article III does not require plaintiffs to wait until they are "engulfed" by this pollution to bring suit. Gaston Copper Recycling Corp., 204 F.3d at 1610; Cent. Delta Water Agency, 306 F.3d at 950 ("[P]laintiffs need not wait until the natural resources are despoiled before challenging the government action leading to the potential destruction.").

Moreover, "purely legal" facial challenges to final rules under the APA are "presumptively reviewable," without application of the rule, Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 440 F.3d 459, 464 (D.C. Cir. 2006) (collecting cases), as underscored by this Court's decision in the Suspension Rule case, S.C. Coastal Conservation League, 318 F. Supp. 3d at 959–70; accord, Puget Soundkeeper I, 2018 WL 6169196, at *1–7, and the common practice of many other courts, e.g., United Steel v. Mine Safety & Health

---

[77] E.g., N.C. Gen. Stat. § 150B-19.3(a); Va. Code Ann. §§ 62.1-44.15(3a), (10); Colo. Rev. Stat. §§ 25-8-504, 25-8-202(8); Mont. Code Ann. §§75-5-203, 75-6-116; see also Doc. 58-1 at 41 n.47 (noting Plaintiffs' members use affected waters in these and many other states).

Admin., 925 F.3d 1279 (D.C. Cir. 2019); California v. Bernhardt, No. 19-cv-06013-JST, 2020 WL 3097091, at *6, 9 (N.D. Cal. May 18, 2020). These cases refute the Agencies' suggestion that facial challenges are appropriate only under specific direct review statutes like 33 U.S.C. § 1369(b). Lujan v. Nat'l Wildlife Fed'n, see Doc. 69 at 41, has no bearing here: unlike the Replacement Rule, the bundle of agency practices challenged in Lujan were "not an 'agency action' within the meaning of [the APA, 5 U.S.C.] § 702, much less a 'final agency action' within the meaning of § 704." 497 U.S. 871, 890 (1990). The Replacement Rule is a "final agency action," so Lujan is off point.

### 2. *Plaintiffs satisfy the incorrect, heightened standards the Agencies would impose.*

Though they need make no such showing, Plaintiffs' standing declarations establish precisely what the Agencies (wrongly) insist upon: that Plaintiffs "point[] to [] third-parties discharging or about to discharge pollutants into waters or wetlands that they personally use and affect them, but that are no longer regulated [under the Replacement Rule]." Doc. 69 at 42. The Agencies simply ignore Plaintiff's standing declarations.

For example, members live on and recreate in large public lakes in the Southeast— including Lake Keowee and Lake Monticello Reservoir in South Carolina, Hyco Lake and Sutton Lake in North Carolina—that currently receive pollutant discharges from power plants. See, e.g. Doc. 58-32 at ¶¶ 2, 5–6 (Lake Keowee). As Plaintiffs explained in their opening brief, these lakes all lose Clean Water Act protection under the Rule's expanded "waste treatment system" exclusion. Doc. 58-1 at 12–15. Unregulated pollution will degrade the quality of these lakes, harming members' diverse activities in and around these waters. E.g., Doc. 58-32 at ¶¶ 10–15; Doc. 58-12 at ¶¶ 11–15; Doc. 58-46 at ¶¶ 6–11; Doc. 58-37 at ¶¶ 8–13.

As also noted in our opening brief, Doc. 58-1 at 43–44, Los Alamos National Laboratory discharges pollutants under EPA-issued NPDES permits into ephemeral streams upstream of the primary drinking water source for Santa Fe, New Mexico.[78] If these permits are terminated, it will lead to degraded drinking water, increased treatment costs, or both for Environment America members living in Santa Fe. Doc. 58-23 at ¶¶ 2, 6–9; see also Doc. 58-25 at ¶¶ 4–10.

### B.  Plaintiffs have organizational standing

The Agencies do not dispute that the Replacement Rule deprives Plaintiffs of information about, and an opportunity to comment on, projects that pollute the waters they were founded to protect and that their members rely on. Rather, they wrongly portray Plaintiffs' organizational harm as a "bare procedural violation." Doc. 69 at 42 (citations and quotations omitted).

