**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

SOUTH CAROLINA COASTAL )
CONSERVATION LEAGUE, *et al*., )
)
      Plaintiffs, )
)
  v. )
)     No. 2:20-cv-01687-BHH
MICHAEL REGAN, *et al.*, )
)
      Defendants, )
)
AMERICAN FARM BUREAU )
FEDERATION, *et al.*, )
)
     Intervenor-Defendants. )
)

**PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR VOLUNTARY REMAND WITHOUT VACATUR, RESPONSE IN
OPPOSITION TO INTERVENOR-DEFENDANTS' CROSS-MOTION FOR SUMMARY
JUDGMENT, AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. v

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.     The Agencies' Motion for Remand Without Vacatur Should Be Denied ......................... 2

       A.    The Agencies Fail to Meet the Standard for Remand Without Vacatur ................. 3

           1.    Allowing an unlawful rule to remain in effect during a rulemaking
               of indefinite duration would prejudice Plaintiffs and harm the
               public interest ............................................................................................. 3

           2.    Remand without vacatur would hardly conserve judicial resources ........... 7

       B.    Remand Is Appropriate Only With Vacatur of the Replacement Rule .................. 8

           1.    The Rule's serious deficiencies—effectively conceded by the
               Agencies—make remand without vacatur inappropriate .......................... 10

           2.    It is remand *without* vacatur that would have disruptive
               consequences across the nation .................................................................. 11

           3.    Courts remanding without vacatur have faced circumstances
               considerably different than those present here ........................................... 16

II.    Plaintiffs' Motion for Summary Judgment Should Be Granted, Intervenors'
     Cross-Motion for Summary Judgment Denied, and the Replacement Rule Vacated ........ 17

       A.    By Failing to Oppose Plaintiffs' Motion for Summary Judgment, the
            Agencies Concede that the Replacement Rule Is Arbitrary, Capricious,
            and Unlawful ................................................................................................. 17

       B.    The Replacement Rule Unlawfully Excludes Navigable Lakes ......................... 18

           1.    The Agencies did not acknowledge their unlawful expansion of the
                waste treatment exclusion during the rulemaking, and Intervenors
                fail to acknowledge it now ........................................................................ 18

           2.    This issue is properly before the Court ...................................................... 22

C.      The Replacement Rule Violates the Administrative Procedure Act......................24

        1.      The Agencies failed to justify their dramatic departure from prior
                policy.........................................................................................................25

                a.      The Agencies failed to confront their own scientific record..........25

                b.      Intervenors' efforts to provide "good reasons" for the
                        Agencies' abrupt policy change fail ...............................................30

        2.      The Agencies failed to meaningfully address the most important
                aspect of the problem: the Rule's impact on water quality.......................32

        3.      The Agencies did not meaningfully consider reliance interests ...............33

        4.      The Agencies made arbitrary distinctions between waters that
                perform similar functions..........................................................................35

D.      The Replacement Rule Codifies an Impermissible Interpretation of
        "Waters of the United States" .............................................................................39

        1.      The Rule conflicts with the Clean Water Act ...........................................40

                a.      The Rule is incompatible with the Clean Water Act's
                        objective..........................................................................................40

                b.      The Rule defies the Clean Water Act's mandate to consider
                        science.............................................................................................43

                c.      The Rule unlawfully reads section 101(b) to undermine the
                        Act's objective ...............................................................................45

                d.      The "Nation" referred to in section 101(a) is "the United
                        States" .............................................................................................47

        2.      Rapanos precludes the Rule's interpretation.............................................49

                a.      The Rule codifies a plurality interpretation that five Justices
                        rejected as impermissible................................................................50

                b.      The majority's rejection of the Rule's jurisdictional test is
                        binding precedent.............................................................................52

                c.      Brand X and Chevron do not resuscitate the Rule.........................55

3.      The Rule contradicts longstanding precedent requiring protection
        of streams and wetlands that significantly affect traditional
        navigable waters........................................................................................57

E.      Intervenors' Undeveloped Challenge to Plaintiffs' Standing Should Be
        Rejected...........................................................................................................61

CONCLUSION.............................................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

A.T. Massey Coal Co. v. Massanari,
    305 F.3d 226 (4th Cir. 2002) ...........................................................................54, 55

Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Agric.,
    317 F. Supp. 3d 385 (D.D.C. 2018) ...............................................................10

Alexander v. Choate,
    469 U.S. 287 (1985)..........................................................................................53

All. for the Wild Rockies v. Marten,
    No. CV 17-21-M-DLC, 2018 WL 2943251 (D. Mont. June 12, 2018)................10

Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission,
    988 F.2d 146 (D.C. Cir. 1993) .........................................................................9, 10

Am. Forest Res. Council v. Ashe,
    946 F. Supp. 2d 1 (D.D.C. 2013) .....................................................................7, 10

Appalachian Power Co. v. EPA,
    251 F. 3d 1026 (D.C. Cir. 2001) ......................................................................23

Arnold v. Welch,
    No. CV 2:16-1359-BHH, 2018 WL 4346870 (D.S.C. Sept. 12, 2018) ...............17

ASSE Int'l, Inc. v. Kerry,
    182 F. Supp. 3d 1059 (C.D. Cal. 2016) ............................................................9, 16

Black Warrior Riverkeeper, Inc., v. U.S. Army Corps of Engineers,
    781 F.3d 1271 (11th Cir. 2015) ........................................................................11

Bostock v. Clayton Cnty.,
    140 S. Ct. 1731 (2020)......................................................................................48

Brzonkala v. Virginia Polytechnic Institute and State University,
    169 F.3d 820 (4th Cir. 1999) ...........................................................................55

Cal. Cmtys. Against Toxics v. EPA,
    688 F.3d 989 (9th Cir. 2012) ...........................................................................9

California v. Wheeler,
    467 F. Supp. 3d 864 (N.D. Cal. 2020) .............................................................57

Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc.,
    25 F. Supp. 3d 798 (E.D.N.C. 2014)......................................................................19

Chevron v. Natural Resources Defense Council,
    467 U.S. 837 (1984)..........................................................................................55

Chlorine Chemistry Council v. EPA,
    206 F.3d 1286 (D.C. Cir. 2000).............................................................................6

Colorado v. EPA,
    445 F. Supp. 3d 1295 (D. Colo. 2020), rev'd on other grounds, 989 F.3d 874
    (10th Cir. 2021)......................................................................................50, 57

Comcast Corp. v. FCC,
    579 F.3d 1 (D.C. Cir. 2009).................................................................................9

County of Maui v. Hawaii Wildlife Fund,
    140 S. Ct. 1462 (2020)..................................................................30, 36, 40, 47

CTIA-Wireless Ass'n v. FCC,
    466 F.3d 105 (D.C. Cir. 2006)............................................................................23

Ctr. For Native Ecosystems v. Salazar,
    795 F. Supp. 2d 1236 (D. Colo. 2011)..............................................................10, 11

Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,
    140 S. Ct. 1891 (2020)..............................................................24, 32, 34, 35

Eastern Enterprises v. Apfel,
    524 U.S. 498 (1998)........................................................................................54

Encino Motorcars, LLC v. Navarro,
    136 S. Ct. 2117 (2016).....................................................................25, 26, 35, 56

Envtl. Def. Fund v. FERC,
    No. 20-1016, 2021 WL 2546672 (D.C. Cir. June 22, 2021) .............................9, 11

Farmworker Ass'n of Fla. v. EPA,
    No. 21-1079, slip op. (D.C. Cir. June 7, 2021).....................................................5, 9

FBME Bank Ltd. v. Lew,
    142 F. Supp. 3d 70 (D.D.C. 2015)..........................................................................3

FCC v. Fox Television Stations, Inc.,
    556 U.S. 502 (2009)................................................................25, 26, 27, 35, 39

Friends of Dereef Park v. National Park Service,
    No. 2:13-cv-03453-DCN, 2014 WL 6969680 (D.S.C. Dec. 9, 2014) ......................16

Georgia v. Wheeler,
    418 F. Supp. 3d 1336 (S.D. Ga. 2019) ............................................................42, 45

Gregg v. Georgia,
    428 U.S. 153 (1976) ...........................................................................................59

Gresham v. Azar,
    950 F.3d 93 (D.C. Cir. 2020) ....................................................................7, 24, 35

Grutter v. Bollinger,
    539 U.S. 306 (2003) ...........................................................................................54

Hall v. Virginia,
    385 F.3d 421 (4th Cir. 2004) .................................................................................6

Higgins v. New Balance Athletic Shoe, Inc.,
    194 F.3d 252 (1st Cir. 1999) ...........................................................................21, 61

Independent Petroleum Association of America v. Babbitt,
    92 F.3d 1248 (D.C. Cir. 1996) ........................................................................35, 36

Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.,
    920 F.2d 960 (D.C. Cir. 1990) ..............................................................................9

Jimenez-Cedillo v. Sessions,
    885 F.3d 292 (4th Cir. 2018) ...............................................................................26

Judge v. Quinn,
    612 F.3d 537 (7th Cir. 2010) ...............................................................................21

Kinetic Concepts, Inc. v. Convatec Inc.,
    No. 1:08-cv-00918, 2010 WL 1667285 (M.D.N.C. Apr. 23, 2010) .......................18

King v. Palmer,
    950 F.2d 771 (D.C. Cir. 1991) .............................................................................54

Makhteshim Agan of North America, Inc. v. National Marine Fisheries Service,
    No. PWG-18-961, 2019 WL 5964526 (D. Md. Oct. 18, 2019) ..............................16

Marks v. United States,
    430 U.S. 188 (1977) .......................................................................................53, 59

Maryland Native Plant Society v. U.S. Army Corps of Engineers,
    332 F. Supp. 2d 845 (D. Md. 2004) ..................................................................16, 17

Mayor of Balt. v. Azar,
    973 F.3d 258 (4th Cir. 2020) ......................................................................24, 25, 27, 28

Mejia v. Sessions,
    866 F.3d 573 (4th Cir. 2017) ................................................................................56

Mercado-Zazueta v. Holder,
    580 F.3d 1102 (9th Cir. 2009), abrogated on other grounds by Holder v.
    Martinez Gutierrez, 566 U.S. 583 (2012) .................................................................56

In re Miller,
    519 B.R. 819 (10th Cir. 2014) ..............................................................................48

Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,
    460 U.S. 1 (1983).................................................................................................53

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983).......................................................................7, 11, 18, 25, 27, 32

N. Cal. River Watch v. City of Healdsburg,
    496 F.3d 993 (9th Cir. 2007) ............................................................................58, 60

N. Cal. River Watch v. Wilcox,
    633 F.3d 766 (9th Cir. 2011) ................................................................................59

N. Coast Rivers All. v. Dep't of Interior,
    No. 1:16-cv-00307-LJO-MJS, 2016 WL 8673038 (E.D. Cal. Dec. 16, 2016) .........................9

Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior,
    275 F. Supp. 2d 1136 (C.D. Cal. 2002) .....................................................................9

National Cable and Telecommunications Association v. Brand X Internet
    Services, 545 U.S. 967 (2005) ............................................................................55, 56

New York v. EPA,
    413 F.3d 3 (D.C. Cir. 2005).................................................................................30

Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,
    556 F.3d 177 (4th Cir. 2009) ................................................................................20

Okla. Dep't of Envtl. Quality v. EPA,
    740 F.3d 185 (D.C. Cir. 2014) ..............................................................................23

Oliver v. Baity,
    208 F. Supp. 3d 681 (M.D.N.C. 2016) ....................................................................18

Padilla-Caldera v. Holder,
    637 F.3d 1140 (10th Cir. 2011) ............................................................................56

Patel v. Napolitano,
    706 F.3d 370 (4th Cir. 2013) ................................................................................56

Paulsen v. Daniels,
    413 F.3d 999 (9th Cir. 2005) ....................................................15

Perrin v. United States,
    444 U.S. 37 (1979)..................................................................48

Okla. ex rel. Phillips v. Guy F. Atkinson Co.,
    313 U.S. 508 (1941)................................................................43

Physicians for Soc. Responsibility v. Wheeler,
    956 F.3d 634 (D.C. Cir. 2020).............................................27, 38

Precon Dev. Corp. v. U.S. Army Corps of Eng'rs,
    633 F.3d 278 (4th Cir. 2011) ...................................................51

Rapanos v. United States,
    547 U.S. 715 (2006)................................13, 29, 38, 40, 42, 46, 50, 51, 52, 54, 58

Renewable Fuels Ass'n v. EPA,
    948 F.3d 1206 (10th Cir. 2020) ................................................27

Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.,
    558 F.3d 731 (8th Cir. 2009) ...................................................18

Schwartz v. Wellin,
    No. 2:13-cv-3595-DCN, 2014 WL 12637912 (D.S.C. Aug. 14, 2014)............................21, 61

Sierra Club v. U.S. Army Corps of Eng'rs,
    909 F.3d 635 (4th Cir. 2018) .....................................................9

Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,
    531 U.S. 159 (2001)..........................................41, 42, 43, 47, 58

United States v. Ashland Oil & Transp. Co.,
    504 F.2d 1317 (6th Cir. 1974) ..................................................40

United States v. Bailey,
    571 F.3d 791 (8th Cir. 2009) ...............................................54, 59

United States v. Cundiff,
    555 F.3d 200 (6th Cir. 2009) ...................................................60

United States v. Davis,
    825 F.3d 1014 (9th Cir. 2016) ..................................................60

United States v. Deaton,
    332 F.3d 698 (4th Cir. 2003) ....................................42, 43, 44, 58, 59

United States v. Donovan,
     661 F.3d 174 (3d Cir. 2011)...............................................................54, 55, 59

United States v. Duvall,
     740 F.3d 604 (D.C. Cir. 2013)...............................................................54, 55

United States v. Gerke Excavating, Inc.,
     464 F.3d 723 (7th Cir. 2006) .......................................................................58

United States v. Halstead,
     634 F.3d 270 (4th Cir. 2011) ......................................................................55

United States v. Home Concrete & Supply, LLC,
     566 U.S. 478 (2012)....................................................................................56

United States v. Jacobsen,
     466 U.S. 109 (1984)....................................................................................53

United States v. Johnson,
     467 F.3d 56 (1st Cir. 2006)...................................................................54, 59

United States v. Riverside Bayview Homes, Inc.,
     474 U.S. 121 (1985)..............................................19, 40, 42, 44, 46, 49, 57

United States v. Robertson,
     875 F.3d 1281 (9th Cir. 2017), vacated on other grounds, 139 S. Ct. 1543
     (2019)..........................................................................................................60

United States v. Robison,
     505 F.3d 1208 (11th Cir. 2007) ..................................................................59

United States v. Spivey,
     956 F.3d 212 (4th Cir. 2020) ......................................................................55

United States v. Young,
     846 Fed. App'x 179 (4th Cir. 2021) ...........................................................59

United Steel v. Mine Safety & Health Admin.,
     925 F.3d 1279 (D.C. Cir. 2019)..................................................................11

Upstate Forever v. Kinder Morgan Energy Partners, L.P.,
     887 F.3d 637 (4th Cir. 2018), vacated on other grounds, 140 S. Ct. 2736
     (2020)..........................................................................................................59

Util. Solid Waste Activities Grp. v. EPA,
     901 F.3d 414 (D.C. Cir. 2018)...................................................................3, 6

Vasquez v. Hillery,
  474 U.S. 254 (1986)................................................................53, 57

W.Va. Coal Ass'n v. Reilly,
  728 F. Supp. 1276 (S.D.W. Va. 1989), aff'd, 932 F.2d 964 (4th Cir. 1991) ..........................20

Wachovia Bank v. Schmidt,
  546 U.S. 303 (2006)........................................................................48

Yahya v. Barr,
  No. 1:20-cv-01150, 2021 WL 798873 (E.D. Va. Jan 19, 2021)............................................18

**Statutes**

Clean Water Act

  33 U.S.C. § 1251(a) ................................................7, 26, 28, 32, 39, 40, 41, 43

  33 U.S.C. § 1251(b) ........................................................................45

  33 U.S.C. § 1311(a) ........................................................................49

  33 U.S.C. § 1329(h) ........................................................................47

  33 U.S.C. § 1341 ..............................................................................46

  33 U.S.C. § 1344(a) ........................................................................49

  33 U.S.C. § 1362(7) ........................................................................49

  33 U.S.C. § 1362(12) ......................................................................49

  33 U.S.C. § 1370 ..............................................................................46

Colo. Rev. Stat. § 25-8-202(8)..................................................................14

Colo. Rev. Stat. § 25-8-504 ......................................................................14

Mont. Code Ann. § 75-5-203 ..................................................................14

Mont. Code Ann. § 75-6-116 ..................................................................14

N.C. Gen. Stat. § 150B-19.3(a)..................................................................14

Va. Code § 62.1-44.15(3a)........................................................................14

Va. Code § 62.1-44.15(10) ......................................................................14

## Regulations

33 C.F.R. § 328.3(a) (2020) ................................................................................. 21

33 C.F.R. § 328.3(a)(8) (1987) ............................................................................. 21

33 C.F.R. § 328.3(c)(12) ....................................................................................... 31

Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg.
37,053 (June 29, 2015) ................................................................. 5, 21, 26, 34

Definition of "Waters of the United States"—Recodification of Pre-Existing
Rules, 82 Fed. Reg. 34,899 (July 27, 2017) ............................................... 5

Definition of "Waters of the United States"—Recodification of Pre-Existing
Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) ......................................... 5, 16