But as spelled out in their declarations and opening brief, Plaintiffs depend on information about proposed projects disclosed through the permitting process to carry out their core functions, including monitoring pollution to the waters they were founded to protect, educating their members on threats to the waters they use and care about, and determining whether to propose legislation. E.g., Doc. 58-48 at ¶¶ 13–15; Doc. 58-20 at ¶¶ 27–30; Doc. 58-34 at ¶¶ 8, 13–14. Plaintiffs rely on these disclosures and the comment process to ensure that project proponents reduce impacts to water resources. E.g., Doc. 58-34 at ¶ 9; Doc. 58-48 at ¶¶ 14–15. Members depend on Plaintiffs to perform these core functions. E.g., Doc. 58-27 at ¶ 41.

The Rule unlawfully deprives Plaintiffs of the information and public participation tools they depend on to do their work. Courts have routinely held lesser injuries sufficient to establish organizational standing. See, e.g., PennEnvironment v. PPG Indus., Inc., 23 F. Supp. 3d 553,

---

[78] See Comment of Rachel Conn, Project Director, Amigos Bravos, et al., on Proposed Revised Definition of "Waters of the United States," at 11–12 (AR 4921) (Apr. 15, 2019) ("Amigos Bravos Comments").

586–88 (W.D. Pa. 2014); <u>Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n</u>, 389 F.3d 536, 546 (6th Cir. 2004); <u>see also</u> <u>NRDC v. EPA</u>, 961 F.3d 160, 168–69 (2d Cir. 2020).

Plaintiffs will attempt to substitute for lost information through increased sampling and monitoring when possible. <u>E.g.</u>, Doc. 58-14 at ¶¶ 13–15; Doc. 58-34 at ¶ 13–14. But because the "Rule directly impairs [Plaintiffs'] ability to" perform their core functions, <u>CASA de Md., Inc. v. Trump</u>, 971 F.3d 220 (4th Cir. 2020), the "consequent drain on [their] resources," <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 379 (1982), cannot be framed as a mere voluntary budget choice. <u>E.g.</u>, <u>Monsanto Co. v. Geertson Seed Farms</u>, 561 U.S. 139, 154 (2010) (finding standing to challenge deregulation of genetically modified crops (GMCs) where risk that non-GMCs would be contaminated by GMCs prompted plaintiff distributors "to conduct testing to find out whether and to what extent their crops have been contaminated.").

## V.    Plaintiffs' Claims Are Ripe for Disposition

In passing, the Agencies *appear* to ask this Court to decline jurisdiction on the grounds that the case is not ripe. <u>See</u> Doc. 69 at 41. Because "perfunctory and undeveloped arguments . . . are waived," this Court should ignore these cursory ripeness arguments. <u>E.g.</u>, <u>Schwartz v. Wellin</u>, No. 2:13-cv-3595, 2014 WL 12637912, at *3 (D.S.C. Aug. 14, 2014).[79] Regardless, Plaintiffs' facial claims against the Rule "can never get riper." <u>Ohio Forestry Ass'n, Inc. v. Sierra Club</u>, 523 U.S. 726, 737 (1998).

Ripeness depends on "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration," <u>Nat'l Park Hospitality Ass'n</u>, 538 U.S. at 808 (citations omitted). "[A] case is fit for judicial decision when the issues are purely

---

[79] Because the Agencies devote so little space to this notion, it is impossible to tell whether they are raising constitutional or prudential concerns. <u>See</u>, <u>e.g.</u>, <u>Nat'l Park Hosp. Ass'n v. Dep't of Int.</u>, 538 U.S. 803, 808 (2003). By failing to present a full argument in their opening brief, they have waived the opportunity to present further argument on it.

legal and when the action in controversy is final and not dependent on future uncertainties." Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC, 713 F.3d 187, 198 (4th Cir. 2013) (citations and quotations omitted). The issues in this case satisfy both requirements: they are pure questions of law concerning a final rule and the process that led to it. See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 417 F.3d 1272, 1282 (D.C. Cir. 2005); accord Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006). "[T]he issue before the Court is one of law, and factual development would not assist the Court." New Hope Power Co. v. U.S. Army Corps of Eng'rs, 746 F. Supp. 2d 1272, 1280 (S.D. Fla. 2010).

The second element of ripeness—the hardship to the parties of withholding consideration —weighs heavily in favor of immediate disposition. The Rule expressly excludes many categories of streams and wetlands, eliminating any procedural check—indeed, any further "agency action" to challenge—before developers or polluters may degrade or destroy waters. As explained above, Plaintiffs and their members will often not even learn of specific projects harming the waters they rely on until it is too late. Forcing Plaintiffs to wait and challenge those specific projects would not just delay but deny them any meaningful judicial review.