Definition of "Waters of the United States" Under the Clean Water Act, 79 Fed.
Reg. 22,187 (Apr. 21, 2014) ....................................................................... 5

Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993) ............................. 6

National Pollutant Discharge Elimination System, 38 Fed. Reg. 13,528 (May 22,
1973) ............................................................................................................ 25

The Navigable Waters Protection Rule: Definition of "Waters of the United
States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) ................................... *passim*

Regulatory Program of the Corps of Engineers, 42 Fed. Reg. 37,122 (July 19,
1977) ..................................................................................................... 25, 34

Revised Definition of "Waters of the United States," 84 Fed. Reg. 4154 (Feb. 14,
2019) ............................................................................................................ 5

## Rules

Fed. R. Evid. 201(b)(2) ......................................................................................... 6

## Other Authorities

123 Cong. Rec. 39,209 (1977) ............................................................................. 46

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 8364
(2d ed. Apr. 2020 update) .......................................................................... 23

Danny Kanso, Ga. Budget & Pol'y Inst., Overview of Georgia's 2021 Fiscal Year
Budget (Jan. 23, 2020), https://perma.cc/A9WQ-FDQH ......................... 15

EPA & U.S. Army Corps of Eng'rs, Memorandum for the Record (June 8, 2021),
https://perma.cc/4Z7Q-JN45 ..................................................................................8, 15, 33

*Flood*, Merriam-Webster, https://perma.cc/AM9C-DM43 (last visited July 8,
2021) .....................................................................................................................38

H.R. Rep. No. 92-911 (1972), https://perma.cc/S9MX-PKNZ .........................................41, 43, 46

Library of Cong., Cong. Research Serv., Envtl. Pol'y Div., 1 A Legislative
History of the Water Pollution Control Act Amendments of 1972 (1973)............................41

Memorandum from Terry England, Ga. House of Representatives, et al. to State
Dep'ts & Agencies (May 1, 2020), https://perma.cc/XAY2-S8YK .........................................15

Off. of Info. & Regul. Affs., Agency Rule List - Spring 2021: Department of
Defense, https://perma.cc/K88C-KEDP (last visited July 8, 2021)...........................................6

Off. of Info. & Regul. Affs., Agency Rule List - Spring 2021: Environmental
Protection Agency, https://perma.cc/8DVC-NWPA (last visited July 8, 2021)........................6

Off. of Info. & Regul. Affs., Spring 2021 Unified Agenda of Federal Regulatory
and Deregulatory Actions, https://perma.cc/YHL5-8DPP (last visited July 8,
2021) .......................................................................................................................6

S. Rep. No. 92-414 (1971), reprinted in 1972 U.S.C.C.A.N. 3668, 1971 WL
11307..........................................................................................................33, 41, 47, 48

S. Rep. No. 92-1236 (1972) (Conf. Rep.), reprinted in 1972 U.S.C.C.A.N. 3776,
1972 WL 12735 ........................................................................................................41, 43

S. Rep. No. 95-370 (1977), reprinted in 1977 U.S.C.C.A.N. 4326, 1977 WL
16152........................................................................................................................48, 49

Twin Pines Minerals, LLC, Restoration (2019),
https://twinpinesmineralscharlton.com/restoration ...................................................................15

## INTRODUCTION

The recent decision by the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Corps") (collectively, "the Agencies") to no longer defend the so-called Navigable Waters Protection Rule ("Replacement Rule" or "Rule")—their arbitrary removal of Clean Water Act protections from countless streams, wetlands, and lakes—and instead to revise or replace it came as welcome news to those, including Plaintiffs, facing serious and potentially irreversible harms from the unlawful rule. As the Agencies now acknowledge, the Replacement Rule failed to comply with the Clean Water Act's water quality objective and has caused significant, actual environmental harms over a year of its implementation.

But the Agencies' anticipated revision of the Rule—a process of undefined duration and uncertain outcome—does nothing to prevent the Rule's harmful effects on the nation's waters during what is likely to be a lengthy rulemaking period. These harms, combined with the seriousness of the Rule's deficiencies, indicate under established precedent that remand to the Agencies is inappropriate unless the Court also vacates the Rule.

On the merits, the Agencies, by failing to oppose Plaintiffs' motion for summary judgment, concede that the Rule is arbitrary, capricious, and unlawful under the Administrative Procedure Act ("APA") and the Clean Water Act ("Act"). Nothing in the response and cross-motion submitted by Intervenor-Defendants ("Intervenors") rehabilitates a Rule that upends prior policy without adequate explanation, undermines the Clean Water Act's sole objective, and applies an interpretation of the Clean Water Act that the Supreme Court has repudiated. The

1

Court should grant summary judgment to Plaintiffs, deny Intervenors' cross-motion for summary judgment, and vacate the Rule.[1]

## ARGUMENT

### I.    The Agencies' Motion for Remand Without Vacatur Should Be Denied.

This is not the ordinary case where an agency requests remand. Here, the Agencies have expressed "substantial concerns" that the Replacement Rule was adopted unlawfully and acknowledged the "harmful effects" it is causing to the nation's waters as long as it remains in place. And the Agencies have identified no timeline for a rulemaking to revise or replace the Rule. The Agencies cite no precedent—and Plaintiffs are aware of none—for a court granting voluntary remand without vacatur of a notice-and-comment rulemaking, over opposition from a party challenging that rule, when the agency has not specifically identified the action it will take on remand.

Plaintiffs support the Agencies' reconsideration of the Rule, and plan to engage in the Agencies' rulemaking process. That open-ended and likely lengthy process, however, does nothing to address the serious harms facing Plaintiffs now: an unlawful rule jeopardizing the waters they depend on. Remanding without vacatur would leave the unlawful Rule in place indefinitely, subjecting the nation's waters to continued harm and preventing Plaintiffs from promptly obtaining the relief to which they are entitled. Accordingly, the Court should deny the Agencies' request for voluntary remand without vacatur and proceed to a ruling on the cross-

---

[1] Chantell and Michael Sackett's untimely motion to intervene in this case, Doc. 130, has not been decided. The Sacketts have nevertheless filed a "[Proposed] Opposition to Plaintiffs' Motion for Summary Judgment and Opposition to Federal Defendants' Motion for Remand." Doc. 144. Plaintiffs continue to oppose the Sacketts' intervention for the reasons set forth in Plaintiffs' response in opposition, see Doc. 137, but reserve the right to respond to the Sacketts' submission should the Court permit their intervention.

motions for summary judgment. Alternatively, if the Court is inclined to remand, the Rule's

serious deficiencies and the disruption it is causing require remand *with* vacatur.

A.    **The Agencies Fail to Meet the Standard for Remand Without Vacatur.**

Although a court has "broad discretion to grant or deny" an agency's motion for

voluntary remand, it must "consider whether remand would unduly prejudice the non-moving

party." Util. Solid Waste Activities Grp. v. EPA, 901 F.3d 414, 436 (D.C. Cir. 2018) (citing

FBME Bank Ltd. v. Lew, 142 F. Supp. 3d 70, 73 (D.D.C. 2015)). The D.C. Circuit has denied

EPA's request to remand certain provisions of a rule where "remand would prejudice the

vindication of [petitioners'] claim." Util. Solid Waste Activities Grp., 901 F.3d at 436. Because

remand without vacatur would prejudice Plaintiffs—preventing them from obtaining judicial

relief from the ongoing, potentially irreversible harms caused by an unlawful rule—while doing

little to conserve the resources of the parties or the Court, remand without vacatur is not

warranted.

1.    **Allowing an unlawful rule to remain in effect during a rulemaking of indefinite duration would prejudice Plaintiffs and harm the public interest.**

Plaintiffs' motion for summary judgment describes not only the Replacement Rule's

profound legal deficiencies but also the considerable ongoing harms caused by the continued

implementation of the Rule. The Corps has been flooded with requests to obtain "approved

jurisdictional determinations" securing the right to pollute or fill newly excluded streams and

wetlands, free of the Clean Water Act's permitting protections. See Doc. 119-1 at 11;

Doc. 119-52. Applying the Rule's restrictive definition of "waters of the United States," the

Corps has found 92% of waters evaluated to be outside the protections of the Clean Water Act—

a dramatic increase in comparison to prior regulatory regimes, under which less than 56% of

waters were found not to be jurisdictional. See Doc. 119-52 ¶¶ 13, 24(a). The resulting threat of degradation of those waters harms Plaintiffs and their members, who depend on threatened waters across the country for drinking, swimming, boating, fishing, and their livelihoods. See Doc. 119-1 at 40–44.

These harms have now been formally acknowledged by the Agencies, whose declarations paint a troubling picture of the damage to the nation's waters caused by the Replacement Rule— damage that increases every day that the Rule remains in effect. The Agencies attest that after "nearly a full year of implementation" of the Rule, they have identified "an increase in determinations by the Corps that waters are non-jurisdictional and an increase in projects for which [Clean Water Act] Section 404 permits are no longer required." Doc. 140-2 ¶ 15.[2] They note that "[t]hese changes have been particularly significant in arid states" such as New Mexico and Arizona, where nearly every stream assessed under the Rule has been found to be non-jurisdictional. Id. ¶ 16.

The resulting harms are not merely theoretical; the Agencies "have heard concerns from a broad array of stakeholders . . . that the reduction in the jurisdictional scope of the [Act] is resulting in significant, actual environmental harms." Id. ¶ 17. According to the Agencies, "[p]rojects . . . proceeding in newly non-jurisdictional waters in state and tribal lands where regulation of waters beyond those covered by the [Act] are not authorized" will "result in discharges without any regulation or mitigation from federal, state, or tribal agencies." Id. ¶ 18. And the impacts to the many ephemeral streams, wetlands, and other aquatic resources that the

---

[2] In support of their motion for voluntary remand without vacatur, the Agencies submitted declarations by EPA's Radhika Fox and the Corps' Jaime A. Pinkham. Paragraphs 5 to 20 of the two declarations are identical. Compare Doc. 140-2 ¶¶ 5–20 with Doc. 140-3 ¶¶ 5–20. In this brief, Plaintiffs cite only to Ms. Fox's declaration (Doc. 140-2) but attribute her statements to "the Agencies" because the same statements appear in Mr. Pinkham's declaration.

Rule excludes from Clean Water Act protection could cause "cascading and cumulative downstream effects," including "effects on water supplies, water quality, flooding, drought, erosion, and habitat integrity." Id. ¶ 20.

Beyond its vivid description of ongoing harm, however, the Agencies' motion is striking for what it does not contain: any indication of how the Agencies intend to prevent the "harmful effects of the [Rule] on the nation's waters" during what is likely to be a lengthy rulemaking process. Id. ¶ 8. The Agencies' last three rulemakings defining "waters of the United States"—the 2015 Clean Water Rule, 2019 Repeal Rule, and 2020 Replacement Rule—took four years, two and a half years, and three years, respectively.[3]

Here, the Agencies' motion provides no timeline for rulemaking—no date by which they will issue a proposed rule, let alone finalize a new rule. The D.C. Circuit recently denied EPA's request to remand without vacatur the agency's approval of a pesticide, instead remanding *with* vacatur, where "EPA has admitted that it will not provide the timely reconsideration that is the central rationale for remand without vacatur." Farmworker Ass'n of Fla. v. EPA, No. 21-1079, slip op. at 1 (D.C. Cir. June 7, 2021) (per curiam) (Ex. 2). In contrast, the D.C. Circuit has agreed to remand provisions of a rule without vacatur where "EPA has explained that it plans to

---

[3] See Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,053, 37,102–03 (June 29, 2015) ("Clean Water Rule") (reporting that Clean Water Rule stakeholder engagement began in 2011); The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250, 22,259–60 (Apr. 21, 2020) (reporting that Repeal Rule and Replacement Rule stakeholder engagement began in March 2017).

    Even focusing only on the period from proposed to final rule, the three rulemaking processes took 14 months, 27 months, and 14 months, respectively. See Definition of "Waters of the United States" Under the Clean Water Act, 79 Fed. Reg. 22,187 (Apr. 21, 2014) (proposed Clean Water Rule); 80 Fed. Reg. 37,053 (June 29, 2015) (final Clean Water Rule); Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 82 Fed. Reg. 34,899 (July 27, 2017) (proposed Repeal Rule); Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) (final Repeal Rule); Revised Definition of "Waters of the United States," 84 Fed. Reg. 4154 (Feb. 14, 2019) (proposed Replacement Rule); 85 Fed. Reg. 22,250 (Apr. 21, 2020) (final Replacement Rule).

reconsider these provisions *and has submitted a proposed timeline to the court*." Util. Solid

Waste Activities Grp., 901 F.3d at 437 (emphasis added). In this case, the executive branch's

Spring 2021 Unified Agenda of Federal Regulatory and Deregulatory Actions suggests that the

Agencies are not planning to issue even a *proposed* "waters of the United States" rule within the

next year.[4] In other words, the Agencies intend to leave their admittedly harmful Rule in place

for months or years—while offering no measures to prevent potentially irreversible harms to the

nation's waters over that time.

The D.C. Circuit has also denied voluntary remand where "EPA made no offer to vacate

the rule; thus EPA's proposal would have left petitioners subject to a rule they claimed was

invalid." Chlorine Chemistry Council v. EPA, 206 F.3d 1286, 1288 (D.C. Cir. 2000). Here, too,

remand without vacatur would force Plaintiffs and the public to live indefinitely with the

"harmful effects" of an unlawful Rule. Doc. 140-2 ¶ 8. Because remand without vacatur would

"prejudice the vindication of [Plaintiffs'] claim[s]," Util. Solid Waste Activities Grp., 901 F.3d at

436, the Agencies' motion should be denied.

---

[4] EPA and the Corps both identify "Revised Definition of 'Waters of the United States'" as one of their "Long-Term Actions." Off. of Info. & Regul. Affs., Agency Rule List - Spring 2021: Environmental Protection Agency, https://perma.cc/8DVC-NWPA (last visited July 8, 2021) (Ex. 3); Off. of Info. & Regul. Affs., Agency Rule List - Spring 2021: Department of Defense, https://perma.cc/K88C-KEDP (last visited July 8, 2021) (Ex. 4). "Long-Term Actions" are defined as those for which the agency does not expect to have a "regulatory action" within the next 12 months. Off. of Info. & Regul. Affs., Spring 2021 Unified Agenda of Federal Regulatory and Deregulatory Actions, https://perma.cc/YHL5-8DPP (last visited July 8, 2021) (Ex. 5). A "regulatory action" is any substantive action by an agency, including a proposed rule, that is expected to lead to the promulgation of a final rule. Exec. Order No. 12,866 § 3(e), 58 Fed. Reg. 51,735, 51,737–38 (Oct. 4, 1993).
    Judicial notice under Fed. R. Evid. 201(b)(2) is appropriate for Exhibits 3, 4, 5, and 6 as public records that are available on government websites. E.g., Hall v. Virginia, 385 F.3d 421, 424 n.3 (4th Cir. 2004); see also Decl. of Mark Sabath ¶¶ 3–6 (Ex. 1).

### 2.     Remand without vacatur would hardly conserve judicial resources.

The Agencies suggest that granting remand would promote judicial economy and conserve the parties' resources. See Doc. 140-1 at 11–13. But that is hardly the case. Cross-motions for summary judgment have already been filed, and by August 2, 2021—just one week after the completion of briefing on the Agencies' motion for voluntary remand—those motions will be fully briefed. See Doc. 142 (scheduling order). No further briefing will be required of any parties. And because the Agencies have elected not to respond to Plaintiffs' motion for summary judgment, no one is "forcing [the Agencies] to litigate the merits." Doc. 140-1 at 12 (quoting Am. Forest Res. Council v. Ashe, 946 F. Supp. 2d 1, 43 (D.D.C. 2013)).

Moreover, no exhaustive review of the record should be required for the Court to rule on the cross-motions for summary judgment. The Agencies are declining to defend the Rule. They all but concede one of Plaintiffs' central claims: that the Agencies "entirely failed to consider an important aspect of the problem," Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("State Farm"), by neglecting to consider the Rule's effects on the Clean Water Act's objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); see Gresham v. Azar, 950 F.3d 93, 102–04 (D.C. Cir. 2020) (finding that objective of relevant statute is important aspect agency must address). The Agencies acknowledge that, in adopting the Rule, they "explicitly and definitively stated in numerous places in the [Rule's] administrative record that they *did not* rely on agency documents in the record that provided some limited assessment of the effects of the rule on water quality . . . ." Doc. 140-2 ¶ 12 (emphasis added); see also 85 Fed. Reg. at 22,332 ("[T]he final rule is not based on the information in the agencies' economic analysis or resource and programmatic assessment."). The Agencies now express "substantial concerns" that the Rule

"did not appropriately consider the effect of the revised definition of 'waters of the United States' on the integrity of the nation's waters." Doc. 140-2 ¶ 10.[5] Accordingly, the Court need not engage in a searching review of the record in order to decide this case.

The Agencies' additional argument that a new rulemaking may fully resolve Plaintiffs' concerns with the Rule, Doc. 140-1 at 13, misses the mark. First, it is far from clear that a new rulemaking will resolve all of Plaintiffs' claims. The Agencies have not outlined the nature of any proposed rule in any detail, stating only that they "intend to consider" issues raised by Plaintiffs on remand. Id. Second, even if new rulemaking does ultimately restore a definition of "waters of the United States" consistent with the Clean Water Act's objective, the Agencies have provided no timetable for that process. See supra Section I.A.1. The harmful "on-the-ground effects" on the nation's waters caused by the Rule, Doc. 140-1 at 10—harms now acknowledged by the Agencies that adopted it, see id.; Doc. 140-2 ¶¶ 8, 10, 15–20—would persist, and likely worsen, over that period. Far from wasting judicial resources, resolving the pending cross-motions for summary judgment—and addressing the harms to the integrity of the nation's waters occurring as long as the Rule remains in place—would represent a sound use of judicial resources.