## VI.    Vacatur without Remand Is the Proper Remedy

When a court has determined that a regulation is unlawful, "the practice of the court is ordinarily to vacate the rule." Nat'l Venture Capital Ass'n v. Duke, 291 F. Supp. 3d 5, 20 (D.D.C. 2017) (quoting Ill. Pub. Telecomms. Ass'n v. FCC, 123 F.3d 693, 693 (D.C. Cir. 1997)); see also Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs, 145 F.3d 1399, 1409 (D.C.Cir.1998) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated ....") (citation and quotations omitted); AARP v. U.S. Equal Emp't Opp. Comm'n, 292 F. Supp. 3d 238, 242 (D.D.C. 2017) (finding that "the [APA] itself

contemplates vacatur as the usual remedy when an agency fails to provide a reasoned explanation for its regulations."). Indeed, courts have routinely vacated unlawful rules promulgated by this administration. See, e.g., Ex. D.

The Agencies needlessly complicate this straightforward remedy by suggesting remand, partial vacatur, or less than nationwide relief is appropriate. But courts vacate unlawfully promulgated rules for good reason—as remanding unlawful actions back to the agency without vacatur can "invite[] agency indifference." NAACP v. Trump, 298 F. Supp. 3d 209, 245 (D.D.C. 2018) (citing In re Core Comm'n, Inc., 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring)). "A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such." NRDC v. EPA, 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring).

Although some courts have declined to vacate rules by applying a two-part test, the Replacement Rule must be vacated even under that analysis. The two factors those courts have considered in deciding whether or not to vacate are "the seriousness of the ... deficiencies of the [agency] action" and "the disruptive consequences of vacatur." St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard, 85 F. Supp. 3d 197, 208 (D.D.C. 2015) (internal citation omitted). Both factors support vacating the Replacement Rule.

First, the Agencies' errors in promulgating the rule are "fundamental," with "little or no prospect of [a] cur[e]." Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Agric., 317 F. Supp. 3d 385, 392 (D.D.C. 2018) (citations and quotations omitted). When an agency has "failed to offer a reasoned explanation" for a rule, the Rule "is therefore *ultra vires* and unenforceable." United Steel, 925 F.3d at 1287. Where, as here, "[t]he APA violations . . . are numerous, fundamental, and far-reaching," vacatur is the appropriate remedy. New York v. U.S. Dep't of Health &

Human Servs., 414 F. Supp. 3d 475, 577 (S.D.N.Y. 2019). Moreover, the Agencies concede that Justice Scalia's repudiated opinion in Rapanos serves as the "unifying legal theory" of the Replacement Rule. Doc. 69 at 16 (citations omitted). That core deficiency cannot be rehabilitated on remand and requires complete vacatur.

The second factor—whether or not vacatur would have disruptive consequences—"is weighty only insofar as the agency may be able to rehabilitate its rationale for the regulation." Comcast Corp. v. FCC, 579 F.3d 1, 9 (D.C. Cir. 2009). Any *post hoc* rationalization would render the APA's important purposes of agency "accountability and reasoned decisionmaking" meaningless as the Agencies cobble together an explanation for a decision already made. Am. Med. Ass'n v. Reno, 57 F.3d 1129, 1132 (D.C. Cir. 1995).

Moreover, courts have found that vacatur would have disruptive consequences largely only in situations where there might be "risk posed by an order *nullifying* an environmental or health regulation central to public safety." AFL-CIO v. Chao, 496 F. Supp. 2d 76, 92 (D.D.C. 2007) (emphasis added). This factor weighs in favor of vacatur here because Plaintiffs ask the court to vacate a facially invalid rule that *eliminates* fundamental environmental protections and puts the public at risk. To allow this Rule to remain in place on remand, or to postpone vacatur for briefing on remedy, would be to implicitly encourage industrial interests to fill as many streams and wetlands as possible before a new rule is promulgated. The Agencies would have no incentive to move quickly and the environmental damage would be devastating. The Corps has already issued revised jurisdictional determinations removing federal protections from wetlands near this Court and across the country.[80] Therefore, the Court should adhere to the general rule

---

[80] See Bloomberg Law, Companies Eager to "Lock In" Trump-Era Water Rule Exemptions (Sept. 10, 2020), https://perma.cc/8LU4-YM9G (permanent link). This evidence is properly before the court because "relief is at issue." Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989).

that "if a plaintiff prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order." Greater Yellowstone Coal. v. Bosworth, 209 F.Supp.2d 156, 163 (D.D.C. 2002) (internal quotation omitted).