**B.    Remand Is Appropriate Only With Vacatur of the Replacement Rule.**

As set forth above, the Agencies' motion for voluntary remand should be denied, and the Court should decide the pending summary judgment motions. If, however, the Court is inclined to remand the Rule, the Rule's fundamental flaws and the disruption it is already causing require remand *with* vacatur.

---

[5] See also Doc. 140-2 ¶¶ 12–15; EPA & U.S. Army Corps of Eng'rs, Memorandum for the Record at 4 (June 8, 2021), https://perma.cc/4Z7Q-JN45 (Ex. 6) ("Memorandum for the Record") (admitting that "substantial effects on the chemical, physical, and biological integrity of the nation's waters were inadequately considered during the . . . rulemaking process").

As Intervenors acknowledge, Doc. 143-1 at 13, courts weighing whether to remand with or without vacatur generally apply the two-part standard that the D.C. Circuit set forth in Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission, 988 F.2d 146 (D.C. Cir. 1993). First, courts consider "'the seriousness of the [rule's] deficiencies'" and whether "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand." Id. at 150–51 (quoting Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin., 920 F.2d 960, 967 (D.C. Cir. 1990)). Second, courts consider the "disruptive consequences" that would accompany vacatur, Allied-Signal, 988 F.2d at 150–51—although "the second Allied-Signal factor is weighty only insofar as the agency may be able to rehabilitate its rationale." Envtl. Def. Fund v. FERC, No. 20-1016, 2021 WL 2546672, at *15 (D.C. Cir. June 22, 2021) (quoting Comcast Corp. v. FCC, 579 F.3d 1, 9 (D.C. Cir. 2009)). Notably, the Fourth Circuit has expressed doubt that remand without vacatur is *ever* warranted, observing that "remand without vacatur principally is relevant in matters where agencies have 'inadequately supported rule[s],'" Sierra Club v. U.S. Army Corps of Eng'rs, 909 F.3d 635, 655 (4th Cir. 2018) (quoting Allied-Signal, 988 F.2d at 150)—not rules with the types of serious substantive deficiencies acknowledged by the Agencies here.

Courts considering remand prior to a ruling on the merits employ "the same equitable analysis" courts use to decide whether to vacate agency action after a merits ruling. ASSE Int'l, Inc. v. Kerry, 182 F. Supp. 3d 1059, 1064 (C.D. Cal. 2016) (vacating and remanding sanction).[6]

---

[6] See also, e.g., Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior, 275 F. Supp. 2d 1136, 1143 (C.D. Cal. 2002); Farmworker Ass'n of Fla., slip op. at 1–2; Cal. Cmtys. Against Toxics v. EPA, 688 F.3d 989, 992–94 (9th Cir. 2012); N. Coast Rivers All. v. Dep't of Interior, No. 1:16-cv-00307-LJO-MJS, 2016 WL 8673038, at *6–13 (E.D. Cal. Dec. 16, 2016); Am. Forest Res. Council, 946 F. Supp. 2d at 42; All. for the Wild Rockies v. Marten, No. CV 17-21-M-DLC, 2018 WL 2943251, at *2–4 (D. Mont. June 12, 2018). "[C]ourts routinely consider decisions

"Vacation of an agency action without an express determination on the merits is well within the bounds of traditional equity jurisdiction." Ctr. For Native Ecosystems v. Salazar, 795 F. Supp. 2d 1236, 1241–42 (D. Colo. 2011) (vacating voluntarily remanded species listing decision).

Notably, in their motion seeking remand, the Agencies do not *oppose* vacatur of the Rule. Instead, they simply do not ask for it, stating that "the Agencies request that the Court order a remand *and are not including a request for vacatur*." Doc. 140-1 at 11 (emphasis added). Given that the Agencies have no intent to rehabilitate their fundamentally flawed Rule and that more disruption would be caused by the retention of the Rule than by its vacatur, vacatur is the only appropriate course if the Rule is remanded.

### 1. The Rule's serious deficiencies—effectively conceded by the Agencies—make remand without vacatur inappropriate.

Remand without vacatur is appropriate when a rule was merely "inadequately supported" and "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand." Allied-Signal, 988 F.2d at 150–51. That is indisputably not the case here, where the Agencies have made clear that they *do not* intend to rehabilitate the Rule on remand. See Doc. 140-1 at 2 (reporting that Agencies will "revise or replace the rule"); see also id. at 9 (stating that Agencies "have identified substantial concerns with the [Rule]" (citation and quotations omitted)).

Further, the Agencies' errors in promulgating the Rule are "fundamental," with "little or no prospect of [a] cur[e]." Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Agric., 317 F. Supp. 3d 385, 392 (D.D.C. 2018) (citations and quotations omitted); see also Ctr. for Native Ecosystems, 795 F. Supp. 2d at 1242–43 (vacating agency action prior to merits decision where

---

from other circuits when analyzing motions for remand." Ctr. For Native Ecosystems v. Salazar, 795 F. Supp. 2d 1236, 1240 (D. Colo. 2011).

action "suffered from significant deficiencies"). As discussed in Section I.A.2, above, the

Agencies concede that they did not appropriately consider the Rule's effects on the integrity of

the nation's waters, see Doc. 140-2 ¶¶ 10, 12–15—a straightforward APA violation. See State

Farm, 463 U.S. at 43 (holding that rule is arbitrary and capricious where agency "entirely failed

to consider an important aspect of the problem"). And where, as here, an agency "failed to offer

a reasoned explanation" for a rule, the rule "is therefore *ultra vires* and unenforceable." United

Steel v. Mine Safety & Health Admin., 925 F.3d 1279, 1287 (D.C. Cir. 2019); see Doc. 119-1 at

17–28 (describing Agencies' failure to provide reasoned explanation for Rule's policy choices).

For a rule that violates central tenets of the APA—and that the promulgating Agencies have no

intention of substantiating—vacatur must accompany any remand.

> ### 2.    It is remand *without* vacatur that would have disruptive consequences across the nation.

Because the Agencies have made clear that they do not plan to substantiate the Rule on

remand, see Doc. 140-1 at 2, the Court need not assign any weight to the potential disruptive

consequences of vacatur. See Envtl. Def. Fund, 2021 WL 2546672, at *15.[7] Nevertheless, to the

extent the Court considers the second Allied-Signal factor, it, too, weighs heavily in favor of

remand *with* vacatur.

Leaving the Rule in place during remand would be far more disruptive than vacating it.

As detailed in Plaintiffs' motion for summary judgment, the Rule upended a regulatory regime

that had been in place for decades, under which navigable lakes, many ephemeral streams, and

adjacent wetlands, among other waters, received protection. See Doc. 119-1 at 12–17, 18–22.

---

[7] For this reason, Intervenors' reliance on Black Warrior Riverkeeper, Inc., v. U.S. Army Corps of Engineers, 781 F.3d 1271 (11th Cir. 2015), is misplaced. The court in Black Warrior Riverkeeper discussed considerations that could inform the vacatur question in the context of an agency error that, on remand, "may well turn out to be inconsequential." Id. at 1290–91.

The Rule removed federal clean water protections that people had relied on in making their livings and buying their homes. See id. at 23–24. And as the Agencies acknowledge, the potential "cascading and cumulative downstream effects . . . on water supplies, water quality, flooding, drought, erosion, and habitat integrity" are severe. Doc. 140-2 ¶ 20. These harms will only continue, and likely increase, if the Rule remains in place on remand.[8]

Intervenors speculate that other federal and state protections will serve to prevent these harms. Relying solely on the Resource and Programmatic Assessment that the Agencies made clear was "*not* used to establish the new regulatory text," 85 Fed. Reg. at 22,332 (emphasis added), Intervenors suggest that the National Pollutant Discharge Elimination System permitting program may address point source discharges of certain pollutants that flow downstream into jurisdictional waters. See Doc. 143-1 at 16–17 (quoting EPA and Dep't of Army, Resource and Programmatic Assessment for the Navigable Waters Protection Rule: Definition of "Waters of the U.S." (AR 11573) (Jan. 23, 2020) ("RPA"), at 79).[9] But this does not justify the Agencies' stripping of jurisdiction from streams and wetlands that should be protected from pollution under the Clean Water Act. Nor would Intervenors' approach provide any safeguards for the excluded streams and wetlands themselves, focusing instead solely on pollution of protected downstream waters. Moreover, the Agencies plainly failed to consider (and Intervenors do not dispute) that the Rule would no longer require a Clean Water Act section 404 permit to fill in these newly

---

[8] The Agencies assert that Plaintiffs would not be prejudiced *by remand*, because Plaintiffs could participate in a new rulemaking that could resolve Plaintiffs' claims. See Doc. 140-1 at 13–14. But the Agencies do not dispute that Plaintiffs would be prejudiced by remand *without vacatur*, which would leave the Replacement Rule and its "harmful effects" Doc. 140-2 ¶ 8, in place for the duration of what is likely to be a lengthy rulemaking process.

[9] Documents in the Administrative Record contain the prefix EPA-HQ-OW-2018-0149 followed by the Docket Document ID. See Doc. 54-1, Ex. 1 (Administrative Record Index). In citing documents in the Administrative Record, Plaintiffs have omitted the prefix and cited only the title of the document, its date, and the Administrative Record Docket Document ID ("AR").

non-jurisdictional wetlands and streams, harming downstream waters by eliminating the filled

waterways' functions[10] and destroying fish and wildlife habitat.

Just as speculative is Intervenors' argument that states can readily protect waters that the

Agencies have left outside the scope of the Clean Water Act—an argument based once again on

the RPA that the Agencies expressly disclaimed. See Doc. 143-1 at 17 (citing RPA at 45–49). As

even Intervenors admit, the ability of states to fill the substantial gaps in federal regulation left

by the Rule is a matter of pure conjecture. See Doc. 143-1 at 29 ("[S]ome states *may* fill any

regulatory gap, and some '*may* be able to find more efficient ways of managing local resources

than the Federal government,' but others '*may* regulate only a subset of affected waters.'"

(quoting 85 Fed. Reg. at 22,334) (emphasis added)). The record is replete with references to

what the states *may* do, coupled with the Agencies' recognition of the "high level of uncertainty

regarding the status of existing state programs, the amount of waters experiencing a jurisdictional

change, and the different ways that a state may respond." Doc. 69-4 at 12–23.[11]

---

[10] Critical functions of the filled waterways that would be eliminated include "pollutant trapping, flood control, and runoff storage." Rapanos v. United States, 547 U.S. 715, 779–80 (2006) (Kennedy, J., concurring); see also, e.g., Doc 119-47 ¶ 9; Doc. 119-28 ¶¶ 25–26.

[11] See also, e.g., 85 Fed. Reg. at 22,288 ("States and Tribes *may* also address ephemeral features as 'waters of the State' or 'waters of the Tribe' under their own laws to the extent they deem appropriate" (emphasis added)); id. at 22,318 ("many States include groundwater in their definitions of 'waters of the State' and therefore *may* subject groundwater to State regulation" (emphasis added)); id. at 22,333 (acknowledging "uncertainties regarding the way States and Tribes might respond following a change in the definition of 'waters of the United States'" and noting that Rule's "potential long-term effects will depend on whether or how States and Tribes choose to modify their existing regulatory programs"); id. at 22,234 ("Potential State responses to a change in the definition of a 'water of the United States' fall along a continuum and depend on legal and other constraints."); EPA & Dep't of Army, Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the United States" (AR 11572) (Jan. 22, 2020) ("EA"), at 38, 47, 57, 59, 61, 62, 65, 79, 85, 86, 105, 162, 186; RPA at 7, 44, 46, 47, 62, 75, 87.

Omitted from Intervenors' argument—but undisputed in the administrative record—is evidence that many states do not have comparable programs,[12] often cannot adopt laws more stringent than federal standards,[13] and do not have adequate staffing to implement more robust programs[14]—much less in the short time needed to prevent the degradation of water quality brought about by the Rule.[15] Georgia, for example—where the Twin Pines Mine is slated to destroy wetlands next to the Okefenokee Swamp—has no wetlands protection program (other than for saltwater marshes) that operates independently from the federal Clean Water Act.[16] And the state does not have nearly the resources to compensate for the Rule's wide gap in federal

---

[12] See 85 Fed. Reg. at 22,270 ("The agencies acknowledge that States without comprehensive pre-existing programs that seek to regulate waters no longer jurisdictional under this final rule may incur new costs and administrative burdens . . . .").

[13] E.g., N.C. Gen. Stat. § 150B-19.3(a); Va. Code §§ 62.1-44.15(3a), (10); Colo. Rev. Stat. §§ 25-8-504, 25-8-202(8); Mont. Code Ann. §§ 75-5-203, 75-6-116.

[14] See 85 Fed. Reg. at 22,270; Barbara D. Underwood et al., Comment Letter on Proposed Rule, Attach. A at 12 (AR 5467) (Apr. 15, 2019) (citing, in letter from attorneys general of 14 states and District of Columbia, "substantial" financial obstacles to states filling gap in lost federal protections).

[15] See Inst. for Pol'y Integrity, Comment Letter on Proposed Rule at 10–12 (AR 6898) (Apr. 15, 2019) (explaining why states have "little incentive" to regulate "pollution across state lines"); Doc. 119-13 at 12–14, 16 (noting in letter from South Carolina Department of Natural Resources that South Carolina has "limited operational programs directly protecting waterways" due to its "long reli[ance] on the historic protections of the Clean Water Act" and expressing "concerns" about impacts to the state's water quality as a result of "large gap" in protections left by Rule); Doc. 119-33 at 36 (expressing concern in comments by North Carolina Department of Environmental Quality and North Carolina Attorney General that many states, like North Carolina, lack time and resources to "propose, pass, and implement new statutes and regulations, as well as hire and properly train their staff" to protect "important resources" left unprotected by Rule); EA at 158 ("New Mexico is not anticipated to protect waters beyond the [Rule]"); id. at 35 (conceding that literature on environmental federalism indicates that state-by-state regulation "can yield inefficiently weak regulations"); see also Doc. 125-1 at 18–21 (Institute for Policy Integrity amicus brief citing states' disincentive to prohibit transboundary pollution, insufficient resources, and (in some states) disinclination to expand clean water protections as reasons states are unlikely to fill regulatory gap left by Rule).

[16] See EPA & Dep't of the Army, Appendices to the Resource and Programmatic Assessment for the Navigable Waters Protection Rule: Definition of "Waters of the United States" (Jan. 23, 2020) (AR 11573) ("RPA Appendices"), at 20–21.

clean water protections.[17] Inadequate and underfunded state programs are no substitute for the requirements of the federal Clean Water Act. Nor does a mining operator's mere statement on its website that it plans to "leave the land better than we found it," Twin Pines Minerals, LLC, Restoration (2019), https://twinpinesmineralscharlton.com/restoration (cited by Intervenors in Doc. 143-1 at 18), replace federal Clean Water Act requirements that ensure the protection of the wetlands in the mine's path.

Moreover, the Agencies now admit that in adopting the Rule they wrongly assumed that states would not weaken their own clean water protections to match the Rule, when in fact they have. See Memorandum for the Record at 4 ("The agencies are also aware of certain states that have already begun taking deregulatory steps to change their state regulatory practices to match the [Rule], contrary to the agencies' estimates . . . ."). Intervenors' assumption that states could protect against the harms caused by leaving the Rule in place on remand is thus unfounded.

Vacating the Rule, on the other hand, would merely restore the status quo that existed for most of the past four decades until the prior administration upended it. The law would revert to the regulations and guidance that predated the Rule—regulations and guidance that the Agencies revived in their 2019 Repeal Rule. See Paulsen v. Daniels, 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in force."). The Agencies themselves have described the prior regime as "a longstanding regulatory framework that is familiar to and well-understood by the agencies, States, Tribes, local governments, regulated entities, and the public." Repeal Rule, 84 Fed. Reg. at 56,661. Indeed, even the

---

[17] See Memorandum from Terry England, Ga. House of Representatives, et al. to State Dep'ts & Agencies (May 1, 2020), https://perma.cc/XAY2-S8YK (Ex. 7) (mandating 14% budget cuts from all state agencies); Danny Kanso, Ga. Budget & Pol'y Inst., Overview of Georgia's 2021 Fiscal Year Budget (Jan. 23, 2020), https://perma.cc/A9WQ-FDQH (Ex. 8) (describing 2021 state budget and associated $3.8 million cut from Department of Natural Resources budget, "including $1.2 million for Environmental Protection and $700,000 for Wildlife resources").

Agencies make no claim that they "or anyone else would be seriously harmed or disrupted" by vacatur of the Rule. <u>ASSE Int'l</u>, 182 F. Supp. 3d at 1065. And Intervenors' claims of potential disruption from vacatur, Doc. 143-1 at 14–16, are notable for their failure to name even a single member of their 17 trade groups who will face undue regulatory burdens if the Rule is vacated. Intervenors' preference for the Rule's dramatic shrinking of Clean Water Act jurisdiction does not counsel against a remedy that restores the status quo during rulemaking.

### 3.    Courts remanding without vacatur have faced circumstances considerably different than those present here.

When courts in this circuit have granted voluntary remand without vacatur, they have done so where litigation was in its early stages and where the agency committed to a specific— and prompt—plan to revisit the contested action. None of those facts are present here.