If the Rule is vacated, the law will revert to the Agencies' October 2019 rule that reinstated regulations and guidance that the Agencies themselves have described as "intended to ensure certainty as to the scope of CWA jurisdiction." Repeal Rule, 84 Fed. Reg. at 56,626, 56,659. There is no rationale for maintaining this plainly unlawful rule on remand and no additional briefing is necessary. That delay will only accelerate the loss of streams and wetlands under this Rule as industrial interests attempt to maximize environmental impact before vacatur.

Because full vacatur of the Rule is warranted, it would be improper to limit the remedy to particular parties or regions, as those questions of scope pertain to traditional equitable relief— not vacatur under the APA. That is because vacatur "invalidate[s]" the challenged agency action, and does "not simply . . . forbid[] its application to a particular individual," as would an order imposing injunctive relief. O.A. v. Trump, 404 F. Supp. 3d 109, 153 (D.D.C. 2019) (collecting cases, citations and quotations omitted). Indeed, "[w]hat would it mean to 'vacate' a rule as to some but not other members of the public? What would appear in the Code of Federal Regulations?" Id.; accord N.M. Health Connections v. HHS, 340 F. Supp. 3d 1112, 1183 (D.N.M. 2018) ("The Court does not know how a court vacates a rule only as to one state, one district, or one party."), rev'd on other grounds, 946 F.3d 1138 (10th Cir. 2019). The Agencies urge the Court to do these "logical gymnastics," O.A., 404 F. Supp. 3d at 153, but "do[] not and cannot cite to instances where a rule has been vacated in its entirety, but limited only to the parties. All of the courts that have been presented with the possibility of such a remedy have

rejected it," <u>City & Cty. of S.F. v. Azar</u>, 411 F. Supp. 3d 1001, 1025 (N.D. Cal. 2019) (collecting cases), <u>appeal</u> <u>dismissed</u>, No. 20-15398, 2020 WL 3053625, at *1 (9th Cir. June 1, 2020).[81]

In addition, nationwide relief is the only practical option here. The Agencies have violated their fundamental duties under the APA and the Clean Water Act in a way that harms Plaintiffs and their members nationwide. Plaintiffs documented their extensive member networks and nationwide reach in support of standing. <u>See</u> Doc. 58-1 at 39–45. "[T]o provide the relief that any APA plaintiff is entitled to receive for establishing that an agency's rule is procedurally invalid, the rule must be invalidated, so as to give interested parties (the plaintiff, the agency, and the public) a meaningful opportunity to try again." <u>New York</u>, 414 F. Supp. 3d at 580 (internal citations omitted).

## CONCLUSION

Because the Replacement Rule violates the APA and the Clean Water Act, the Court should deny the cross-motions for summary judgment, grant summary judgment to Plaintiffs, and vacate the Replacement Rule as arbitrary, capricious, and contrary to law.

---

[81] The cases the Agencies cite, <u>see</u> Doc. 69 at 44–4, including <u>Monsanto</u>, 561 U.S. at 165–66 and <u>Virginia Soc'y for Human Life, Inc. v. FEC</u>, 263 F.3d 379, 394 (4th Cir. 2001), dealt with injunctions, not vacatur—the "ordinary result" when a rule violates the APA, <u>Nat'l Mining Ass'n</u>, 145 F.3d at 1409. An injunction "'is a judicial process or mandate operating in personam,'" whereas vacatur—like a stay—"operates upon the [] proceeding itself." <u>Cf.</u> <u>Nken v. Holder</u>, 556 U.S. 418, 428 (2009). Because vacatur invalidates the challenged *action*, the scope questions relevant to an injunction do not apply.

Respectfully submitted this the 21st day of September 2020.

s/ Frank S. Holleman III
D.S.C. Bar No. 1911
fholleman@selcnc.org
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
Telephone: (919) 967-1450
Facsimile: (919) 929-9421

Geoffrey R. Gisler*
ggisler@selcnc.org
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
Telephone: (919) 967-1450
Facsimile: (919) 929-9421

Kelly F. Moser*
kmoser@selcnc.org
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
Telephone: (919) 967-1450
Facsimile: (919) 929-9421

Nicholas S. Torrey*
ntorrey@selcnc.org
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
Telephone: (919) 967-1450
Facsimile: (919) 929-9421

Leslie A. Griffith*
lgriffith@selcnc.org
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
Telephone: (919) 967-1450
Facsimile: (919) 929-9421

*Attorneys for Plaintiffs*
*Pro hac vice*