In <u>Friends of Dereef Park v. National Park Service</u>, No. 2:13-cv-03453-DCN, 2014 WL 6969680 (D.S.C. Dec. 9, 2014), the court remanded an agency approval without vacatur "because the parties [had] not fully briefed the legality" of the agency's action, and because the agency had represented that it intended to voluntarily withdraw the approval on remand. <u>Id.</u> at *4. Similarly, in <u>Makhteshim Agan of North America, Inc. v. National Marine Fisheries Service</u>, No. PWG-18-961, 2019 WL 5964526 (D. Md. Oct. 18, 2019), the court remanded a biological opinion without vacatur where motions for summary judgment had not yet been filed and the agency had "a concrete plan" with specific deadlines for revising or reaffirming the opinion, such that the court held an "expectation that the [action] will issue in the coming months . . . ." <u>Id.</u> at *2–3.[18]

---

[18] The court in <u>Maryland Native Plant Society v. U.S. Army Corps of Engineers</u>, 332 F. Supp. 2d 845 (D. Md. 2004), also remanded without vacatur because it believed that the agency was likely to substantiate its permitting decision. <u>See id.</u> at 862 ("Where a court determines that a remand is appropriate because an agency's explanation is deficient, remand without vacatur allows the

Here, in contrast, the parties have nearly completed briefing on cross-motions for summary judgment (for the second time); the Agencies intend to continue applying their unlawful Rule during the pendency of their rulemaking; and the Agencies have provided no specific plan or timeline for the completion, or even the initiation, of the rulemaking process. Remand is appropriate only *with* vacatur of the Rule.

## II. Plaintiffs' Motion for Summary Judgment Should Be Granted, Intervenors' Cross-Motion for Summary Judgment Denied, and the Replacement Rule Vacated.

Nothing in Intervenors' briefing serves to rehabilitate a Replacement Rule that the Agencies have now conceded is arbitrary, capricious, and unlawful. Because the Rule unlawfully excludes navigable lakes, departs from prior policy without adequate explanation, undermines the Clean Water Act's sole objective, and applies an interpretation of the Act that the Supreme Court has repudiated, the Court should grant summary judgment to Plaintiffs, deny Intervenors' cross-motion for summary judgment, and vacate the Rule.

### A. By Failing to Oppose Plaintiffs' Motion for Summary Judgment, the Agencies Concede That the Replacement Rule Is Arbitrary, Capricious, and Unlawful.

Because the Agencies have elected not to oppose Plaintiffs' motion for summary judgment or otherwise to respond to the arguments contained therein, they have conceded that the Replacement Rule is arbitrary, capricious, and unlawful for the reasons set forth in Plaintiffs' motion. See Arnold v. Welch, No. CV 2:16-1359-BHH, 2018 WL 4346870, at *2 (D.S.C. Sept. 12, 2018) (Hendricks, J.) ("Where a party fails to respond to the opposing party's argument in support of the opposing party's motion for summary judgment, the party who fails to respond

---

agency an opportunity to respond to the deficiency identified by the court."). No such outcome is likely here, where the Agencies have indicated that they do not intend to substantiate the Rule on remand.

will be found to have conceded to that argument.").[19] Accordingly, the Court should grant summary judgment to Plaintiffs as against the Agencies.

The Agencies' concession is also highly relevant to the resolution of Plaintiffs' motion for summary judgment as against Intervenors and Intervenors' cross-motion for summary judgment. The very Agencies that adopted the Rule are no longer defending it in this litigation, having identified "substantial concerns" about its lawfulness. Doc. 140-2 ¶ 10. In fact, as discussed in Section I.A.2, above, the Agencies now express concern that they failed to consider the Rule's effects on water quality—the most "important aspect of the problem," State Farm, 463 U.S. at 43, and the basis for one of Plaintiffs' central claims. For this reason and the additional grounds set forth below, summary judgment for Plaintiffs is warranted.

**B.    The Replacement Rule Unlawfully Excludes Navigable Lakes.**

    **1.    The Agencies did not acknowledge their unlawful expansion of the waste treatment exclusion during the rulemaking, and they fail to acknowledge it now.**

Traditional navigable public lakes that were impounded to provide cooling water—including Lake Keowee and Lake Monticello in South Carolina—are now deemed non-jurisdictional under the Rule for the first time in the history of the Clean Water Act. The Rule denies traditional navigable waters, including large public lakes, the protections of the Act by applying the Rule's exclusions "even if the water satisfies one or more of the conditions to be a [jurisdictional] water." 85 Fed. Reg. at 22,325. This dramatic and unprecedented change allows previously protected "waters navigable in fact" to be excluded from the pollution protections

---

[19] See also, e.g., Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs., 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."); Yahya v. Barr, No. 1:20-cv-01150, 2021 WL 798873, at *2 (E.D. Va. Jan 19, 2021); Oliver v. Baity, 208 F. Supp. 3d 681, 690 (M.D.N.C. 2016); Kinetic Concepts, Inc. v. Convatec Inc., No. 1:08-cv-00918, 2010 WL 1667285, at *8 (M.D.N.C. Apr. 23, 2010) (collecting cases).

afforded to "waters of the United States," in violation of the most basic tenets of the Act. See

United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 123 (1985). As a result, lakes

that are navigable-in-fact, are impoundments of traditional navigable waters, and are used in

interstate commerce now fall within the broad new waste treatment system exclusion.

   This is unquestionably a change in policy. Before the Agencies enacted the Rule, electric

utilities categorized such lakes as "cooling ponds," see Doc. 119-1 at 14–15, but the lakes were

still subject to the jurisdiction of the Clean Water Act and thus protected from unpermitted

pollution. That did not stop electric utilities from trying—unsuccessfully—to evade these

protections by asserting that such lakes should be exempt from the Act, as Duke Energy

attempted with Sutton Lake in Wilmington, North Carolina:

> Defendant [Duke Energy] argues that because DENR [the state environmental
> agency] treats Sutton Lake as a cooling pond through its permits, it is not a water
> of the United States. However, this argument is not convincing, particularly where
> defendant has other public lakes used as cooling reservoirs for other power plants,
> which are classified and treated as waters of the United States.

Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc., 25 F. Supp. 3d 798, 809 (E.D.N.C.

2014). Now, the Rule adopts the unlawful position that these public lakes are excluded from the

"waters of the United States," solely because they provide cooling water and were impounded

prior to the 1972 Clean Water Act. See 85 Fed. Reg. at 22,325.

   Intervenors do not attempt to defend this change, instead disputing that any change has

even occurred. This is the same stonewalling position that the Agencies took in the rulemaking

process by refusing to acknowledge the change or to respond to comments from those concerned

about the new approach to excluding large public lakes from the Act.[20] See Doc. 119-1 at 15–16.

---

[20] Tex. Comm'n on Envtl. Quality, Comment Letter on Proposed Rule: Revised Definition of
"Waters of the United States" (AR 4887) (Apr. 15, 2019) ("TCEQ Comments"), at 2.

Instead, Intervenors devote their argument to wastewater treatment systems created pursuant to a Clean Water Act section 404 permit. See Doc. 143-1 at 43. But the impounded traditional navigable waters at issue here were not created under section 404 and have always been at the core of the Act's protections. The Fourth Circuit has upheld EPA's longstanding position that impoundments of such waters of the United States "remain 'waters of the United States,'" even if they are used for treatment. W.Va. Coal Ass'n v. Reilly, 728 F. Supp. 1276, 1290 (S.D.W. Va. 1989), aff'd, 932 F.2d 964 (4th Cir. 1991) (per curiam). The Fourth Circuit subsequently recognized an exception where stream segments that had *never* been protected under the Act were converted for waste treatment pursuant to a section 404 permit. See Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 215 (4th Cir. 2009). But the Ohio Valley exception is irrelevant here: large public lakes created prior to the Clean Water Act (and thus prior to section 404) are now excluded by the Rule for the first time, with none of the section 404 analysis or mitigation of impacts on which Ohio Valley relied. See id. Nothing in Ohio Valley justifies removing the Act's existing pollution protections from navigable lakes used for boating, fishing, and swimming, simply because they also provide cooling water and were "constructed prior to the 1972 [Clean Water Act] amendments." 85 Fed. Reg. at 22,325 (applying the exclusion to "all" such impoundments). Yet that is exactly what the Rule does.

With Intervenors unwilling to acknowledge the new approach to excluding navigable public lakes and the Agencies no longer defending the Rule, there is no basis for upholding the Rule's new exclusions. Intervenors purport to "adopt" arguments made by the Agencies in earlier briefing, but the motions setting forth those arguments have been dismissed and thus are not

before the Court.[21] Nevertheless, out of an abundance of caution, Plaintiffs briefly address the reasons that those arguments are meritless.

First, the new "waste treatment system" exclusion applies to lakes and ponds that provide cooling water across the board, not on a "case-specific basis," Doc. 143-1 at 43. The Rule excludes *all* such lakes and ponds by including "cooling pond" in the definition of "waste treatment system," 85 Fed. Reg. at 22,339, and applying the waste treatment exclusion even if the "cooling ponds" are traditional navigable waters. 33 C.F.R. § 328.3(a) (2020) (providing that all bases for jurisdiction are "subject to the exclusions"); 85 Fed. Reg. at 22,325.

Next, the Rule's new approach conflicts with past practice. The exclusion now applies not only to systems "constructed in accordance with the requirements of the [Act]" and its section 404 permitting program, but also to "*all* waste treatment systems constructed prior to the 1972 [Clean Water Act] amendments," including navigable public lakes. Id. at 22,325 (emphasis added). No previous regulation withheld the Act's protections from such waters. See Doc. 119-1 at 13. Indeed, the Agencies preserved jurisdiction over such waters in the 2015 Clean Water Rule, see 80 Fed. Reg. at 37,096, and the 2019 Repeal Rule that revived the pre-2015 regulations. 33 C.F.R. § 328.3(a)(8) (1987).

The Replacement Rule's new waste treatment exclusion is indefensible: it removes Clean Water Act jurisdiction from navigable lakes—waters at the heart of any reasonable understanding of "waters of the United States." Neither the Agencies in their rulemaking, nor

---

[21] See Doc. 106 (dismissing cross-motions for summary judgment without prejudice). Any arguments not developed by Intervenors in their current motion are no longer part of this case and cannot be considered. E.g., Schwartz v. Wellin, No. 2:13-cv-3595-DCN, 2014 WL 12637912, at *3 (D.S.C. Aug. 14, 2014) ("perfunctory and undeveloped arguments . . . are waived" (quoting Judge v. Quinn, 612 F.3d 537, 557 (7th Cir. 2010))); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("The district court is free to disregard arguments that are not adequately developed.").

Intervenors here, have acknowledged—let alone provided a reasoned explanation for—this unprecedented and impermissible approach.

### 2.    This issue is properly before the Court.

Intervenors also assert that this issue was waived and that the Court should defer review until some later time. See Doc. 143-1 at 44. Neither argument has merit.

First, the issue was raised in comments on the draft Rule; it was not waived. The Texas Commission on Environmental Quality ("TCEQ") objected that

> [t]he definition of 'waste treatment system' could cause confusion due to the inclusion of 'cooling pond' within the proposed definition. Texas has many surface water impoundments or reservoirs built on perennial and intermittent streams, some of significant size, that were built primarily for cooling purposes. These may be considered cooling ponds and therefore subject to the exclusion. The TCEQ recommends the Agencies remove the term 'cooling ponds' from the definition.

TCEQ Comments at 2. This comment squarely presented the issue that the Rule's new waste treatment system exclusion threatens jurisdictional surface water impoundments "of significant size," which Texas argued should remain protected under the Act and not be subject to the exclusion.

From the opposite end, utilities asked the Agencies to exclude large public recreational lakes from the Act. A utility trade group and previous Intervenor in this case, the Edison Electric Institute, specifically encouraged the application of the waste treatment exclusion to impounded "waters of the United States" and told the Agencies that the district court ruling on Sutton Lake, see supra Section II.B.1, was "inappropriate[]."[22]

---

[22] Thomas R. Kuhn, Edison Elec. Inst., Comment Letter on Proposed Rule: Revised Definition of "Waters of the United States" (AR 8115) (Apr. 15, 2019), at 14–15. The Edison Electric Institute was an Intervenor in this case until voluntarily dismissing itself in February 2021. See Doc. 103 (granting motion to dismiss). Intervenors are in no position to argue waiver where one of their own raised the waste treatment exclusion issue in comments to the Agencies.

As a result, there can be no question that the Agencies were confronted with this issue during their rulemaking. Plaintiffs were under no obligation to submit duplicative comments. See CTIA-Wireless Ass'n v. FCC, 466 F.3d 105, 117 (D.C. Cir. 2006) (holding issue was properly before court where it was raised by third party during comment period).[23] Moreover, comments need only "be made with sufficient specificity reasonably to alert the agency" to the issue. Appalachian Power Co. v. EPA, 251 F. 3d 1026, 1036 (D.C. Cir. 2001). Here, commenters voiced concern that the new expansion of the waste treatment system exclusion threatened "significant" reservoirs, TCEQ Comments at 2, which was more than enough to reasonably alert the Agencies to the issue.

Despite having been presented with the issue in public comments, the Agencies kept silent. The Agencies' "response" to Texas did not acknowledge that significant lakes would be subject to the exclusion for the first time. Instead, they stated that impoundments "*currently excluded* from jurisdiction would also remain excluded under the final rule." Doc. 69-7 at 61 (emphasis added). This statement does nothing to address the new removal of jurisdiction from navigable lakes previously protected under the Act. The Agencies' failure to address this significant concern was arbitrary and capricious. E.g., Gresham, 950 F.3d at 103 (finding agency action arbitrary and capricious where agency "dismiss[ed] concerns in a handful of conclusory sentences").

The Rule's unjustified exclusion of public lakes must be corrected now. Until the Rule's adoption, utilities, and anyone else attempting to discharge pollutants to these lakes, had been

---

[23] See also Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 8364 (2d ed. Apr. 2020 update) (collecting cases and noting that a plaintiff is not "generally require[d] . . . to raise an objection herself during notice-and-comment proceedings; it suffices that another person has raised the issue, allowing the agency to consider it."). Even if multiple parties had not raised the issue, the Agencies had an obligation to consider this serious issue themselves. See, e.g., Okla. Dep't of Envtl. Quality v. EPA, 740 F.3d 185, 192 (D.C. Cir. 2014).

subject to the Clean Water Act. By changing the scope of the Act, the Agencies opened up *any* lake that falls within the terms of the new exclusion to unregulated pollution. A particular utility's *future* NPDES renewal process does not address the Rule's *current* removal of Clean Water Act protections against the unregulated dumping of pollution into these lakes by *anyone*. Judicial review now is necessary to correct the serious conflicts that the Rule has created with the Clean Water Act and the APA.

### C.    The Replacement Rule Violates the Administrative Procedure Act.

Throughout their rulemaking, the Agencies attempted to shield their procedural shortcomings behind a new legal interpretation. Because a new legal interpretation—even if correct—does not excuse agencies from the obligation to "turn square corners" in following the APA's reasoned decision-making requirements, Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1909–10 (2020), Intervenors attempt to show that the Agencies met those requirements. The effort fails.

Intervenors stress that the Agencies' purported justifications for the Rule "span 75 pages of the Federal Register." Doc. 143-1 at 28. Of course, compliance with the APA is not measured by the volume of rulemaking documents an agency produces; it is assessed by the substance of those documents and the quality of agency decision-making. "[J]ust because an agency puts words to a page does not mean it has provided a 'sufficiently reasoned basis.'" Mayor of Balt. v. Azar, 973 F.3d 258, 277 n.8 (4th Cir. 2020) (en banc). Nowhere in the record did the Agencies reasonably explain why they adopted an interpretation of the Clean Water Act they had never before taken; how the Rule would affect the integrity of the nation's waters; how the Agencies weighed longstanding reliance interests against competing policy concerns; or why they did not afford similar treatment to streams and wetlands that perform similar functions. The Agencies'

failure to provide such a "sufficiently reasoned basis," id., renders the Rule unlawful under the APA.

> 1.    **The Agencies failed to justify their dramatic departure from prior policy.**

For close to half a century, the Agencies recognized that Clean Water Act jurisdiction must be defined functionally, and extended broadly, to achieve the Act's water quality objective. That determination, based on the application of the Agencies' scientific expertise to define the legal standard, has not been meaningfully addressed, much less repudiated, in this rulemaking, and the Agencies have provided no "good reasons" or "changed circumstances" to justify their departure from it. See, e.g., FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009); State Farm, 463 U.S. at 42; Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2126 (2016). This is fatal to the Rule.

> a.    *The Agencies failed to confront their own scientific record.*

In adopting the Replacement Rule, the Agencies reversed decades of precedent for protecting streams and wetlands that are integral to the quality of downstream traditional navigable waters[24]—all without providing "good reasons" for their dramatic change of course. Fox, 556 U.S. at 515. As the Fourth Circuit held in Jimenez-Cedillo v. Sessions, 885 F.3d 292 (4th Cir. 2018), "[a]n 'unexplained inconsistency' in agency policy indicates that the agency's

---

[24] See, e.g., National Pollutant Discharge Elimination System, 38 Fed. Reg. 13,528, 13,529 (May 22, 1973) (regulating "[t]ributaries of navigable waters of the United States"); Regulatory Program of the Corps of Engineers, 42 Fed. Reg. 37,122, 37,128 (July 19, 1977) (regulating "adjacent wetlands that form the border of or are in reasonable proximity to other waters of the United States"); Clean Water Act Jurisdiction following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States at 1, 8, 12 (AR 11695) (Dec. 2, 2008) ("Rapanos Guidance") (regulating impermanent streams and wetlands not abutting navigable waters if shown to significantly affect navigable water quality); Clean Water Rule, 80 Fed. Reg. at 37,055, 37,104–06 (regulating impermanent streams and wetlands shown to significantly affect navigable water quality).

action is arbitrary and capricious, and therefore unlawful." Id. at 298 (quoting Encino Motorcars, 136 S. Ct. at 2126). Perhaps the Rule's most glaring "unexplained inconsistency" is its categorical exclusion of ephemeral streams and many wetlands outside the annual floodplain of jurisdictional streams and rivers.

The Agencies' 2015 Science Report confirmed that ephemeral streams and many non-floodplain wetlands exert a significant impact on the quality of downstream waterways.[25] These findings were reviewed and approved by a panel of 27 of the nation's top scientists, including hydrologists, wetland and stream ecologists, biologists, geomorphologists, biogeochemists, and freshwater scientists. Clean Water Rule, 80 Fed. Reg. at 37,062. Based largely on these findings, the Agencies in the 2015 Clean Water Rule concluded that achieving the Act's objective to protect the integrity of the nation's waters, see 33 U.S.C. § 1251(a), *necessitated* regulating the pollution and destruction of many ephemeral streams and integral non-floodplain wetlands. E.g., 80 Fed. Reg. at 37,055, 37,104–06.

Then, in 2019—just one year before issuing the Replacement Rule—the same Agencies promulgated a "Repeal Rule" in which they announced that they would apply the 2008 Rapanos Guidance. The Rapanos Guidance deems streams and wetlands jurisdictional if they have a "significant nexus" to traditional navigable waters based on "the functions" they provide—including their capacity to hold back "flood waters that would otherwise enter traditional navigable waters," and "to transfer nutrients and organic carbon vital to support downstream food webs . . . [and] habitats]." Rapanos Guidance at 11.

---

[25] E.g., EPA Office of Rsch. & Dev., Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence (AR 11691) (Jan. 2015) ("Science Report"), at ES-2 to ES-4, 2-22 to 2-30, 3-1 to 3-45, 4-20 to 4-39.

Yet in the Replacement Rule, the Agencies categorically excluded ephemeral streams and many non-floodplain wetlands from federal protection, notwithstanding the determination they made in 2015 and 2019 that such waters were integral to protecting water quality. They did so without pointing to any "change[d] circumstances" that would warrant such an abrupt reversal, State Farm, 463 U.S. at 42, and without disputing the factual conclusions of the Science Report, the Clean Water Rule, the Rapanos Guidance, or the functional analysis they embody.[26] These failures render the Rule unlawful under the APA. See Fox, 556 U.S. at 516 ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."); Physicians for Soc. Responsibility v. Wheeler, 956 F.3d 634, 644 (D.C. Cir. 2020) ("[W]hen departing from precedents or practices, an agency must offer a reason to distinguish them or explain its apparent rejection of their approach." (internal quotations omitted)); Renewable Fuels Ass'n v. EPA, 948 F.3d 1206, 1255 (10th Cir. 2020) (finding change in agency policy arbitrary and capricious where "EPA ignored or failed to provide reasons for deviating from prior studies"). "Indeed, it is the 'agency's responsibility' to offer an explanation why it made a certain decision, when 'every indication in the record points the other way.'" Mayor of Balt., 973 F.3d at 276 (quoting State Farm, 463 U.S. at 56).

Intervenors maintain that the Agencies did not need to rely on science to draw the Rule's jurisdictional lines, because such lines "are *legal* distinctions that have been established within the overall framework and construct of the [Clean Water Act]." Doc. 143-1 at 25 (quoting 85 Fed. Reg. at 22,271 (emphasis added by Intervenors)). Even apart from the flaws in the Agencies' legal analysis, see infra Section II.D, the problem with this argument is evident. There

---

[26] Contrary to Intervenors' claim, Plaintiffs do not fault the Agencies because they "did not wholesale adopt the [Science] Report," Doc. 143-1 at 23. Rather, having so recently embraced the science embodied in that report, the Agencies were required to accept it again or to point to "good reasons" to reject it. Fox, 556 U.S. at 515. They did neither.

is no dispute that science must "operate within the [Clean Water Act's] legal framework," Doc. 143-1 at 25, or that "'the agencies' interpretative task' also requires 'legal interpretation,'" id. at 26 (quoting Clean Water Rule, 80 Fed. Reg. at 37,057). But even Intervenors acknowledge that the Agencies' legal interpretation cannot *ignore* the established science. See Doc. 143-1 at 26 (recognizing that "the agencies 'must rely, *not only on the science*,' but also their technical expertise, practical experience, and 'the compelling need for clearer, more consistent, and easily implementable standards'" (quoting Clean Water Rule, 80 Fed. Reg. at 37,057 (emphasis added))).

This is where the Agencies went astray: making a legal determination wholly detached from—and directly in conflict with—the scientific record that the Agencies had so recently assembled. The Agencies had a duty to address this substantial body of science "head-on," as the APA requires. Mayor of Balt., 973 F.3d at 277. Rather than utilize their expertise to explain their departure from prior conclusions and policy, the Agencies sidestepped scientific analysis entirely. This failure is particularly egregious because, as the Agencies now recognize, Doc. 140-2 ¶ 11, the governing statute has the sole objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), a legal objective inherently based in scientific fact and analysis.

Contrary to the evidence in the record, Intervenors insist that the Agencies did take account of science in crafting the Rule. See Doc. 143-1 at 24–25. But the examples they cite only reinforce the Agencies' failure to confront the scientific evidence bearing on the issue.

Incorporating science into the method for calculating the "typical year"—a technical measure for *implementing* the Rule—and the definitions of flow classifications (which themselves rely on the "typical year" concept), see Doc. 143-1 at 24, are not the same as using

science to draw the Rule's jurisdictional lines in the first place. See, e.g., 85 Fed. Reg. at 22,288 (describing science-informed flow classifications, the use of typical year test, and other aspects to "implement" the Rule "such as the development of tools and science-based approaches to identify flow classifications and typical year conditions").

Intervenors also claim that the Agencies used the Science Report to inform aspects of the Rule—specifically, the Agencies' recognition of the "connectivity gradient" that characterizes streams and wetlands. See Doc. 143-1 at 24–25. But simply pointing to the gradient without analyzing the factors that determine the gradient itself or a water's place on it, as the Agencies did in adopting the Rule, is an empty gesture. In fact, both "volume" of flow and "mass of inputs" are key variables in determining where a stream falls along the gradient. SAB Letter to Gina McCarthy, SAB Review of the Draft Science Report (AR 0386) (Oct. 14, 2014), at 54. By ignoring those variables with respect to ephemeral streams, the Agencies irrationally excluded "torrents thundering at irregular intervals through otherwise dry channels," while protecting "[t]he merest trickle, if continuous." Rapanos, 547 U.S. at 769 (Kennedy, J., concurring). For this reason, among others, EPA's Science Advisory Board members concluded that the Replacement Rule the Agencies had proposed was "fully at odds" with EPA's own Science Report. Mazeika P. Sullivan et al., Comment Letter on Proposed Rule: Revised Definition of "Waters of the U.S." (AR 3825) (Apr. 5, 2019), at 3. Because the Agencies failed to address their own scientific record and to provide good reasons for excluding streams, wetlands, and other waters that their own experts have found essential to meeting the Act's objective, the Rule is arbitrary and capricious.

> b.     *Intervenors' efforts to provide "good reasons" for the Agencies' abrupt policy change fail.*

Intervenors attempt to justify the Agencies' radical departure from prior policy and science based on the Rule's intended "clarity" and a professed concern over "states' rights." Doc. 143-1 at 20–21. Neither justification holds up.

Intervenors' claim that the Rule's intended "regulatory certainty" is a "good reason" for the Agencies' policy reversal is without merit. The Rule is anything but clear. Moreover, even a true elimination of confusion cannot justify a departure from the sole objective of the Clean Water Act, as has occurred here.

As the Supreme Court observed in County of Maui v. Hawaii Wildlife Fund, 140 S. Ct. 1462 (2020), "a more absolute position . . . may be easier to administer," but when "those positions have consequences that are inconsistent with major congressional objectives, as revealed by the statute's language, structure, and purposes," they must be rejected. Id. at 1477. For this reason, Intervenors' reliance on New York v. EPA, 413 F.3d 3 (D.C. Cir. 2005), is unavailing; the "need for regulatory certainty" may be a legitimate factor when an agency is "balancing . . . the environmental, economic, and administrative goals" of a statute, id. at 37, but regulatory certainty cannot be the basis for acting *contrary* to the statute's goals. See Cnty. of Maui, 140 S. Ct. at 1477. Indeed, the Agencies now question whether, in adopting a Rule without adequately considering its effects on water quality, they omitted "a critical element in assuring consistency with the statutory objective of the [Act]." Doc. 140-2 ¶ 13.

In any event, the Rule's purported clarity is illusory. For example, whether a stream is considered "perennial," "intermittent," or "ephemeral"—and thus whether it is potentially jurisdictional under the Rule—is delimited by the fundamentally indeterminate "typical year"

test. A stream is jurisdictional if it is "perennial or intermittent in a typical year." 85 Fed. Reg. at 22,339 (33 C.F.R. § 328.3(c)(12)).

The definition of this key term is a mind-bending morass. "Typical year" is defined as a time "when precipitation and other climatic variables are within the normal periodic range (*e.g.*, seasonally, annually) for the geographic area of the applicable aquatic resource based on a rolling thirty-year period." 85 Fed. Reg. at 22,339. This definition fails to specify which time period is to be averaged in calculating the "normal" periodic range—it could be a "seasonal[]" or "annual[]" average, or some other unspecified time period. Id. And whether precipitation counts as "typical" or "atypical" depends on whether it is evaluated against an annual or a seasonal average; a dry season could be atypical compared to the seasonal average, but precipitation over the whole year could be typical, or vice versa. Consequently, a given stream's flow could qualify as intermittent (and potentially jurisdictional) or ephemeral (and not jurisdictional), depending on whether the precipitation in a given year or season were deemed "typical." The Rule's variable and confusing standard does not come close to providing the regulatory certainty that Intervenors claim. Even if it did, clarity cannot rescue a rule that thwarts the objective of the Act it is supposed to enforce.

Finally, Intervenors contend that the Agencies adequately explained their policy reversal as an effort to expand the role of states in implementing the Clean Water Act, an effort the Agencies claimed was more consistent with section 101(b) of the Act. See Doc. 143-1 at 20–21. But even if the Agencies' novel view that the Act's water quality "objective" in section 101(a) must yield to the policy in section 101(b) were correct—which it is not, see infra Section II.D.1.c—the Agencies were required to explain, based on evidence, how such "other interests and policy concerns" outweighed the grave costs associated with the diminished water quality

that the undisputed record evidence showed would occur under the Rule. <u>Dep't of Homeland
Sec.</u>, 140 S. Ct. at 1914. Reasonably explaining their policy reversal and evaluating the
consequences are "the agenc[ies'] job, but [they] failed to do it." <u>Id.</u> These requirements are
fundamental to the APA.

### 2.    The Agencies failed to meaningfully address the most important aspect of the problem: the Rule's impact on water quality.

The Agencies did not consider or explain the effects of their chosen jurisdictional
boundaries on the integrity of the nation's waters. They thereby failed to meaningfully address
the rulemaking's most important issue: the Rule's effects on the Clean Water Act's objective to
"restore and maintain the chemical, physical, and biological integrity of the Nation's waters."
33 U.S.C. § 1251(a). The record evidence demonstrates that the Rule's exclusion of ephemeral
streams and many wetlands will significantly degrade water quality. <u>See</u> Doc. 119-1 at 8–9, 22–
23. In the face of this evidence, the Agencies' claim that the Rule "effectively furthers" the Act's
"objective," <u>e.g.</u>, 85 Fed. Reg. at 22,287—when it plainly does the opposite—is a textbook case
of arbitrary agency action. <u>See</u> <u>State Farm</u>, 463 U.S. at 43.

The Agencies now admit to "concern that when interpreting the jurisdictional scope of
the [Clean Water Act], the [Rule] did not appropriately consider the effect of the revised
definition of 'waters of the United States' on the integrity of the nation's waters." Doc. 140-2
¶ 10; <u>see also</u> <u>id.</u> ¶¶ 12–14. As the Agencies point out, in adopting the Rule, they "explicitly and
definitively stated in numerous places in the [Rule's] administrative record that they *did not* rely
on agency documents in the record that provided some limited assessment of the effects of the
rule on water quality . . . ." <u>Id.</u> ¶ 12 (emphasis added); <u>see also</u> 85 Fed. Reg. at 22,332 ("[T]he
final rule is not based on the information in the agencies' economic analysis or resource and

programmatic assessment."). The Agencies' concession that they failed to adequately evaluate the Rule's water quality effects evinces a clear APA violation.

In seeking to defend the Agencies' arbitrary action, Intervenors make a single argument: that the Agencies also assumed that "'many states will continue to regulate newly non-jurisdictional waters, thereby reducing any potential impacts from changes in [Clean Water Act] jurisdiction.'" Doc. 143-1 at 29 (quoting EA at 105). Notably, the Agencies no longer advance this argument, and for good reason: As discussed in Section I.B.2, above (and admitted by Intervenors, see Doc. 143-1 at 29), the suggestion that states may fill the substantial gaps in federal regulation left by the Rule is entirely speculative, and the undisputed record evidence demonstrates that states are unlikely to do so. Indeed, the Clean Water Act was enacted specifically to address the ineffectiveness of state efforts to protect water quality, which "ha[d] been inadequate in every vital aspect." S. Rep. No. 92-414 (1971), reprinted in 1972 U.S.C.C.A.N. 3668, 3674, 1971 WL 11307 (Ex. 9). And the Agencies now admit that states have actually *weakened* their own clean water protections in response to the Rule, contrary to the Agencies' assumption during the rulemaking. See Memorandum for the Record at 4.

Lacking historical or record support for their earlier reliance on the states' ability to compensate for the sharp reductions in federal Clean Water Act jurisdiction, the Agencies failed to adequately address the overwhelming evidence that their Rule would degrade water quality.

### 3. The Agencies did not meaningfully consider reliance interests.

As set forth in Plaintiffs' motion for summary judgment, the Agencies did not meaningfully assess the interests of those who had for decades relied on federal protections for lakes, streams, and wetlands expressly excluded from coverage under the Replacement Rule. See Doc. 119-1 at 23–24. Intervenors raise two arguments in response; neither withstands scrutiny.

First, Intervenors contend that the 2015 Clean Water Rule could not have engendered significant reliance interests because it was quickly challenged and enjoined. Doc. 143-1 at 22–23, 30. This argument should be disregarded as an "impermissible *post hoc* rationalization[]," Dep't of Homeland Sec., 140 S. Ct. at 1909, as nowhere in the record did the Agencies discuss the reliance interests of any parties except for states—and even states' reliance interests were only briefly considered and summarily dismissed. See 85 Fed. Reg. at 22,336; Doc. 69-1 at 29.

In any event, the federal protections that homeowners, business owners, and others have relied on include far more than just the 2015 Clean Water Rule. As Plaintiffs' motion made clear, Doc. 119-1 at 18–20, 24, the Replacement Rule reversed clean water safeguards that had been in place for almost half a century under the Clean Water Act, through every other administration, and the public had every reason to rely on those protections. The Agencies' 1980s regulations extended broad clean water protections to all streams and wetlands in "reasonable proximity to other waters of the United States." 42 Fed. Reg. at 37,128. Those regulations, as limited by the 2008 Rapanos Guidance, offered case-by-case protections for integral streams and wetlands, including ephemeral streams and wetlands that are not covered under the Replacement Rule. Rapanos Guidance at 1, 8, 12. The Clean Water Rule provided even clearer protections for waters found to significantly affect the physical, chemical, and biological integrity of the nation's waters. Clean Water Rule, 80 Fed. Reg. at 37,055, 37,104–06. Plaintiffs' members bought homes and made their livelihoods based on these federal safeguards that had existed for decades, including every definition of "waters of the United States" prior to this one. E.g., Doc. 119-1 at 40–43.

Second, Intervenors suggest that the Agencies adequately "considered . . . any reliance interests" by "consult[ing] with" various stakeholders and "provid[ing] the general public with

extensive opportunities to make their views known." Doc. 143-1 at 23. But merely hearing from stakeholders does not satisfy an agency's obligation to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." Dep't of Homeland Sec., 140 S. Ct. at 1915. Intervenors do not offer a single citation to where the Agencies acknowledged reliance interests beyond the Agencies' brief dismissal of state concerns—let alone meaningfully assessed them, as the APA requires. See, e.g., Gresham, 950 F.3d at 103 ("Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking."). Because the Agencies failed to address "serious reliance interests," the Rule violates the APA. Encino Motorcars, 136 S. Ct. at 2126 (quoting Fox, 556 at 515); see also Dep't of Homeland Sec., 140 S. Ct. at 1913–14.

**4.    The Agencies made arbitrary distinctions between waters that perform similar functions.**

As in Independent Petroleum Association of America v. Babbitt, 92 F.3d 1248 (D.C. Cir. 1996), the Agencies treated similar cases in a dissimilar manner, without providing a "legitimate reason" for doing so. Id. at 1258. Intervenors, like the Agencies themselves, fail to cite a single scientific principle underlying the Rule that could rationally explain which streams and wetlands are jurisdictional and which are not. The Agencies' failure renders the Rule arbitrary and capricious.

First, the Rule treats similarly situated streams differently without a rational justification. The Agencies concluded *in this rulemaking* that ephemeral streams fed by precipitation "perform similar hydrological and ecological functions" as do perennial and intermittent streams fed by groundwater, "including moving water, sediments, and nutrients, providing connectivity within the watershed and habitat to wildlife," and "supporting biodiversity." EA at 107. Even

Intervenors do not dispute that "ephemeral streams 'exert a strong influence on the character and functioning of downstream waters.'" Doc. 143-1 at 27 (quoting 85 Fed. Reg. at 22,288). Yet the Agencies categorically excluded ephemeral streams from jurisdiction while protecting most perennial and some intermittent streams, EA at 9–17, 22–23, purportedly on the basis of their ecological benefits. See 85 Fed. Reg. at 22,288 ("The 'tributary' definition . . . 'rests upon a reasonable inference of ecological interconnection' with traditional navigable waters.").

The Agencies now question the soundness of that distinction, expressing "concern[] that the [Rule] did not look closely enough at the effect ephemeral waters have on traditional navigable waters when the agencies decided to categorically exclude all ephemeral waters." Doc. 140-2 ¶ 14. Because the Agencies unlawfully failed to "treat similar cases in a similar manner," Indep. Petroleum Ass'n, 92 F.3d at 1258, the Rule does not comport with the APA.

Intervenors understandably waste little ink attempting to defend the scientific basis for the Rule's exclusion of streams that—by the Agencies' and Intervenors' own admissions— strongly influence the integrity of downstream waters. Instead, they argue that the exclusion of ephemeral streams is justified by the need to "establish categorical bright lines that provide clarity and predictability." Doc. 143-1 at 28 (quoting 85 Fed. Reg. at 22,325). Intervenors' argument is both legally and factually misguided. As discussed above, see supra Section II.C.1.b, the Rule is anything but clear. And even if achieved, "clarity and predictability" cannot come at the cost of consistency with the objective of the governing statute. See Cnty. of Maui, 140 S. Ct. at 1477.

The Agencies' justification for excluding certain wetlands fares no better. For example, the Rule arbitrarily distinguishes between wetlands separated from jurisdictional waters by a natural barrier (jurisdictional) and wetlands separated from jurisdictional waters by an artificial

barrier (non-jurisdictional). See Doc. 119-1 at 25–26. According to the Agencies when they adopted the Rule, that distinction is based solely on the claim that wetlands separated by an artificial barrier lack a "sufficient surface water connection" to jurisdictional waters. Doc. 143-1 at 31 (quoting 85 Fed. Reg. at 22,311). But the Agencies never offered any scientific or record-based explanation for (1) *why* a surface water connection is necessary, or (2) *what* makes a surface water connection "sufficient" for the purpose of differentiating between wetlands.[27]

Just six months prior to issuing the Replacement Rule, in fact, the same Agencies adopted a Repeal Rule that made no such distinction between natural and artificial barriers. Not only were "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like" *jurisdictional* under the Rapanos Guidance incorporated into the Repeal Rule, but so were wetlands if (1) they had "an unbroken or *shallow sub-surface* connection to jurisdictional waters"; or (2) "their proximity to a jurisdictional water is reasonably close, supporting the science-based inference that wetlands have an ecological interconnection with jurisdictional waters." Rapanos Guidance at 5–6 (emphasis added). Six months later, the Agencies abruptly discarded that analysis and adopted their arbitrary distinction. In light of the Agencies' fundamentally different treatment of wetlands separated from jurisdictional waters by two types of barriers, simply saying that one barrier is natural and one is artificial is not a reasoned explanation. See, e.g., Physicians for Soc. Responsibility, 956 F.3d at 646.

---

[27] Intervenors do not even attempt to defend the Agencies' arbitrary distinction between wetlands touching jurisdictional waters at only "one point" for no "specific duration" (jurisdictional *even without* a surface water connection) and wetlands close to, but not touching, jurisdictional waters (jurisdictional *only with* a surface water connection within a typical year). See Doc. 119-1 at 26 (citing 85 Fed. Reg. at 22,315).

Similarly, the Rule's differentiation between wetlands that are flooded *by* jurisdictional waters and wetlands that flood *into* jurisdictional waters is arbitrary and unrelated to the statutory objective of improving downstream water quality. See Doc. 119-1 at 26. Intervenors recite the Agencies' claim that flooding from a wetland *to* a jurisdictional water "is more like diffuse stormwater run-off and directional sheet flow over upland" and thus does not render the wetland jurisdictional. Doc. 143-1 at 31. But that claim fails: flooding is, by definition, sheet flow over uplands. *Flood*, Merriam-Webster, https://perma.cc/AM9C-DM43 (last visited July 8, 2021) (defining flood as "a rising and overflowing of a body of water especially onto normally dry land").

Moreover, the Agencies' experts have found that "even [] wetlands that rarely flood can be important because of long-lasting effects on streams and rivers," Science Report at 4-39, and wetlands with occasional surface water connections provide benefits "that could affect downstream waters if they are connected to (or isolated from) the river network in such a way that it allows (or prevents) transport of materials to downstream waters," id. at 4-41. Indeed, "some effects of non-floodplain wetlands on downstream waters *are due to their isolation*, rather than their connectivity. Wetland 'sink' functions that trap materials and prevent their export to downstream waters (e.g., sediment and entrained pollutant removal, water storage) result because of the wetland's ability to isolate material fluxes." Id. at ES-4; see also Rapanos, 547 U.S. at 775 (Kennedy, J., concurring) (noting wetlands' pollution storage functions mean that "the absence of an interchange of waters [may be what] makes protection of the wetlands critical to the [Act]"). The Agencies simply disregarded these "inconvenient facts," Fox, 556 U.S. at 537, when they irrationally distinguished between wetlands that perform similar functions.

The Agencies in their rulemaking—and now Intervenors in their brief—have attempted to justify the Rule's distinctions between similar cases by saying those cases are not identical. What they have not done is explain why the identified differences *matter* in the drawing of jurisdictional lines. Streams and wetlands that perform similar functions for downstream waters must be treated similarly absent "good reasons" for not doing so. Id. at 515. In adopting the Rule, the Agencies offered no such reasons.

### D.    The Replacement Rule Codifies an Impermissible Interpretation of "Waters of the United States."

Because the Replacement Rule was promulgated in violation of the APA, the Court need not address the substance of the Agencies' interpretation of the Clean Water Act. But the Rule also codifies an impermissible reading of the Act, stripping protections from millions of stream miles and wetland acres that science shows are *integral* to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Rule is incompatible with this sole congressional objective set out in the first words of the Act, and upends 40 years of Supreme Court precedent and agency practice protecting waters that significantly affect downstream traditional navigable waters.

Moreover, a majority of the Supreme Court rejected the relative permanence and continuous surface connection requirements as unsupported by the Act or in the Court's cases interpreting it—a point not disputed by Intervenors. These requirements are the two foundational tests that underlie the Rule. These fatal errors by the Agencies resolve the interpretive issues in this case and provide separate grounds on which to vacate the Rule.

1.    **The Rule conflicts with the Clean Water Act.**

a.    *The Rule is incompatible with the Clean Water Act's objective.*

In a statute declaring its sole objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a)—and using "broad" but ambiguous terms ("waters of the United States") to define which waters are protected, <u>Riverside Bayview</u>, 474 U.S. at 133—the Agencies have unreasonably exercised their discretion to strip protections from millions of stream miles and wetland acres that science shows are integral to the quality of downstream navigable waters.[28] <u>See</u> <u>Rapanos</u>, 547 U.S. at 778 (Kennedy, J., concurring) ("The limits the plurality would impose . . . give insufficient deference to Congress' purposes in enacting the Clean Water Act."); <u>id.</u> at 806 (Stevens, J., dissenting) (opining that plurality interpretation "endangers the quality of waters which Congress sought to protect").

Emphasizing the Clean Water Act's objective, the Supreme Court held last year that courts must reject interpretations of the Act that carry "consequences that are inconsistent with major congressional objectives, as revealed by the statute's language, structure, and purposes." <u>Cnty. of Maui</u>, 140 S. Ct. at 1468, 1477 (rejecting construction that would preclude EPA from regulating discharges to groundwater that reach navigable waters). The Court explained that statutory interpretations should not "creat[e] loopholes that undermine the statute's basic federal regulatory objectives." <u>Id.</u> at 1477. It is difficult to conceive of a greater loophole than the one created by the Replacement Rule. By stripping protections from integral streams and wetlands, the Rule encourages polluters to discharge waste upstream of traditional navigable waters, allowing "[t]he navigable part of the river [to] become a mere conduit for upstream waste." <u>United States v. Ashland Oil & Transp. Co.</u>, 504 F.2d 1317, 1326 (6th Cir. 1974), not to mention

---

[28] <u>E.g.</u>, Doc. 119-1 at 40; Science Report at ES-2 to ES-4, 2-22 to 2-30, 3-1 to 3-45, 4-20 to 4-39.

the damage to the streams and wetlands themselves. These consequences are incompatible with the Act's objective and with the logic of <u>County of Maui</u>.

Indeed, that was the state of affairs before the Act's passage, when clean water protections were left to the whim of state governments under immense pressure from large industry groups, causing a race-to-the-bottom. <u>E.g.</u>, Library of Cong., Cong. Research Serv., Envtl. Pol'y Div., 1 <u>A Legislative History of the Water Pollution Control Act Amendments of 1972</u>, at 494 (1973) (Ex. 10) (statement of Rep. Vanik during debates on H.R. 11896 that "due to the pressures of powerful economic interests, the States do not establish meaningful water quality levels"). That regime led to abysmal water quality and was rejected by Congress when it passed the Clean Water Act. <u>See</u> S. Rep. No. 92-414, 1972 U.S.C.C.A.N. at 3674 (finding that pre-Act "effort to abate and control water pollution ha[d] been inadequate in every vital aspect."). Yet the Rule, in large part, returns to that regime, despite undisputed record evidence, <u>see</u> <u>supra</u> Section I.B.2, and the Act's history showing that states cannot or will not fill the gap in lost federal protections. This violates the Act's mandate to protect water quality, 33 U.S.C. § 1251(a), and Congress' directive to give "waters of the United States" the "broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes." H.R. Rep. No. 92-911, at 131 (1972), https://perma.cc/S9MX-PKNZ (Doc. 119-53); S. Rep. No. 92-1236 (1972) (Conf. Rep.), <u>reprinted</u> <u>in</u> 1972 U.S.C.C.A.N. 3776, 3822, 1972 WL 12735 (Doc. 119-54).

Citing <u>Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers</u>, 531 U.S. 159 (2001) ("<u>SWANCC</u>"), Intervenors claim that the Agencies "implemented the Rule to be consistent with . . . the agencies' constitutional authority under the Commerce Clause." Doc. 143-1 at 21. But <u>SWANCC</u> provides no support for the proposition that the Agencies'

Commerce Clause authority extends so narrowly; the Court in SWANCC held that the Corps could not regulate an isolated gravel pit created for mining activities based solely on the fact that it served as habitat for migratory birds. 531 U.S. at 167. By contrast, the Court has consistently held that it is well within the Agencies' authority to regulate waters with a "significant nexus" to navigable waters pursuant to "Congress' concern for the protection of water quality and aquatic ecosystems." Id.; see Rapanos, 547 U.S. at 782 (Kennedy, J., concurring) (significant nexus interpretation "does not raise federalism or Commerce Clause concerns"); Riverside Bayview, 474 U.S. at 134 (affirming Corps' jurisdiction over wetlands that "border . . . or are in reasonable proximity to other waters of the United States," so as to support an "ecological judgment" that the "wetlands may affect the water quality of adjacent lakes, rivers, and streams."); accord Georgia v. Wheeler, 418 F. Supp. 3d 1336, 1369 (S.D. Ga. 2019) ("[J]ust because the Agencies could not assert jurisdiction over the isolated ponds in SWANCC based on migratory birds does not mean that the Agencies could not find . . . that similar ponds have a significant nexus to primary waters.").

    The Fourth Circuit rejected Intervenors' logic when it denied a Commerce Clause challenge to the Corps' regulation of "nonnavigable tributaries and their adjacent wetlands" under the far more protective definition of "waters of the United States" in force before the Replacement Rule. See United States v. Deaton, 332 F.3d 698, 707–08 (4th Cir. 2003). That challenge "d[id] not present a serious constitutional question," as the commerce "power over navigable waters also carries with it the authority to regulate non-navigable waters when that regulation is necessary to achieve Congressional goals in protecting navigable waters." Id. Indeed, "[t]here is no constitutional reason why Congress cannot, under the commerce power,

treat the watersheds as key to flood control on navigable streams and their tributaries." Okla. ex

rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 525 (1941).[29]

Regulating non-navigable waters integral to the water quality of traditional navigable

waters does not raise constitutional questions—particularly not ones that would justify gutting

clean water protections for millions of integral stream miles and wetland acres. The Rule is

incompatible with the Act's objective and predicated on an erroneous view of the scope of

Congress' power under the Commerce Clause.

> b.    *The Rule defies the Clean Water Act's mandate to consider
> science.*

The Rule also places limits on the scope of federal clean water protections without regard

for the established science on how streams and wetlands affect navigable water quality. As

Plaintiffs have explained, see supra Section II.C.1.a, the Rule's treatment of the connectivity

gradient is arbitrary and was rejected by the Agencies' own experts. Further, the use of scientific

tools to implement a jurisdictional test with no basis in science does not mean that the test

protects the "chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C.

§ 1251(a); see supra Section II.C.1.a. Defining the reach of the Clean Water Act is, of course, a

"legal issue of statutory construction," Doc. 143-1 at 37, but the *statute* requires a scientific

determination about which waters are integral to the nation's water quality—as the Supreme

---

[29] Intervenors also claim that SWANCC erased the legislative history showing Congress intended "waters of the United States" to be interpreted broadly. See Doc. 143-1 at 38. SWANCC did no such thing, simply noting that nothing "in the legislative history . . . signifies that Congress intended to exert anything more than its commerce power over navigation," 531 U.S. at 168 n.3. That observation in no way negates Congress' intent to exercise its commerce power over navigation in the "broadest possible constitutional" way by regulating "waters of the United States." H.R. Rep. No. 92-911, at 131; S. Rep. No. 92-1236, 1972 U.S.C.C.A.N. at 3822. It simply indicates, as SWANCC held, "that covered nonnavigable waters are those with some connection to navigable ones." Deaton, 332 F.3d at 709. By stripping protections from countless streams, wetlands, and lakes that significantly affect navigable water quality, the Rule disregards the full-throated exercise of commerce power that Congress intended.

Court and every court of appeals to consider the question have repeatedly held. See Doc. 119-1 at 30–31.

The Agencies have discretion, based on their scientific expertise, to determine which waters require protection to achieve the Act's objective. E.g., Riverside Bayview, 474 U.S. at 134 ("[T]he Corps' ecological judgment about the relationship between waters and their adjacent wetlands provides an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act."). As the Fourth Circuit has long recognized, that deference is predicated on the Agencies' exercise of scientific judgment about "how far coverage must extend in order to protect the navigable waters." Deaton, 332 F.3d at 711–12 (finding jurisdiction appropriate because "discharges into nonnavigable tributaries and adjacent wetlands have a substantial effect on water quality in navigable waters").

But deference does not extend so far as to permit the Agencies to disregard science and the Act's objective, stripping protections from streams, wetlands, and lakes that undisputed science shows are integral to the nation's water quality. The Agencies now appear to acknowledge this. See Doc. 140-2 ¶ 10 (expressing "substantial concerns" that the Rule "did not appropriately consider the effect of the revised definition of 'waters of the United States' on the integrity of the nation's waters."). The Rule does not draw jurisdictional lines based on the significance of streams' and wetlands' influence on navigable waters; it relies on a repudiated legal interpretation by a plurality of the Court.

Intervenors address their responses to a straw man, claiming that Plaintiffs would extend jurisdiction to all waters with "interconnectedness (of any degree)" and that Plaintiffs would have the Agencies consider "only" science. Doc. 143-1 at 37. Not so. Plaintiffs would have the Agencies extend jurisdiction to those waters that the Agencies, based on science and their

technical expertise, determine significantly affect the chemical, physical, and biological integrity

of traditional navigable waters—an approach consistent with the Clean Water Act's objective,

Supreme Court precedent, and decades of agency practice. Plaintiffs' complaint is simply that

the Rule does "not allow[] federal jurisdiction where a water *significantly* affects the . . .

integrity" of navigable waters, an "absurd" result "inconsistent with the text and purpose of the

[Act]." Georgia, 418 F. Supp. 3d at 1369 (emphasis added).

> c.  *The Rule unlawfully reads section 101(b) to undermine the Act's objective.*

As Plaintiffs explained in their motion for summary judgment, Doc. 119-1 at 34–37, the

text, structure, purpose, and history of the Clean Water Act show that sections 101(a) and 101(b)

are in harmony: Section 101(a) sets out the Act's sole objective to "restore and maintain the

chemical, physical, and biological integrity of the Nation's waters," and section 101(b) sets out

specific functions for the states to perform in the cooperative federalism Congress envisioned to

achieve that objective.

Nothing in the Act suggests that Congress enacted section 101(b) as an exception to the

Act's water quality objective, carving out huge swaths of the nation's streams and wetlands from

the Act's regulatory protections. To the contrary, the Act was passed *because of* the failures of

state-based regulatory systems. See supra Section I.B.2. When Congress sought to implement the

policy in section 101(b) and recognize the role of states in protecting the nation's water quality,

it did so expressly. In the very next sentence after the policy statement, Congress provided that

states shall implement the Act's core permit programs under sections 402 and 404, among other

functions. 33 U.S.C. § 1251(b). And in Section 401, Congress empowered states to veto or

condition federal permits for projects that threaten to violate state water quality standards.

In Intervenors' view, the Act's "policy" of transferring to states certain "regulatory duties" in section 101(b), <u>Riverside Bayview</u>, 474 U.S. at 136, justifies stripping federal Clean Water Act jurisdiction regardless of the harm it will cause the nation's waters. That reading spells doom for the Act's objective, because states are unwilling or unable to fill the gap in lost federal protections. <u>See</u> <u>supra</u> Section I.B.2. Indeed, this sort of voluntary, state-led regime left the nation's waters "in serious trouble, thanks to years of neglect, ignorance, and public indifference," H.R. Rep. 92-911, at 66—the precise evil Congress sought to remedy with the Clean Water Act. Intervenors' tortured interpretation of the Act has never before been adopted by any court or other administration.

Intervenors latch on to the <u>Rapanos</u> plurality's assertion that Congress' policy in section 101(b) "refer[s] to something beyond the . . . state administration program" because Congress announced that policy in 1972 but did not establish the state administrative programs until the 1977 amendments to the Act. 547 U.S. at 737. That argument overlooks that Congress set out in the 1972 Act exactly how it envisioned the states' role in protecting water quality. For example, the 1972 Act granted states veto power over federally licensed or permitted projects threatening state water quality. <u>See</u> 33 U.S.C. § 1341. It gave states the authority to impose stricter water pollution standards than those required by the Act. <u>See</u> 33 U.S.C. § 1370. And it reserved to states responsibility for containing pollution from nonpoint sources.

If anything, Congress amended the Act in 1977 to show how its policy in section 101(b) would otherwise be carried out—by having states administer certain of the Act's functions. Indeed, the 1977 amendments "retain[ed] the comprehensive jurisdiction over the Nation's waters exercised in the 1972 Act." <u>Riverside Bayview</u>, 474 U.S. at 137 (quoting 123 Cong. Rec.

39,209 (1977)).[30] Section 101(b) does not exclude integral waters from the Act's regulatory protections.

Intervenors argue that the Act sets out non-regulatory programs, such as federal financial assistance to states to control non-point-source pollution, 33 U.S.C. § 1329(h), that sweep beyond certain of the Act's regulatory programs. Doc. 143-1 at 38–39. But Intervenors offer no explanation as to why the existence of such non-regulatory programs justifies removing federal regulatory protections from waters whose health is integral to achieving the Act's objective. This sort of voluntary, state-led regime left "[m]any of the Nation's navigable waters [] severely polluted, and . . . unfit for most purposes," S. Rep. No. 92-414, 1972 U.S.C.C.A.N. at 3674, motivating Congress to pass the Clean Water Act.

Intervenors' expansive reading of section 101(b) would have the policy of that section swallow up the 1972 Act and return regulation of the nation's waters to the regime that Congress disavowed in 1972. Because such a reading would frustrate the Clean Water Act's sole objective, it must be rejected. See Cnty. of Maui, 140 S. Ct. at 1477.

> d.    The "Nation" referred to in section 101(a) is "the United States."

Intervenors insist that "the Nation's waters" means something different than "waters of the United States"—i.e., that "Nation" refers to something other than "the United States." E.g., Doc. 143-1 at 40–41. But there is no interpretive canon that counsels attributing different meanings to synonymous words.

---

[30] To the extent section 101(b) has any relevance to the meaning of "waters of the United States," it simply ensures a focus on waters with a "significant nexus" to navigable waters, rather than waters with no such nexus. See SWANCC, 531 U.S. at 167, 174. Nothing supports reading section 101(b) to *strip* protections from waters with a significant nexus to navigable waters, as the Rule does.

Intervenors fault Plaintiffs for not naming a canon to support the common-sense reading that "Nation" means "the United States." Id. But this reading is supported by *the* foundational canon: that courts "interpret[] a statute in accord with the ordinary public meaning of its terms." Bostock v. Clayton Cnty., 140 S. Ct. 1731, 1738 (2020). "Congress certainly does use synonyms in its drafting, and courts should not strain to interpret words differently when their ordinary meaning is synonymous. Thus, the rule against superfluities" relied on by Intervenors "cannot be used to override the 'fundamental canon of statutory construction . . . .'" In re Miller, 519 B.R. 819, 823 n.22 (10th Cir. 2014) (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)); accord Wachovia Bank v. Schmidt, 546 U.S. 303, 314 (2006) ("Congress may well have comprehended the [different] words . . . not as contrasting, but as synonymous").

Legislative history uses the terms as synonyms. The Senate Committee Report from the 1972 Act identifies the goal "to ultimately eliminate the discharge of pollutants into the Nation's waters." S. Rep. No. 92-414, 1972 U.S.C.C.A.N. at 3684. Section 301 of the Act established that there is no "inherent right to use the nation's waterways for the purpose of disposing of wastes." Id. at 3709. Section 402's public participation requirements were included as "[a]n essential element in any control program involving the nation's waters." Id. at 3738. The Senate Committee Report supporting the 1977 amendments recognized that the Act enacted a "national policy" that prohibited "communities and industries" from discharging "waste directly into the Nation's waters." S. Rep. No. 95-370 (1977), reprinted in 1977 U.S.C.C.A.N. 4326, 4330, 1977 WL 16152 (Ex. 11). The committee recognized "the need to achieve a high degree of municipal waste treatment for discharges into the Nation's rivers, lakes, and streams." Id. at 4331. The report covered wetlands too, stating that "[t]here is no question that the systematic destruction of the Nation's wetlands is causing serious, permanent ecological damage." Id. at 4336. Section 404

was designed to prevent the "unregulated destruction of these areas" by "regulating the kinds of activities which interfere with the overall ecological integrity of the Nation's waters." Id. In each of these passages, congressional leaders were discussing the Act's suite of pollution controls that apply only to "navigable waters," e.g., 33 U.S.C. §§ 1311(a), 1362(12), 1344(a), which "Congress chose to define . . . broadly as 'waters of the United States.'" Riverside Bayview, 474 U.S. at 133; see 33 U.S.C. § 1362(7).

Last, Intervenors contend that "the Nation's waters" and "navigable waters" must "mean[] two different things." Doc. 143-1 at 41. Whatever force that argument may carry in the abstract, it ignores that the Act defines "navigable waters" as "waters of the United States." 33 U.S.C. § 1362(7). Common sense, legislative history, regulatory history, and the case law Plaintiffs cited in their motion for summary judgment, see Doc. 119-1 at 37–38, demonstrate that the "Nation's waters" are no different than the "waters of the United States." Intervenors' reliance on this supposed distinction to justify the Agencies' contravention of the Clean Water Act's objective is without merit.

### 2. **Rapanos preclides the Rule's interpretation.**

Although the Supreme Court in Rapanos split 4-1-4 over the meaning of "waters of the United States," a binding majority rejected Justice Scalia's plurality interpretation as impermissible. Because the Rule codifies that repudiated construction, it is unlawful. But even if the majority's clear rejection of Justice Scalia's opinion were not binding, the opinion of five Justices that the Rule's governing tests are unlawful is highly persuasive authority. Rapanos provides an independent basis to invalidate the Rule.

a.    *The Rule codifies a plurality interpretation that five Justices rejected as impermissible.*

As Plaintiffs explained in their motion for summary judgment, the Agencies in the Replacement Rule "'self-consciously intended to take the plurality opinion . . . , flesh out the details, and make it the new law of the land.'" Doc. 119-1 at 28 (quoting Colorado v. EPA, 445 F. Supp. 3d 1295, 1311 (D. Colo. 2020), rev'd on other grounds, 989 F.3d 874 (10th Cir. 2021)). Intervenors deny that the Rule is "wholly" based on Justice Scalia's opinion, claiming the Rule incorporates the "commonalities" between the plurality and concurring opinions. Doc. 143-1 at 35 (citation and quotations omitted). But Intervenors do not identify a *single provision* of the Rule that diverges from the two limitations in Justice Scalia's opinion—the relative permanence and regular surface connection requirements—that were rejected by five Justices.

Justice Kennedy and the four dissenting Justices in Rapanos rejected every material aspect of Justice Scalia's plurality opinion, save for uncontroversial points such as that the Act covers "something more than traditional navigable waters." Rapanos, 547 U.S. at 731. As a majority of the Court concluded, however, "[f]rom this reasonable beginning the plurality proceeds to impose two limitations [that] are without support in the language and purposes of the Act or in our cases interpreting it." Id. at 768–69 (Kennedy, J., concurring); see id. at 800 (Stevens, J., dissenting) (same).

The Rule incorporates both of the plurality's limitations. As to tributaries, the Rule's categorical exclusion of ephemeral streams embraces Justice Scalia's "relatively permanent" flow requirement, 85 Fed. Reg. at 22,288–89 (defining tributary based on "Rapanos plurality's position that 'the waters of the United States' include only relatively permanent, standing or flowing bodies of waters"), and discards the majority view that "nothing in the statute suggests" Congress "dr[ew] a line to exclude irregular waterways." Rapanos, 547 U.S. at 769–70

(Kennedy, J., concurring); see id. at 800–01 (Stevens, J., dissenting) (finding relative

permanence requirement "arbitrary").[31] As to wetlands, the Rule invokes Justice Scalia's surface

connection requirement, 85 Fed. Reg. at 22,279 (defining "'adjacent wetlands' to include . . .

wetlands [with] certain regular hydrologic surface connections to [jurisdictional waters]"), and

ignores the majority view that such a requirement is "inconsistent with the Act's text, structure,

and purpose," Rapanos, 547 U.S. at 776; see id. at 804 (Stevens, J., dissenting) (finding

continuous surface connection requirement "arbitrary").[32] In short, the Rule's central thesis—that

the term "waters of the United States" encompasses only "relatively permanent flowing and

standing waterbodies" and waters with "a specific surface water connection" to such waters,

85 Fed. Reg. at 22,273—was rejected by a Court majority as lacking any "support in the

language and purposes of the Act or in our cases interpreting it." Rapanos, 547 U.S. at 767–68

(Kennedy, J., concurring); id. at 800 (Stevens, J., dissenting).

  The differences between Justice Scalia's and Justice Kennedy's opinions are

irreconcilable, overwhelming the purported commonalities identified by Intervenors. See

Doc. 143-1 at 34–35. For example, whereas Justice Kennedy recognized that the Act's text

incorporates "a flexible ecological inquiry into the relationship between the wetlands at issue and

traditional navigable waters," Precon Dev. Corp. v. U.S. Army Corps of Eng'rs, 633 F.3d 278,

294 (4th Cir. 2011) (citing Rapanos, 547 U.S. at 779–80 (Kennedy, J., concurring)), Justice

---

[31] While Intervenors claim that unspecified aspects of the Rule's "tributary" definition
"'incorporate[] important aspects of Justice Kennedy's opinion, together with those of the
plurality,'" Doc. 143-1 at 35 (quoting 85 Fed. Reg. at 22,291), the sentence following the one
they selectively quote from the Rule's preamble adopts the *plurality's* requirement of "relatively
permanent flow" for jurisdictional tributaries and rejects Justice Kennedy's interpretation. 85
Fed. Reg. at 22,291.
[32] Even the Rule provision asserting jurisdiction over wetlands separated from jurisdictional
waters by a single "natural feature," 85 Fed. Reg. at 22,338, is intended to implement the surface
connection requirement, id. at 22,311 ("[T]he presence of a . . . natural feature indicates that a
sufficient surface water connection occurs between the jurisdictional water and the wetland.").

Scalia interpreted the text as hostile to ecological considerations. See Rapanos, 547 U.S. at 770

(Kennedy, J., concurring); id. at 801, 805 (Stevens, J., dissenting). And while both require a

"connection to" navigable waters, Justice Scalia required a "continuous surface connection,"

Rapanos 547 U.S. at 742, whereas Justice Kennedy carried forward the science-based, functional

test from Riverside Bayview and SWANCC, finding waters jurisdictional if they "significantly

affect" traditional navigable waters. Id. at 779–80. Siding with Justice Scalia, the Rule rejects the

very concept of the significant nexus test at the core of Justice Kennedy's opinion and the

Court's decisions in Riverside Bayview and SWANCC. See Doc. 119-62 at 16 ("[T]he NWPR

removes the bedeviling 'significant nexus' concept for identifying 'navigable waters.'").

In sum, the Replacement Rule codifies Justice Scalia's two-pronged jurisdictional test—a

test rejected by five Justices in Rapanos as an impermissible construction of "waters of the

United States."

        *b.*     *The majority's rejection of the Rule's jurisdictional test is binding*
             *precedent.*

Intervenors do not deny that a Supreme Court majority in Rapanos rejected the plurality's

jurisdictional test. Instead, they urge this Court to ignore the majority's repudiation of the Rule's

governing test because several Justices in that majority dissented from the bottom-line judgment

in Rapanos that the decision of the court of appeals should be vacated and remanded. See

Doc. 143-1 at 36. Intervenors fail to grapple with the long line of Supreme Court cases

establishing that points of law embraced by any five Justices—including those in dissent—are

binding law. Even the Agencies agree that "[w]hen there is no majority opinion in a Supreme

Court case, controlling legal principles may be derived from those principles espoused by five or

more justices," including dissenters. Rapanos Guidance at 3 & nn.15–16 (collecting cases).

Intervenors say virtually nothing about the eight Supreme Court opinions Plaintiffs have cited establishing that points of law embraced by any five Justices, including dissenters, in a fractured opinion are binding. See Doc. 119-1 at 29 n.38 (collecting cases). For example, in United States v. Jacobsen, 466 U.S. 109 (1984), the Court held that the claim before it "must be tested" against the "standard [that] was adopted by a majority of the Court in" a prior fractured opinion—a majority comprised of two Justices opining for the Court and four dissenters. Id. at 115–17. In Alexander v. Choate, 469 U.S. 287 (1985), the Court ascertained that the "holding" of a prior fractured decision was a rule of law embraced by four concurring Justices and three dissenters. Id. at 293 & n.8. In Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1 (1983), the Court affirmed a lower court's "recogni[tion] that the four dissenting Justices and Justice BLACKMUN formed a majority [in a prior case] to require application of [a legal test they agreed on]." Id. at 17.

Intervenors' effort to undermine Vasquez v. Hillery, 474 U.S. 254 (1986), is unavailing. There, the Court treated as "precedent[]" the views of a three-justice plurality plus "[t]wo additional Justices [who] *dissented from the judgment*" in a prior case. Id. at 261 n.4 (emphasis added). The dissenters in the prior case did not "concur[] in the relevant part of the *judgment*," as Intervenors claim, Doc.143-1 at 36 (emphasis added)—they agreed with the plurality on a *point of law* in a broader analysis leading to a judgment from which they "dissented." Vasquez, 474 U.S. at 261 n.4. That is precisely what happened in Rapanos, where the four dissenters agreed with Justice Kennedy on a point of law—that the plurality's interpretation of "waters of the United States" is impermissible—but disagreed with Justice Kennedy's judgment of reversal.

Intervenors' claim that "none of th[e]se cases discussed" Marks v. United States, 430 U.S. 188 (1977), Doc. 143-1 at 36, is precisely the point. Where, as here, it is "immediately

obvious how [the Justices'] views could be combined to form a five-Justice Majority," courts

have no "reservations" about "combining a dissent with a concurrence to find [a] ground of

decision embraced by a majority of the Justices." United States v. Johnson, 467 F.3d 56, 65 (1st

Cir. 2006) (collecting cases); accord United States v. Donovan, 661 F.3d 174, 182–83 (3d Cir.

2011); United States v. Bailey, 571 F.3d 791, 798–99 (8th Cir. 2009). As then-circuit judge

Kavanaugh explained, "when at least five Justices—the dissent plus either the plurality or

concurrence—would reach a given result, then lower courts should reach that result." United

States v. Duvall, 740 F.3d 604, 611 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (citing

Rapanos, 547 U.S. at 810 (Stevens, J., dissenting)). In such cases, courts need not resort to the

convoluted Marks analysis that Intervenors urge. See Doc. 143-1 at 33–35. Indeed, the Supreme

Court has observed that "[i]t does not seem useful to pursue the Marks inquiry to the utmost

logical possibility." Grutter v. Bollinger, 539 U.S. 306, 325 (2003).[33]

The Fourth Circuit, too, has applied this approach. In A.T. Massey Coal Co. v.

Massanari, 305 F.3d 226 (4th Cir. 2002), the court interpreted the Supreme Court's fractured

decision in Eastern Enterprises v. Apfel, 524 U.S. 498 (1998). On one issue—whether a

particular statute was constitutionally applied under Eastern—there was no obvious majority

view, so the Fourth Circuit applied Marks, looking for "the opinion of the Justices concurring in

the judgment on the 'narrowest grounds.'" A.T. Massey, 305 F.3d at 236. On another issue—

whether an application of the statute violated the Takings Clause—there was an obvious majority

in Eastern, "i.e., Justice Kennedy and the four dissenters[] believed that the . . . Act, and its

---

[33] Intervenors' reliance on King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc),
Doc. 143-1 at 33, is inapt. King did not interpret Rapanos. As the First Circuit explained in
Johnson—a case that did interpret Rapanos—the different Supreme Court case King addressed
lacked an "obvious" majority view; thus, King's approach does not apply to Rapanos. Johnson,
467 F.3d at 65.

assessment of premiums, did not constitute a taking." <u>Id.</u> at 237 n.17 (citation and quotations omitted). Quoting Third Circuit precedent, the Fourth Circuit suggested that it was "bound to follow the five-four vote against the takings claim in <u>Eastern</u>." <u>Id.</u>; <u>see also Donovan</u>, 661 F.3d at 182 (stating Third Circuit rule that if "votes of dissenting Justices . . . combined with the votes from plurality or concurring opinions[] establish a majority view on the relevant issue," it creates binding law).[34]

In short, the explicit majority agreement in <u>Rapanos</u> that the plurality interpretation codified by the Rule is impermissible constitutes a binding rejection of the Rule. The question of which waters the Agencies *must* regulate is beside the point, because five Justices held that the Agencies *must not* interpret "waters of the United States" in the manner of the plurality opinion. This Court should not countenance the Rule's attempt to "contradict[] the will of a majority of the Supreme Court," defying "common sense" and "vertical stare decisis." <u>Duvall</u>, 740 F.3d at 616–18 (Kavanaugh, J., concurring).

       c.      *<u>Brand X</u> and <u>Chevron</u> do not resuscitate the Rule.*

Against this backdrop, Intervenors' reliance on <u>Chevron v. Natural Resources Defense Council</u>, 467 U.S. 837 (1984), and <u>National Cable and Telecommunications Association v. Brand X Internet Services</u>, 545 U.S. 967 (2005) ("<u>Brand X</u>"), to defend the Rule fails. First, the

---

[34] Other Fourth Circuit cases applying <u>Marks</u> dealt with Supreme Court opinions where there was majority agreement on the relevant point of law among the concurring and plurality opinions. <u>See</u> <u>United States v. Spivey</u>, 956 F.3d 212, 214 n.3 (4th Cir. 2020); <u>United States v. Halstead</u>, 634 F.3d 270, 278–79 (4th Cir. 2011). These cases had no occasion to address whether, in the absence of such agreement among Justices supporting the judgment, clear agreement among any five Justices would have similarly established binding law. <u>Brzonkala v. Virginia Polytechnic Institute and State University</u>, 169 F.3d 820 (4th Cir. 1999), relied on by Intervenors, is inapposite because the Supreme Court opinion interpreted in that case did not contain clear majority agreement among concurring and dissenting Justices. To the contrary, the dissent "reached the constitutional question expressly *not* addressed by the majority and unnecessary to the concurrence." <u>Id.</u> at 878 (emphasis added).

Agencies' rulemaking is not entitled to Chevron deference due to the procedural violations of the APA discussed in Section II.C, supra. See Encino Motorcars, 136 S. Ct. at 2125 (when "agency procedures . . . are defective, a court should not accord Chevron deference to the agency interpretation."). Second, under Chevron and Brand X, Agencies may not adopt a statutory interpretation if a court has unambiguously foreclosed it. That is exactly what happened here—five Justices in Rapanos held that Justice Scalia's plurality interpretation codified by the Rule is impermissible.

Brand X only sanctions agency interpretations "otherwise entitled to Chevron deference," 545 U.S. at 982, which, in turn, only applies to "reasonable" interpretations, Mejia v. Sessions, 866 F.3d 573, 583 (4th Cir. 2017). Thus, when a court holds that an interpretation of an ambiguous statutory phrase—such as "waters of the United States"—is legally impermissible or unreasonable, the agency may not codify that interpretation under Brand X. See, e.g., Padilla-Caldera v. Holder, 637 F.3d 1140, 1152–53 (10th Cir. 2011) ("[I]f this court holds that [an agency's] interpretation of an ambiguous provision of [a statute] is unreasonable, the [agency] cannot ignore our holding and continue to follow its unreasonable interpretation."); Mercado-Zazueta v. Holder, 580 F.3d 1102, 1112–13 (9th Cir. 2009) ("While agencies retain discretion to fill ambiguous statutory gaps, it does not follow that an agency may repeatedly put forward an interpretation that we already have examined under Chevron and found unreasonable at its second step."), abrogated on other grounds by Holder v. Martinez Gutierrez, 566 U.S. 583 (2012).[35]

---

[35] Because Justice Kennedy and the Rapanos dissenters were evaluating a judicial interpretation (Justice Scalia's), and not an agency interpretation offered under Chevron, their omission of the word "unambiguous" is irrelevant. Courts need not use "magic words" for their statutory interpretations to foreclose future agency readings. Patel v. Napolitano, 706 F.3d 370, 375–76 (4th Cir. 2013) (discussing United States v. Home Concrete & Supply, LLC, 566 U.S. 478

Crucially, Intervenors do not dispute that a Court majority in <u>Rapanos</u> rejected Justice

Scalia's plurality construction as impermissible. That forecloses Intervenors' reliance on <u>Brand</u>

<u>X</u> and <u>Chevron</u>. The Agencies lack authority to codify a statutory interpretation rejected by a

Supreme Court majority. <u>Colorado</u>, 445 F. Supp. 3d at 1311–12 (citing <u>Vasquez</u>, 474 U.S. at

262 n.4).[36]

### 3. The Rule contradicts longstanding precedent requiring protection of streams and wetlands that significantly affect traditional navigable waters.

Because the Supreme Court rejected Justice Scalia's plurality interpretation that the

Replacement Rule codifies—and because the Rule independently violates both the APA and the

Clean Water Act—the Court need not address the separate issue of whether <u>Rapanos</u> established

a "controlling" interpretation of "waters of the United States." Should the Court reach the issue,

however, the Rule must be vacated on this distinct ground, as the Agencies discarded the

functional inquiry that the Supreme Court has adhered to for decades and that Justice Kennedy

most recently described in <u>Rapanos</u>.

The Supreme Court and the Fourth Circuit have consistently recognized that the scope of

Clean Water Act jurisdiction is informed by the scientific reality that protecting traditional

navigable waters requires regulating upstream waters and wetlands that significantly affect their

quality. <u>See</u> Doc. 119-1 at 30–32; <u>Riverside Bayview</u>, 474 U.S. at 135 n.9 (valid jurisdiction

based on whether covered wetlands "have significant effects on water quality and the aquatic

---

(2012), and explaining that when a court rejects an interpretation based on statutory text, legislative history, and incongruity with the statutory scheme, the agency is precluded from adopting it under <u>Brand X</u>—the lack of "magic words" in the court's opinion notwithstanding).

[36] In denying a motion for preliminary injunction against the Rule, the court in <u>California v. Wheeler</u>, 467 F. Supp. 3d 864 (N.D. Cal. 2020), was apparently "unaware" of the voluminous precedent establishing that views held by *any* five Justices of the Court constitute binding law. <u>Colorado</u>, 445 F. Supp. 3d at 1311 n.9.

ecosystem"); SWANCC, 531 U.S. at 167 ("It was the significant nexus between the wetlands and 'navigable waters' that informed our reading of the [Act] in Riverside Bayview."); Rapanos, 547 U.S. at 779–80 (Kennedy, J., concurring) ("waters of the United States" includes non-navigable waters that "significantly affect the chemical, physical, and biological integrity" of navigable waters); Deaton, 332 F.3d at 712 (valid jurisdiction because "discharges into nonnavigable tributaries and adjacent wetlands have a substantial effect on water quality in navigable waters."). In inviting a protracted and unnecessary battle over whether Rapanos establishes a "controlling" interpretation of "waters of the United States," Doc. 143-1 at 33–36, Intervenors ignore that Justice Kennedy's opinion reaffirms the Supreme Court's consistent holding that "waters of the United States" are those that significantly affect traditional navigable waters.

Further, Intervenors refuse to recognize the unanimous chain of precedent *after* Rapanos recognizing that waters satisfying Justice Kennedy's "significant nexus" articulation of the standard are "waters of the United States." Six circuit courts have construed Rapanos to hold that (1) waters and wetlands satisfying the significant nexus test are "waters of the United States," and (2) waters and wetlands need not satisfy Justice Scalia's test to qualify. Of those, three circuits—the Seventh, Ninth, and Eleventh—hold that Kennedy's standard controls because it intrudes less on the Agencies' ability to protect the nation's waters than the plurality standard and is thus "narrowest" under Marks. United States v. Gerke Excavating, Inc., 464 F.3d 723, 724–25 (7th Cir. 2006); N. Cal. River Watch v. City of Healdsburg, 496 F.3d 993, 999–1000 (9th Cir. 2007);[37] United States v. Robison, 505 F.3d 1208, 1221–22 (11th Cir. 2007).[38] Three

_____

[37] The Ninth Circuit has subsequently stated that City of Healdsburg did not necessarily preclude the Agencies from using Justice Scalia's test to establish jurisdiction in addition to asserting jurisdiction over waters that satisfy Justice Kennedy's test. N. Cal. River Watch v. Wilcox, 633

other circuits—the First, Third, and Eighth—find that there are no "narrowest" grounds under Marks because, in a limited set of cases, Justice Scalia would allow jurisdiction over waters that Justice Kennedy would not. These courts thus look to Justice Stevens' dissent, which would affirm jurisdiction whenever Justice Kennedy's or Justice Scalia's test is satisfied. With a majority affirming jurisdiction when either test is met, these circuits hold that Clean Water Act jurisdiction extends to all waters satisfying either the Kennedy or Scalia test. See Donovan, 661 F.3d at 182–84; Johnson, 467 F.3d at 63–66; Bailey, 571 F.3d at 799. Critically, *no court* limits jurisdiction to Justice Scalia's test alone, as the Rule does.

The Fourth Circuit, too, has identified Justice Kennedy's opinion as "controlling." See Upstate Forever v. Kinder Morgan Energy Partners, L.P., 887 F.3d 637, 649 n.10 (4th Cir. 2018) (noting "Justice Kennedy's controlling opinion in Rapanos"), vacated on other grounds, 140 S. Ct. 2736 (2020) (mem.).[39] The Fourth Circuit's approach in Upstate Forever is consistent with its longstanding view that the scope of "waters of the United States" turns on the Agencies' scientific judgments about "how far coverage must extend in order to protect the navigable waters." Deaton, 332 F.3d at 711.

---

F.3d 766, 781 (9th Cir. 2011).

[38] The Supreme Court took the same approach in Marks, finding that the narrowest ground in a fractured opinion was the one least restrictive of government authority. See 430 U.S. at 193–94 (holding that concurrence interpreting First Amendment to prohibit government regulation of obscenity was broader than plurality opinion authorizing regulation of obscenity). So, too, did the case on which Marks relied. See Gregg v. Georgia, 428 U.S. 153, 169 & n.15, 188 (1976) (holding that concurrence finding death penalty unconstitutional per se was broader than plurality opinion finding it unconstitutional only under certain conditions).

[39] "[T]he unchallenged portion of an opinion containing a vacated judgment is at least persuasive authority." United States v. Young, 846 Fed. App'x 179, 182 (4th Cir. 2021) (collecting cases).

Intervenors cite five circuit court decisions that apply <u>Marks</u> to different fractured Supreme Court cases, Doc. 143-1 at 33–34,[40] but fail to cite a single one of the circuit opinions discussed above that interpret <u>Rapanos</u>. Nor do Intervenors acknowledge that the Ninth Circuit, one of the circuits subscribing to their preferred "logical subset" approach to <u>Marks</u>—<u>see</u> <u>United States v. Davis</u>, 825 F.3d 1014, 1021–22 (9th Cir. 2016)—has already held that "Justice Kennedy's concurrence provides the controlling rule of law for our case." <u>City of Healdsburg</u>, 496 F.3d at 999–1000.[41] That is because "Justice Kennedy's concurrence fits within the dissent, and . . . narrows federal authority less than the plurality's decision." <u>Robertson</u>, 875 F.3d at 1292. No court has taken Intervenors' approach, straining to find agreement between plurality and concurring opinions that "flatly reject the other's view." <u>Cundiff</u>, 555 F.3d at 210. It is *Justice Kennedy's* opinion "about the core meaning of ['waters of the United States'] that the Agencies cannot ignore in their subsequent rulemaking"—not a nonexistent "common ground." Doc. 143-1 at 34, 35.

But the fatal flaw in Intervenors' argument is not this failure to recognize the consensus view of <u>Rapanos</u>—it is their defense of a Rule that discards the approach to Clean Water Act jurisdiction that the Supreme Court, Fourth Circuit, and every court of appeals to consider the issue has endorsed for decades in favor of a restrictive view rejected by a majority of the Supreme Court. It is simply unreasonable to interpret the phrase "waters of the United States" to categorically exclude countless streams and wetlands that exert a significant effect on navigable water quality. The Rule flies in the face of decades of precedent supporting this conclusion.

---

[40] A sixth case cited by Intervenors addressed <u>Rapanos</u> but reserved the question of "which test in-fact controls" because "jurisdiction is proper under both Justice Kennedy's and the plurality's tests." <u>United States v. Cundiff</u>, 555 F.3d 200, 210 (6th Cir. 2009).

[41] "<u>City of Healdsburg</u> remains valid and binding precedent" after <u>Davis</u>. <u>United States v. Robertson</u>, 875 F.3d 1281, 1292 (9th Cir. 2017), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u>, 139 S. Ct. 1543 (2019).

### E. Intervenors' Undeveloped Challenge to Plaintiffs' Standing Should Be Rejected.

In a footnote, Doc. 143-1 at 18 n.2, Intervenors suggest that the Court consider the argument as to Plaintiffs' standing made in the *Agencies'* initial motion for summary judgment, which the Court dismissed without prejudice. Doc. 106. Intervenors have not raised their own objection to Plaintiffs' standing in either their initial summary judgment motion, <u>see</u> Doc. 68-1, or their present motion. Even the Agencies do not challenge Plaintiffs' standing in the current briefing. <u>See</u> Doc. 140-1. "The district court is free to disregard arguments that are not adequately developed." <u>Higgins</u>, 194 F.3d at 260; <u>see also</u> <u>Schwartz</u>, 2014 WL 12637912, at *3 ("perfunctory and undeveloped arguments . . . are waived"). In any event, Plaintiffs have amply demonstrated their standing, <u>see</u> Doc. 119-1 at 38–44, Exs. 1–47, and have addressed the Agencies' prior argument to the contrary. <u>See</u> Doc. 73 at 53–60.

### CONCLUSION

For the foregoing reasons, the Court should (1) deny the Agencies' motion for voluntary remand without vacatur, (2) grant Plaintiffs' motion for summary judgment, (3) deny Intervenors' cross-motion for summary judgment, and (4) vacate the Replacement Rule.

Alternatively, the Court should (1) grant in part and deny in part the Agencies' request for voluntary remand without vacatur, and (2) vacate and remand the Replacement Rule.

Respectfully submitted this the 12th day of July 2021.

s/ Frank S. Holleman III
Frank S. Holleman III
D.S.C. Bar No. 1911
Kelly F. Moser*
Geoffrey R. Gisler*
Nicholas S. Torrey*
Leslie A. Griffith*

Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
fholleman@selcnc.org
kmoser@selcnc.org
ggisler@selcnc.org
ntorrey@selcnc.org
lgriffith@selcnc.org

Mark Sabath*
Southern Environmental Law Center
201 West Main Street, Suite 14
Charlottesville, VA 22902-5065
Telephone: (434) 977-4090
Facsimile: (434) 977-1493
msabath@selcva.org

*Attorneys for Plaintiffs*
*Pro hac vice*

**EXHIBITS TO PLAINTIFFS' COMBINED RESPONSE/REPLY**

| # | Name |
|---|------|
| 1 | Declaration of Mark Sabath |
| 2 | Farmworker Ass'n of Fla. v. EPA, No. 21-1079, slip op. (D.C. Cir. June 7, 2021) |
| 3 | Off. of Info. & Regul. Affs., Agency Rule List - Spring 2021: Environmental Protection Agency, https://perma.cc/8DVC-NWPA (last visited July 8, 2021) |
| 4 | Off. of Info. & Regul. Affs., Agency Rule List - Spring 2021: Department of Defense, https://perma.cc/K88C-KEDP (last visited July 8, 2021) |
| 5 | Off. of Info. & Regul. Affs., Spring 2021 Unified Agenda of Federal Regulatory and Deregulatory Actions, https://perma.cc/YHL5-8DPP (last visited July 8, 2021) |
| 6 | EPA & U.S. Army Corps of Eng'rs, Memorandum for the Record (June 8, 2021), https://perma.cc/4Z7Q-JN45 |
| 7 | Memorandum from Terry England, Ga. House of Representatives, et al. to State Dep'ts & Agencies (May 1, 2020), https://perma.cc/XAY2-S8YK |
| 8 | Danny Kanso, Ga. Budget & Pol'y Inst., Overview of Georgia's 2021 Fiscal Year Budget (Jan. 23, 2020), https://perma.cc/A9WQ-FDQH |
| 9 | S. Rep. No. 92-414 (1971), reprinted in 1972 U.S.C.C.A.N. 3668, 1971 WL 11307 [excerpts] |
| 10 | Library of Cong., Cong. Research Serv., Envtl. Pol'y Div., 1 A Legislative History of the Water Pollution Control Act Amendments of 1972 (1973) [excerpts] |
| 11 | S. Rep. No. 95-370 (1977), reprinted in 1977 U.S.C.C.A.N. 4326, 1977 WL 16152 [excerpts] |